**No. 24-1209**

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

*In re* LI

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in U.S. Patent Application Serial Number 13/576,565

# CORRECTED OPENING BRIEF OF APPELLANTS LI LI AND QUNZHU LI

**Appellants**

Li Li
Qunzhu Li

5-1101, Building 1st, No. 5,
Lianmeng Road, Jianxi
District, Luoyang Henan
Province 471003, P. R China
+86-13511013479
45993.02@gmail.com;
45993.01@gmail.com
ha8528@163.com

May 9, 2024

## IDENTIFICATION OF EXEMPLARY CLAIMS

**U.S. Patent App. No. 13/576,565**

**Claim 1.** A method circulating a cold regenerated catalyst, comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, wherein the one riser reactor comprises only one reaction zone or at least two reaction zones;

separating the gas and oil products from the reacted catalyst in a settler;

stripping the separated catalyst in a stripping section;

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;

cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use;

wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

**Claim 13.** A method for circulating a cold regenerated catalyst, comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, wherein the one riser reactor comprises only one reaction zone or at least two reaction zones;

separating the reacted catalyst from the gas and oil products in a settler;

stripping the separated catalyst in a stripping section;

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;

cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use;

wherein a heat-exchanging element-is mounted inside the regenerated catalyst cooler, and a fluidizing medium distributor is located in the lower part of the regenerated catalyst cooler;

blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space being disposed in the downstream location of the regenerated catalyst cooler before the cooled regenerated catalyst entering the riser reactor; and

wherein when the one rise reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

**Claim 20.** A method for circulating a cold regenerated catalyst, comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, wherein the one riser reactor comprises at least one reaction zone;

separating the reacted catalyst from the gas and oil products in a settler;

stripping the separated catalyst in a stripping section;

burning and regenerating the stripped catalyst in a regenerator to obtain a

hot regenerated catalyst;

cooling the hot regenerated catalyst by a catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use;

wherein a heat-exchanging element having a heat-taking medium inside is mounted inside the regenerated catalyst cooler, and a fluidizing medium distributor is located in the lower part of a catalyst mixing buffer space;

blending and buffering the cooled regenerated catalyst in the catalyst mixing buffer space being disposed underneath the heat-exchanging element before the cooled regenerated catalyst entering the riser reactor, wherein the catalyst mixing buffer space is independent and separate from spaces taken by the heat-exchanging element; and

wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

## TABLE OF CONTENTS

STATEMENT OF RELATED CASES ........................................................................ 9
JURISDICTIONAL STATEMENT........................................................................ 10
STATEMENT OF THE ISSUES ........................................................................ 11
STATEMENT OF THE CASE ........................................................................ 15
I. The Patent Application in Suit ........................................................................ 15
II. The Prior Art Li Reference ........................................................................ 21
III. The Present Application's Prosecution History ........................................ 23
IV. Summary of the Argument........................................................................ 25
V. Argument........................................................................ 34
i. Standard of Review.......................................................................... 34
ii. Prosecution errors in patent Examination and Appeal ........................................ 34
iii. Miscomprehending in Rejection of Feature 1 of claims 1, 13, and 20 ........................ 44
A. No *Prima Facie* Case, Not all the claim elements are disclosed by Li .................... 44
B. The Examiner's Findings as to Feature 1 is a "Impermissible Hindsight" .............. 48
C. Unexpected results over Li supported by Specification of the present application ....... 50
D. Unexpected results over Li - A direct and fair comparison between the claimed Feature 1 and Li .......................................................................... 51
E. The criticality or unexpected results over Li are supported by Annexes 11-43 and by Four Declarations, by the three Opinion Evidence .................................... 53
F. An "omission of an element with retention of its function" under MPEP§2144.04 II B ....55
G. To sum up .......................................................................... 56
iv. Miscomprehending in Rejection of Feature 1 of claims 13, and 20 ........................57
v. As to Objective Evidence .......................................................................... 63
VI. As to Claim 6, 16, 22 And Other Claims .................................................. 71
VII. Conclusion .......................................................................... 72

# TABLE OF AUTHORITIES

**Cases**

**1. The Case cited by MPEP §2145** ............................12,14,26,32,44,52,53,54,62

*Soni,* 54 F.3d at 750, 34 USPQ2d at 1687

*In re Alton,* 76 F.3d 1168, 37 USPQ2d 1578 (Fed. Cir. 1996)

*In re Beattie,* 974 F.2d 1309, 1313, 24 USPQ2d 1040, 1042-43 (Fed. Cir. 1992)

*Piasecki,* 745 F.2d at 1472, 223 USPQ at 788

**2. The Case cited by MPEP §2145 X.A.** …….……...13,14,28,32,42,44,48,57,60,62

*In re McLaughlin,* 443 F.2d 1392, 1395, 170 USPQ 209, 212 (CCPA 1971)

**3. The Case cited by MPEP §2143 A, C, E** ……………….……….13,14,32,42,44,60

*Zurko,* 258 F.3d at 1385, 59 USPQ2d at 1697
*Ahlert,* 424 F.2d at 1092,165 USPQ 421

**4. The Case cited by MPEP§2144.04 II.B** ……………….……13,26,28,32,35,39,55,56

*In re Edge,* 359 F.2d 896, 149 USPQ 556 (CCPA 1966).

**5. The Case cited by MPEP § 2111.01 II** …………….…………………….….……42,59

*Superguide Corp. v. DirecTV Enterprises, Inc.,* 358 F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004).

**1. The Case cited by MPEP § 2141.02, § 2141.03** …………………….….……44,46

*In re Ochiai,* 71 F.3d 1565, 1572 (Fed. Cir. 1995)

*CFMT v. Yieldup Intern. Corp.,* 349 F.3d 1333, 1342 (Fed. Cir. 2003)

*Graham v. John Deere Co.,* 383 U.S. 1, 148 USPQ 459 (1966)

*In re Rinehart,* 531 F.2d 1048, 189 USPQ 143 (CCPA 1976);

*In re Lintner,* 458 F.2d 1013, 173 USPQ 560 (CCPA 1972);

*In re Saunders,* 444 F.2d 599, 170 USPQ 213 (CCPA 1971);

*In re Tiffin,* 443 F.2d 394, 170 USPQ 88 (CCPA 1971), amended, 448 F.2d 791, 171 USPQ 294 (CCPA 1971);

*In re Warner,* 379 F.2d 1011, 154 USPQ 173 (CCPA 1967), cert. denied, 389 U.S. 1057 (1968).

*Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 218 USPQ 871 (Fed. Cir.1983);

*Schenck v. Nortron Corp.,* 713 F.2d 782, 218 USPQ 698 (Fed. Cir. 1983)

*In re Rijckaert,* 9 F.3d 1531, 28 USPQ2d 1955 (Fed. Cir. 1993)

*W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 220 USPQ 303 (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984)

**2. The case cited by MPEP§2141.02 V** ……………………………………………49

*In re Rijckaert,* 9 F.3d 1531, 28 USPQ2d 1955 (Fed. Cir. 1993).

**3. The case cited by MPEP § 2111** ………………………………………………59

*In re Cortright,* 165 F.3d 1353, 1359, 49 USPQ2d 1464, 1468 (Fed. Cir. 1999)

4. **The case cited by MPEP§2125** ……………………………………………42,60

*Jockmus v. Leviton,* 28 F.2d 812 (2d Cir. 1928).

*In re Aslanian,* 590 F.2d 911, 200 USPQ 500 (CCPA 1979).

**5. The case cited by MPEP§716.01** ………………………………12,14,26,44,62

*In re Rothermel,* 276 F.2d 393, 125 USPQ 328 (CCPA 1960).

**The case cited by MPEP §716.01(c)III:** ……………………………14, 44,62,69

*In re Oelrich,* 579 F.2d 86, 198 USPQ 210 (CCPA 1978)

**The case cited by MPEP §716.02(a) I:** …………………………15,44,54,62,63

*In re Corkill,* 711 F.2d 1496, 226 USPQ 1005 (Fed. Cir. 1985).

**Remarks:** For brevity, all subsequent citations of the above Case 1-9 in this Appeal document, are replaced with "MPEP §xxxx".

**6. The Others**

*In re Van Os,* 844 F.3d 1359, 1360 (Fed. Cir. 2017) …………………………10

*Graham v. John Deere Co.,* 383 U.S. 1, 148 USPQ 459 (1966) ……………10

*In re Lee,* 277 F.3d 1338, 1346 (Fed. Cir. 2002) ……………………………10

*Abtox Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997) ………………30

*Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098 (Fed. Cir. 1996) ……………………………………………………………30

*In re Robertson,* 169 F.3d 743, 745, 49 USPQ2d 1949, 1950-51 (Fed. Cir. 1999) …………………………………………………………43,61

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ………………………………………………………… 11

37 C.F.R. 1.132 ……………………………………………12,14,26,28,35,53,54,66

Rules

Fed. Cir. R. 47.4(a)(5) …………………………………………………………… 3

Fed. Cir. R. 47.5（b） …………………………………………………………… 3

Fed. Cir. R. 47.5 ……………………………………………………………… 9

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellants states that: (a) no other appeal in or from the same proceeding was previously before this or any other appellate court, whether under the same or a similar title; and (b) the no cases will be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This appeal is from a final written decision of the Patent Trial and Appeal Board ("Board") entered on May 22, 2023 in U.S. Patent Appl. Ser. No. 13/576,565. This Court therefore has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A).

# STATEMENT OF THE ISSUES

**Appellants raise the following issues:**

1. The Board erred in finding that Examiner disregarded the ***key facts or Arguments reiterated*** *(e.g. four "teach away", "unexpected results" over Li, and "omission of an element" etc.)*, which is supported by ***five Declarations*** under 37 C.F.R. 1.132, therefore it is insufficient under MPEP§2144.03 A,C,E and §716.01 [*See In re Rothermel,* 276 F.2d 393, 125 USPQ 328 (CCPA 1960)].

**Remarks:** ① During prosecution, the Examiner cited CN1664074A (hereinafter referred to as "Li", "Li Reference" or "Li-patent" ) against the nonobviousness of the pending claims, asserting that Li disclosed all the limitations of Features 1&2 of Claim 1 and that claim 1 are obvious over Li. In order to rebut the Examiner's rejection, Appellants had submitted Annexes 1-54 (Appx272-698) and their specific indications including 7 pages of detailed indications (see Table 1, 2, 3 on Appx267-271, 582, 646) and Five Declarations that clearly detail the authenticity and relevance of the Evidence (Annexes 1-54 (Appx272-698)).

② Qunzhu Li's declaration (see Item 4A on Appx264) *filed on March 19, 2018* have a detailed comparative analysis of the technical solutions and effects of the present invention over Li, and ***declare the authenticity of all evidences*** (including Annexes 1-6,7-10,46-48,49,50 (Appx272-344, 583-641, 615-645, 553-567, 568-581) and the objective evidence, Annexes 11-43 (Appx364-552) and ***their relevance***.

- **MPEP §2145**

Office personnel should consider all rebuttal arguments and evidence presented by Appellants. See, e.g., *Soni,* 54 F.3d at 750, 34 USPQ2d at 1687 (error not to consider evidence presented in the specification). *C.f., In re Alton,* 76 F.3d 1168, 37 USPQ2d 1578 (Fed. Cir. 1996) (error not to consider factual evidence submitted to counter a 35 U.S.C. 112 rejection); *In re Beattie,* 974 F.2d 1309, 1313, 24 USPQ2d 1040, 1042-43 (Fed. Cir. 1992) (Office personnel should consider declarations from those skilled in the art praising the claimed invention and opining that the art teaches away from the invention.); *Piasecki,* 745 F.2d at 1472, 223 USPQ at 788 ( " [Rebuttal evidence] may relate to any of the *Graham* factors including the so-called secondary considerations." ).

- **MPEP§2144.03 A:**

It is ***never appropriate*** to rely solely on “common knowledge” in the art ***without evidentiary support*** in the record, as the principal evidence upon which a rejection was based. *Zurko,* 258 F.3d at 1385, 59 USPQ2d at 1697 (“[T]he Board cannot simply reach conclusions based on its own understanding or experience—or on its assessment of what would be basic knowledge or common sense. Rather, the Board must point to some concrete evidence in the record in support of these findings.”).

- **MPEP 2144.03 C:**

**If Appellants Challenges a Factual Assertion as Not Properly Officially Noticed or Not Properly Based Upon Common Knowledge, the Examiner Must Support the Finding With Adequate Evidence**

“…… If appellant adequately traverses the examiner’s assertion of official notice, **the examiner must provide documentary evidence in the next Office action if the rejection is to be maintained.** See 37 CFR 1.104(c)(2). See also *Zurko*, 258 F.3d at 1386, 59 USPQ2d at 1697 ("[T]he Board [or examiner] must point to some concrete evidence in the record in support of these findings" to satisfy the substantial evidence test). If the examiner is relying on personal knowledge to support the finding of what is known in the art, the examiner must provide an affidavit or declaration setting forth specific factual statements and explanation to support the finding. See 37 CFR 1.104(d)(2).

- **MPEP 2144.03 E: Summary**

It is never appropriate to rely solely on common knowledge in the art without evidentiary support in the record as the principal evidence upon which a rejection was based. See *Zurko,*258 F.3d at 1386, 59 USPQ2d at 1697; *Ahlert,* 424 F.2d at 1092,165 USPQ 421.

- **MPEP§2144.04：Legal Precedent as Source of Supporting Rationale [R-11.2013]**

As discussed in MPEP § 2144, if the facts in a prior legal decision are sufficiently similar to those in an application under examination, the examiner may use the rationale used by the court. Examples directed to various common practices which the court has held normally require only ordinary skill in the art and hence are considered routine expedients are discussed below. If the Appellants has demonstrated the criticality of a specific limitation, it would not be appropriate to rely solely on case law as the rationale to support an obviousness rejection.

- **MPEP §2144.04 II.B:**

  Note that the omission of an element and retention of its function is an indicia of unobviousness. *In re Edge,* 359 F.2d 896, 149 USPQ 556 (CCPA 1966).

2. The Board erred in finding that Examiner asserted that *“Li includes wherein a catalyst cooler is connected to a riser and used to adjust the temperature of* ***each zone*** *in the riser”* (see line 5-6 of 1st Full paragraph in Appx164 of Final Office Action *filed on Dec. 24,2021*)， but without any rationale and any documentary evidence to support and by comparing merely Fig. 2 of the present application with

Fig. 1 of Li. Therefore, this is **not in light of Specification of Li,** ***is incorrect under*** MPEP§2143 A,C,E and *is a* ***"Impermissible Hindsight"*** under MPEP§2145 X.A. *See In re McLaughlin,* 443 F.2d 1392, 1395, 170 USPQ 209, 212 (CCPA 1971)

***Remarks:*** *Table 1 on Appx 267-271 and Annexes1-6, ,49,50 (Appx272-363, 553-567, 568-581) that*

the three *"teaching away"* from the Feature 1 proven by *Annexes1-6, 49,50 (Appx272-363, 553-567, 568-581);*

the above *"omission of an element"* under MPEP §2144.04 II B; and

the *"Unexpected Result"*,

which is supported by ***four Declarations*** under 37 C.F.R. 1.132, and by ***Six "Objective Evidence"*** under MPEP §716 and by Annexes 11-18,21-43 (Appx364-552).

3. The Board erred in finding that Examiner asserted that *"Li disclosed the mixing buffering space"* (see Para. 7, at Appx161 and Para. 9, at Appx162 of Final Office Action filed on Dec. 24,2021) by comparing merely Fig. 2 of the present application with Fig. 1 of Li, because the both are totally different. This is **not in light of Specification** of Li **and without any written document support,** ***is incorrect under*** MPEP§2143 A,C,E and is a "Impermissible Hindsight" under MPEP§2145 X.A. *See In re McLaughlin,* 443 F.2d 1392, 1395, 170 USPQ 209, 212 (CCPA 1971)

**Remarks:** Table 2,3 on Appx582, 646 and Annexes7-10,46-48,51-54 (Appx583-614, 615-630, 647-698)) that the ***one "teaching away"*** from the

Feature 2 proven by Annexes 7-10,46-48,51-54 (Appx583-614, 615-630, 647-698); and the "Unexpected Results",

which is supported by five declarations under 37 C.F.R. 1.132 and by Annexes 11-43 (Appx364-552).

4. The Board erred in finding that Examiner disregarded the synergistic effect /result of Features 1 & 2, **three** ***"Opinion Evidence"*** of non-obviousness under MPEP §716.01(c)III and three ***"Objective Evidence"*** of non-obviousness （such as *the unexpected results under MPEP §716.02(a)I, Long-Felt Need and Failure of Others under MPEP §716.04, a commercial success under MPEP §716.03*）

which are supported by the previously submitted Annexes 11-43 (Appx364-552), therefore it is not appropriate under MPEP §716, §2144.03A,C,E,and §2145.

- **MPEP §716.01(c)III:** ***Opinion Evidence***

  *In re Oelrich,* 579 F.2d 86, 198 USPQ 210 (CCPA 1978) (factually based expert opinions on the level of ordinary skill in the art were sufficient to rebut the prima facie case of obviousness)

- **MPEP §716.02(a) I:**

  "A greater than expected result is an evidentiary factor pertinent to the legal conclusion of obviousness ... of the claims at issue." *In re Corkill,* 711 F.2d 1496, 226 USPQ 1005 (Fed. Cir. 1985).

5. The Board erred in construing the "comprising" limitation as open-ended, allowing for different catalysts from different catalyst coolers for adjusting the reaction temperatures of ***each of*** different reaction zones, ***a new ground***, as coming within the scope of the challenged claims.

Accordingly, independent claims 1, 13, and 20 are all patentable under pre-AIA 35 U.S.C. § 103(a) over Li. The same reasons are also applicable to the remaining depending claims.

# STATEMENT OF THE CASE

## I. The Patent Application in Suit

Inventors Li Li and Qunzhu Li ("Appellants") filed U.S. Patent Appl. Ser. No. 13/576,565 on February 11, 2010 (hereinafter referred as the_*"present application"*), published as U.S. Appl. Pub. No. 2012/0298556 (the "Pub.'556")[1] on November 29, 2012. *See id.* The claimed invention pertains to the "use of the method and equipment for circulating cooled regenerated catalyst for tar catalytic cracking and low-grade gasoline catalytic cracking." See [ Specification at 6 (Appx215) ], ¶ [0001].

### i. The distinguishing Feature 1 of the claim 1,13,20

The claim 1 of the *present application* as finally proposed by Appellants before the U.S. Patent and Trademark Office ("PTO"), reads:

> A method for circulating a cold regenerated catalyst, comprising:
>
> reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, ***wherein the one riser reactor comprises only one reaction zone or at least two reaction zones***;
>
> separating the gas and oil products from the reacted catalyst in a settler, stripping the separated catalyst in a stripping section;
>
> burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;
>
> cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200° C to 720° C, for cycling use;
>
> ***wherein when the one riser reactor comprises at least two reaction zones***, ***the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor***, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the riser reactor, so as to keep the reaction temperature in an optimal value.

See [Decision on Appeal at Appx3] (emphasis added).

**The independent claimed Feature1 of 1,13,20 recite, *inter alia*:**

" … wherein when the one riser reactor comprises at least two reaction zones, the one

[1] Citations hereinafter are to the Pub. '556 for ease of reference, *unless otherwise specified.*

regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so *as to keep the reaction temperature of each of the reaction zones in an optimal value*, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, *so as to keep the reaction temperature in an optimal value*." (hereinafter referred to as **"Feature 1")**

Here, the Appellants respectfully believes that at least the technical feature *"**each** of which respectively connects **one** riser reactor (2) each other is used to adjust the reaction temperature of **each** reaction zones of the corresponding riser reactor, so as to keep the reaction temperature of each of the reaction zones in the best value respectively;"*(*hereinafter referred to as* ***"Feature 1"***) contributes to the solution solving the technical problem in present application. *(see paragraphs 0012 and 0052 in Specification, Appx215, 218)*

Furthermore, Appellants respectfully submit that the two key milestones in FCC's catalyst cooler as follows:

① **US4396531 to Lomas – 1983**

(cited by Examiner in Office Action dated on April 6, 2015, see Appx763-769)




● Propose an optimization by a catalyst cooler which is connected to the Riser and is used to strike the balance of variables comprising: 1) the quantity of heat to be withdrawn from the catalyst in the cooling zone; 2) the desired extent of passivation of contaminating metals on the catalyst; and 3) the extent desired of the striping of non-condensable gases from the catalyst *(See Evidence 11, Lomas, column 7, lines 23-34 on Appx768).*

● Does not mention a degree of freedom which would make the catalyst-to-oil ratio an independent variable.

● Concerns neither the heat balance of Feed zone and Reaction zone, nor the optimal control of reaction temperature.

● Does not achieve a commercial running.

② **US6059958 to Ramos-1997**

(cited by Examiner in Office Action dated on April 6, 2015, see Appx553-567)




**Remarks:** In the figure above, the yellow part is the pre-lifting Zone 8 and the mixing zone 9 of the hot and cold catalyst; The red part is the Feed Zone, wherein the Feed enters and vaporizes by contacting with the catalyst); the blue part is the reaction (conversion) Zone.

● Propose an FCC process with a catalyst cooler which is connected to Riser for cooling of

regenerated catalyst for decreasing the temperature of Catalyst, thereby increasing the Feed temperature， so as to improve the atomizing effect of feed and decrease the thermal cracking of Feed zone; and

● Only mentions the heat balance of Feed zone;

● Neither pay attention to the optimal control of reaction temperature , nor mention the heat balance of reaction zone. *(See Evidence 12, Ramos, column 9, lines 22-30,59-67 on Appx561);*

● Does not achieve a commercial running.

Furthermore, all common knowledge about the thermal balance of FCC reaction regeneration system, only include the thermal balance of the conventional FCC reaction system and the thermal balance of the regeneration system, which is clear that deal with neither the catalyst cooler nor the separate thermal balance of the various functional Zone in the riser reactor system (such as the pre-lift zone, feed zone, reaction zone, etc.).

In fact, it is the present application that firstly proposed that "using the cooling technology of the catalyst, makes the catalyst to oil ratio (of the reaction zone) an independent adjustable variable" *(see **para.0012 in page 1 (Appx215)**)*, so that the optimal catalyst to oil ratio and reaction temperature (of the reaction zone) can be used "*(see **para.0052 in page 4 (Appx218)**)*, so that the optimal control of reaction temperature and the overall optimization of reaction system are realized， so as to decrease the yield of coke and offgas, ***thereby increasing the processing capacity of 15-20%*** *(see **para.0060 in page 4 (Appx218)**)* for the first time, ***which is unexpected***, *because Li, due to the interaction or interfere of two catalyst cooler A/B, is only a partly independently adjustable variable, and is not as the above "freely" as said in Feature 1 and Specification* of present application***(See paragraphs 0012, 0052 and 0060, in page 1, 4, 4 (Appx215, Appx218) in Specification of the present application).***

After 27 years of tireless exploration and research starting from UOP's first patent of the catalyst cooler connected with the Riser, the present application came out in 2008 and achieved the commercial running for the first time in 2008.

Therefore, the present application satisfies thee "*Long-Felt Need and Failure of Others*" under MPEP §716.04

As the highlighted language makes clear, when there are at least two reaction zones in the claimed riser reactor, at least one regenerated catalyst cooler must be connected to the riser reactor to adjust the reaction temperature of ***each*** reaction zone thereof. The claim goes on to specify that such

temperature adjustment serves to keep such temperature at "***an optimal value***".

As an example, Table 2 of the Present application reflects 525° C and 505° C for the riser reactor's first and second reaction zones, respectively. See [page 9 in (Appx178) Specification], Table 2. This is contrasted with the prior art referenced in Table 2, wherein the temperature for the riser reactor (with no separate reaction zones) is 525° C. *See id.* These operational differences result in a greater temperature differential between the regenerated catalyst and raw materials in the prior art. *Id.*, ¶ [0154], Table 2 in [page 9 (Appx223) in Specification]. The prior art's temperature differential made the raw material uniquely prone to cracking. See *Id.*, ¶ [0156] in (page 9 (Appx223) in Specification).

The specification of the Present application teaches that the cold regenerated catalyst leaves the catalyst cooler 8A "through the cold pipeline 11A." See (page 7 (Appx221) in Specification, ¶ [0120]) The catalyst (along with the cold-shocking agent and oil and gas) then enters "the first reaction zone 3," followed by "the second reaction zone 2 of the riser reactor." *Id.*, ¶¶ [0125], [0126], (see page 7 (Appx221) in Specification)

Figure 2 of the present application graphically depicts that path:




See_ [Present application], Fig. 2 (annotated).

- **The distinguishing Feature 1 of the claim 1,13,20**

Here, Appellants respectfully submit that the **Feature 1**, according to the context of Claim 1 and Specification of the present application, is *"**one** catalyst cooler is connected to **one** riser reactor having one or more reaction zone(s), and is used to regulated the reaction temperature of **each** of one or more reaction zone(s) of one riser reactor"*, which differs substantially from Li as follows:

① **The distinguishing Feature 1** includes a functional limitation that is *"one cooler is used for the reaction temperature of each of one or more reaction zone(s) of one riser reactor"*; rather than the selection of the specific operating parameters.

② **The distinguishing Feature 1**, *as a whole,* should not be split and the ***nonobviousness*** of the Feature 1 should be evaluated in entirety

③ **The distinguishing Feature 1** have been proposed by present application for the first time in the field, and there is No documentary record that disclose the **<u>Feature 1</u>** in Common Knowledge and Prior Art including **Li** before the filing date of the present application.

**ii. The distinguishing Feature 2 of the claim 13,20**

**A. The synergistic effect/result of Features 1 & 2 that is unexpected to those skilled in the art**

① The Feature 1 puts forward the stricter requirement of the uniformity (especially in temperature) of the cooled regenerated catalyst exiting the catalyst cooler, so as to realize "precise and optimal control of reaction temperature of each reaction zone"; meanwhile Feature 2 proposes "the downstream catalyst mixing buffering space" for the first time in FCC field, to ensure the more uniform temperature of the cooled catalyst entering to the downstream riser reactor, so as to meet the above stricter requirement.

② There is a close connection between Feature 1 and Feature 2 in the technical means and the technical effects/functions. ***In a cooperative combination of Feature 1 and Feature 2*** which are synergistic, can improve operational reliability, safety, controllability, and flexibility in commercial unit.

B. **The distinguishing Feature 2 of the claim 13,20**

① It is clear from independent claims 1 that the step of "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space" （9A/B） is one independent step to get the cooled catalyst itself an uniform and stable temperature.

② **The claimed Feature 2** is an overall means including a functional limitation, which have

been proposed by present application **for the first time** in the art (that is FCC field), and there is No documentary record in Common Knowledge and prior arts including **Li** before the filing date of the present application (see Table 2 on Appx582 and Annexes 6-10,46-48,51-54 (Appx583-614, 615-630)).

In fact, "*a catalyst mixing buffer space*" shows a clear limitation of "for mixing and buffering the cooled catalyst"; rather than "for the cooled catalyst mixing with the said fluidizing medium" (see paragraph [0016] in specification (Appx216)).

## II. **The scope and content of Li** (CN1664074A)

Chinese Patent No. 1664074 (the "Li" or "Li Reference") issued on July 4, 2007. *See* [Li Reference at Appx699]. The Li Reference's named inventors are the same as those named on the Present application. *See* [Li Reference (Translation) at Appx758]; [Present application at Appx210]; [Qunzhu Li Decl. (Jan. 15, 2018) at Appx254], ¶ 2.

As the Board recognized, the Li reference "teaches the cooled regenerated catalyst is sent from a catalyst cooler (e.g., 8A) as a feed to the riser reactor via transporting pipe 11A." *See* [Decision on Appeal at Appx6] (citations omitted). Further, "a second catalyst cooler 8B may be used to feed cold regenerated catalyst to reaction zone 2 . . . via auxiliary rising pipe 6 (*i.e.*, transporting pipe) and pipeline 11B." *Id.* The two cooled regenerated catalyst paths from regenerated catalyst coolers 8A and 8B in the Li Reference are depicted in Figure 1, as follows:



Cooled regenerated catalyst sent from first regenerated catalyst cooler (8A)



Cooled regenerated catalyst sent from second regenerated catalyst cooler (8B)

See [Li Reference at Appx759], Fig. 1.

Nowhere does the Li Reference expressly teach that either regenerated catalyst cooler 8A or 8B adjusts "the reaction temperature of each of the reaction zones . . . so as to keep the reaction temperature of each of the reaction zones in an optimal value." *See* [Gao Decl. (Oct. 22, 2015) at Appx253], ¶ 10 (stating the Li Reference does not teach "that the reaction temperature of each reaction zone is controlled by the adjustment of the temperature of the cooled regenerated catalyst or the cold regenerated catalyst mixture"); see [Zhang Decl. (Oct. 21, 2015) at Appx244-245], ¶ 13 (stating the Li Reference does not concern "overall optimization for both each reaction-zone of the Riser").

**i. The claimed Feature 1 differs from Li at least in:**

Appellants submits that **Li** discloses that "***two** regenerated catalyst coolers* is used to adjust the reaction temperature of the reaction zones of the riser reactor comprising at least two reaction zones, respectively *i.e.* ***catalyst cooler A*** is used to adjust the reaction temperature of 1st reaction zone, ***catalyst cooler B*** is used to adjust the reaction temperature of 2nd reaction zone", and

that the use of multiple catalyst coolers which is connected to one riser reactor by ***an auxiliary Riser or a gasoline Riser etc***. *(see **page 2/18 (Appx742), line 21** to page 3/18 (Appx743), the fourth line from the bottom in Specification of **Li** and Figs 1-4 of **Li**)*

**The claimed Feature 1 differs from Li at least in:**

(1) **Li** does not disclose that each catalyst cooler is **used to** adjust the reaction temperature of ***each*** reaction zone of the corresponding riser reactor, so as to keep the reaction temperature of ***each*** of the reaction zones in the best value respectively;

(2) **Li** does not disclose the "mixing buffer space" downstream of the catalyst cooler for buffering and mixing the cooled catalyst; and

（3） **Li** disclose that "the higher reaction temperature" is used (see ***page 16 (Appx715), line 3,*** *in **Li**'s translation;* i.e. ***page 8/18 (Appx748), line 19-20*** *in Specification of **Li** ).*

**ii. The claimed Feature 2 differs from Li at least in:**

**Li** fails to teach, disclose, or suggest **the distinguishing *Feature 2*** that is interpreted as "the mixing buffer space 'for blending and buffering for mixing catalyst and fluidized gas'", *and **there is no documentary evidence** that teach, disclose, or suggest* **the distinguishing *Feature 2.***

Appellants respectfully submit that the term "mixing" and "buffering" is well-known to those skilled in the art, therefore, the technical effects/functions of **the distinguishing Feature 2** is

well-known to those skilled in the art, so that there is no a verbose statement in Specification of the present application.

## III. The Prosecution History of the Present application

Prior to the second appeal to the Board, the Examiner rejected claims 1-7, 10, 13-25, 27, 29, 31 (claims 32, 33 are cancelled) on Section 103 grounds in view of the Li Reference.[2] see [Decision on Appeal at Appx2-4]. As a ground for appeal, Appellants raised the Li Reference's failure to teach "one regenerated catalyst cooler . . . used to adjust the reaction temperature of each reaction zone of the one riser reactor comprising at least two reaction zones." see [Decision on Appeal at Appx5].

The Board disagreed with Appellants, finding that the Li Reference teaches "***one*** or more interior or outside heat removing equipment, i.e. catalyst coolers." See [Decision on Appeal at Appx5] (emphasis in original). Importantly, the Board omitted the immediately following passage describing two catalyst coolers, each regulating reaction temperatures in their respective reaction zones, *i.e.*, the antithesis of the present application proposed claims. *See* [Li Reference (Translation) at Appx702].

Further, according to the Board, "[f]eeding the cold regenerated catalyst to the bottom of the riser reactor an into reaction zone 1 (ref. no. 3) would also feed the catalyst to reaction zone 2 (ref. no. 2) in Li's Figure 1 and adjust the temperature ***at some level*** within reaction zone 2 as the catalyst is sent through reaction zones 1 and 2 in its way to disengager 1 (Li, Figure 1)." *See* [Decision on Appeal at Appx5] (emphasis added).

The Board apparently refers to the following catalyst path:

[2] The Examiner also rejected claim 32 of the Present application on Section 103 grounds over the Li in view of Palmas (U.S. Appl. Pub. No. 2010/0152515). *See* [Decision on Appeal at Appx4]. As the Board noted, Appellants rely solely on their arguments regarding the Li in urging the patentability of claim 32. *See id.* (claims 32, 33 are cancelled)




See [Li Reference at Appx759], Fig. 1 (annotated).

Otherwise, the Board effectively allowed for the second catalyst coming from a second catalyst cooler (8B) in the Li Reference because of the challenged claims' open-ended "comprising" limitation. *See* [Decision on Appeal at Appx6] (citation omitted). According to the Board, the Li Reference does not preclude the use of "other control equipment and control methods." *Id.* However, as explained below, in light of the proposed claims' proper construction, **the Board could not simply ignore** the Li Reference's teachings of a second catalyst from a second catalyst cooler and the effects thereof.

***On reconsideration, the Board altered its comments on the Li reference***—specifically, that the two catalyst coolers only "mainly" (presumably, as opposed to "exclusively") cool their respective reaction zones. *See* [Reconsideration Decision at Appx237]. The Board then reiterated that the catalyst from catalyst cooler 8A travels through both reaction zones on the way to settler 1. *Id.* The Board concluded that "[t]his interaction of the catalyst in the 1st reaction zone 3 and 2nd reaction zone 2 is controlled to maintain the reactor at the optimum values as disclosed by Li on pages 2 to 3 of the English language translation." *Id.* However, ***the Board does not particularly identify*** what in those pages teaches the use of a single catalyst to cool both reaction zones to an ***"optimum value,"*** as opposed to ***"some level,"*** as the Board originally found in its appeal decision. *See* [Decision on Appeal at Appx5].

Finally, the Board doubled down on its claim construction point that the term "comprising" is open-ended and, consistent with the specification's teachings, "one, two, or more catalyst coolers may

be used in the invention." *See* [Reconsideration Decision at Appx237].

## IV. Summary of the Argument

**i.** During prosecution, the examiner cited CN1664074A (hereinafter refers to as "Li") against the nonobviousness of the pending claims, asserting that Li disclosed all the limitations of Features 1&2 of Claim 1 and that claim 1 are obvious over Li.

In order to rebut the examiner's rejection, the Appellants submitted Annexes 1-54 (Appx272-698) and their specific indications including 7 pages of detailed indications (see Table 1, 2, 3 on Appx267-271, 582, 646) that clearly detail the authenticity and relevance of the Evidence (Annexes 1-54 (Appx272-698)).

A. The Common Knowledge *(see Table 1 on Appx267-271 and Annexes1-6,49,50 (Appx272-363, 553-567, 568-581))* prove ***the level*** of ordinary skill in the art and ***the three "teaching away"*** from the Feature 1 of Claim 1, 13 and 20, but all of which are disregarded by Examiner and Board.

B. The Common Knowledge *(see Table 2,3 on Appx582, 646 and Annexes7-10,46-48, 51-54 (Appx583-614, 615-630, 647-698))* prove ***the level*** of ordinary skill in the art and **the one *"teaching away"*** from the Feature 2 of Claims 13 and 20, all of which are disregarded by Examiner and Board.

C. The Annexes 11-18, 21-43 (Appx364-447, 448-552) *(see Table 1 on Appx267-271)* prove the Six "Objective Evidence" *(including the "Unexpected Result")* under MPEP §716; and

Appellants also submitted the ***five Declarations*** **b**y Zhang, Gao, and Qunzhu Li Under 37 C.F.R. 1.132, Table 1, 2, 3***, which*** prove the "Unexpected Result" of the Features 1&2 over Li, and the authenticity and relevance of the Evidence (Annexes 1-54 (Appx272-698)) **(*especially Li's declaration dated on Mar. 18, 2018)***.

**But all of them is disregarded by Examiner,** the only excuse in Examiner's Answer (see Appx109-111) is that *"Li discloses the claimed Feature 1 and Feature 2"*. **And the Board affirmed** but without any rationale and any documentary evidence to support in ***Decision on Appeal*** *(2023-000079), dated on May 22,2023*. Therefore, this are NOT adequate under MPEP §716.01, and §2145.

**D. Examiner and Board disregarded the *"omission of an element"* under 2144.04 II B.**

In view of the above, the above prosecution errors (at least 17 items) ***result in the root Errors in the factual assertion and findings of the Decision*** **on Appeal** (2023-000079), which should be withdrawn.

In the Decision on Request for Rehearing (dated on Oct. 4,2023), however, Board excused only that "*we do not hold that it is obliged to explicitly address conclusory and unsupported arguments raised by a litigant. [citation omitted]"")*"; and that *"In this case, Appellant's numerous citations for teaching "common knowledge", for example, does not explain how that "common knowledge" would not have led to the subject matter of claim 1.",* （See page 9 (Appx234)）*as follows：*

> *generally*). Appellant has the burden of explaining how the evidence they present relates to the claims and obviousness rejection. *Ex parte Ishizaka*, 24 USPQ2d 1621, 1624 (BPAI 1992). As noted *supra* in this decision on rehearing, the Board will not scour the record to put together an argument for Appellant. It is incumbent on Appellant to apply the evidence to the rejection and claims and make their case and not merely include conclusory statements based on the unexplained evidence. *Cf. Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1339 (Fed. Cir. 2016) ("Recognizing the Board operates under stringent time constraints, we do not hold that it is obliged to explicitly address conclusory and unsupported arguments raised by a litigant. [citation omitted]"). In this case, Appellant's numerous citations for teaching "common knowledge", for example, does not explain how that "common knowledge" would not have led to the subject matter of claim 1.

In fact, Appellants submitted Annexes 1-54 (Appx272-698) and their specific indications including totally 7 pages of detailed indications **(see Table 1, 2, 3 on Appx267-271, 582, 646)** that clearly detail the authenticity and relevance of the evidences (Annexes 1-54 (Appx272-698)). Rather, Examiner and Board without providing any documentary Evidence to support disregarded all of Annexes 1-54 (Appx272-698) and their indications.

## ii. As to Feature 1 of Claim 1,13,20

1. The claimed Feature 1, including a functional limitation, is a overall means, rather than the selection of the specific operating parameters, **should not be split** and the non-obviousness of the claimed Feature 1 **should be evaluated in entirety** under MPEP §2141.02 I-VI.
2. Li fails to disclose the claimed Feature 1 "*one regenerated catalyst cooler is used to adjust the reaction temperature of each of one or more reaction zone of the one riser reactor*".
3. Examiner asserted (Board affirmed) that *"Li includes wherein a catalyst cooler is connected to a riser and used to adjust the temperature of* ***each zone*** *in the riser"* (*see line 5-6 of 1st* Full paragraph in page 5 (Appx164) of Final Office Action *filed on Dec. 24,2021*).

**Board affirmed** the above Examiner's finding by **<u>a new ground</u>** of *"Although Li teaches*

*that a second catalyst cooler 8B* ***may*** *be used to feed cold regenerated catalyst to reaction zone 2 of riser reactor 4 via auxiliary rising pipe 6 (i.e. transporting pipe) and pipeline 11B, we note that claim 1 uses the open-ended claim language "comprising" and does not exclude an additional catalyst cooler (e.g.8A or 8B)"* on page 5 (Appx6), line 17-21 of the Decision on Appeal.

4. Examiner and Board split excessively Feature 1 *(almost splits to the extent "technical term-levels", such as "catalyst cooler or reaction zone", etc.)*. However, the above "over-splitting" does not even reflect *the sequence, function of the above basic steps.*

5. Examiner and Board disregarded the above Common Knowledge *(Table 1 on Appx267-271 and Annexes1-6, ,49,50(Appx272-363, 553-567, 568-581)) that* prove ***the level*** of ordinary skill in the art;

the three *"teaching away"* from the Feature 1 proven by *Annexes1-6, 49,50 (Appx272-363, 553-567, 568-581);*

*the above "omission of an element"* under 2144.04 II B; and

the "Unexpected Result" which is supported by detailed comparison between the invention and Li, by four declarations under 37 C.F.R. 1.132, and by the six "Objective Evidence" under MPEP §716 and by Annexes 11-43 (Appx364-552).

Their aforementioned assertions and findings, lack documentary evidence to support. Therefore, they are merely their personal understanding or opinion, which are inappropriate under MPEP§ 2144.03A, C, E and §2144.04, and are "impermissible hindsight" under MPEP§ 2145.X.A.

**6. In response to the Decision for Rehearing, Appellants would like to emphasize on the misinterpretation of claim 1, especially the distinguishing technical feature 1, by the board.**

The Decision *on Request for Rehearing* states on page 10 as follows:

> Claim interpretation in a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970 (Fed. Cir. 1995). The term "comprising" in United States' patent law conveys an open-ended meaning to the claim where any limitations in addition to the those recited are permitted. *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Our analysis of claim 1 makes explicit that the claim is open-ended and does not exclude using an additional catalyst cooler. This determination is not a new ground of rejection.

**The Claimed Feature 1**, **including a functional limitation,** reads:

*"wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value". (Feature 1)*

**Remarks:** In this final RCE (dated on Sept. 13, 2021), the Appellants amended the inaccurate English translation of the relevant paragraph ( [0015,0016,0017, 0084,0085,etc.] ) of Specification while amending the claim.

It can be seen that, in Feature 1, the step of "the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor" is **a close ended feature**. This feature **excluded** using other elements to adjust the reaction temperature.

**7. As to "Comprising"**

**The Board cites** *"Markman v. Westview Instruments, Inc., 52 F.3d 967, 970 (Fed.Cir.1995)" and "Genentech, Inc. v. Chiron Corp., 112 F.3d 495,501 (Fed.Cir.1997)"* to support that Feature 1 **does not exclude** using an additional catalyst cooler. However, we understand a term "comprising" in a product claim means other components maybe added, and term "comprising" in a method claim means other steps maybe added. In the present claim 1 which is a method claim, the term **"comprising"** means that the technical solution **does not exclude using any additional step**, however, the claimed Feature 1 specifically and clearly excluded using other "elements" i.e. other regenerated catalyst cooler, in addition to the **one** regenerated catalyst cooler. The term "comprising" in method claim 1 **does not** mean that claim 1 does not exclude any other components and **does not mean** that any step in claim 1 is open ended.

The Board apparently **misinterpreted** the plain meaning of term ***"comprising",*** which should not include the claimed distinguishing Feature 1 of Claim 1,13,20.

● **The Proper Construction of "Comprising"**

In the second Appeal below, the Board recognized Li's teaching "that a second catalyst cooler

8B may be used to feed cold regenerated catalyst to reaction zone 2." See [Decision on Appeal at Appx6]. However, according to the Board, because of the use of "the open-ended claim language **'comprising,'**" the present application's proposed claims do not exclude "an additional catalyst cooler." See *Markman,* 517 U.S. at 372.

The Federal Circuit has espoused the general rule that "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). ***An exception to that rule occurs when an applicant evinces "a clear intent" to limit "a" or "an" to "one."*** *Id.* See also *Abtox Inc. v. Exitron Corp.*, 122 F.3d 1019 (Fed. Cir. 1997); *Insituform Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098 (Fed. Cir. 1996). Here, the claim language, specification, and prosecution history all evince such a limiting intent.

Proposed claim 1 reads, in relevant part, "reacting hydrocarbon materials with a catalyst in a riser reactor," "cooling the hot regenerated catalyst by a regenerated catalyst cooler," and, "when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor." See [Decision on Appeal at Appx3] (emphasis added). This language clarifies that one catalyst cooler adjusts the temperature in each reaction zone.

As part of the prosecution of the present application, original claim 1 specified that the riser reactor has "one, two or more reaction zones," and that "[p]art of the regenerated catalysts . . . are cooled by the catalyst cooler . . . and enter into the pre-lift or directly into each reaction zone of riser reactor." See [Original Claims (Aug. 1, 2012) at Appx201-202]. Appellants also submitted evidence during prosecution that, in the claimed invention, "[t]he newly ***one*** regenerated catalyst cooler is used to adjust the reaction temperature of ***each of*** *the two reaction zones* of the **one** riser reactor connected to the cooler so as to keep them [sic] an optimized value respectively." See [Annex 37 (Appx519-523) at 1], ¶ 1 (emphasis added).

This intrinsic evidence—the claim language, specification, and prosecution history—all support the conclusion that, notwithstanding the use of the term "comprising," the proposed claims are limited to a single catalyst cooler adjusting the reaction temperature of each reaction zone in a riser reactor. In other words, contrary to the Board's construction of the term "comprising" in the proposed claims, such claims do not cover a method in which different catalyst coolers each adjusts the reaction temperatures of different reaction zones.

Because the Board misconstrued the "comprising" limitation, its resulting obviousness

conclusion is clearly erroneous. Moreover, because the Board failed to offer any evidence regarding obvious modifications to the Li Reference concerning the single use of a catalyst cooler, there would be nothing to address on remand, and the Board's decision should, therefore, simply be reversed.

## iii. As to Feature 2 of Claim 13,20

1. The claimed **Feature 2** includes a functional limitation of "for mixing and buffering the cooled catalyst"; ***rather than "for the cooled catalyst mixing with the said fluidizing medium" as argued by Examiner;*** and clearly shows "a catalyst mixing buffer space in *downstream location of the catalyst cooler* " which is used to blend and buffer the cooled catalyst so as to make ***the cooled catalyst itself*** a uniform and stable temperature. *Please see Appx173, line 21-22 and 24-26 of the originally-filed Specification of the present application.*

2. Li fails to disclose "*any axial space*" inside the catalyst cooler, ***much less "a downstream catalyst mixing buffering space".***

**The Examiner solely relies on the figures of Li and speculates** that there is a step in Li is blending and buffering the cooled regenerated catalyst. However, there is no documentary evidence for the Examiner's above assertion.

**3. The Board,** ***taken out of context, altered mistakenly "in the downstream location*** *of the catalyst cooler"* **into** *" **the downstream portion** of the catalyst cooler"* **which has no basis in fact** *(see line 1-6 of 1st full paragraph in page 7 (Appx8) of the Decision).*

***Remarks:*** *In this final RCE (dated on Sept. 13, 2021), the Appellants amended the inaccurate English translation of the relevant paragraph ( [0015,0016,0017, 0084,0085,etc.] ) of Specification while amending the claim.*

In the amended Specification, that *"in the downstream of"* in Para.[0017] is amended to *"in the downstream location of"*, that *"in the downstream"* in Para. [0016] is amended to *"in the downstream location"*.

The Board's finding ***disregarded the following two key fact*** recorded in the specification:

① As the four non-limited example (see *page 16 (Appx185), line 10-12; page 19 (Appx188),line 16-17;page 22 (Appx191), line 15-16; page 23 (Appx192),line 3-4 of the originally-filed specification)*, it is clearly recited that *"…… and the regenerated catalyst after being cooled enters the mixing and buffering space 9A…….*", which clearly indicates that *"the catalyst mixing*

*buffer space 9A/B"* is a downstream space that is independent and separate from the catalyst cooler 8A/B; however, **the Board, *taken out of context,* disregarded the above description**.

② In fact, based on the description on *the page 15 (Appx184),line 28* ***to*** *page 16 (Appx185),line 9, the page 18 (Appx186),line 1-13***,** *the page 21 (Appx189),line 13-27* **and** *the page 25 (Appx193),line 20* ***to*** *page 26 (Appx194),line 4 of the originally-filed Specification, the catalyst cooler* ***(8A/B)*** and *the catalyst mixing buffer space* ***(9A/B)*** in the attached drawings1-4, **are *two different equipment having the same diameter only*** *(See Table 3 on Appx646 and Annexes 51-54 (Appx615-630))*, and **the two constitute *an integrated device****, that is, the heat-taking equipment.*

4. Examiner and Board split excessively Feature 2 *(almost splits to the extent "technical term-levels", such as "catalyst", "mixing buffer space" or "downstream location or portion", etc.).* However the above "over-splitting" ***does not even reflect*** *the sequence, function of the above basic steps.* Therefore, Examiner's Finding (Board affirmed) regarding *"Li disclosed the mixing buffering space" (see Para. 7, in page 2 and Para. 9, in page 3 (Appx162) of Final Office Action filed on Dec. 24,2021),* **not in light of Specification** of the present application **and without any written document support, *is incorrect under*** *MPEP§2143 A,C,E and is* ***a "Impermissible Hindsight"*** *under MPEP§2145 X.A.*

5. Examiner and Board disregarded the above Common Knowledge *(Table 2,3 on Appx582, 646 and Annexes7-10,46-48,51-54 (Appx583-614, 615-630, 647-698)) that* prove ***the level*** of ordinary skill in the art;

the one *"teaching away"* from the Feature 2 proven by *Annexes 7-10,46-48,51-54 (Appx583-614, 615-630, 647-698)*; and

the "Unexpected Results" which is supported by five declarations under 37 C.F.R. 1.132 and by Annexes 11-43 (Appx364-552).

Their aforementioned assertions and findings, lack documentary evidence to support. Therefore, they are their personal understanding or opinion, which are inappropriate under MPEP§ 2144.03A, C, E and §2144.04, and are "impermissible hindsight" under MPEP§ 2145.X.A.

**iv. As to Objective Evidence**

Examiner and Board disregarded the previously submitted Annexes 11-43 (Appx364-552) and the *five Declarations* by Zhang, Gao, and Qunzhu Li under 37 C.F.R. 1.132 which prove that

① ***the level*** of ordinary skill in the art;

② the **four** *"teaching away"* from the claimed *Feature 1 and Feature 2;*

③ *"Omission of an element with retention of its function"* under MPEP §2144.04 II B;

④ the five declarations under 37 C.F.R. 1.132; and

⑤ the **six** *"Objective Evidence"* under MPEP §716.

However, during patent examination and Appeal, the Examiner and Board did not provide any documentary evidence to support their findings, all of which are the personal opinion or understanding. Examiner and Board disregarded the above ***key facts or Arguments reiterated*** *(four "teach away", "unexpected results" over Li, and "omission of an element" etc.)*, therefore it is insufficient under MPEP§2144.03 A,C,E and §2145.

Li's declaration *filed on March 19, 2018* have a detailed comparative analysis of the technical solutions and effects of the present invention and Li, and ***declare the authenticity of all evidences*** (including all common knowledge evidence Annexes 1-6,7-10,46-48,49,50 (Appx272-344, 583-641, 615-645, 553-567, 568-581) and objective evidence, Annexes 11-43 (Appx364-552) and ***their relevance*** (see Item 4A on Appx264).

Examiner did not consider the above 17 key point or fact therefore it is insufficient under *MPEP §2144.03 A, B, C.* Board disregarded also the above key facts *and Arguments* for rebutting *the Final Rejection* by Examiner, **which are the prosecution errors.**

The only excuse in the Decision on Appeal (*see line 1-5 of 1st full paragraph of Appx12*) is that *"several declarations are in a rather skeletal and conclusory fashion* ***because Li teaches all limitations*** *on which Appellants relies as critical or significant.",* but without documentary evidence to support, therefore, the recited ***case law*** *by Board* would not be appropriate under MPEP§2144.04.

In response to the decision for rehearing, Appellants would like to emphasize again the following 4 key points as to *"Long-Felt Need and Failure of Others"* under MPEP §716.04:

① up to July 2015, there has been NO report for a successful commercial application of Others' technology in the world (see Appendix 5 (Appx437), filed on October19, 2015).

② the Others (such as US 4,396,531, US 6,059,958), the two Reference provided by Examiner, using the technical solution of "a catalyst cooler for a riser" as suggested by the Board, have failed wholly in commercial application.

Li, with the poor operability in commercial unit, dose not really realize "freely independent control of the catalyst-to-oil ratio" because of the mutual interference between the two catalyst coolers existing inherently in Li. There is no one to adopt Li after 2008 (see Table 1 on Appx267-271,

Appendix 5 (i.e. Annex 17 on Appx437-442), and Annexes 13-16, 25-43 (Appx368-436, 459-552)).

Therefore, **Li has failed in commercial application also, which means the market share of the present application is 100%, and Li's is zero.**

Therefore, that the Board' finding in the Decision on appeal as to "the long-standing need has been fulfilled by Li" (see Appx13, line 2), so does the Board in the Decision for Rehearing, all are wrong.

③ only the present application solves the technical problem that people have been eager to solve but have never succeeded for more than 27 years from the filling date of US 4,396,531, filed on Aug. 13, 1981 (see page 82 (Appx76) of PPT); thereby realizing the commercial running in the world for the first time.

④ Annex 1 (Appx272-282), page 319; Annex 3 (Appx292-306), page 877-878, and Annex 4 (Appx307-338), page 139, prove that the catalyst-to-oil ratio has been always a non-independently adjustable variable (parameter). It is the present application solves the problem that people have been eager to solve but have never succeeded for more than 40 years, thereby realizing the freely independent control of the catalyst-to-oil ratio in commercial unit in the world for the first time.

In view of the above 4 facts the present application is the only one that is capable of commercial running, which means that **the market share of the present application is 100%, and Li's is zero.** Therefore, the claimed Feature 1 is nonobvious and patentable over Li based on MPEP §716.04 *"Long-Felt Need and Failure of Others"*.

## v. Summary

Accordingly, ***it is wholly inappropriate*** that the Examiner and the Board disregarded the above-mentioned Common Knowledge (Annexes 1-6,7-10,46-48,49,50,51-54 (Appx272-344, 583-641, 615-645, 553-567, 568-581)), the objective evidence (Annexes 11-18,21-43 (Appx364-447, 448-552)), that Appellants' arguments that the Examiner is engaging in *"impermissible hindsight"* and that the Common Knowledges ***teach away*** from the claimed Features 1&2. Therefore, all Board' Findings in the Decision on Appeal are wrong also, and should be withdrawn.

Accordingly, independent claims 1, 13, and 20 are all patentable under pre-AIA 35 U.S.C. § 103(a) over Li. The same reasons are also applicable to the remaining depending claims.

Accordingly, reconsideration and withdrawal of the rejection of Claim 1,13,20 under 35 U.S.C. § 103(a) are respectfully requested.

# V. Arguments

Generally, the Appellants respectfully submits that Li Reference (CN1664074A, hereinafter refer to " **Li** "), the prior art by Examiner, does not disclose all the limitations of Features 1 & 2 of the claims present in the present application. Appellants submits that the detailed reasons for this are given in the Appeal Brief, the Reply Brief , the PPT for the Oral Hearing and the Request for Rehearing previously submitted by Appellants. Appellants now responds to some new arguments and points raised by the Examiner and by the Board. However, the lack of a response to an issue raised by the Examiner and by the Board should not be taken as agreement with the Examiner and the Board since the Appellants believes, the PPT for the Oral Hearing and the Request for Rehearing previously submitted by Appellants adequately counters all of the issues.

Appellants respectfully submit that the Board erred in affirming the rejections of claims by the Examiner in the Final Action.

**i. Standard of Review**

This Court reviews the Patent Trial and Appeal Board's factual findings for substantial evidence and legal determinations de novo. See, e.g., In re Van Os, 844 F.3d 1359, 1360 (Fed. Cir. 2017). Obviousness, the sole basis for rejecting the proposed claims below, is a question of law based on underlying factual inquiries. The factual inquires are set forth in Graham v. John Deere Co., 383 U.S. 1, 148 USPQ 459 (1966). Objective evidence relevant to the issue of obviousness must be evaluated by Office personnel. Id. at 17-18, 148 USPQ at 467. Such evidence, sometimes referred to as "objective evidence" or "secondary considerations," may include evidence of commercial success, long-felt but unsolved needs, failure of others, and unexpected results. Further, the Board "must make findings of relevant facts, and present its reasoning in sufficient detail that the court may conduct meaningful review of the agency action." In re Lee, 277 F.3d 1338, 1346 (Fed. Cir. 2002).（Emphasis added）

**ii. Prosecution errors during patent examination and Appeal**

During patent examination and Appeal, the Examiner did not provide any documentary evidence to support their findings, all of which are the personal opinion or understanding.

**A. Examiner and Board disregarded the previously submitted Annexes 1-54 (Appx272-698) by Appellants**

For the rebuttal Argument, Appellants submitted respectfully the *five Declarations* by Zhang, Gao, and Qunzhu Li Under 37 C.F.R. 1.132, Table 1,2,3 on Appx267-271, 582, 646 and Annexes 1-54 (Appx272-698) including their indications, which prove that

① ***the level*** of ordinary skill in the art;

② the **four** *"teaching away"* from the claimed *Feature 1 and Feature 2* supported by the Common Knowledge *(see Table 1,2,3 on Appx267-271, 582, 646 and Annexes 1-6,7-10,46-48,49,50,51-54 (Appx272-344, 583-641, 615-645, 553-567, 568-581, 615-630))*;

③*"Omission of an element with retention of its function"* under MPEP §2144.04 II B; and

④ the **six** *"Objective Evidence"* under MPEP §716 (*or "the so-called secondary consideration"*, *see Table 1,2,3 on Appx267-271, 582, 646 and Annexes 1-54 (Appx272-698)).*

### B. Examiner and Board disregarded the three "teach away" from Feature 1 and the "impermissible hindsight"

1. The Common Knowledge *(Table 1 on Appx267-271 and Annexes1-6,49,50 (Appx272-363, 553-567, 568-581))* prove ***the level*** of ordinary skill in the art and the three *"teaching away"* from the Feature 1 of claims 1, 13 and 20, all of which are disregarded by Examiner and Board.

① Annex 1 (Appx272-282), pages 326-327 and Annex 3 (Appx292-306), page 916, prove *that " the catalytic cracking reaction in the riser is* ***a very complex parallel-sequential reaction*** *and* ***the reaction depth should be properly controlled "*** **; and**

Annex 1 (Appx272-282), page 366; Annex 3 (Appx292-306), page 1153; Annex 4 (Appx307-338), page 349-353; Annex 5 (Appx339-344), page 49 and Annex 50 (Appx568-581), prove that ***"high reaction temperature" teaches away from*** the claimed function of Feature 1 that is *"suitable catalyst-to-oil ratio" and* ***"suitable reaction temperature".***

However, ***the interaction of*** *"higher catalyst-to-oil ratio" and* ***"higher reaction temperature"*** inevitably leads to enhance the non-ideal reaction such as thermal cracking and condensation etc., thereby causing a large increase in the offgas and coke yields.

Therefore, the Common Knowledge and prior arts also disclose that the optimization requires "high reaction temperature" which is a long-standing technical prejudice in the field for more than 40 years and teaches away from the Claimed Feature 1. *For details, see Table 1 on Appx267-271 and Annexes 1-5,49,50 (Appx272- 344, 553-567, 568-581) and their indications and on Appx41-43 of PPT.*

Li discloses that the optimization ***requires "high reaction temperature"*** *(See* ***page 16 (Appx715), line 3*** *in Li's English translation,* ***i.e. the 19th to 20th line*** *of page 8/18 (Appx748) In Li's Chinese Specification).*

② Annex 3 (Appx292-306), page877-878 prove that *"**the catalyst-to-oil ratio has been always a non-independently adjustable variable** (parameter)"*, which teaches away from the claimed function of *"a freely independently adjustable variable of the catalyst-to-oil ratio"* by (only) one cooler for each reaction zone of one riser reactor as said in Feature 1 and Specification.

Li, due to the interaction or interfere of two catalyst cooler A/B, is only ***a partly in adjustable variable*** by two Coolers respectively used for 1st or 2nd reaction zone (***rather than "freely"*** as said in Feature 1 and Specification of present application).

③ Li discloses that catalyst coolers A and C can be omitted, implicitly teaching that catalyst cooler B cannot be omitted *(See* ***the 1st full paragraph*** *of page 3 (Appx702) and the* ***2nd full paragraph*** *of page 3 (Appx702) in Li's English translation,* ***i.e. the 14th to18th line*** *of page 3/18 (Appx743), and the 2th to 5th line of page 13/18 (Appx753) etc. in Li's Chinese Specification)****,*** which also teaches away from Feature 1.

But as to above ***three "teaching away" reiterated*** many times by Appellants *during Previous Procedures* such as *AFCP, Preappeal and Previous Appeal (**the Previous Board disregarded also**) etc.,* Examiner did not considered by any documentary evidence and Board disregarded also, therefore it is insufficient under MPEP§2144.03 A,C,E. Those are all the prosecution errors resulting in the miscomprehending on the factual assertions and findings. Accordingly, ***it is wholly inappropriate*** for the Examiner and Board to disregard the above-mentioned common knowledge and Appellants' arguments that the Examiner is engaging in *"impermissible hindsight"* or that the common knowledge ***teaches away*** from the claimed Feature 1. ***For details, see pages 15-19 (Appx43-45) of PPT.***

2. Here Appellants respectfully reiterates that the Feature 1, *according to the context of Claim 1 and Specification* of the present application, is ***"(only)*** one ***catalyst cooler is connected to (only) one riser reactor having one, two or more reaction zones,*** and *is used to regulate the reaction temperature of* ***each of one or more reaction zones*** *of one riser reactor*", which differs substantially from Li.

① The Feature 1 includes a functional limitation that is "one cooler is used for the reaction temperature of ***each*** *of one or more reaction zon*e of one riser reactor"; **rather than** ***the selection of the specific operating parameters.***

*For details, Please see* ***page 6,7 (Appx38, 39)*** *of PPT.*






② The Feature 1, ***as a whole,*** should not be split and the nonobviousness of the Feature 1 should be evaluated in entirety under MPEP §2141.02 I-VI.

③ Examiner splits excessively Feature 1 (almost splits to the extent "technical term-levels", such as *"catalyst cooler" and "reaction zone",* etc.), but the above "over-splitting" does not even reflect the sequence, function of the above basic steps of Feature 1.

④ The Feature 1 has been proposed by the present application ***for the first time in the field***, and there is ***No documentary record*** in Common Knowledge and Prior Art ***including Li*** before the filing date of the present application *(see Table 1 on Appx267-271 and Annexes 1-6, 49,50 (Appx272-363, 553-567, 568-581),* with Annex indications for all Annexes *submitted on Jan. 17, 2018*).

Appellants respectfully reiterates again that there is a great increase in the catalyst-to-oil ratio of first reaction zone of present application ***(because*** *all the catalyst for cycling* ***wholly enters first reaction zone*** *of one riser in present application; instead, all the catalyst for cycling is* ***split into two parts entering two separate risers in Li****.)*, thereby enhancing the catalyst activity and increasing the quantity of the active center. Thus, a suitable (relatively low) reaction temperature of the first reaction zone is adopted, thereby achieving "the multi-zone overall optimization" and "optimal control of

reaction extent", based on the above-mentioned common knowledge and prior arts .

**Therefore, Li, *having the almost same range of operating parameters but different operating method*, does not affect the patentability and non-obviousness of Feature 1 Over Li.**

But as to above ***key facts or arguments reiterated*** many times by Appellants *during Previous Procedures* such as *AFCP, Preappeal and Previous Appeal* (***the Previous Board disregarded also***) *etc.,* Examiner has not considered by any documentary evidence and Board disregarded also, therefore it is insufficient under MPEP§2144.03 A,C,E. Those are all the prosecution errors resulting in the miscomprehending on the factual assertions and findings. Accordingly, ***it is wholly inappropriate*** for the Examiner and Board to disregard the above-mentioned common knowledge and Appellants' arguments that the Examiner is engaging in *"impermissible hindsight"* or that the prior art *"teach away"* from the claimed Feature 1.

**C. Examiner and Board disregarded that "the omission of an element"**

The Feature 1, after "omitting catalyst cooler B and another riser etc.", is with retention of Li's function (In fact, with the better function, especially with the lower yield of offgas and coke and with the better operability over Li) (see Point 4, and Annex 1,3,4 (Appx272-282, 292-338); and Point 5 of Table 1 on Appx267-271 and Annex 4,6 (Appx307-338, Appx345-363)) which is non-obvious over Li under MPEP § 2144.04 II.B.

For details as to non-obviousness and patentability of the claimed Feature 1 over Li, please see page 5-27 (Appx38-49) of PPT, page 12-19 (Appx125-132) of Appeal Brief, and page 2-7 (Appx80-85) of Reply Brief.

**D. The Examiner and Board failed to consider *the synergistic effect /result of Features 1&2*** that is unexpected *to those skilled in the art*, which is a prosecution error.

1. **Feature 1 put forward *the stricter requirement of the uniformity*** *(especially in temperature)* of the cooled regenerated catalyst exiting the catalyst cooler, so as to realize "precise and optimal control of reaction temperature of each reaction zone"; and meanwhile ***Feature 2 proposes*** *"the downstream catalyst mixing buffering space"* ***for the first time in FCC field***, to ensure the more uniform temperature of the cooled catalyst entering to the downstream riser reactor, so as to meet the above stricter requirement.

2. There is a close connection between the **Feature 1** and **Feature 2** in the technical means and the technical effects/functions. In a cooperative combination of the **Feature 1** and **Feature 2**

which are synergistic, can improve operational reliability, safety, controllability and flexibility in commercial unit with better operability. *Please see page* ***28 (Appx49)*** *of PPT,* ***page 24 (Appx137)*** *of Appeal Brief.*

### E. Examiner and Board disregarded that the one "teaching away" from Feature 2 and the "impermissible hindsight"

**1.** The Common Knowledge *(Table 2,3 on Appx582, 646 and Annexes 7-10, 46-48, 51-54 (Appx583-614, 615-630))* prove that ***the level*** of ordinary skill in the art and *one "teaching away"* from the Feature 2, all of which are disregarded by Examiner and Board.

① The claimed **Feature 2 of***"the downstream catalyst mixing buffer space"*, has been proposed by present application ***for the first time*** *in the field,* and there is No documentary record in Common Knowledge and prior arts including **Li** before the filing date of the present application.

② Based on the context of Specification of the present application, it is clear from the claimed Feature 2 of claims 13 and 20 that the step of "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space *in the downstream location of ……*" is one independent step to get the cooled regenerated catalyst ***itself*** an uniform and stable temperature. See page 30,31 (Appx50, 52) of PPT.






③The Feature 2 shows a clear functional limitation *"for mixing and buffering the cooled catalyst"*; **rather than** *"for the cooled catalyst mixing with the said fluidizing medium"*.

(*Please see paragraphs 0016, 0017* of Specification, ***i.e. page 4 (Appx173), lines 21-22 and 24-26 of the originally-filed Specification*** of the present application).

Therefore, the **Feature 2,** including a functional limitation, should not be split, and the non-obviousness of **Feature 2** should be evaluated in entirety also under MPEP 2142.02 I-VI.

**2.** However, the Board, *taken out of context,* altered mistakenly *"**in the downstream location** of the catalyst cooler"* **into** *" **the downstream portion** of the catalyst cooler"* **which has no basis in fact and Examiner did not think so, which is a new ground.**

① In fact, based on the description of *page 15,line 28* ***to*** *page 16,line 9, page 18,line 1-13*, *page 21,line 13-27* **and** *page 25,line 20* ***to*** *page 26,line 4 of the originally-filed Specification, the catalyst cooler **(8A/B)*** and *the catalyst mixing buffer space **(9A/B)*** in the attached drawings1-4 **are *two different equipment having the same diameter only*** and **the two constitute *an integrated device***, *that is, the heat-taking equipment.*

***Please* see** *Table 3* on Appx646 *and Annexes 51-54 (Appx615-630) and theirs indications.*

② In fact, the Board disregarded the key point ***in their quotes*** *(see line 1-7 of 1st full paragraph of* the Decision) that is "*……and* ***the regenerated catalyst after being cooling enters into the mixing buffer space*** **9A/B** *in the lower part of the heat-taking equipment.".* ***Please see*** *page 16 (Appx225), line 10-12; page 19 (Appx228), line 16-17; page 22 (Appx231), line 14-16; page 23 (Appx232), line 2-4.*

Apparently, in the present application, the *"catalyst mixing buffer space"* is ***in a downstream location*** independent and separate from the catalyst cooler under ***MPEP §2111.01 II***.

> ***MPEP §2111.01 II:***
>
> ***a particular embodiment*** *appearing in the written description* ***may not be read into a claim*** *when the claim language is broader than the embodiment." Superguide Corp. v. DirecTV Enterprises, Inc., 358 F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004).*

In Figs. 1-4 of the present application, particular reference numbers 9A and 9B have been specifically identified.

**3. The Board also asserted (*see the statement in page 10 (Appx780)*** *of the previously Appeal Decision dated on October 8, 2020)*: *"To the extent that paragraphs 16 and 17 of Specification may somehow be understood to disclose a mixing buffer space that is in a location independent and separate from the catalyst cooler, such a feature is not recited in claim 1, and, therefore, constitutes an unclaimed embodiment.".*

Therefore, Examiner and Board splits excessively Feature 2 (almost splits to the extent *"technical term-levels"*, such as *"catalyst"*, *"downstream of"* and *"mixing buffer space"*, etc.). But the above "over-splitting" does not even reflect the sequence, function of the above basic steps. Hence, it is incorrect under MPEP§2142, and is ***"Impermissible Hindsight"*** under MPEP§2145 X.A.

**4.** NO documentary evidence **including Li,** teaches or suggests the claimed Feature 2 and the problem to be solve and function/results of Feature 2.

①Therefore, it is not in conformity with MPEP §2125 that Examiner anticipates, infers or speculates that *"Li discloses the claimed Feature 2"* by comparing merely Fig. 2 of the present application with Fig. 1 of Li, because they are totally different.

Therefore, **Board' findings** *(see page 7 (Appx8), lines 4-5 from the bottom)* that *"the Examiner's finding that the lower part of Li's catalyst cooler 8A or 8B is considered a mixing buffer*

*space is reasonable.”,* **is a miscomprehending and *“Impermissible Hindsight”*** under MPEP §2145 X.A.

② There are many types of structure (*such as up-flow mode and down-flow mode etc.*) and connection structure for the catalyst cooler *(see **Para. 0029** of Specification of the present application **i.e. page 7 (Appx176), lines 8-14 of the originally-filed Specification** of the present application）.*

**For the “up-flow mode”, *due to the catalyst flows from down to up, the “downstream of” means at “a top of cooler”, rather than “at a bottom of cooler”.***

That *“no downstream axial space” and “use of an up-flow mode”*, are not claimed limitations, but this does prove that ***“Li has a downstream axial space”*** *is just* ***a probability or possibility.***

> **See** “…… Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.’” ***In re Robertson,*** *169 F.3d 743, 745, 49 USPQ2d 1949, 1950-51 (Fed. Cir. 1999).*

**5.** Many textbooks *(see table 2 on Appx582 and Annexes 7-10 (Appx583-630))* state that “an external heat exchanger (i.e. common catalyst cooler) is isothermal (i.e. temperature is uniform)” since 1940s, which means that *the catalyst mixing and buffering space is **"superfluous, or useless"***, and therefore, **teaches away from Feature 2.**

But as to the above ***“teaching away” reiterated*** many times by Appellants *during Previous Procedures* such as *AFCP, Preappeal and Previous Appeal (**the Previous Board disregarded also**) etc.,* Examiners have not considered by any documentary Evidence and Board disregarded also, therefore it is insufficient under MPEP§2144.03 A, C, E. Those are all the prosecution errors resulting in the miscomprehending on the factual assertions and findings. **Accordingly**, ***it is wholly inappropriate*** for the Examiner and Board to disregard the above-mentioned common knowledge and Appellants’ arguments that the Examiner is engaging in *“impermissible hindsight”* or that the prior art *“teach away”* from the claimed Feature 1.

In view of the above, Feature 2 is a typical example of which the technical problem, existing indeed in production practice and being neglected for a long time, has been solved by the use of common knowledge (in the chemical filed) which has been abandoned because of technical prejudice in FCC field. Therefore, *the claimed Feature 2 is non-obvious* over Li**.**

**However, Examiner and Board disregarded the above key fact or Arguments for rebutting the Final Rejection, which is a prosecution error.**

For details, as to non-obviousness and patentability of the claimed Feature 2 over Li, please see page 29-37 (Appx50-54) of PPT, page 19-23 (Appx132-136) of Appeal Brief, and page 8-14 (Appx86-92) of Reply Brief.

**F. In view of the above, the above 16 key Evidence** ***for the rebuttal argument*** have NOT been considered or have been considered with only *"a general statement"* by Examiners. ***The only excuse*** of the Final Rejection, *in Examiner's Answer (see Appx100-101) and in Final Office Action (see Appx164-165),* is that *"Li disclosed all claimed element and their result"* of the claimed ***Features 1&2***, but without any documentary evidence to support. Hence, **the above Examiner's findings are two *"Impermissible Hindsight"*** *under MPEP §2145 X.A.* Therefore, it is NOT adequate under MPEP§716.01, §716.01(a), §716.01(c)III, §716.02(a)I, §716.03, §716.04, §2145 and §2143 A,C,E.

Examiner, by the ***only excuse*** that "**Li *includes*** *all claimed element of claimed Features 1 & 2 and their results"*, disregarded the Appellants' arguments related to "teaching away" and Objective Evidences "are not relevant to the current rejection". Here, Appellants submits that the rejection from which appeal is taken is an obviousness rejection under 35 USC 103. However, ***the Examiner has not rejected the present claims as being anticipated under 35 USC 102.***

In particular, Appellants strenuously reiterates *that Features 1 and 2 combined* and ***taken as part of the invention as a whole*** should be considered and that the Examiner has improperly ***disregarded the 17 arguments made related to*** *"teaching away", "unexpected results", "Long-Felt Need and Failure of Others", "commercial success" or " impermissible hindsight" etc.,* which are relevant to an Examiner's rejection made under 35 USC 103.

However, Board disregarded the above-mentioned Table 1,2,3 on Appx267-271, 582, 646 and Annexes 1-54 (Appx272-698), and the above-mentioned 17 rebuttal arguments. Appellants respectfully emphases again that are ***prosecution errors*** and that the Decision on Appeal ***should be withdrawn.***

For the at least one of the above-mentioned reason, Appellants strenuously reiterates that Board affirmed the examiner's rejections ***without providing any documentary evidence to support,*** which is their personal opinion or understanding also and that such prosecution errors ***(at least 17 "Overlooks") result in the root errors in the factual assertion and findings of the Decision*** on Appeal (2023-000079) which should be withdrawn.

### iii. Miscomprehending in Rejection and Decision of the Feature 1

**A. No *Prima Facie* Case, Not all the claim elements are disclosed by Li**

> To support an obviousness rejection, MPEP §2143.03 requires the "consideration" of every claimed feature in an obviousness determination and ***MPEP § 2141.02*** requires consideration of *the "[claimed] invention and prior art as a whole."* Further, the Board of Patent Appeal and Interferences recently confirmed that a proper obviousness determination *still requires the Office to make "a searching comparison of the claimed invention –* ***including all its limitations – with the teaching of the prior art.***" In re Wada and Murphy, Appeal 2007-3733 (January 14, 2008), citing In re Ochiai, 71 F.3d 1565, 1572 (Fed. Cir. 1995) and CFMT v. Yieldup Intern. Corp., 349 F.3d 1333, 1342 (Fed. Cir. 2003) (emphasis in original). Further, the necessary presence of all claim features is axiomatic, since the Supreme Court has long held that obviousness is a question of law based on underlying factual inquiries, including … ***ascertaining the differences between the claimed invention and the prior art.*** *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966) (emphasis added). Indeed, Appellants submits that this is the reason why Section 904 of the MPEP instructs Examiners to conduct an art search that covers "the invention *as described and claimed*." (Emphasis added). In sum, it remains well-settled law that an obviousness rejection requires at least a suggestion of all the claim elements.

The independent claims recite, *inter alia*:

" … wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so *as to keep the reaction temperature of each of the reaction zones in an optimal value*, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, *so as to keep the reaction temperature in an optimal value*."(hereinafter refer to as **"Feature 1")**

**1.** The Examiner has failed to address the claimed Feature 1. The Examiner has failed also to establish "*prima facie* case of obviousness". That is *"the reaction temperature of each of one or more reaction-zones in the prior art is kept respectively in an optimum value by the adjusting of one regenerated catalyst cooler"* as recited in the claimed Feature 1.

① ***Appellants submits that the Examiner has not addressed the limitation and is improperly attempting to shift the burden of proof to the Appellants.*** The Examiner does not adher to the legal concept to bear the burden of presenting a *prima facie* case of obviousness based upon a preponderance of the evidence of record. *See MPEP 2142.* ***The Appellants respectfully points out that the Examiner does not show in the rejection how the limitation of*** "*to keep the reaction temperature of each of the reaction zones in an optimum value*" ***is met.***

Accordingly, there is no requirement, as the Examiner suggests, for the Appellants to provide

a showing that the cold shock agent infers a lack of control of the reactor temperature. ***The burden** is on the Examiner to show that **each and every limitation** of the claimed invention **would have been obvious** to one having ordinary skill in the art. **Appellants submits that the Examiner has not met this burden** because the Examiner has **not shown how this limitation is met by the cited art.***

> The legal concept of *prima facie* obviousness is a procedural tool of examination which applies broadly to all arts. It allocates who has the burden of going forward with production of evidence in each step of the examination process. See *In re Rinehart,* 531 F.2d 1048, 189 USPQ 143 (CCPA 1976); *In re Lintner,* 458 F.2d 1013, 173 USPQ 560 (CCPA 1972); *In re Saunders,* 444 F.2d 599, 170 USPQ 213 (CCPA 1971); *In re Tiffin,* 443 F.2d 394, 170 USPQ 88 (CCPA 1971), *amended,* 448 F.2d 791, 171 USPQ 294 (CCPA 1971); *In re Warner,* 379 F.2d 1011, 154 USPQ 173 (CCPA 1967), *cert. denied,* 389 U.S. 1057 (1968).
> The examiner bears the initial burden of factually supporting any *prima facie* conclusion of obviousness. If the examiner does not produce a *prima facie* case, the Appellants is under no obligation to submit secondary evidence to show nonobviousness. ……. The decision of whether to submit evidence after a rejection should be influenced by the goals of compact prosecution, which encourages the early submission of such evidence. It is also noted that evidence submitted after final rejection may be denied entry into the record. **See MPEP 2142.**

For example, beginning on page 9 of the Examiner's Answer，the Examiner has determined that "'cold shock agent' is defined in Li as cold spent or regenerated catalyst and is used to 'conveniently control the temperatures of each of the reaction zones.'". The Examiner then determines that Appellants has not shown that "cold shock agent" infers a lack of control of reactor temperature, such is not implied in the common knowledge or prior art, and such is contrary to the direct teachings of Li.

By way of illustration, the Appellants pointed out in the Appeal Brief that *the "cold shock" agent in Li, as a non-limited example, could potentially produce wide swings* in the reaction temperature which could take the reaction temperature outside of the *optimum value* in the reaction zone, and that therefore the limitation is not inherently met by the reference. However, *there is **no burden on Appellants to show*** that this will necessarily infer a lack of control of the reaction temperature as the Examiner suggests. The purpose of this argument was, and is, to aid in understanding how the limitation of "*to keep the reaction temperature of each of the reaction zones in an optimum value*" has not been met because it is reasonable that a "cold shock" agent could cause swings in temperature which are outside of the optimum value in the reaction zones in an optimum value.

② The Examiner's finding in Final Office Action *(see Appx164, lines 8-9)* recites *"This includes wherein a catalyst cooler is connected to a riser and used to adjust the temperature of each zone in the riser"* **in Li.** However *the Appellants respectfully points out that **the Examiner does not***

***show in the rejection how the limitation of*** *"cooler B being designed to adjust the second reaction zone may be cancelled* " **is met.**

③ Therefore, the above assertion by Examiner is not consistent with the interpretation that one of ordinary skill in the art would reach, because one of ordinary skill in the art ***(including Li also)*** would think that it is ***impossible*** *that a catalyst cooler is used to adjust the reaction temperature of each reaction zone of a riser* before the filling date of the present application.

Here, Appellants respectfully emphases again that *"the* ***one*** *catalyst cooler"* in the claimed **Feature 1** is *not* ***"a*** *catalyst cooler****"*** ***and*** *that "catalyst cooler* ***8A****" and "catalyst cooler* ***8B****"* **in Li** ***are different substantively in theirs function***, based on the record of **Li's Specification** *(See from Last line 1-3 of Page 2 (Appx701) to Line 1-10 of Page 3 (Appx702) of* **Li's** English translation).

Here, Appellants respectfully emphases again that *the following 4 key point:*

① up to July, 2015, there are NO report for successful commercial application of Others' technology in the world *(see Appendix 5 (Appx437), filed on October19, 2015).*

② the Others *(such as US 4,396,531, US 6,059,958),* the two Reference provided by Examiner, using the technical solution of *"a catalyst cooler for a riser"* as suggested by the Board, have failed wholly in commercial application.

Li, with the poor operability in commercial unit, dose not really realize "freely independent control of the catalyst-to-oil ratio" because of the mutual interference between the two catalyst coolers existing inherently in Li, and **there is No one to adopt Li after 2008** *(see Table 1 on Appx267-271, Appendix 5 (i.e. Annex 17 on Appx437-442), and Annexes 13-16, 25-43 (Appx368-436, 459-552)).*

Therefore, **Li had failed in commercial application also.**

**The Board's finding in the Decision on appeal** as to *"the long standing need has been fulfilled by Li"* ***(see Appx13, line 2)*** **is wrong.**

③ only the present application solves ***the technical problem*** that people have been eager to solve but have never succeeded ***for more than 27 years*** from the filling date of *US 4,396,531, filed on Aug. 13, 1981 (see page 82 (Appx76) of PPT);* thereby ***realizing the commercial running in the world for the first time.***

④ Annex 1 (Appx272-282), page 319; Annex 3 (Appx292-306), page 877-878 and Annex 4 (Appx307-338), page 139, prove that the catalyst-to-oil ratio has been always a non-independently adjustable variable *(parameter).* It is the present application solves the

problem that people have been eager to solve but have never succeeded ***for more than 40 years,*** thereby ***realizing the freely*** independent control of the catalyst-to-oil ratio ***in commercial unit in the world for the first time.***

**Therefore, the claimed Feature 1 is nonobvious and patentable over Li** and ***Li*** *in a combination of others* based on MPEP § 716.04 *"Long-Felt Need and Failure of Others"*.

In view of the above, **No *Prima Facie* Case is established, and Not all the claim elements of the claimed Feature 1 are disclosed by Li.**

**B. The Examiner's Finding as to Feature 1 is a "Impermissible Hindsight"**

The Examiner's Finding in Final Office Action *(see page 5 (Appx164), line 8-9)* regarding *"This includes wherein a catalyst cooler is connected to a riser and used to adjust the temperature of each zone in the riser"* ***in Li, is a "Impermissible Hindsight"*** *under MPEP§2145 X.A.*

The above Examiner's finding without relying on scientific theory and ***without any documentary evidence,*** is their personal understanding or opinion, and is NOT appropriate under MPEP §2144.03 A, C, E, and §2142.

**1.** However, Board affirms the above Examiner's finding by **a new ground** of *"Although Li teaches that a second catalyst cooler 8B may be used to feed cold regenerated catalyst to reaction zone 2 of riser reactor 4 via auxiliary rising pipe 6 (i.e. transporting pipe) and pipeline 11B, we note that claim 1 uses the open-ended claim language "comprising" and does not exclude an additional catalyst cooler (e.g.8A or 8B)"* on page 5 (Appx6), line 17-21 of the Decision on Appeal.

**2.** Board alleged that *"Cooler 8A, feeding the cold regenerated catalyst into reaction zone 1 (ref.no. 3) would also feed the catalyst to reaction zone 2 (ref. no.2) in Li's Figure 1 and adjust the temperature* ***at some level*** *within reaction zone 2"* (see page 5 (Appx6), line 10-16 of the Decision on Appeal). However, *it* ***is not in the line of the interpretation*** *that one of ordinary skill in the art would reach.* ***Furthermore,*** based on **Li's** specification *(see 1st and 2nd full paragraph in page 8 (Appx707)),* Li's two catalyst cooler *8A/8B* is used *respectively* for adjusting the reaction temperature of ***only one (not each)*** reaction zone *that is respectively* for adjusting first reaction zone and second reaction zone.

Therefore, that *"Cooler 8A would adjust the temperature* ***at some level*** *within reaction zone 2"*, alleged by Board, ***is "Impermissible Hindsight" also.***

**3.** Board alleged also that *"Li teaches that two or three cooler arrangement (8A, 8B, and 8C) does not limit Li to using other control equipment and control methods (Li 19, bottom of 2nd full*

*paragraph; 20, bottom of 1st full paragraph)", **obviously,*** based on the spirit of Li and the interpretation that one of ordinary skill in the art would reach, *the above "**other** control equipment and control methods"* ***does not include*** *the above* ***"Impermissible Hindsight",*** *that is "**Cooler 8A** would adjust the temperature* ***at some level*** *within reaction zone 2".*

> ● To reach a proper determination under **35 U.S.C. 103**, ***the examiner must step backward in time and into the shoes worn by the hypothetical "person of ordinary skill in the art"*** when the invention was unknown and just before it was made. In view of all factual information, the examiner must then make a determination whether the claimed invention "as a whole" would have been obvious at that time to a hypothetical person of ordinary skill in the art. Knowledge of Appellants' disclosure must be put aside in reaching this determination, yet kept in mind in order to determine the "differences," conduct the search and evaluate the "subject matter as a whole" of the invention. The tendency to resort to "hindsight" based upon Appellants' disclosure is often difficult to avoid due to the very nature of the examination process. However, impermissible hindsight must be avoided and the legal conclusion must be reached on the basis of the facts gleaned from the prior art. ***See MPEP 2142.***

> ● **MPEP§2141.02 V**
>
> Obviousness cannot be predicated on what is not known at the time an invention is made, even if the inherency of a certain feature is later established. In re Rijckaert, 9 F.3d 1531, 28 USPQ2d 1955 (Fed. Cir. 1993).

Firstly, the wording "may" means *"may" or "may not"*, however, Li only teaches that *"a second catalyst cooler 8B must be used to **feed** cold regenerated catalyst to reaction zone 2"* based on Li's Specification *(See page 2 (Appx701), last line 1-3 to page 3 (Appx702), line 10 of Li's English translation*).

Gleaning from all Office Action and Examiner's Answer, Examiner never said the above-mentioned **"may".** In addition, the above assertion by Board *that "we note that claim 1 uses the open-ended claim language "**comprising**" and **does not exclude** an additional catalyst cooler (e.g.8A or 8B)",* is confused about the ***different*** function *of catalyst cooler 8A and catalyst cooler 8B (see 1st and 2nd full paragraph in page 8 (707)).*

Here, Appellants respectfully emphases that *we have been insisted that only one Cooler,* based on the guidance of Li, ***must be cooler B,*** *NOT cooler A and cooler C. That is,* ***the cooler B is essential*** *in Li.* **But Examiner has never objected.**

Thus, this is **a new ground by Board** in Decision on Appeal. **Board alleged that *"Appellants dose not dispute this teaching in Li"* (***see page 5 (Appx6), line 2-3***) is wrong also.**

Secondly, **the Board still miscomprehend the solution of Feature 1**.

Claim 1 is a method claim. The claimed Feature 1 of Claim 1 uses language "comprising"

which means that *"The* Claim 1 *does not exclude other steps"*. **In Feature 1**, "the ***one*** regenerated catalyst cooler is connected to the ***one*** riser reactor and is used to adjust the reaction temperature of ***each*** of the reaction zones of the ***one*** riser reactor, *so as to keep the reaction temperature of* ***each*** *of the reaction zones in an optimal value,* respectively", **the expression** "*the* ***one*** *cooler is connected to the one riser"* means "*only one cooler is connected to one riser reactor*", ***like the phrase "one to one" or "word for word".*** Based on the Claim 1 and the Specification of present application, the expression "***the one … the one…***" in Feature 1 ***defines clearly a close-ended relationship*** *between "the regenerated catalyst cooler" and "the riser reactor",* that is *"**only one** regenerated catalyst cooler is connected to **only one** riser reactor".*

Board's Finding in the Decision on Appeal regarding "*Li teaches a single catalyst cooler may be used and the claims do not exclude using more than one catalyst cooler"(* see page 10 (Appx11),line 7-8 of the Decision), is not in the light of the interpretation that one of ordinary skill in the art would reach, and is not in the line of the Li's Specification. What is actually disclosed by Li is "when a single catalyst cooler 8B is used, *the single catalyst cooler 8B* ***must be connected to the junction*** *of the first reaction zone and the second reaction zone,* ***only for adjusting*** *the reaction temperature of the second reaction zone";* ***instead of*** *the pre-lifting zone 4 (or the bottom of the riser) before the first reaction zone* ***for adjusting*** *the reaction temperature of* ***each*** *of the* ***first*** *reaction zone and the* ***second*** *reaction zone* **.**

In view of the above, the Decision on Appeal ***confuses*** *the different function* of the Cooler A and the Cooler B, ***this is the reason why*** *Board asserts that the Cooler A and Cooler B in Li are interchangeable,* which is the miscomprehending of the spirit of Li's specification, and is not consistent with the interpretation that one of ordinary skill in the art would reach.

In view of the above, the above Examiner's finding regarding "*Li includes "a catalyst cooler is used to adjusting the reaction temperature of* ***each*** *reaction zone in a riser""* ***is wholly wrong,*** *and* ***Board, by the two new Ground,*** affirmed the Examiner's assertion and finding, all of which is wrong also and should be withdrawn.

Therefore, the obviousness rejections of claims 1, 13, and 20 under 35 USC 103 should be reversed because the Examiner and Board have failed to present a *prima facie* case of obviousness.

**C. Unexpected results over Li** are supported by Specification of the present application

Base on Claim 1 and the Specification of the present application *(see Para. 0012-0019 of*

*Specification* ***i.e. page 3 (Appx172), line 26 to page 5 (Appx174), line 24 of the originally-filed specification*** *of the present application)*, the claimed **Feature 1,** including a functional limitation, clearly defines that *"the location of the cooler, what it is connected to and what it adjusts"* and that its effect/function is *"to keep them at the best value, respectively",* ***rather than "the selection of specific parameter*** *in a range of the operating parameters".*

The problem to be solved of claimed Feature 1 is *"to make the catalyst-to-oil ratio as an independent adjustable variable, ……"* ***by (only) one catalyst cooler*** as said in Feature 1 (see para.0012 *of Specification* ***i.e. page 3 (Appx172),line 26 to page 4 (Appx173),line 1 of the originally-filed specification*** *of the present application*) ; thereby using "*the suitable catalyst-to-oil ratio and the suitable reaction temperature of first reactor zone* "(*see para.0052 of Specification* ***i.e. page 11 (Appx180), lines 25-26 of the originally-filed specification*** *of the present application*), so as to decrease the yield of coke and offgas, thereby increasing the processing capacity of 15-20% *(see para.0060 of Specification* ***i.e. page 12 (Appx179), lines 17-19 of the originally-filed specification*** *of the present application*) ***for the first time***, ***which is unexpected.***

**Li,** *due to the interaction or interfere of two catalyst cooler 8A/8B*, is only a partly independently adjustable variable, and is not as the above *"freely or wholly"* as said in Feature 1 and Specification of the present application. The *two catalyst cooler 8A/8B* **in Li** is used ***respectively*** *for adjusting the reaction temperature of* ***only one (not each)*** *reaction zone, that is,* ***respectively*** *for* adjusting the reaction temperature of *first reaction zone and second reaction zone*. Thus, the claimed Feature 1 is **nonobvious and patentable over Li.**

**D. Unexpected results over Li - A direct and fair comparison between the claimed Feature 1 and Li**

There is a direct and fair comparison between the present application and Li in Appeal Brief, Reply Brief and PPT for Oral Hearing to prove the nonobviousness and unexpected results of the claimed Feature 1 of the present application over Li.

**But Board disregarded the key fact for rebutting the Final Rejection by Examiner, which is a prosecution error.**

① **No documentary evidence including Li, discloses or teaches or suggests the problem to be solve and function/results of Feature 1. Therefore, Feature 1 is non-obvious over Li.**

***Li is different substantively from the claimed Feature 1 in the means, the problem to be***

***solve and function/results.*** *See 11-13 (Appx41-42) of PPT.*

The problem to be solved of the claimed **Feature 1** is "to make the catalyst-to-oil ratio as an independent adjustable variable, …"by (only )one catalyst cooler as said in Feature 1 (see para.0012 *of specification (Appx215) of the present application*); thereby using "the suitable catalyst-to-oil ratio and the suitable reaction temperature of first reactor zone "(see para.0052 (Appx218) *of specification of the present application*), so as to decrease the yield of coke and offgas, thereby increasing the processing capacity of 15-20% (see para. 0060 *(Appx218) of specification of the present application*) ***in the world*** **for the first time**, which is **unexpected** .

**Li,** due to the interaction or interfere of two catalyst cooler A/B, *is only a partly independently adjustable variable,* and ***is not as the above "freely or wholly"*** as said in Feature 1 and Specification of the present application. ***See Page 5-13 (Appx38-42) of PPT.***

***Thus, Feature 1 is nonobvious and patentable over Li.***

But Examiner and Board disregarded the above key arguments that Appellants emphases many time and Board overlooked also in Decision on Appeal (2023-000079), therefore it is insufficient under MPEP§2144.03 A, C, E, and §2145.

② In order to rebut the new ground by Board, after oral hearing, Appellants provided the supplementary information and key Argument to Board, including the following **direct and fair comparison** between the present application and **Li** to prove the unexpected results. However, Board has not accepted, but the Decision on Appeal is based on the above new ground, **which is a prosecution error.**

**The unexpected results** achieved by the present application is to "*make the catalyst-to-oil ratio as an independent adjustable variable by only one catalyst cooler as said in Feature 1* (see *para.0012 (Appx215) of specification* of the present application)*, thereby using "the suitable catalyst-to-oil ratio and the suitable reaction temperature of first reactor zone"* (see para.0052 (Appx218) of specification of the present application)***for the first time,*** so as to decrease the yield of coke and offgas, ***thereby increasing the processing capacity by 15-20%*** " (see para.0060 (Appx218) of specification of the present application)***for the first time*** in the world.

● Please refer to Table 2 on Appx582 of the present application, it can be seen that the temperature of the first reaction zone is 525 ℃, the catalyst-oil ratio is 8.6. In Table 3 (Appx646), the carbon % is decreased from 9.3 % to 7.9%, which is about 15% percent decrease, and will result in an

increase of *15-20% in the processing capacity. Please notice that the "carbon %" is the yield of coke.* The decrease in the yield of coke can increase **the processing capacity of the regenerator by *15-20%***, ***thereby increasing the processing capacity by 15-20%*** *(see* ***para.0060 (Appx218)*** of specification of the present application*)* of the whole system. The main function of the regenerator is to burn the coke/carbon on the stripped catalyst to regenerate the spent catalyst, and less coke on the stripped spent catalyst will result in an increase in **the processing capacity of the regenerator.**

● Please also refer to Li, the last two page of the description**,** see *table 4,5 in page 37-38 (Appx736-737) of Li's English translations,* the temperature of the first reaction zone is **560**℃, which is higher than **525**℃ that used in the present application; the catalyst-to-oil ratio is **8**, which less than **8.6** that used in the present application; the **"carbon %"** is **10.3%**, which is higher than **7.9%** that obtained in the present application. This means that the present application can obtain more than 20% decrease in the **yield of coke** over Li, and accordingly can increase **the processing capacity of the regenerator by *15-20%***, ***thereby increasing the processing capacity by 15-20%*** *(see* ***para.0060 (Appx218)*** *of specification of the present application)* of the whole system.

The following table will explain this direct comparison in a better way to be understood.

| | **Example of present application** | **Example of Li** |
|---|---|---|
| **catalyst-to-oil ratio** | 8.6 (see table 2 on Appx223) | 8.0 (see table 4) |
| **Temperature of first reaction zone** | 525 °C (see table 2 on Appx223) | **560** °C (see table 4) |
| **yield of Coke** *i.e. Carbon* | 7.9% (see table 3 on Appx223) | 10.3%(see table 5) |
| Decrease in the yield of coke | about 20% | |
| **Increase of the processing capacity** | about 20% | |

Although the raw material used in the present application is a little different from that used in **Li,** the above experiment data are good enough to prove the unexpected result achieved by the present application **over Li.**

**E. The criticality or unexpected results over Li are supported by Annexes 11-43 (Appx364-552) and**
**by Four Declarations, by the three Opinion Evidence.**

**However, the above *criticality or unexpected results* have not been considered by**

**Examiners， which is insufficient** *under MPEP§716, §2144.03 A,C,E, and §2145 (especially MPEP §716 .01 (c)III, §716.02).*

In order to rebut the above Examiner's ‘Impermissible Hindsight’, Appellants respectfully submits Annexes 11-43 (Appx364-552), the ***four Declarations*** by Gao, Zhang and Li Under 37 C.F.R. 1.132 and the Common Knowledge (Table 1 on Appx267-271 and Annexes 1-6, 49,50 (Appx272-363, 553-567, 568-581)) ***showing three "teaching away"*** *from Feature* ***1.***

**1.** The four Declarations Under 37 C.F.R. 1.132, ***declaring the substantive difference*** between the Features 1&2 and **Li** and ***the criticality or unexpected results over Li***, which are Objective Evidence of non-obviousness *under MPEP §716,* but Examiners have NO comment or have only one general statement for the rejection, which, therefore, ***is insufficient*** *under MPEP§716.01(a), §2144.03 A, B, C and §2145.*

**2.** The Common Knowledge (see Table 1 on Appx267-271 and Annexes 1-6, 49,50 (Appx272-363, 553-567, 568-581)) including **Li** show that there are ***three "teaching away"*** from the claimed **Feature 1.**

【As to the four Declarations, *Table 1 on Appx267-271 and Annexes 1-6, 49,50 (Appx272-363, 553-567, 568-581) and three "teaching away",* is argued many times by Appellants during Previous Procedures such as RCE, AFCP, Pre-appeal and Appeal, etc.. 】**see Page Appx40, 43,of PPT.**

But Examiner have not been considered with any explanation by any documentary evidence, therefore it is insufficient under *MPEP §2144.03 A, B, C.* Board disregarded also the above key facts *and Arguments* for rebutting *the Final Rejection* by Examiner, **which is a prosecution error.**

The excuse in the Decision (see line 1-5 of 1st full paragraph of page 11 (Appx 12)) is that *"several declarations are in a rather skeletal and conclusory fashion* ***because Li teaches all limitations*** *on which Appellants relies as critical or significant.",* but without rationale and documentary Evidence to support, therefore, the recited ***case law by Board*** would not be appropriate under MPEP§2144.04.

Here, Appellants respectfully emphases that the above four Declarations Under 37 C.F.R. 1.132 were made herein of their own knowledge *after they* ***have reviewed and understood the following 6 references:*** CN1664074A ***(i.e. Li)***, U.S. Patent No. 5,019,353, US Patent No. 4830728, U.S. Patent No. 6,059,958, U.S. Patent No. 4,396,531 and U.S. Patent No. 2,531,356, ***as the basis for rejections by Examiner set forth in the Office Action, and that all*** above four Declarations, having been compared the claimed Features 1&2 with Li in details, **are not** "in a rather skeletal and

conclusory fashion", and are sufficient to rebut the Examiner's and APJ's final Rejection.

**3. As to the three "teach away", the three "Opinions evidence" under *MPEP §716 .01 (c)III and Annexes 11-43 (Appx364-552),* Examiner have not been considered, and Board disregarded also.**

Here, Appellants respectfully indicate many times that the above ***difference of 40-60 times in profit*** as different as before, ***much greater than those*** which would have been expected from the prior art to an unobvious extent, are of a significant, practical advantage, so the claimed claim 1 possesses non-obviousness and patentability under MPEP §716.02(a) I.

The multi-parameter overall optimization of Feature 1of the present invention brings out a unexpected synergetic effect *(see Annexes 11-43 (Appx364-552))*, for example:

- The running result of a unit *with capacity of 1.0 million ton/year* shows *that there is a great increase in the profit of 166 million RMB annually* and *the payback period of invest* is about *1.0 month (normally more than 5 years) (see Annex 32 (Appx496-500));* ***and***
- The running result of a unit *with capacity of 1.4 million ton/year shows that there is a great increase in the profit of 185 million RMB annually,* and *the payback period of invest* is about *1.5 months (normally more than two years) (see Annex 28 (Appx476-480)).*

For details, please see ***"objective evidence"*** beginning at ***page 39*** of this Appeal document.

**Remarks:**

**(1)** On Oct. 23, 2015, Appellants submitted the **two Declaration by Zhang and by Gao.** On October 19, 2015, Appellants submitted Appendix 1-8, of which Appendix 1-5 correspond to Annex 18,40,24,12,17 (i.e., Appx443-447, 531-535, 457-458, 366-367, 437-442), respectively;

Which supports that the claimed claim 1 (including Features 1&2) of the present application have the criticality or unexpected results over Li, and over Li in views of Others.

(2) During Previous Procedures AFCP, On Jan. 17, 2018, and On March 23,2018, Appellants submitted t**he two Declaration by Qunzhu Li**, an inventor of both the present application and Li (CN16640474A), herewith Table 1 on Appx267-271 and Annexes 1-6,49,50 (Appx272-363, 553-567, 568-581) and their indications, and Table 2 on Appx582 and Annexes 7-10,46-48 (Appx583-614) and theirs indications.

Which supports that the claimed claim 1 (including Features 1&2) of the present application have the criticality or unexpected results over Li in a combination of Others.

(3) On Jan. 23, 2021, Appellants submitted Annexes 11-43 (Appx364-552) and **a Declaration by Qunzhu Li,** herewith Table 3 on Appx646 and Annexes 51-54 (Appx647-698) and their indicators.

(4) Appellants respectfully indicate that the facticity and nexus of all objective Evidences i.e. Annexes 11-43 (Appx364-552)) and the present application, which is supported also by the declaration by Li (see Appx264, line 5-10, filed on March 19, 2018).

**F. An "Omission of an element with retention of its function"** under MPEP §2144.04 II B.

Examiner and Board have No comment on "Omission of an element with retention of its function", which is NOT appropriate under MPEP §2144.04 II B.

Please see page 22-24, 48 (Appx46-47, 59) of PPT, page 32 (Appx145) of Appeal Brief, and page 17 (Appx95) of Reply Brief.

**The four advantages of the claimed Feature 1 over Li,** as follows:

① There is a great increase in the catalyst-to-oil ratio of first reaction zone of the present application that results in a great Increase in the catalyst activity and the quantity of the active center, because all the catalyst for cycling enters wholly first reaction zone of one riser in the present application; instead of, ***all the catalyst for cycling is split into two parts and*** enter ***respectively*** *two different Risers* **in Li;**

② To adopt "suitable catalyst-to-oil ratio and suitable reaction temperature", instead of "higher catalyst-to-oil ratio and higher reaction temperature" **in Li,** thereby reducing the yield of coke and offgas;

③ To overcome the deficiency of Li that the catalyst-to-oil ratio in the first reaction zone *cannot be freely independent adjustable (see Item 3 of Table 1 on Appx267-271, and Annex 3,4 (Appx292-306, 307-338)),* due to the restrictions of heat balance; and

④ To eliminate the mutual interference due to operational fluctuations of the two catalyst coolers existing inherently **in Li** *(see Item 5 of Table 1 on Appx267-271 and Annex 4,6 (Appx307-338, Appx345-363)).*

In view of the above, Feature 1, after "omitting catalyst cooler B and another riser etc.", is with retention of **Li's** function also (In fact, with the better function, especially with the lower yield of offgas and coke and with the better operability **over Li**) (*see Item 4, and Annex 1,3,4 (Appx272-282, 292-306, 307-338); and Item 5 of Table 1 on Appx267-271 and Annex 4,6 (Appx307-338, 345-363)),* which is non-obvious over Li.

**In view of the above, the claimed Feature 1 is nonobvious and patentable over Li. However, Board disregarded the above four key point for rebutting the Final Rejection by Examiner, which is a prosecution error.**

The ***only excuse*** is also that *"Li disclosed all claimed element and their result"* but without any documentary evidence to support. Therefore, it is NOT adequate under MPEP § 2144.04 II.B.

**G. To sum up, Appellants respectfully indicate that,**

However, as to above ***key facts or Arguments reiterated*** *(three "teach away", "unexpected results" over Li, and "omission of an element" etc.)* many times by Appellants *during Previous Procedures* such as *AFCP, Preappeal and Previous Appeal* (***the Previous Board disregarded also***) *etc.,* Examiner has not considered by any documentary evidence and Board disregarded also, therefore it is insufficient under MPEP§2144.03 A,C,E.

Those are all prosecution errors resulting in the miscomprehending on the factual assertions and findings. Accordingly, ***it is wholly inappropriate*** for the Examiner and Board to disregard the above-mentioned common knowledge (Annexes 1-10,46-48,51-54 (Appx272-363, 583-614, 615-630, 647-698)) and Appellants' arguments that the Examiner is engaging in *"impermissible hindsight"* or that the prior art *"teach away"* from the claimed Feature 1.

**The Feature 1,** ***as a whole, should not be split*** *and* the nonobviousness of the **Feature 1** should be evaluated in entirety. However, Examiner splits excessively Feature 1 *(almost splits to the extent "technical term-levels", such as* ***"catalyst cooler or reaction zone",*** *etc.).*

However, the above "over-splitting" ***does not even reflect*** *the sequence, function of the above basic steps.* Therefore, Examiner's Finding regarding *"This includes wherein a catalyst cooler is connected to a riser and used to adjust the temperature of* ***each zone*** *in the riser"* ***in Li***, ***is incorrect*** *and is* ***a "Impermissible Hindsight"*** *under MPEP§2145 X.A.*

**For at least one of the aforementioned reasons, the claimed Feature 1 is patentable and nonobvious over Li.**

For details, as to non-obviousness and patentability of the claimed Feature 1 over Li, please see page 5-27 (Appx38-49) of PPT, page 12-19 (Appx125-132) of Appeal Brief, and page 2-7 (Appx115-120) of Reply Brief .

**iv. Miscomprehending in Rejection and Decision of Feature 2**

Feature 2 of Claims 13 and 20 reads as follows:

> *"blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space being disposed in the downstream location of the regenerated catalyst cooler before the cooled regenerated catalyst entering the riser reactor;" (hereinafter referred as* ***"Feature 2"*** *)*

**1.** The Common Knowledge *(Table 2,3 on Appx582, 646 and Annexes 7-10, 46-48, 51-54 (Appx583-614, 615-630, 647-698))* prove that ***the level*** of ordinary skill in the art and *one "teaching away"* from the Feature 2, all of which are disregarded by Examiner and Board.

① The claimed **Feature 2** *"the downstream catalyst mixing buffer space"*, has been proposed by the present application ***for the first time*** *in the field,* and there is No documentary record in Common Knowledge and prior arts including **Li** before the filing date of the present application (see Table 2 on Appx582 and Annexes 7-10,46-48 (Appx583-614, 615-630), Table 3 on Appx646 and Annexes 51-54 (Appx647-698)).

The claimed **Feature 2,** including a functional limitation, should not be split, and the non-obviousness of **Feature 2** should be evaluated in entirety also under MPEP 2142.02 I- VI.

② The claimed Feature 2 shows a clear functional limitation *"for mixing and buffering the cooled catalyst"*(see *page 4 (Appx173),* ***line 21-22 and 24-26*** *of the originally-filed Specification)*; rather than *"for the cooled catalyst mixing with the fluidizing gas"*.

Based on the context of Specification of the present application, it is clear from the claimed Feature 2 of claims 13 and 20 that the step of "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space *in the downstream location of* ……" is one independent step to get the cooled regenerated catalyst ***itself*** an uniform and stable temperature.

③There is **NO written record** as to *"the catalyst mixing buffer space"* (nowhere *"a lower space" of* or *"downstream of" the catalyst cooler*) in all prior art and common knowledge (including Li) . Li shows only *"a fluidizing medium enters the lower part of the catalyst cooler* by a fluidizing medium (35A/B) distributor" and ***fails to disclose the downstream (or axial) space,*** because *the fluidizing gas (35A/B) distributor in Li* **could be set at the radial gap** between the two heat-exchanging elements, or between the heat-exchanging element and the wall.

(see paragraphs 0016, 0017 of Specification published *on Nov.29,2012,* ***i.e.*** *page 4 (Appx173), line 21- 22 and 24-26 of the originally-filed Specification* of the present application and page 30,31 (Appx50-51) of PPT)

**2. Board' assertions** *(see line 1-6 of 1st full paragraph in page 7 (Appx8) of the Decision)* that ***"****the Specification states that the downstream* ***portion*** *of the catalyst cooler contains a "buffer space for the mixed buffer catalyst" (Spec.4:21-22). The Specification describes catalyst cooler 8A as having fluidized media 35A, lifting media such as air, steam, etc., 36A, and taking-heat medium 37A(Spec.16:4-9). The Specification describes a lower part of the catalyst cooler is the mixing buffer space (Spec.16:10-12; 19:16-17;22:15-16; 23:3-4)."* ***are taken out of context and disregarded the following key points:***

① Based on the plain meaning, the term *"in the downstream location of* the catalyst cooler*"* means that "downstream of catalyst cooler before the riser reactor" (see *page 4 (Appx173),* ***line 21-22 and 24-26*** *of the originally-filed Specification),* which clearly indicates that "the catalyst mixing buffer space" is set in the downstream location of the catalyst cooler; however, the Board, *taken out of context,* **altered** mistakenly *"**in the downstream location** of the catalyst cooler"* **into** *" **the downstream portion** of the catalyst cooler"* **which has no basis in fact and Examiner did not think so.**

② As the four non-limited example (see *page 16 (Appx185), line 10-12; page 19,line 16-17;page 22, line 15-16; page 23,line 3-4)* of the originally-filed specification, it is clearly recited that *"…… and the regenerated catalyst after being cooled enters the mixing and buffering space 9A…….*", which clearly indicates that *"the catalyst mixing buffer space 9A/B"* is a downstream space that is independent and separate from the catalyst cooler 8A/B; however, **the Board, *taken out of context,* disregarded the above description**.

③ In fact, based on the description of *the page 15,line 28* ***to*** *page 16,line 9, the page 18,line 1-13***,** *the page 21,line 13-27* **and** *the page 25,line 20* ***to*** *page 26,line 4 of the originally-filed Specification, the catalyst cooler* ***(8A/B)*** and *the catalyst mixing buffer space* ***(9A/B)*** in the attached drawings1-4, **are *two different equipment having the same diameter only*** *(See Table 3 on Appx646 and Annexes 51-54 (Appx647-698))*, and **the two constitute *an integrated device**, that is, the heat-taking equipment.*

**Note:** ① For better format and clarity ,the above paragraphs were amended in the Response submitted on Sept. 14, 2021. Support for this amendment be found throughout the original specification of the application, including Figs. 1-4.

② *the reference number "9A" indicating the lower mixing buffer space is recited literally in the original PCT International Publication, but the reference number "9A" was inadvertently omitted in the English translation of the present application).*

Feature 2 should be interpreted on the basis of paragraphs 0016, 0017 of Specification ***(i.e.*** *page 4, line 21- 22 and 24-26 of the originally-filed Specification)* of the present application; because the appended Fig.1-4, as four specific embodiments, are the non-limiting examples, rather than the restriction.

***MPEP §2111.01 II:***

***a particular embodiment*** *appearing in the written description* ***may not be read into a claim*** *when the claim language is broader than the embodiment." Superguide Corp. v. DirecTV Enterprises, Inc., 358 F.3d 870, 875, 69 USPQ2d 1865, 1868 (Fed. Cir. 2004).*

***The arrows*** *in the catalyst channels (10A,11A, etc.) in the appended drawings 1-4* ***show the flow directions of the catalyst. Therefore, the terms "lower part" and "downstream" are substantially different at all.*** *The* ***term*** *"downstream" means that can be arranged alone* ***in any location*** *that is* ***after the cooler and before the riser reactor;*** *of course, "downstream of the catalyst cooler"* ***includes "in the lower part*** *of the integrated device* ***i.e., the heat-taking equipment."***

Apparently, in the present application, the term *"catalyst mixing buffer space"* is ***in a downstream location*** independent and separate from the catalyst cooler. In Fig. 1-4 of the present application, particular reference numbers9A and 9B have been specifically identified.

***MPEP §2111:***

- *The broadest reasonable interpretation* ***does not mean the broadest possible interpretation. Rather,*** *the meaning given to a claim term must be consistent with the ordinary and customary meaning of the term (unless the term has been given a special definition in the specification), and* ***must be consistent with the use of the claim term in the specification and drawings.*** *Further, the broadest reasonable interpretation of the claims* ***must be consistent with the interpretation that those skilled in the art would reach.*** *In re Cortright, 165 F.3d 1353, 1359, 49 USPQ2d 1464, 1468 (Fed. Cir. 1999)*

● **As to Board' assertions** *(see line 6-13 of 1st full paragraph in page 7 (Appx8) of the Decision),* taken out of context, that *"The Specification does not provide any particular structure of the mixing buffer space other than it being a lower part of the catalyst cooler. Indeed, the Specification discloses the catalyst coolers are "traditional industrial equipment" (Spec.7:8). Appellants does not disclose any modification of the traditional catalyst coolers to create a mixer buffer space. This disclosure appears to indicate that catalyst coolers having a lower region that functions as a mixer buffer space were conventional in the art.".*

**Here, Appellants respectfully emphases the following three arguments:**

① Based on *the plain meaning* of the word " *mixing" and " buffer",* ***"a catalyst mixing buffer space"*** includes a functional limitation, *that is "for blending and buffering the cooled catalyst"* ***itself*** to get a uniform and stable temperature, which is ***well-known*** to those skilled in the art.

② Based on *the page 7, line 8-14 in the originally-filed Specification* of present application, the structure and the operating parameter etc. of the catalyst cooler ***including the location of*** *the fluidizing medium distributor* is ***also well known*** *to those skilled in the art.*

③ **The size calculation** of *the catalyst mixing buffering space*, ***well-known as common knowledge, is determined*** *by the strictly following control requirements* of *reaction temperature* of downstream reactor *(see Table 2 on Appx582 and Annexes 46-48 (Appx615-630))*, ***rather than an arbitrary dimensions***, which is ***also well-known*** to those skilled in the art.

Therefore, Examiner splits excessively Feature 2 (almost splits to the extent *"technical term-levels"*, such as *"catalyst"*, *"downstream of"* and *"mixing buffer space"*, etc.). However, the above "over-splitting" does not even reflect the sequence, function of the above basic steps, is incorrect under MPEP§2142, and is ***"Impermissible Hindsight"*** under MPEP§2145 X.A and MPEP§2143 A,C,E .

**3. Therefore, the Board also asserted (*see the statement in page 10 (Appx780) of the previously Appeal Decision dated October 8, 2020*):** *"To the extent that paragraphs 16 and 17 of Specification may somehow be understood to disclose a mixing buffer space that is in a location independent and separate from the catalyst cooler, such a feature is not recited in claim 1, and, therefore, constitutes an unclaimed embodiment."*.

4. NO documentary evidence **including Li,** teaches or suggests the claimed Feature 2 and the problem to be solve and function/results of Feature 2.

Therefore, it is not in conformity with MPEP§2125 that Examiner anticipates, infers or speculates that *"Li discloses the claimed Feature 2"* by comparing merely Fig. 2 of the present application with Fig. 1 of Li, because they are totally different.

**<u>MPEP§2125</u>:**

> *Drawings and pictures can anticipate claims if they clearly show the structure which is claimed. In re Mraz, 455 F.2d 1069, 173 USPQ 25 (CCPA 1972). However,* ***the picture must show all the claimed structural features and how they are put together.*** *Jockmus v. Leviton, 28 F.2d 812 (2d Cir. 1928).* ***When the reference is a utility patent,*** *it does not matter that the feature shown is unintended or unexplained in the specification.* ***The drawings must be evaluated*** *for what they* ***reasonably disclose*** *and* ***suggest to one of ordinary skill in the art.*** *In re Aslanian, 590 F.2d 911, 200 USPQ 500 (CCPA 1979).*

Therefore, **Board's findings** *(see page 7 (Appx8), lines 4-5 from the bottom)* that *"the Examiner's finding that the lower part of Li's catalyst cooler 8A or 8B is considered a mixing buffer space is reasonable."*, **is a miscomprehending and *"Impermissible Hindsight"*** under MPEP §2145 X.A.

① There is **NO written record** as to *"the catalyst mixing buffer space"* (nowhere *"a lower space"of* or *"downstream of" the catalyst cooler*) in all prior art and common knowledge (including Li) . Li shows only *"a fluidizing medium enters the lower part of the catalyst cooler* by a fluidizing medium (35A/B) distributor" and ***fails to disclose the downstream (or axial) space,*** because *the fluidizing gas (35A/B) distributor in Li* ***could be set at the radial gap*** between the two heat-exchanging

elements, or between the heat-exchanging element and the wall *(see Table 3 on Appx646 and Annex 51-54 (Appx647-698)).*

● USP 5066627 is an example that there is no any vertical space or gap at the bottom of Cooler.

② There are many types of structure (*such as up-flow mode and down-flow mode etc.*) and connection structure for the catalyst cooler *(see* ***Para. 0029 of Specification*** *of the present application* ***i.e. Page 7 (Appx176), lines 8-14 of the originally-filed Specification*** *of the present application*）.

**For the "up-flow mode",** ***due to the catalyst flows from down to up, the "downstream of" means at "a top of cooler", rather than "at a bottom of cooler".*** (please see Page 29,30,31 (Appx50-51) of PPT)

That *"no downstream axial space" and "use of an up-flow mode"*, are not claimed limitations, but this do prove that *"Li has a downstream axial space" is just* ***a probability or possibility.***

> **See** "…… Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.'" ***In re Robertson,*** *169 F.3d 743, 745, 49 USPQ2d 1949, 1950-51 (Fed. Cir. 1999).*

5. Many textbooks *(see table 2 on Appx582 and Annexes 7-10 (Appx583-614))* state that "an external heat exchanger (i.e. common catalyst cooler) is isothermal (i.e. temperature is uniform)" since 1940s, which means that *the catalyst mixing and buffering space is* ***"superfluous, or useless"***, and therefore, **teaches away from Feature 2.**

But as to the above ***"teaching away" reiterated*** many times by Appellants *during Previous Procedures* such as *AFCP, Preappeal and Previous Appeal(****the Previous Board disregarded also****) etc.,* Examiners have not considered by any documentary evidence and Board disregarded also, therefore it is insufficient under MPEP§2144.03 A,C,E. Those are all the prosecution errors resulting in the miscomprehending on the factual assertions and findings. Accordingly, ***it is wholly inappropriate*** for the Examiner and Board to disregard the above-mentioned common knowledge and Appellants' arguments that the Examiner is engaging in *"impermissible hindsight"* or that the prior art *"teach away"* from the claimed Feature 1.

In view of the above, Feature 2 is a typical example of which the technical problem, existing indeed in production practice and being neglected for a long time, has been solved by the use of common knowledge (in the chemical field) which has been abandoned because of technical prejudice in FCC field, therefore, *the claimed Feature 2 is non-obvious* over Li .

*See Table 2 on Appx582 and Annexes 7-10, 46-48 (Appx583-614, 615-630), Table 3 on Appx646 and Annexes 51-54 (Appx647-698) and their indications.*

**However, Examiner and Board disregarded the above key fact or Arguments for rebutting the Final Rejection by Examiner, which is a prosecution error.**

For details, as to non-obviousness and patentability of the claimed Feature 2 over Li, please see page 29-37 (Appx50-54) of PPT, page 19-23 (Appx132-36) of Appeal Brief, and page 8-14 (Appx86-92) of Reply Brief.

**v. As to Objective Evidence**

Appellants respectfully emphasizes that Examiner disregards or overlooks the six Objective Evidence including three Opinion Evidence under *MPEP §716.01(c)III*, and the three Objective Evidence of non-obviousness under *MPEP §716.02(a)I, §716.03, §716.04*, all is supported by Annexes 11-43 (Appx364-552).

The only excuse in Examiner's Answer (see page Appx109-111） is that "***Li** discloses the claimed Feature 1 and Feature 2",* **but without any rationale and any documentary evidence to support.**

Therefore, it is NOT adequate under MPEP §716.01, 716.01(a) and §2145.

However, Board, *except for "Commercial success",* disregarded all above-mentioned Objective Evidence of nonobviousness under MPEP 716.01 also, which are the prosecution errors.

For details, as to six "objective evidence", please see page 79-86 (Appx75-78) of PPT, page 24-28 of Appeal Brief, and page 14-18 of Appeal Brief.

As discussed in MPEP § 2144, *relying solely on case law as the rationale to support* without any fact or documentary evidence, the seven recited case law by Board, would not be appropriate.

1. **As to Annexes 11-43 (Appx364-552) – to support the criticality or unexpected results over Li**

The Decision on appeal has NO comment or only one *general* sentence *(or one general statement)* on the following ***foue key facts and arguments,*** all of which should ***belong to "overlook"*** .

① All the submitted evidence about common knowledge (Table 1 on Appx267-271 and Annexes 1-6, , 49, 50 (Appx272-363, 553-567, 568-581), *filed on Jan.17, 2018*), *and Objective Evidence (*Annex 11-43 (Appx364-552), *filed on Jan. 23, 2021*), prove that:

a. unexpected results of Feature 1 over Li;

b. three "teach away" from Features 1;

c. For the first time, this present application realizes "independent control of the catalyst-oil ratio" in the commercial unit in the field, and truly solves the world-wide technical problem that people have been eager to solve but have never been successful, which has plagued the field for more than 40 years;

As discussed above, Appellants respectfully reiterates that *the unexpected results drive from the claimed invention, and flow from the function and the advantage disclosed or inherent in Specification, and accords with the scope and the contents of the present invention, which is supported also by all documentary evidence* (*see Annexes 11-43 (Appx364-552)*) , *as follows:*

*The multi-parameter overall optimization of the present invention brings out* a *unexpected synergetic effect in commercial running, for example:*

● The running result of a unit *with capacity of 1.0 million ton/year* shows *that there is a great increase in the profit of 166 million RMB annually* and *the payback period of invest* is about *1.0 month (normally more than 5 years) (see Annex 32 (Appx496-500));* ***and***

● The running result of a unit *with capacity of 1.4 million ton/year shows that there is a great increase in the profit of 185 million RMB annually,* and *the payback period of invest* is about *1.5 months (normally more than two years) (see Annex 28 (Appx476-480)).*

Appellants respectfully indicate that *the above* ***difference of 40-60 times in profit*** *as different as before,* ***<u>much greater than those</u>*** *which would have been expected from the prior art to an unobvious extent, are of a significant, practical advantage, so the claimed claim 1 possesses non-obviousness and patentability under MPEP §716.02(a) I.*

② This present application's great commercial successes can be proved by the second prize of Chinese National Science And Technology Progress Award. The technical features of the awarded project *(Annex 11,12 (Appx364-367))*, the sci-tech novelty search report *(Annex 13-17 (Appx368-442))*, the industrial application results of users *(Annex 25-39, 42, 43 (Appx459-530, 543-547, 548-552))*, and the experts' evaluation opinions *(Annex 18, 21-24, 40 (Appx443-447, 448-458, 531-535))*, are completely consistent with the features 1 and 2 of claim 1 of the present application.

③ All the submitted evidence about common knowledge (Table 2 on Appx582 and Annexes 7-10,46-48 (Appx583-614, 615-630), *filed on Jan.17, 2018*; Table 3 on Appx646 and Annexes 51-54

(Appx647-698), *filed on Jan. 23, 2021*), *and objective evidence (*Annex 11-43 (Appx364-552), *filed on Jan. 23, 2021*), prove that:

**Each commercial unit has the claimed Feature 2 "downstream catalyst mixing buffer space" which is proposed by the present application for the first time.**

The two distinguishing features of claim 1 of the present application are complementary and inseparable. They are interrelated and interact in the technical sense.

They work together to solve a technical problem, that is, to improve the controllability, flexibility, reliability and stability of the device operation. Therefore, they should not be treated separately and isolated, ***but as a whole.***

**④ Since the technical effect of the present application is far better than that of Li.** Nobody is willing to adopt Li after the successful operation by using the present application. By the end of 2014, the invention claimed in this application has been applied to 15 commercial units and achieved great commercial success.

The above commercial success is not caused by the improvement of sales technology and advertising, but from the present invention, the scope of claim 1, and the functions and advantages of the distinctive Feature 1 as recited in the specification (adopting a more suitable reaction temperature,) and the inherent functions and advantages of the distinctive Feature 2 (improving the controllability, flexibility, reliability and stability of the operation).

**Appellants respectfully indicate that the Board, as did the Examiner, overlooked the above objective evidence (Item I ),** ***only by one sentence of no relevance*** without any detailed analysis and written evidence to support, which is NOT appropriate under MPEP§716 and MPEP§2144.03 C.

2. **Appellants respectfully indicate also that *there is no comment in the Board Decision on the above*** *Item ii and iii,* which is also NOT appropriate under MPEP§716 and MPEP§2144.03 C. **As to Commercial success**

The Board added **new arguments**, *i.e. new ground,* against the Appellants' commercial success arguments.

Specifically, the Board alleges that "they do not show the relative market share of the 15 commercial units in this industry", "Gross sales figures do not show commercial success absent

evidence as to market share", and "the evidence provided also does not show or address the time period during which the product was sold or as to what sales would normally be expected in the market".

**Appellant respectfully reiterates** the following arguments to traverse the above new arguments: Appellants' *previously provided evidence* shows that *the "relative market share" of the present invention* ***is 100% over Li,*** because **"**there is ***No one to adopt Li*** *after 2008"*. **See page 82 (Appx76)** of PPT **and Annexes 11-43 (Appx364-552).**

**Therefore, the above assertions and finding in the Decision on appeal is at all wrong.**

**3. As to <u>Long-Felt Need and Failure of Others</u>**

**Appellants respectfully reiterates the following key points:**

① the results of several Sci-tech search reports show that, there are no report for successful commercial application of Others' technology in the world (see Table 1 and Appendix 5 i.e. Annex 17 **on Appx 437-442**, Annexes 13-16, 25-43 (Appx368-436, 459-552) ) .

② the Others (such as US 4,396,531, US 6,059,958, and CN1288933A etc.) have failed in the research and exploration on commercial application;

③ Li, with the poor operability in commercial unit, dose not really realize "freely independent control of the catalyst-to-oil ratio" because of the mutual interference between the two catalyst coolers existing inherently in Li, **there is No one to adopt Li after 2008** (see Table 1 on Appx267-271, Appendix 5 (i.e. Annex 17 on Appx437-442), and Annexes 13-16, 25-43 (Appx368-436, 459-552) ). Therefore, **Li had failed in commercial application also.**

④ **Annex 1 (Appx272-282), page 319+**Annex 3 (Appx292-306) (see page 877-878) +Annex 4 (Appx307-338), page 139, prove that the catalyst-to-oil ratio has been always a non-independently adjustable variable *(parameter).* It is the present application solves the problem that people have been eager to solve but have never succeeded ***for more than 40 years,*** thereby ***realizing the freely*** independent control of the catalyst-to-oil ratio ***in commercial unit in the world for the first time.***

⑤ It is the present application that solves the technical problem that people have been eager to solve but have never succeeded for more than 27 years from the filling date of US 4,396,531, filed on Aug. 13,1981 (see Table 1 on Appx267-271 and Appendix 1-8 (Appx443-447, 531-535, 457-458, 366-367, 437-442, 448-456), filed on October 19,2015, and two declarations by Li, filed on January 17,2018 and March 23, 2018 (Appx254-264)).

**Therefore, the Board' finding in the Decision on appeal** as to *"the long standing need has*

*been fulfilled by Li"* (see page 13 (Appx14),line 2) **is at all wrong.**

**4. As to Five Declaration**

Li's declaration *filed on March 19, 2018* has a detailed comparative analysis of the technical solutions and effects of the present invention and Li, and ***declare the authenticity of all evidences*** (including all common knowledge evidence Annexes, annex 1-6,7-10,46-48,49,50 (Appx272-344, 583-641, 615-645, 553-567, 568-581) and objective evidence, Annexes 11-43 (Appx364-552) and ***their relevance*** (see Item 4A on Appx264).

Examiner have not been considered with any documentary evidence, therefore it is insufficient under *MPEP §2144.03 A, B, C.* Board disregarded also the above key facts *and Arguments* for rebutting *the Final Rejection* by Examiner, **which is a prosecution error.**

The excuse in the Decision (see line 1-5 of 1st full paragraph of page 11 (Appx12)) is that *"several declarations are in a rather skeletal and conclusory fashion* ***because Li teaches all limitations*** *on which Appellants relies as critical or significant.",* but without rationale and documentary evidence to support, therefore, the recited ***case law by Board*** would not be appropriate under MPEP§2144.04.

Here, Appellants respectfully emphases that the above four declarations Under 37 C.F.R. 1.132 were made herein of their own knowledge *after they* ***have reviewed and understood the following 6 references:*** CN1664074A ***(i.e. Li)***, U.S. Patent No. 5,019,353, US Patent No. 4830728, U.S. Patent No. 6,059,958, U.S. Patent No. 4,396,531 and U.S. Patent No. 2,531,356, ***as the basis for rejections by Examiner set forth in the Office Action*** *(see Item 4 in page 1-2 of two declarations (Appx240-241, 247-248) )**, and that all*** above four Declarations, having been compared the claimed Features 1&2 with Li in details, **are not** *"in a rather skeletal and conclusory fashion".*

① **Zhang's Declaration** (7 pages, filed on Oct. 23,2015) declares: The criticality and non-obviousness of claim 1 and its distinguishing Feature 1 *(see Item11 in page 4 (Appx243) and items No. 13 and 14 in page 5-7 (Appx244-246)),* and the criticality and non-obviousness of distinguishing Feature 2*(see the 1st full paragraph (Item 12) in page 5 (Appx244)).*

② **Gao's Declaration** (7 pages, filed on Oct. 23, 2015) declares also: The criticality and non-obviousness of claim 1 and its distinguishing Feature 1 *(see Item 11 in page 4 (Appx250) and items No. 13 and 14 in page 5-7 (Appx251-253)),* and the criticality and non-obviousness of distinguishing Feature 2

After having reviewed and understood the following ***6 references:*** CN 1664074 (i.e. Li-patent), U.S. 5,019,353 to Harandi, US 4830728 to Herbst, U.S. 6,059,958 to Ramos, U.S. 4,396,531 to Lomas and U.S. 2,531,356 to Evans, which are ***the basis for rejections set forth in the Office Action*** regarding independent claim 1, Zhang and Gao declare the *Criticality and Non-obviousness of the claimed **Feature 1 and Feature 2** of Claim 1* over Li, according to Specification and Claim 1 of present invention.

**The key points of two Declaration by Zhang and Gao, as follows:**

**a.** By means of regenerated catalyst cooling technology, *under the requirement of chemical equilibrium ,* the present invention puts forward for the first time, which uses *'suitable large catalyst-to-oil ratio and suitable low reaction temperature'* to realize *the multi-zone optimization* of FCC reaction and *optimal control of reaction extend,* further realizing *overall optimization of the whole reaction and regeneration process.* As a result, this can help restrain greatly the unideal reactions such as over-cracking, thermal cracking and thermal condensation etc., and enhance greatly ideal reactions such as catalytic cracking, isomerization and aromatization etc. with high selectivity, and promote the reaction selectivity , so as to reduce coke and off-gas yield.*(see Item 11 in page 4 (Appx243, 250))*

b. In order to do so (as above Item A), *the means for making the temperature of the cooled regenerated catalyst* from the regenerated catalyst cooler *adjustable is critical,* because the cooled regenerated catalyst exiting the mixing buffer space is directly fed to each reaction zone.

The said mixing buffer space downstream of the catalyst cooler can help control *precisely the temperature of the cooled regenerated catalyst* exiting the catalyst cooler, so as *to help control precisely the reaction temperature* of riser reactor, which *is critical, also. (see Item 12 in page 5 (Appx244, 251))*

c. Li neither pays attention especially to overall optimization for both each reaction-zone of the RISER and the whole reaction and regeneration process, nor points out especially that *the 'suitable lower reaction temperature'* could bring huge technical and economic effects. *(see Item 13, from last line 1 in page 5 (Appx244,251) to line 4 in page 6 (Appx245, 252))*

d. Li neither sets the mixing buffer space to get uniform and stable temperature in the downstream of the catalyst cooler as recited in claim 1. *(see Item 13, lines 11-12 in page 6 (Appx245, 252))*

**Therefore, Li does not disclose, teach or suggest *the claimed Features 1& 2* of Claim 1.**

③ **Li's Declaration** (7 pages, filed on Jan. 17, 2018), based on Common Knowledge (Annex 1-6,7-10, 46-48 (Appx272-344, 583-641, 615-645),etc.) and Evidence(Annexes11-43,49,50 (Appx364-552, 553-567, 568-581)) also, declares that criticality and non-obviousness of distinguishing Feature 1 *(see Item 2 on page 1/7 (Appx254) to Item 3 on page 3/7 (Appx256)),* and criticality and non-obviousness of distinguishing Feature 2 *(see Item 4 on page 3/7 to Item 5 on page 5/7 (Appx258));* and

a. Non-obviousness of claim 1 should be evaluated as a whole *(see Item 6 on page 5/7 (Appx258))*;

b. "the unexpected results under MPEP §716.02" *(see Item 8 on page5/7 to page 6/7 (Appx259))*;

c. "a Commercial Success under MPEP §716.03"*( see Item 9 on page 6/7 to page 7/7 (Appx260))*;

d. "Long-Felt Need and Failure of Others under MPEP §716.04"*(see Item 7 on page 6/7 (Appx259)).*

④ **Li's Declaration** (Appx261-264, 4 pages, filed on March 19, 2018), based on Common Knowledge (Annex 1-6,7-10, 46-48,49,50 (Appx272-344, 583-641, 615-645, 553-567, 568-581) etc.) and Evidence (Annex 11-43 (Appx364-552)) also, declares that:

a. The criticality and non-obviousness of distinguishing Feature 1 (see Item 3 from page 3/4 (Appx263) to page 4/4(Appx264)), and the criticality and non-obviousness of distinguishing Feature 2 (see Item 1 on page 2/4 (Appx262) to Item 2 on page 3/4 (Appx263)); and

b. The authenticity and relevance of all evidence (Annex 1-50, including evidence (Annex 11-43) (see Item 4A on page 4/4 (Appx264));

c. *"commercial success"* under MPEP 716.04 and *"Long-felt need and failure of others"* under MPEP 716.04 (see page 4/4 (Appx264), Item 4b-4e).

Here, Appellants respectfully indicate that **the facticity of all objective Evidences** (i.e. Annex 11-43 (Appx364-552), including Appendix1-8 (Appx443-447, 531-535, 457-458, 366-367, 437-442, 448-456), filed on Oct.19,2015 and Annexes 11,13-16,25-40,42-43 (Appx364-365, 459-535, Appx543-552), as further corroborating evidences for the filed Appendix 1-8) **and nexus with the present invention, is supported also by the declaration by Li** (see line 5-10, Appx264, filed on March 19, 2018).

⑤ **Li's Declaration** submitted *on Sept.14,2021*)

Two sets operation data of a **commercial unit together prove** that there is **indeed a radial temperature difference** (up to 139.7 ℃) **caused by a non-uniform or abnormal flow and heat-exchanging** etc. in the catalyst bed of the catalyst cooler using the present application. But the temperature of the cold regenerated catalyst into the riser, after the mixing and buffering by the patented catalyst mixing buffer space of the present application, **has been mixed itself evenly, thereby fully meeting the control accuracy requirements** of the reaction temperature optimal control of riser reactor. (**See Li's Declaration** submitted *on Sept.14,2021*)

By the end of 2014, there are totally 15 sets of commercial units using the present application, all of which can run smoothly for a long period with safety and stability.

Here, **Appellants respectfully reiterates that** the above-mentioned criticality are supported by four declaration by Zhang, Gao, and Li, **have not been considered by examiners and by Board** without any documentary evidence

Here, Appellants respectfully reiterates that the evidence (Annex 11-43 (Appx364-552)) contains **13 industrial experiments or operation data** (to be added to Table 1 (Appx267-271)) which prove the technical effect of the claimed Feature 1 and Feature 2, which also proves the non-obviousness of the technical solution and claim 1 of the present invention.

**5. OPINION EVIDENCE under MPEP §716.01(c)III:**

See also *In re Oelrich,* 579 F.2d 86, 198 USPQ 210 (CCPA 1978) (*factually based expert opinions on the level of ordinary skill in the art were sufficient to rebut the prima facie case of obviousness*);

The following 3 Opinion Evidence, supporting by *the running results* of more than 6 years operation of *15 commercial units*, are factually based expert opinions on the level of ordinary skill in the art *and are sufficient to rebut the prima facie case of obviousness.*(see Annex 25-39,42-43 (Appx459-530, Appx543-552))

① In June 2015, *Passed Appraisal of the Identification Committee* led by Yang Qiye (*Academician from Chinese Academy of Engineering*), that 'the innovativeness of the technology is outstanding and at international leading level' (See *the underlined par*t of *Appendix 1 i.e. Annex 18 on Appx443-447*) . ***The members*** *of the Committee are all senior engineer, senior professor, senior researcher* ***from Sinopec, CNPC, Tsinghua University, and Chemchina, etc..***

② In Feb. 2015, having obtained high praise of Identification Committee led by Jin Yong (Academician from Chinese Academy of Engineering) that *'The technology innovation is outstanding and at the international leading level'*. (*See the underlined part of* Appendix 2 *i.e. Annex 40 on Appx531-535*)

③ High praised by Chen Bingzhen, Academician from Chinese Academy of Engineering, in July 2015'…, In view of this problem, the present invention…, puts forward 'FCC process with cooled regenerated catalyst recycling technology'…, ***which solves the worldwide problem by optimizing the above operation parameters***, …'(See *the underlined part* of Appendix 8, i.e. Annex 24 on Appx457-458, the opinions by Chen Bingzhen, Academician from Chinese Academy of Engineering).

Therefore, the Board' Finding in the Decision on Appeal is wrong also, and should be withdrawn.

Accordingly, independent claims 1, 13, and 20 are all patentable under pre-AIA 35 U.S.C. § 103(a) over Li. The same reasons are also applicable to the remaining depending claims.

Accordingly, reconsideration and withdrawal of the rejection of Claim 1,13,20 under 35 U.S.C. § 103(a) are respectfully requested.

**VI. As to claim 6,16, 22 and other claims**

Appellants submits that claims 6, 16, and 22 are separately argued.

Appellants respectfully indicate that Li uses only single-parameter adjustment of the catalyst-to-oil ratio to realize the control of reaction temperature.

There is no evidence including Li which discloses or suggests that the reaction temperature is controlled by the adjustment of the temperature of the cooled catalyst or the cold regenerated catalyst mixture, nor the combined control of the multi-parameters to realize the optimal control and accurate control of reaction temperature (See para. 0024 (Appx216) in specification of the present application).

The criticality or unexpected results of claim 6,16 and 22 over Li, is also supported by five declarations by Zhang, Gao, and Li, which have not been considered also by Examiners with any documentary evidence.

Therefore, the claim 6, 16, and 22 are non-obvious and patentable over Li.

Appellants respectfully emphases that Board affirmed the Examiner's finding without any documentary support, which is NOT appropriate.

All other Claims (Claims 2-5,7,10,14-15,17-19,21,23 and 24-31 are non-obvious and patentable over Li.

Accordingly, all other Claims (Claims 2-5,7,10,14-15,17-19,21,23 and 24-31) under 35 U.S.C. § 103(a) are respectfully requested.

## VII. Conclusion

Therefore, Appellants respectfully submits that the obviousness rejections of claims 1, 13, and 20 under 35 USC 103 should be reversed because the Examiner and Board have failed to present a *prima facie* case of obviousness which addresses all of the limitations of these independent claims. The same reasons are also applicable to the remaining depending claims.

For the foregoing reasons, Appellants respectfully request that this Court reverse the Board's decision.

Last but not least, the present application has been examined for more than 11 years. If there is something unclearly, Appellants request respectfully the Board to give another opportunity for inventor to make a specific presentation or explanation in Writing, or by E-mail in five days.

Any questions regarding this Appeal can be directed to Qunzhu Li, one of the inventors, at +86-13511013479, or via email: ha8528@163.com.

Respectfully submitted,

Dated:__April 9, 2024

By:_/s/_Li Li__ _______
Li Li

By:_/s/_Qunzhu Li_____
Qunzhu Li

5-1101, Building 1st, No. 5, Lianmeng Road,
Jianxi District, Luoyang Henan Province

471003, P. R China
+86-13511013479
45993.02@gmail.com; 45993.01@gmail.com
ha8528@163.com

# ADDENDUM

| Date | Description | Appx. Nos. |
|---|---|---|
| 2023/5/22 | Decision on Appeal | Appx1-15 |
| 2023/5/15 | An Oral Hearing was held on April 25, 2023. | Appx16-35 |
| 2022/10/5 | A Reply Brief was filed on October 5, 2022. | Appx79-96 |
| 2022/8/5 | An Examiner’s Answer was issued on August 5, 2022. | Appx97-113 |
| 2022/4/21 | An Appeal Brief was filed on April 21, 2022. | Appx114-156 |
| 2022/3/24 | A Notice of Appeal was filed on March 24, 2022. | Appx157-158 |
| 2021/12/24 | A Final Rejection was issued on December 24, 2021. | Appx159-169 |
| 2012/8/1 | The Originally-Filed Specification was filed on August 1, 2012. | Appx170-209 |
| 2012/11/29 | The Specification was published on November 29, 2012. | Appx210-224 |
| 2023/10/4 | A Decision on Request for Rehearing dated October 04, 2023 | Appx225-238 |
| 2022/4/21 | Claim Appendix on Appeal | Appx787-795- |

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/576,565 | 08/01/2012 | Li Li | GBLYGX001-APPEAL | 8815 |

98346 7590 05/22/2023
Bayramoglu Law Offices LLC
Bayramoglu Law Offices LLC
1540 West Warm Springs Road
Suite 100
Henderson, NV 89014

| EXAMINER | |
|---|---|
| DOYLE, BRANDI M | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1771 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/22/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

gokalp@bayramoglu-legal.com
in@bayramoglu-legal.com

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* LI LI and QUNZHU LI

---

Appeal 2023-000079
Application 13/576,565[1]
Technology Center 1700

---

Before JEFFREY T. SMITH, MICHAEL P. COLAIANNI, and DEBRA L. DENNETT, *Administrative Patent Judges.*

COLAIANNI, *Administrative Patent Judge.*

DECISION ON APPEAL

STATEMENT OF THE CASE

Pursuant to 35 U.S.C. § 134(a), Appellant[2] appeals from the Examiner's decision to reject claims 1–7, 10, 13–25, 27, 29, 31–33. *See* Final Act. 1. We have jurisdiction under 35 U.S.C. § 6(b). Oral arguments were heard in this appeal on April 25, 2023. A transcript of the oral argument will be made available in due course.

We AFFIRM.

---

[1] This application was the subject of Appeal No. 2016-003658 in which the Board affirmed the Examiner. We incorporate the content of that decision into our present decision.
[2] "Appellant" refers to "applicant" as defined in 37 C.F.R. § 1.42. Appellant identifies the real party in interest as Qunzhui Li And Li Li. Appeal Br. 3.

CLAIMED SUBJECT MATTER

The claims are directed to method and equipment for circulating cooled regenerated catalyst. Claim 1, reproduced below, illustrates the claimed subject matter:

> 1. A method for circulating a cold regenerated catalyst, comprising:
>
> reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, wherein the one riser reactor comprises only one reaction zone or at least two reaction zones;
>
> separating the gas and oil products from the reacted catalyst in a settler, stripping the separated catalyst in a stripping section;
>
> burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;
>
> cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use;
>
> wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

REFERENCES

The Examiner relies on the following references to reject the claims:

| Name | Reference | Date |
|---|---|---|
| Palmas | US 2010/0152515 A1 | Jun. 17, 2010 |
| Li Qunzhu | CN 1664074 | Sept. 7, 2005 |

## REJECTIONS

The Examiner maintains the following rejections:

1. Claims 1–7, 10, 13–25, 27, 29, 31, and 33 under 35 U.S.C. § 103 as unpatentable over Li[3].
2. Claim 32 under 35 U.S.C. § 103 as unpatentable over Li in view of Palmas.

Appellant separately argues independent claims 1, 13, and 20 and dependent claims 6, 16, and 22 under Rejection (1) (Appeal Br. 10–31). Any claim not separately argued will stand or fall with the independent claims (i.e., 1, 13, or 20) it ultimately depends from.

Although Rejection (2) of claim 32 is separately addressed in the Appeal Brief, Appellant merely relies on arguments made regarding Li with respect to claim 1 (Appeal Br. 33). Accordingly, the rejection of claim 32 will stand or fall with our analysis of the rejection of claim 1 over Li.

## OPINION

### REJECTION (1)

The Examiner's findings and conclusions regarding Li are located on pages 4 to 7 of the Final Action.

Appellant argues the Examiner misapplied the obviousness standard (Appeal Br. 10). Appellant contends the Examiner failed to address the use of cooled regenerated catalyst of one regenerated catalyst cooler to keep respectively the reaction temperature of each of the reaction zone or zones in an optimum value (Appeal Br. 12–13). Appellant argues the agent used to

---

[3] We rely on and refer to the English language translation of Li dated May 29, 2016 that is of record throughout this decision.

cool Li's riser reactor is called "cold shock," which implies wide temperature swings that would be outside the optimum value (Appeal Br. 13).

Appellant's argument is undermined because Li describes the "cold shock" agent as being cold regenerated catalyst which is fed to the riser reactor (Li 5, first full paragraph). Appellant uses cold regenerated catalyst as the feed material to control the temperature in the riser reactor zones. *See e.g.*, Spec. 7:18–23; 8:11–21). Accordingly, Appellant's argument is not persuasive given the identity of the material (i.e., cold regenerated catalyst) used to control riser reactor temperatures.

Appellant argues Li does not teach one regenerated catalyst cooler is used to adjust the reaction temperature of each reaction zone of the one riser reactor comprising at least two reaction zones (Appeal Br. 14). Appellant contends Li uses two regenerated catalyst coolers (i.e., 8A and 8B in Figure 1) that feeds cooled regenerated catalyst to two separate zones of the riser reactor, respectively (Appeal Br. 14, 17). Appellant argues the currently claimed invention differs from Li by removing catalyst cooler 8B and auxiliary riser 6 as shown on page 16 of the Appeal Brief. Appellant argues the Examiner's determination that Li implicitly discloses that one catalyst cooler is used to adjust the reaction temperature of each reaction zone of the one riser reactor is not supported by the documentary evidence and is based on impermissible hindsight (Appeal Br. 17). Appellant argues that omitting Li's catalyst cooler 8B but retaining its function is an indication of non-obviousness (Appeal Br. 17–18).

We are not persuaded by Appellant's arguments because Li teaches that a single catalyst cooler may be used (Li 2, last paragraph). That is, Li

states, "The regenerator is provided with *one* or more inside or outside heat taking apparatuses, that is, catalyst coolers." (emphasis added). Appellant does not dispute this teaching in Li (Appeal Br. *generally*). Rather, Appellant argues catalyst cooler B and corresponding auxiliary riser is required and catalyst coolers A and C are optional (Appeal Br. 15–16). In other words, Appellant argues that catalyst cooler 8B is the only single cooler required by the claims. Appellant argues that Li does not teach a single catalyst cooler is used to adjust the temperature of each reaction zone in the riser reactor comprising at least two reaction zones (Appeal Br. 14). However, Li teaches the cooled regenerated catalyst is sent from a catalyst cooler (e.g., 8A) as a feed to the riser reactor via transporting pipe 11A (Li 19, 1st full ¶ and 2nd ¶). Feeding the cold regenerated catalyst to the bottom of the riser reactor and into reaction zone 1 (ref. no. 3) would also feed the catalyst to reaction zone 2 (ref. no. 2) in Li's Figure 1 and adjust the temperature at some level within reaction zone 2 as the catalyst is sent through reaction zones 1 and 2 on its way to disengager 1 (Li, Figure 1). Although Li teaches that a second catalyst cooler 8B may be used to feed cold regenerated catalyst to reaction zone 2 of riser reactor 4 via auxiliary rising pipe 6 (i.e., transporting pipe) and pipeline 11B, we note that claim 1 uses the open-ended claim language "comprising" and does not exclude an additional catalyst cooler (e.g., 8A or 8B). Moreover, Li teaches that two or three cooler arrangement (8A, 8B, and 8C) does not limit Li to using other control equipment and control methods (Li 19, bottom of 2nd full paragraph; 20, bottom of 1st full paragraph).

Appellant further argues that Li fails to teach a catalyst mixing buffer space as recited in independent claims 13 and 20, which Appellant refers to

as Feature 2 (Appeal Br. 19). Appellant argues the Examiner's rejection is based on Li's figures and speculates about the step of blending and buffering the cooled and regenerated catalyst (Appeal Br. 19). Appellant argues there is no documentary evidence to substantiate the Examiner's assertion regarding Li's figures (Appeal Br. 20). Appellant argues the Examiner's determination that Li teaches blending and buffering the cooled regenerated catalyst is based on impermissible hindsight (Appeal Br. 20). Appellant argues Li's Figures show a fluidizing medium (i.e., 35a or 35b) enters the lower part of the cooler by a fluidizing medium distributor and does not show a downstream axial space where blending and buffering would have occurred (Appeal Br. 21). Appellant argues the present application clearly shows a separate and independent catalyst mixing buffer space 9A downstream of the catalyst cooler that blends the catalyst to avoid a radial temperature difference caused by non-uniform or abnormal flow and heat-exchanging (Appeal Br. 21).

As correctly noted by the Examiner, Appellant does not specifically define the scope of the term mixing buffer space in the Specification (Ans. 10). The Examiner finds, based on the context of how the phrase is used in the Specification, mixing buffer space means a lower region of the catalyst cooler in which the catalyst is combined (mixed) with the fluidizing media and withdrawn from the cooler (Ans. 10–11). The Examiner also looks at the plain meaning of the phrase mixing buffer space and determines the phrase can be interpreted as an area in the lower region of the shell/cooler designated for combining the catalyst with the fluidizing gas and/or hold up or space between the cooling tube and catalyst outlet, wherein the cooled catalyst particles together pass through as the catalyst particles travel from

the shell inlet in the upper region to the outlets in the lower base (Ans. 12). The Examiner finds there are no details regarding mixing in the claim that would require a uniform and stable temperature as argued by Appellant (Ans. 12–13). Based on the Specification and plain meaning of the words in the phrase "mixing buffer space" the Examiner reasonably determines that Li teaches such a space in the catalyst cooler in which cooled catalyst and the fluidizing gas mix before leaving the cooler (Final Act. 5).

The Specification states that the downstream portion of the catalyst cooler contains a "buffer space for the mixed buffer catalyst" (Spec. 4:21–22). The Specification describes catalyst cooler 8A as having fluidized media 35A, lifting media such as air, steam, etc., 36A, and taking-heat medium 37A (Spec. 16:4–9). The Specification describes a lower part of the catalyst cooler is the mixing buffer space (Spec. 16:10–12; 19:16–17; 22:15–16; 23:3–4). The Specification does not provide any particular structure of the mixing buffer space other than it being a lower part of the catalyst cooler. Indeed, the Specification discloses the catalyst coolers are "traditional industrial equipment" (Spec. 7:8). Appellant does not disclose any modification of the traditional catalyst coolers to create a mixer buffer space. This disclosure appears to indicate that catalyst coolers having a lower region that functions as a mixer buffer space were conventional in the art.

Therefore, the Examiner's finding that the lower part of Li's catalyst cooler 8A or 8B is considered a mixing buffer space is reasonable. Li shows a space between the fluidized media 35A, 35B and coil that circulates the taking-heat media 37A, 37B (Li, Fig. 1). The space is located in the bottom of the catalyst coolers and holds the catalyst before it is sent on to the riser

reactors or back to the regenerator (Li, Fig. 1). Neither the claims nor the Specification recite a size for the mixer buffer space. The Specification describes that regulating the fluidized media 35A in the mixer buffer space 9A of the catalyst cooler 8A controls the temperature of the cold regenerated catalyst (Spec. 16:13–17). Li discloses the temperature of the cold regenerated catalyst that leaves catalyst cooler 8A is controlled by regulating the flow rate of the fluidization medium 35A (Li 19, first full paragraph). Accordingly, Li's catalyst cooler functions in the same manner to control cold regenerated catalyst temperatures by regulating the fluidization medium 35A in the catalyst cooler located in the exiting region of the cooler. Therefore, Appellant has not shown that the space at the bottom of Li's catalyst coolers cannot be considered a mixer buffer space within the meaning of the claims.

*Claims 6, 16, and 22*

Claim 6 depends from claim 1 and recites:

> controlling the reaction temperature in the reaction zone of the riser reactor by adjusting a ratio of the cooled regenerated catalyst that enters the riser reactor and feed of the hydrocarbon materials that enter the riser reactor, adjusting the temperature of the cooled regenerated catalyst, using a multi-point feeding technology, adding a quenching agent to the riser reactor, or a combination thereof.

Claims 16 and 22 are identical to the subject matter of claim 6, except for their dependency.

Regarding claims 6, 16, and 22, Appellant argues Li uses only single-parameter adjustment of the catalyst-to-oil ratio to realize control of the reaction temperature (Appeal Br. 31). Appellant contends Li does not teach

using combined control of multi-parameters to control reaction temperature (Appeal Br. 31).

Contrary to Appellant's arguments, Li teaches controlling the reaction temperature in the reaction zones by using the cold regenerated catalyst, hot regenerated catalyst, cold shock agent 34, and the lifting medium 32 to control the temperature in the reaction zones (Li 19, 2nd full paragraph). Li discloses that the hot regenerated catalyst, cold regenerated catalyst, and lifting media are mixed with a hydrocarbon feed to achieve a desired equilibrium temperature. *Id*. Li teaches that other control methods and equipment may be used to control the reaction zone temperature. *Id*. Li teaches that injection point of cold shock agent 34 may be either upstream or downstream of the injection point of the cold catalyst or at the inlet of the auxiliary rising pipe 6 in order to conveniently control the temperatures of each of the reaction zones (Li 21, 4th full paragraph). Li teaches using different parameters to control the temperature of the reaction zones, which fall within the subject matter of claims 6, 16, and 22.

Appellant argues the following points regarding the Examiner's prima facie case: (1) the Examiner improperly relied on hindsight and personal understanding in making the obviousness rejection, (2) common knowledge shows that Li teaches away from the claimed invention, (3) expert opinion evidence has not been considered by the Examiner, (4) Examiner improperly relies solely on Figure 2 of the present application to Li's Figure 1 in rejecting the claims, and (5) Appellant successfully removed a catalyst cooler but retained its function which is an indicia of non-obviousness (Appeal Br. 30–32). We are unpersuaded by arguments (1), (2), (4) and (5) for the reasons discussed above in this decision. The Examiner's rejection

does not rely solely on Li's Figure 1 or impermissible hindsight, but rather cites to portions of Li's translation to support these findings based on Li's figures (Final Act. 4–7). Li does not teach away from Appellant's sending of cold regenerated catalyst to a riser reactor having two reaction zones to control the temperature in each of the reaction zones, or the use of a mixer buffer space for the reasons discussed above. Appellant's argument about removing a feature but retaining the feature's function is not persuasive because Li teaches a single catalyst cooler may be used and the claims do not exclude using more than one catalyst cooler. Regarding expert opinion evidence, the Examiner has considered that evidence but found it unpersuasive because Li teaches the claimed limitations argued to be non-obvious (Ans. 14).

We find the Examiner has established a prima facie case of obviousness with regard to claims 1–7, 10, 13–25, 27, 29, 31, and 33 over Li. We now consider Appellant's allegation of secondary considerations.

Appellant cites to voluminous annexes and declarations as showing secondary considerations (i.e., unexpected results, commercial success, and long felt need) (Appeal Br. 17–18, 22–23, 24–28). Appellant argues the "multi-parameter overall optimization of the present invention brings out an unexpected synergetic effect and huge "butterfly effect." (Appeal Br. 26). Appellant cites to an increase in profit for the plant with a payback on the investment of about 1.5 months instead of 5 years (Appeal Br. 26–27). Appellant further argues the invention has received praise from academicians of the Chinese Academy of Engineering and won second prize of the National Science and Technology Progress Award in 2015 (Appeal Br. 27). Appellant provides further argument regarding long felt need and

failure of others (Appeal Br. 27–28). Appellant argues the Sci-tech search reports show no report for successful commercial application of any other technology in the world (Appeal Br. 28). Appellant contends others such as US 4,396,631 and US 6,059,958 have failed in the research and exploration on a commercial application (Appeal Br. 28). Appellant contends no one in the industry adopted Li's catalyst cracker plant with two catalyst coolers after 2008 (Appeal Br. 28). Appellant contends that the industry has been eager to solve the reactor temperature control problem for more than 40 years, since the advent of the riser reactor (Appeal Br. 18, 28).

As we noted in our previous decision on pages 13 to 14, Appellant's reference to several declarations in a rather skeletal and conclusory fashion is insufficient because, as the Examiner explains (Ans. 14–15) and as we discussed above, Li teaches the limitations on which Appellant relies as critical or significant. *In re Kao,* 639 F.3d 1057, 1068 (Fed. Cir. 2011) ("[T]here is a more fundamental requirement that must be met before secondary considerations can carry the day. 'For objective evidence of secondary considerations to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the *claimed invention.'")* (internal citation omitted); *In re Baxter Travenol Labs.,* 952 F.2d 388, 392 (Fed. Cir. 1991) ("[W]hen unexpected results are used as evidence of nonobviousness, the results must be shown to be unexpected compared with the closest prior art. Mere recognition of latent properties in the prior art does not render nonobvious an otherwise known invention."). We reiterate from that decision, to the extent that the Appellant can substantiate that "[n]o one is willing to utilize the solution of [Li] since 2008," whereas a total of 15 commercial units were successfully

implemented from 2008-2014 (Second Li Decl. at 4 (emphasis removed)), such would merely demonstrate that something falling within the scope of claim 1 suffers from the same deficiencies as Li's method or system. Moreover, such conclusory statements in the declaration are entitled to little probative value as they are not accompanied by detailed comparisons and discussions as to what are being compared. *Cf In re Borkowski,* 505 F.2d 713, 718 (CCPA 1974) ("The affidavits for the most part consist of vague and general statements in the broadest terms as to what the exhibits show along with the assertion that the exhibits describe a reduction to practice. This amounts essentially to mere pleading, unsupported by proof or showing of facts."); *In re Lindner,* 457 F.2d 506, 508 (CCPA 1972) ("[M]ere conclusory statements in the specification and affidavits are entitled to little weight when the Patent Office questions the efficacy of those statements.").

We add that the Appellant's commercial success arguments are insufficient because they do not show the relative market share of the 15 commercial units in this industry. Gross sales figures do not show commercial success absent evidence as to market share. *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015 (Fed. Cir. 1985). The evidence provided also does not show or address the time period during which the product was sold or as to what sales would normally be expected in the market. *Ex parte Standish*, 10 USPQ2d 1454 (BPAI 1988).

Regarding Appellant's allegation of long felt need, we note that the long-felt need must not have been satisfied by another before the invention by the inventor. *Newell Companies v. Kenney Mfg. Co.*, 864 F2d 757, 768 (Fed. Cir. 1988). In this case, Li teaches subject matter of claims 1, 13, and 20 argued by Appellant. In other words, Appellant's claimed invention is

already taught or would have been suggested by the prior art, Li, and thus, the long standing need has been fulfilled by Li.

For the above reasons, we determine Appellant's evidence of secondary considerations when considered along with the Examiner's evidence of obviousness is insufficient to overcome the prima facie case of obviousness. We affirm the Examiner's obviousness rejections (1) and (2).

## CONCLUSION

The Examiner's rejections are AFFIRMED.

DECISION SUMMARY

The following table summarizes our decision:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1–7, 10, 13–25, 27, 29, 31, 33 | 103 | Li | 1–7, 10, 13–25, 27, 29, 31, 33 | |
| 32 | 103 | Li, Palmas | 32 | |
| **Overall Outcome** | | | 1–7, 10, 13–25, 27, 29, 31–33 | |

TIME PERIOD FOR RESPONSE

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a). *See* 37 C.F.R. § 1.136(a)(1)(iv).

AFFIRMED

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/576,565 | 08/01/2012 | Li Li | GBLYGX001-APPEAL | 8815 |

98346 7590 05/15/2023
Bayramoglu Law Offices LLC
Bayramoglu Law Offices LLC
1540 West Warm Springs Road
Suite 100
Henderson, NV 89014

| EXAMINER | |
|---|---|
| DOYLE, BRANDI M | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1771 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 05/15/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

gokalp@bayramoglu-legal.com
in@bayramoglu-legal.com

PTOL-90A (Rev. 04/07)

RECORD OF ORAL HEARING

UUNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

*Ex parte* LI LI, and QUNZHU LI

Appeal 2023-000079
Application 13/576,565
Technology Center 1700

Oral Hearing Held: April 25, 2023

Before JEFFREY T. SMITH, MICHAEL P. COLAIANNI, and DEBRA L. DENNETT, *Administrative Patent Judges.*

APPEARANCES:

ON BEHALF OF THE APPELLANT:

GOKALP BAYRAMOGLU, Ph.D., ESQ.
of: Bayramoglu Law Offices LLC
1540 West Warm Springs Road,
Suite 100
Henderson, Nevada 89014
(702) 462-5973
in@bayramoglu-legal.com

The above-entitled matter came on for hearing Monday, April 25, 2023, commencing at 1:00 p.m., at the Patent & Trademark Office, 600 Dulany Street, Alexandria, Virginia.

P-R-O-C-E-E-D-I-N-G-S

1:03 p.m.

JUDGE SMITH: This is Appeal No. 2023-000079. Counselor, as we agreed to, you have 35 minutes for this presentation. At the end of the presentation we will go off the record because the proceeding is being transcribed. We will answer any questions of our transcriber that will be added to the record once they're completed. With that, you have 35 minutes, and you can begin.

MR. BAYRAMOGLU: Okay, Simon, will you please translate to Mr. Li to start the presenting? We cannot hear you. I believe you are on mute.

INTERPRETER: Okay, can you hear me?

MR. BAYRAMOGLU: Yes.

INTERPRETER: Good afternoon, Your Honors. I am Simon. I'm the interpreter of Mr. Li. I will be reading a statement of Mr. Li's representation. First, the Appellant respectfully emphasizes that a prima facie case of obviousness cannot be established for at least the following reasons. Please see Slide No. 4, two patentable features as claimed in Claims 1, 13 and 20. Claims 1, 13 and 20 are patentable and non-obvious over Li in at least Feature 1. Please see Slide 5. Based on the spec and Claim 1 of the application, see Paragraph 0012, 0015 to 0019 of the spec, Feature 1 clearly defines that the location of the cooler, what it is connected to and what it adjusts and its effect or/and function is to keep them at the best value, respectively.

Second, the problem to be solved of the claimed Feature 1 is to make the catalyst-to-oil ratio a freely independent adjustable variable by only one catalyst cooler as said in Feature 1, see Paragraph 0012 for the first time, thereby using the suitable catalyst-to-oil ratio and the suitable reaction temperature of the first reaction zone, see Paragraph 0054 for the first time, so as to decrease the yield of the coke and offgas, thereby increasing the processing capacity by 15 to 20 percent, see Paragraph 0060 for the first time, which is unexpected because Li, due to the interaction or interference of the two catalyst coolers A and B is only a partially independently adjustable variable, and is not as above freely as said in Feature 1 and the specification of this application. Thus, Feature 1 is nonobvious and patentable over Li.

Please turn to Slide 6. This is the disclosure of Li. Please note that the cooler 8B on the left circle is essential for Li to feed regenerated catalyst to auxiliary riser 6 on the right side circle. B uses cooler 8A to adjust the reaction temperature of the first reaction zone 3 and uses the cooler 8B to adjust the reaction temperature of second reaction zone 2. Please see Slide 7. This is Figure 2 of this application. Please note that the cooler B on the left and the auxiliary riser 6 are omitted in this application. Thus the first reaction zone 3 and the second reaction zone 2 are both adjusted by cooler 8A in the right.

In Figure 2, cooler 8B is used to only remove heat from the regenerator 5, which is different from what the cooler 8B does in Li. The claim Feature 1, after omitting catalyst cooler B and then other rises, resulting in a notable change in both the operating parameters

and the processing speed. For example, an inevitable increase in the catalyst-to-oil ratio, which will substantially affect the optimization of the major operating parameters of the reaction zones, increase the processing capacity by 15 to 20 percent, which is not anticipated or expected for those skilled in art before the finding of this invention.

Please see Slide 9. The present application has solved the technical problem that people have been eager to solve, but never succeeded in solving for more than 40 years since the riser reactor came out, which is supported by common knowledge. See Table 1 and Annexes 1-6, 49, 50 and their indications. The criticality or unexpected results of Feature 1 as a whole is also supported by Annexes 11 through 43, by three opinions of evidence, by two declarations by Zhang and by Gao, and by two declarations by Li. Thus, Feature 1 is nonobvious and patentable over Li.

Please see Slides 11-13. No documentary evidence, including Li, discloses or teaches or suggests the problem to be solved or the function or results of Feature 1. Please see Slide 15. There are three teach-aways from Feature 1. One, Li discloses that the optimization requires, quote, high reaction temperature, end quote. See Lines 19-20 of Page 8. And that the interaction of, quote, high catalyst-to-oil ratio and high reaction temperature, end quote, will enhance the non-ideal reaction, thereby causing a large increase in the offgas and coke yields, so do all common knowledge in the prior art.

See Item 1, 2 of Table 1 and Annexes 1-5, 49, 50. This is a longstanding technical prejudice in the FCC field and teaches away

from the claimed function of Feature 1, which is, quote, suitable reaction temperature and suitable catalyst-to-oil ratio, end quote. Please see Slide 16. Annex 3 proves that the catalyst-to-oil ratio has always been a non-independently adjustable variable or parameter which teaches away from the function of Feature 1, quote, a freely independently adjustable variable of the catalyst-to-oil ratio, end quote, by only one cooler for each reaction zone of the riser reactor.

Li, due to the interaction or interference of the two catalyst coolers, A and B, is only a partly independently adjustable variable by two coolers respectively for the first and second reaction zone, rather than freely as above said. Three, Li discloses that catalyst coolers A and C can be omitted, which implicitly teaches that the catalyst cooler B cannot be omitted. See Lines 14 through 18 on Page 3 of Li, which teaches away from Feature 1. Therefore, the disclosure that Li discloses in Feature 1 is impermissible hindsight. Please see Slide 17. First, the Feature 1 includes a functional limitation that is, quote, one cooler is used for the reaction temperature of each reaction zone of one riser reactor, end quote, rather than the selection of the specific operating parameters.

Two, the Feature 1 as a whole should not be split, and the non-obviousness of the Feature 1 should be evaluated in entirety. Three, the examiner splits excessively Feature 1, almost splits to the extent of technical term-levels such as, quote, catalyst cooler or reaction zone, end quote. But the above over-splitting does not even reflect the sequence or function of the above basic steps. Four, the Feature 1 has

been proposed by the instant application for the first time in the FCC field, and there is no documentary record in common knowledge and prior art, including Li.

Let's go to Slide 23. The advantages of Feature 1 over Li are as follows. One, there is a great increase in catalyst-to-oil ratio for the first reaction zone of the present application, which results in a great increase in the catalyst activity and increase in the quantity of the active sensor because all the catalyst for entering -- cycling enters wholly the first reaction zone of the one riser in the present application. In contrast, it is split into two parts entering two different risers in Li, and it overcomes the deficiency of Li that the catalyst-to-oil ratio in the first reaction zone cannot be freely independently adjusted. See Item 3 of Table 1 and Annexes 3 and 4. Due to the restrictions of the heat balance, it eliminates the mutual interference due to operational fluctuations of the two catalyst coolers existing inherently in Li. See Item 5 of Table 1 and Annexes 4 and 6.

In view of the above, Feature 1, after omitting catalyst (audio interference) with retention of Li's function also. In fact, it has been guided especially with a lower yield of offgas and coke and with better operability over Li. See Item 4 and Annexes 1, 3, 4, and Item 5 of Table 1 at Annexes 4 and 6, which is non-obvious over Li.

Let's turn to Slide 28. Appellants respectfully indicate that the examiner has failed to consider the synergistic effect or result of Feature 1 and 2, which is unexpected to those skilled in the art. Two, Claims 13 and 20 further applicable and non-obvious over Li in

Feature 2. Please see Slides 29-33. One, Feature 2 “the downstream catalyst mixing buffer space,” a whole means, should not be split, and the non-obviousness of Feature 2 should be also evaluated in entirety. Two, the function of Feature 2 “downstream catalyst mixing buffer space” is for mixing and buffering the cooled catalyst, see Paragraphs 16 and 17 of the specification, rather than “for the cooled catalyst mixing with the fluidizing gas,” as understood by the examiner.

As a non-limited example, Paragraph 86, Lines 1-4 of the specification clearly recited that "the regenerated catalyst after cooling enters the mixing and buffering space, Line 8.” Feature 2 includes a functional limitation rather than a selection of specific operating parameters of the catalyst mixing and buffering space. The examiner splits excessively Feature 2, almost splits to the extent of technical term-levels, such as, quote, catalyst, downstream of, and mixing, etc. But the over-splitting does not even reflect the sequence or function of the above basic steps. Turn to Slide 34-36.

There is no written record regarding the catalyst mixing buffer space in all prior art and common knowledge, including Li. Li shows only a fluidizing medium enters the lower part of the catalyst cooler by a fluidizing medium 35A/B distributor, and does not disclose anywhere the downstream or axial space. There are many types of structure, such as upflow mode and downflow mode, etc., and connection structures for the catalyst cooler. See Paragraph 29. “No downstream axial space,” “use of an upflow mode,” are not claimed

limitations, again, but this does prove that "Li has a downstream axial space" is just a probability or possibility.

See "Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." In re Robertson, citation noted. Next, the key—

MR. BAYRAMOGLU: Excuse me. Your Honors, with your permission, I would like to remind the inventor that we are at the 15-minute mark, so any time you take from this point on will be taken away from my arguments.

JUDGE SMITH: Thank you, yes. I was about to state such, but --

INTERPRETER: Okay, please give me one more minute, okay?

JUDGE SMITH: Okay.

INTERPRETER: Many textbooks state than an external heat exchanger is isothermal, i.e., the temperature is uniform, which is a longstanding technical prejudice and teaches away from Feature 2. Four, no documentary evidence including Li teaches or suggests Feature 2 and problem to be solved or the function of Feature 2. Please see Table 2, Annexes 7-10. So, there is no teaching suggestion or motivation to improve Li, Feature 2, is non-obvious over Li.

Okay. Okay, so, we're done. We're done.

JUDGE SMITH: We thank you for your presentation, and now we'll turn it over to your representative so we can focus more on the

differences between the invention as claimed and the Li reference. You can begin.

MR. BAYRAMOGLU: Thank you, Your Honor. Again, this is Gokalp Bayramoglu. I'm representing Appellant/Applicant Qunzhu Li and Li Li for the Appeal No. 2023-000079. Applicant respectfully requests that this panel reverse examiner's rejection of Claims of Application No. 13/576,565 for the following reasons. First, examiner rejected claims under 35 USC 103, although the examiner has not established the prima facie case of obviousness. We argue this in the appeal brief, Page 12. The reason I make this statement because the examiner has not followed the established provided by the US Supreme Court in Graham v. John Deere and KSR v. Teleflex.

The examiner has not provided any reason to modify Li or combine Li with any other reference, and in this case, examiner only used the Li reference. And Li reference had a single riser with two reaction zones, and regenerated catalyst, and cold shock agent that goes into the second reaction zone. And again, there is no reason to which the subject matter of Claim 1 will modify Li reference. As Your Honors know, the stated reason does not have to be the same reason the inventor had when he invented this, but there has to be some reason. Without the reason, a skilled person would not have the motivation to modify the prior art, and in this case, to modify the Li reference.

It's clear that in her final rejection notice and also in the answer to the appeal brief, the examiner pointed out that all the claim

indications, and here we are talking about 1, 13 and 20, either disclosed by Li, either explicitly or implicitly, and here I'm talking about Claims 1, 13, 20, they all have same limitation that the method of the claims having one riser with a single reaction zone or one riser with two reaction zones. The invention is that there is one regenerated catalyst at the bottom of the first of the risers. Now, again, we believe examiner reached the conclusion and obviousness decision by rejecting the claims without giving a reason.

Second, examiner, we believe, ignored the case law established, again, by Supreme Court and Federal Circuit. There are also Board precedents. Li discloses cold shock agent for second reaction zone, whereas Claim 1 requires single regenerated catalyst for both reaction zones. So, the question here is not if Li discloses the claim inherently. The question is if a skilled person will modify Li by eliminating the cold shock agent for the second reaction zone to reach a method where only a sealed regenerated catalyst is used, both in the first reaction zone and the second reaction zone. The examiner has not stated why a skilled person would eliminate catalyst B of Li, which is the subject matter of the Application's Claim No. 1, 13 and 20.

JUDGE SMITH: Excuse me, Counselor. What exactly in your claim is eliminating reactor B of Li? Your claim seems to be open to its inclusion.

MR. BAYRAMOGLU: Well, it bears on interpretation, Your Honor, yes. However, what I am viewing is that elimination of any element on a claim and keeping its function is an indication of

obviousness. This is Li, if you allow me for a second, under MPEP § 2144.03 —

JUDGE SMITH: Before you go on, Counselor—

MR. BAYRAMOGLU: I'm sorry.

JUDGE SMITH: Excuse me, before you go on, what in the claim requires its elimination to meet this claim?

MR. BAYRAMOGLU: Just a second, Your Honor. Well, claim — the current claim does not state that B should not be used. There is no positive reciting of that or negative, whichever way you look at it. However, claim is clear that it states, I'm reading the last part of the claim, wherein when one riser reactor comprises at least two reaction zones. The one regenerated catalyst is connected to the one riser reactor and is used to adjust the temperature of each of the reaction zones of the one riser reactor. Then it goes on to talk about two reaction zones.

So, based on the fact that catalyst B is missing, the claim, the invention claims that there is only one regenerated catalyst is being used. And the fact that Li's catalyst B is omitted, it shows the non-obviousness because the function of catalyst B retains while it's not being used. Again, with your permission I would like to go back to omission of an element with potential dysfunction.

JUDGE SMITH: Okay, but before you go there, you realize your claim states comprising, and there is no express language eliminating that component.

MR. BAYRAMOGLU: Well, it does say comprising. However, Your Honor, comprising language, of course, you could use that for claim construction. However, if this was Li's product that they were making and selling, then comprising would make the claim that you are at least using my steps or my structure. And on top of that, you're adding catalyst B. It doesn't matter. In other ways, it doesn't matter when it comes to infringement.

However, for determining the claim scope for obviousness, I don't believe we have to state that B is excluded. The fact that B is not in the claim, it shows that we are only using in this claim, they're only using one regenerated catalyst.

JUDGE SMITH: You can proceed with your argument.

MR. BAYRAMOGLU: I'm sorry?

JUDGE SMITH: You can proceed.

MR. BAYRAMOGLU: Okay. Thank you, Your Honor. Okay, and again, omission of an element with retention of the element's function is indication of non-obviousness, and this is listed under MPEP § 2144.04, II.B and there in the Graham decision of the Supreme Court also discusses this point.

Furthermore, it is our argument that right here, is — we believe Li teaches away because Li specifically states that catalyst B has to be used, and therefore, the argument that you do not have a sound reason, and any reason at all, that would not —

JUDGE COLAIANNI: Counselor?

MR. BAYRAMOGLU: I'm sorry?

JUDGE COLAIANNI: Counselor, this is Judge Colaianni. Just one question for you. I know you're saying that Li is requiring two catalyst coolers. How do you respond to Li's disclosure on, let me just find it here, Page 2 of the translation at the bottom there? It says the regenerator is provided with one or more inside or outside heat-taking apparatuses, that is catalyst cooler. It seems to envision using one catalyst cooler, pointing to Li's disclosure.

MR. BAYRAMOGLU: I'm sorry? Where?

JUDGE COLAIANNI: I'm looking at the full translation. This is not the machine translation. This is the full translation. Let me see if there's a date on it. It's a verification of English translation from Li Zhao. This was dated May 29th, 2016.

MR. BAYRAMOGLU: Okay. I'm sorry, Your Honor. Could you please read that again? Maybe if you read that, I'll be able to —

JUDGE COLAIANNI: Sure. This is at the bottom. This is part of the Li disclosure, and it says the regenerator is provided with one or more inside or outside heat-taking apparatuses, that is catalyst coolers. And then it goes through a discussion. It says, if catalyst cooler A is mainly employed to regulate the reaction time for the first reaction zone to maintain its optimum value, the catalyst cooler B is mainly employed to regulate the reaction time for the second reaction zone to maintain an optimum value. But the premise of this, the topic sentence of this paragraph here, says that the regenerator is provided with one or more catalyst coolers.

How do you respond to that? Li appears to at least envision or disclose that one catalyst cooler may be used as part of the apparatus.

MR. BAYRAMOGLU: Yes, Your Honor. The catalyst cooler — my understanding of that is that in one catalyst cooler, however, how the riser is structured and the steps used for it. So, my understanding of Li is that the riser has two reaction zones, and each reaction zone — for the first reaction zone, a catalyst cooler is used. I mean, a regenerated catalyst is used, which comes from the catalyst cooler, as you pointed out. And then, for the second reaction zone, the cold agent, cold shock agent is used.

Now, Your Honor, if you look at Claim 32, examiner, in the final August action, called in another reference, Palmas. And examiner pointed out that because the issue there was — you already heard the inventor talking about it needs to be considered together. But the fact of the matter, we need to be honest there, that is for Claims 1, 13, 20.

There is more language. We state that there is a riser, and then one reaction zone. And then it says four — one riser, two reactions. So, because of that, the examiner went and found Palmas, which discloses one riser, one reaction zone.

However, Palmas, I looked at Palmas, and Palmas discloses that there is one riser, one reaction zone. However, Palmas uses two separate — hold on, let me tell you this here. Palmas uses two separate catalysts. And if Your Honor can stay with me for a second, I will read to you—

JUDGE COLAIANNI: While you're looking for that, were these arguments made in your principal brief, with regard to Palmas?

MR. BAYRAMOGLU: No, Your Honor. We have not — Palmas isn't included.

JUDGE COLAIANNI: Okay.

MR. BAYRAMOGLU: However, we did discuss Claim 32, and we did discuss the identical — in Claim 32.

JUDGE COLAIANNI: Correct, but the arguments are limited to what was presented in the brief for your oral argument.

In this case, my review of your discussion regarding Claim 32 is referring back to the deficiency that your argument is regarding to Li. I didn't see the technical matters regarding Palmas in your argument. I read through your argument and the brief.

MR. BAYRAMOGLU: Okay.

JUDGE COLAIANNI: But to get back to what Li discloses, it appears to me that Li at least envisions using one reactor. The claim, as Judge Smith was saying at the beginning, is open-ended, so it doesn't really exclude having more than one or exclude an additional catalyst cooler as part of the claim. It appears that the wherein clause in the claim that you refer to Feature 1 is referring to the catalyst cooler that's connected to one riser in the reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor.

My question to you is, if you have a single cooler that's feeding cold catalyst, cold regenerated catalyst into the bottom of the riser, or

even into the middle of the riser between the reaction zones, how is that not cooling each of the reaction zones?

MR. BAYRAMOGLU: Well, actually that's a good point, Your Honor. It will — I mean, when the catalyst goes into the riser from the bottom or from the middle, as you pointed out, let's say it enters from the bottom. It will go through the first reaction zone and it will — there is no other place to go. It has to go to the second reaction zone, just as Li claims.

However, what we are arguing, Your Honor, is that there is another cooler, another cold agent, cold shock agent, used by Li. Not using that — I guess where I disagree with Your Honor is that the way the claim is written, the fact that it does not claim cold shock, that means it's not using —

JUDGE COLAIANNI: Doesn't Li define cold shock as being cold regenerated catalyst? My reading of the translation defines cold shock agent as including cold regenerated catalyst. It says, for example, this is on Page 5 of the Li translation, the formal translation, it says the cold shock agent may be gaseous or liquid water and oil products, including inferior gasoline, recycled oil, verified oil, and so on, and may also be cold catalyst, including cold regenerated catalyst, cold spent catalyst, cold semi-regenerated catalyst, and so on. Preferably cold regenerated catalyst.

It seems to me the cold shock agent you're referring to could very well be and is envisioned by Li as being a cold regenerated catalyst.

MR. BAYRAMOGLU: Well, Your Honor, it really doesn’t matter. To me, it is immaterial what cold shock is because it doesn’t change the fact that Li uses one regenerated catalyst at the bottom of the riser and then another regenerated catalyst, cold shock or whatever it is. This invention does not (Audio interference). You don't use it. And the fact you don't use it, it's keeping the function by eliminating steps, and it’s clearly supported by the case law.

JUDGE COLAIANNI: Okay. I believe that —

JUDGE DENNETT: Could I just ask one quick — this is Judge Dennett. In your assertion that Li only requires two catalysts, is that based on Feature 1? Because the text of the disclosure would seem to suggest that Li is disclosing otherwise, that it seems to be broader than only Feature 1. So, I’m not sure what you’re pointing at to say that Li is requiring the multiple catalysts since the text seems to suggest otherwise, one or more.

MR. BAYRAMOGLU: Well, Your Honor, the text may say one or more, but again, I need to find the associated documents. I think it is Figure 1, I believe. It was Figure 1 or 2 of Li that shows — hold on, let me — I believe it is a figure that shows one riser, two reaction zones, with the coolant actually — the catalyst coming from the bottom, and then the cold shock coming into the second reaction zone. That’s the figure I’m looking at. I’m sorry, I don’t have the figure right in front of me.

JUDGE DENNETT: That's fine. I understand your answer, but it does sound like you're relying on the figure for the claim interpretation or the disclosure interpretation. Is that correct?

MR. BAYRAMOGLU: For that, Your Honor, for that matter, actually, I think examiner, I believe, on that one — because examiner went and found Palmas. Although as I understand we didn't argue Palmas in the appeal brief, the examiner pulled Palmas in to show that there is one riser and one reaction zone, just for the language in the claim. If you look at the record, Your Honor, you will see that. The examiner did not see Li disclosing one riser, one reactor, which I agree with that. I'm not sure—did I go over my time?

JUDGE SMITH: Yes, we've actually exceeded the time for this hearing. We will give you a moment to sum up your arguments at this point.

MR. BAYRAMOGLU: Thank you, Your Honor.

In summary, I would like to point out that examiner's rejection is not based on case law. Examiner has not given any reason for the element of Li used in the claim. Therefore, under the case law, retaining the function, eliminating the element shows an obviousness. We also believe that Li teaches away by saying that you have to have a second cold shock.

Therefore — and we also believe there is a hindsight. Of course, we argued this, and I won't repeat it in the appeal brief. I didn't get into the section of mixing space, mixing buffer space, but I will leave

it for the appeal brief. If you have any question on that, I'll be happy to answer. Thank you for your time.

JUDGE SMITH: Any further questions, Judge Colaianni?

JUDGE COLAIANNI: I have no further questions. Thank you, Judge Smith.

JUDGE SMITH: Judge Dennett, any further questions?

JUDGE DENNETT: Nothing further from me, thank you.

JUDGE SMITH: Well, we thank you for coming in.

INTERPRETER: Excuse me, Your Honor. The inventor would file a post-hearing brief to answer your questions about Li. Just to ask —

JUDGE SMITH: We are not entertaining a post-brief filing at this time. The proceeding is based on the record that's already before us between the appeal brief and your reply brief. We do not need any additional briefing at this time. Thank you for the offer.

And we thank you for coming in today. We thank you for the commentary from the inventor, as well. At this point, we are off the record.

(Whereupon, the above-entitled matter went off the record at 1:45 p.m.)

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re Application of | : | |
| | : | |
| Li Li et al. | : | Confirmation No. 8815 |
| | : | |
| U.S. Patent Application No. 13/576,565 | : | Group Art Unit: 1771 |
| | : | |
| Filed: August 1, 2012 | : | Examiner: DOYLE, Brandi M. |

For: METHOD AND EQUIPMENT FOR CIRCULATING COOLED REGENERATED CATALYST

**Reply Brief Under 37 C.F.R. § 41.41**

This Reply Brief is filed under 37 CFR 41.41. Appellant now responds to the Examiner's Answer dated 08/05/2022. Appellant respectfully requests that the PTAB consider the following remarks. Appellant submits that under 37 CFR 41.141(b)(2) these remarks are responsive to arguments raised in the Examiner's answer.

**Remarks/Arguments** begins on page 2 of this document.

## Reply

Generally, the Appellant respectfully submits that the applied prior art does not disclose all the limitations of the claims present in the present application. Appellant submits that the detailed reasons for this are given in the Appeal Brief. Appellant now responds to some new arguments and points raised by the Examiner in the Examiner's answer. However, the lack of a response to an issue raised by the Examiner in the Answer should not be taken as agreement with the Examiner since the Appellant believes the Appeal brief, and all previously submitted Arguments, Annexes 1-54, Experts' Opinions and five Declarations adequately counters all of the issues.

### I. Issues regarding Examiner's Answer

### A. Examiner's response to Appellant's argument I(ii)

- **<u>Key Arguments in response to issues raised in the Examiner's Answer</u>**

The independent claims recite, *inter alia*:

" … wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so *as to keep the reaction temperature of each of the reaction zones in an optimal value*, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, *so as to keep the reaction temperature in an optimal value*."

*(hereinafter referred as **"Feature 1"**)*

#### a. Determined the scope and content of Li

Appellant submits that Li discloses that "two regenerated catalyst coolers is used to adjust the reaction temperature of the reaction zones of the riser reactor comprising at least two reaction zones, respectively i.e. catalyst cooler A is used to adjust the reaction temperature of 1st reaction zone, catalyst cooler B is used to adjust the reaction temperature of 2nd reaction zone". (see Li (CN 1664074) English translation *Page 1 line 12 to Page 4 last line, and Figs 1-4* of Li).

***However, Examiner disregard that the both reactor and reaction zone are two different concepts, and confused the reactor and the reaction zone,*** therefore Examiner's inference of "This includes wherein a catalyst cooler is connected to a riser and used to adjust the reaction temperature of each zone in the riser or the temperature."*(see Page 4 line 5-6* of Examiner's Answer), *without any documentary evidence,* is not in light of the Specification of Li and the level of ordinary skill in the pertinent art under the provisions of MPEP. (*See page 4 last sentence i.e.* p.4 ¶1 in Page 4 line 4 of Ex. Answer, referring to the following section of Li):

> The catalyst cooler of the present invention is provided with one or more catalyst outlets, wherein one of them is used to transport the cold regenerated catalyst back to the regenerator, and the regenerator temperature can be controlled by regulating the flow rate of the fluidization medium including air, steam and so on and the flow rate of catalyst returning pipe conveying medium including air, steam and so on, to maintain it at the optimum value. The other one or two catalyst outlets are individually used to transport the cold regenerated catalyst to recycle to one or two raising pipes (reactor), and the temperatures of the reaction zones of the raising pipes can also be controlled by regulating the flow rate of the fluidization medium including air, steam and so on and the flow rate of catalyst returning pipe conveying medium including air, steam and so on, to maintain it at the optimum value.

Appellant respectfully submits that the plain meaning of the above Last sentence in the section of Li referenced by the Examiner's answer (the underlined part) means that the other catalyst outlets may be disposed as one or two, and is (or are) individually connected to one or two riser reactor(s), and used to adjust the temperatures of the reaction zones of the corresponding risers, ***instead of the temperatures of Each reaction zone.***

As disclosed at page 2 last three line to page 3 line 10 of **Li,** cooler-A, cooler-B, and cooler-C respectively serve different functions. Specifically, cooler A is configured to adjust only the reaction temperature of the first reaction zone; and cooler B is configured to adjust the reaction temperature of only second reaction zone of one riser reactor; and cooler C is configured to adjust the temperature of regenerator.

The independent claim covers two implementation modes.

**(i) The sole implementation mode of the present invention**

The sole implementation mode of the present application is provided with two Riser (i.e. raising pipe), which are a heavy oil Riser and an auxiliary Riser.

Cooler A is connected to a (heavy oil) riser reactor comprising a first reaction zone and a second reaction zone. Cooler B is connected to an auxiliary riser, which is connected to the joint between the first reaction zone and the second reaction zone of the heavy oil riser reactor. Cooler C is configured to adjust the regenerator temperature. (*See page 6, first full paragraph of Li, page 8, first full paragraph* of Li and the Fig. 1 of Li).

**(ii) The joint implementation mode of the present invention**

When the present application is jointly implemented, it is provided with two Riser *(i.e.* raising pipes), which are a heavy oil Riser and a gasoline riser reactor. According to the technological requirements the joint implementation mode is divided into a plurality of reaction zones (generally three reaction zones). The heavy oil riser has at least 2 reaction zone, and the catalyst or catalyst mixture used for cold shock enters the middle (the connection of the 1st reaction zone and the 2nd reaction zone) of the heavy oil riser reactor.

Cooler A is configured to adjust only the reaction temperature of the first reaction zone; and cooler B is configured to adjust only the reaction temperature of second reaction zone of one riser reactor; and cooler C is configured to adjust the temperature of regenerator. (*See page 8, antepenultimate line to page 9 line 4 of Li, page13, 2nd paragraph* of Li and the Fig. 2,3,4 of Li )

As annotated below, Li discloses the use of multiple catalyst coolers which is connected to one riser reactor comprising the ***auxiliary Riser etc***.




**b. Appellant respectfully emphasizes that:**

According to the guidance of Li, only one cooler must be cooler B, not cooler A or cooler C, Li discloses that coolers A and C can be omitted (*See Page 3 first full paragraph, page 8 second full paragraph and Page 13 third paragraph etc.* of Li), which means that cooler B cannot be omitted (because the catalyst or catalyst mixture used *for cold shock agent* enters the joint i.e. the connection of the 1st reaction zone and the 2nd reaction zone of the heavy oil riser reactor). Appellant therefore submits that ***Li teaches away*** from the claimed Feature 1.

In view of the above, Examiner's assertion (*see page 4 line 5-6* in Examiner's Answer) that "Li implicitly discloses that one catalyst cooler is used to adjust the reaction temperature of each reaction zone of the one riser reactor" is ***not supported by any documentary evidence,*** which ***isn't appropriate and is impermissible hindsight*** under MPEP§2143.03, and §2145 X.A., especially MPEP§2143.03 C.

> Li teaches that the regenerated catalyst cooler(s) comprise one or more coolers located inside or outside the regenerator (p. 2, ¶ 4). There may be separate coolers to adjust one or more of the risers and/or the regenerator or one catalyst cooler with a plurality of outlets for sending catalyst to each of the desired riser reactors and regenerator (e.g. p. 2, ¶ 4 to p. 4, ¶ 1). This includes wherein a catalyst cooler is connected to a riser and used to adjust the reaction temperature of each zone in the riser or the temperature. The cooler cools the catalyst to a

Appellant respectfully submits, that the Examiner only cites to Li (CN 1664074A) to address all of the limitations of the independent claims. With respect to the above identified claim limitations, the Examiner concludes the above (See Page 4 Line 1-6 of Examiner's Answer). Appellant submits that for the reasons discussed above, the Examiner has failed to address each and every limitation of the independent claim.

Appellant respectfully requests reversal of the Examiner's rejection.

- **Additonal Arguments**

Beginning on page 9 of the Examiner's Answer the Examiner has determined that "'cold shock agent' is defined in Li as cold spent or regenerated catalyst and is used to 'conveniently control the temperatures of each of the reaction zones.'" The Examiner then determines that Appellant has not shown that "cold shock agent" infers a lack of control of reactor temperature, such is not implied in the general art, and such is contrary to the direct teachings of Li.

In response, the legal concept of *prima facie* obviousness is a procedural tool of examination which applies broadly to all arts. It allocates who has the burden of going forward with production of evidence in each step of the examination process. See *In re Rinehart,* 531 F.2d 1048, 189 USPQ 143 (CCPA 1976); *In re Lintner,* 458 F.2d 1013, 173 USPQ 560 (CCPA 1972); *In re Saunders,* 444 F.2d 599, 170 USPQ 213 (CCPA 1971); *In re Tiffin,* 443 F.2d 394, 170 USPQ 88 (CCPA 1971), *amended,* 448 F.2d 791, 171 USPQ 294 (CCPA 1971); *In re Warner,* 379 F.2d 1011, 154 USPQ 173 (CCPA 1967), *cert. denied,* 389 U.S. 1057 (1968). The examiner bears the initial burden of factually supporting any *prima facie* conclusion of obviousness. If the examiner

does not produce a *prima facie* case, the applicant is under no obligation to submit secondary evidence to show nonobviousness. See MPEP 2142.

Appellant submits that the Examiner has not addressed the limitation in the rejection and is improperly attempting to shift the burden of proof to the Appellant. The Examiner not adhering to the legal concept and office burden of presenting a *prima facie* case of obviousness based upon a preponderance of the evidence of record. See MPEP 2142. The Appellant respectfully points out that the Examiner does not show in the rejection how the limitation of "*to keep the reaction temperature of each of the reaction zones* *in an optimum value*" is met. Accordingly, there is no requirement, as the Examiner suggests, for the Appellant to provide a showing that the cold shock agent infers a lack of control of the reactor temperature. The burden is on the Examiner to show that each and every limitation of the claimed invention would have been obvious to one having ordinary skill in the art. Appellant submits that the Examiner has not met this burden because the Examiner has not shown how this limitation is met by the cited art.

The Appellant pointed out in the Appeal Brief that the "cold shock" agent in Li could potentially produce wide swings in the reaction temperature which could take the reaction temperature outside of the *optimum value* in the reaction zone, and that therefore the limitation is not inherently met by the reference. However, there is no burden on Appellant to show that this will necessarily infer a lack of control of the reaction temperature as the Examiner suggests. The purpose of this argument was, and is, to aid in understanding how the limitation of "*to keep the reaction temperature of each of the reaction zones in an optimum value*" has not been met because it is reasonable that a "cold shock" agent could cause swings in temperature which are outside of the optimum value in the reaction zones in an optimum value.

Therefore, Appellant respectfully submits that the obviousness rejections of claims 1, 13, and 20 under 35 USC 103 should be reversed because the Examiner has failed to present a prima facie case of obviousness which addresses all of the limitations of these independent claims.

**B. Examiner's response to Appellant Argument II**

- **Key Arguments in response to issues raised in the Examiner's Answer**

Claims 13 and 20 are additionally argued separately from claim 1.

**<u>Feature 2 of Claims 13 and 20 reads as follows：</u>**

*"blending and buffering the cooled regenerated catalyst <u>in a catalyst mixing buffer space</u> being disposed in the downstream location of the regenerated catalyst cooler before the cooled regenerated catalyst entering the riser reactor;" (hereinafter referred as "**Feature 2**")*

It is clear from independent claims 13 and 20 that the step of "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space" （9A/B） is one independent step to get the cooled catalyst itself an uniform and stable temperature.

For the Board's convenience, Appellant reproduces below Fig. 1 of instant application.




**<u>Fig. 1 of the instant application</u>**

The claimed Feature 2 is an overall means with a functional limitation, which have been proposed by instant application **for the first time in FCC field**, and there is No documentary record in Common Knowledge and Prior Act including **Li** before the filing date of the instant application (see Table 2 and Annexes 7-10,46-48).

**i. Determined the scope and content of Li**

**1. Li fails to teach, disclose, or suggest the claimed *Feature 2***. The Examiner agrees with "mixing buffer space is not used in Li"; but the Examiner, solely relies on the Figures of Li, **speculates** that there is a space **in Li, *and*** is interpreted as "the mixing buffer space 'for blending and buffering for mixing catalyst and fluidized gas'"***(see page 4 line 15-19 of Examiner's Answer)**, however, there is no documentary evidence for supporting the Examiner's above assertion.***

> The term "mixing buffer space" is not used in Li, however, the space in the catalyst cooler in which cooled catalyst and the fluidizing gas mix before leaving the cooler is interpreted as the mixing buffer space for blending and buffering (figures; p. 18, ¶ 3-4). Note, blending is not used in the instant application with respect to the cooler, but does teach the mixing buffer space, for mixing catalyst and fluidized gas and thus blending is interpreted as a synonym for mixing.

In fact, "The downstream catalyst mixing buffer space" of the claimed Feature 2 shows a clear functional limitation ***"for mixing and buffering the cooled catalyst";*** rather than ***"for the cooled catalyst mixing with the said fluidizing medium"*** (see page 4 line 21-25 in Specification of instant application), because ***the cooled catalyst mixes with the said fluidizing medium*** by the fluidizing gas (35A/B) distributor **in Li,** which, ***without the downstream (axial) space,*** may be set *at **the radial gap*** between the two heat-exchanging elements ***or the radial gap*** between the heat-exchanging element and the shell. ***see*** *Table 3 and Fig. 8-106, 8-107 in Page 1341, Fig.8-109, 8-110 in Page 1342 of Annex 51; Fig.6-60,6-61 in Page 337 of Annex 52; and the attached Figure of Annex 53, 54.*

**(i)** Figure 8-106, 8-107 of Annex 51, figure 6-61 of Annex 52, Annex 53 and Annex 54 jointly prove that:
In order to save space and investment, two devices in FCC reaction regeneration part may form an integrated equipment with equal diameter; and the diameter

of catalyst delivery pipeline can be the same as that of equipment (especially catalyst cooler).In Figure of Annex 54, the diameter of catalyst inlet is equal to that of catalyst cooler, which is the common knowledge in the field of FCC.

**(ii)** Figure 6-61 of Annex 52 and Annex 53 prove that

There can be no axial (vertical) space in the catalyst cooler. And its fluidizing medium distributor can be set between the heat exchange tubes, or in the radial (horizontal section) direction between the heat exchange tube and the shell.

**(iii)** Figure 8-104, 8-105 of Annex 51, show the upflow catalyst cooler, wherein the catalyst flows from bottom to top, whose "downstream" is in the top of the catalyst coolers.

**(iv)** Figures 8-104, 8-105, 8-106, 8-107 on page 1341 of Annex 51, figures 8-109 and 8-110 on page 1342 of Annex 51, figures 6-60 on page 337 of Annex 52, and figures in Annex 53 and Annex 54 jointly prove that:

Many external catalyst coolers have NO axial (vertical) space and no downstream space.

**(v)** In conclusion, all common knowledge and prior art (including Li patents) DO not disclose "downstream catalyst mixing buffer space".

In fact, the terms "lower part" and "downstream" are substantially different, ***the Examiner's above assertion splits excessively the overall Feature 2 and its function/effect, and disregarded two key point of both*** (the location of the space) ***'downstream of the catalyst cooler'*** **and** (the function of the space) ***'for blending and buffering the cooled catalyst'*** as recited in <u>claimed Feature 2</u> of the instant application.

In fact**, the Board also assert:** *"To the extent that paragraphs 16 and 17 of Specification of the instant application may somehow be understood to disclose a mixing buffer space that is in a location independent and separate from the catalyst cooler, such a feature is not recited in claim 1, and, therefore, constitutes an unclaimed embodiment.".* ***See the statement*** *at page 10 of* ***the Appeal Decision*** *dated October 8, 2020.*

Therefore, the Examiner's above assertion, *without any written document support,* ***is in clear violation of*** MPEP 2143.01 III, 2143.03. 2144.03 A,B,C (especially 2144.03 A,C ), and is a ***<u>'Impermissible Hindsight'</u>*** *under MPEP§2145 X.A.*

For the Board's convenience, Appellant reproduces below Fig. 1 of Li.




**Fig. 1 of Li**

As can be see above, **Li** shows only "a fluidizing medium enters the lower part of the catalyst cooler by a fluidizing medium (35A/B) distributor" and ***does not disclose anywhere (including the figures of Li) the downstream (axial) space*** for "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space" as recited in independent claims of the instant application. See *"To establish inherency, the extrinsic evidence 'must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill. Inherency, however,* ***may not be established by probabilities or possibilities.*** *The mere fact that a certain thing may result from a given set of circumstances is not sufficient.'" In re Robertson,* 169 F.3d 743, 745, 49 USPQ2d 1949, 1950-51 (Fed. Cir. 1999).

**2. As to the Following Examiner's Answers *(see form page 12 last 5 line to page 13 first full paragraph)*, Appellant respectfully emphases the 5 key facts as follows that:**

① Because the terms "mixing" and "buffer" are the common knowledge, there is no need to descript the function, dimensions, or operating conditions for mixing buffer space. Therefore there is no need to indicate any specific limitations, because even the empty area or space, as we know, have also the function of "mixing and buffering";

② The "uniform and stable temperature" and "preventing radial temperature difference" caused by non-uniform and abnormal flow' limitations that Appellant argues are not taught by Li, do not be the claimed limitations also, but which is clearly and unquestionably determined in the light of the above two common knowledge of the two terms "mixing and buffering" , which is supported by the Five declaration submitted previously by Gao, Zhang and Li;

③ "Downstream axial space" that Appellant argues are not taught by Li, dose not be claimed limitations also. The claimed limitation of instant application is "Downstream space" instead of "Downstream axial space", therefore "the fluidizing gas distributor of Li may set in a radial gap", "no downstream axial space", "use of an up-flow mode", again are not claimed limitations, ***but this do prove that "Li has a downstream axial space" is just a probability or possibility;***

④ with respect to the "teaching away" is to prove that the "catalyst mixing buffer space" is that this application has been made and applied for the first time; is relevant to the current rejection which anticipates the claimed space; and

⑤ "The result of commercial use" supported by the third Declaration by Li, shows unexpected results of the claimed Feature 2 and is relevant to rebut the Examiner's rejection.

(referring to the following ***page 12 last 5 line to page 13 first full paragraph of*** **Examiner's Answers**)

There is no indication that the buffer space imparts any limitations beyond the empty area which allows the catalyst to pass through as it makes its way from the upper region of the shell and out of the withdraw lines in the lower region of the shell. There are no details regarding mixing in the claim that would require "a uniform and stable temperature" as argued by appellant and no details provided in the specification that require the mixing step occur in any particular manner, under any particular conditions, for any time or happening, or to solve any known problem. Outside the phrase mixing/mixed buffer space, the instant specification does not use the word mix/mixed/mixing/mixture in discussing the steps of cooling the regenerated catalyst or the catalyst cooling apparatus.

Therefore, Li teaches a "mixed buffer space" and satisfies the limitations of claims 13 and 20. "Downstream axial space", "uniform and stable temperature" and "preventing radial temperature difference caused by non-uniform and abnormal flow" limitations Appellant argues are not taught by Li are not claimed limitations. Similarly, Appellants key facts regarding the fluidizing gas of Li set in a radial gap, no downstream axial space, use of an up-flow mode, and size calculation of the mixing buffer space, again are not claimed limitations and not persuasive to rebut the teaching of Li with respect to the anticipated claim limitations. Lastly, Appellant's arguments with respect to the teaching away and commercial use of a separate process are not relevant to the current rejection which anticipates the claimed cooler. Further, the specific arguments presented, and previously presented in the declarations, do not compare and show unexpected results of a claimed system to the closest art of record.

- **Furthermore Arguments**

**(i)** Beginning on page 13 of the Examiner's answer the Examiner disregards the Appellant's arguments related to "teaching away" and commercial use "… are not relevant to the current rejection which *anticipates* the claimed cooler." (emphasis added). Appellant submits that the rejection from which appeal is taken is an obviousness rejection under 35 USC 103. The Examiner has not rejected the present claims as being anticipated under 35 USC 102. Accordingly, it is wholly inappropriate for the Examiner to disregard Appellants arguments that the Examiner is engaging in impermissible hindsight

or that the prior art teaches away from the claimed invention.

***In particular Appellant strenuously reiterates that Features 1 and 2 combined and taken as part of the invention as a whole should be considered and that the Examiner has improperly disregarded arguments made related to "teaching away", commercial use, or impermissible hindsight etc., which are relevant to an Examiner's rejection made under 35 USC 103.***

In view of the above, Examiner's assertion that "Li discloses implicitly a mixing buffer space downstream of the catalyst cooler" is ***not supported by any documentary evidence",*** is "impermissible hindsight" under MPEP§2143.03, and§2145 X.A., especially §2143.03 C.

***Those skilled in the art do not have the motivation and Do be impossible to think of*** that it is necessary "to be disposed a catalyst mixing buffer space in the downstream location of the catalyst cooler", because it is a "superfluous, or useless" step. ***Therefore, the Claimed Feature 2 is patentable and non-obvious over Li.***

Therefore, the claimed **Feature 2** is a typical example of which the technical problem, existing indeed in production practice and being neglected for a long time, has been solved by the use of common knowledge (in the chemical filed) which has been abandoned because of technical prejudice in FCC field, So, the claimed **Feature 2 is non-obvious over Li** under MPEP §2145 X.D.

**C. Examiner's response to Appellant Argument III**

**(vi)** Beginning on page 13 of the Examiner's Answer to the Appeal Brief the Examiner suggests that Features 1 and 2 are only combined in claims 13 and 20. In response, Applicant is arguing claims 13 and 20 separately from claim 1 and therefore these claims, which do include Features 1 and 2 *should not be considered to stand and fall with claim 1.* See 37 CFR 41.37(c)(1)(iv). *Appellant again strenuously submits that* ***Features 1 and 2 as recited in claims 13 and 20 should be considered in the context of the invention as a whole*** *in claims 13 and 20.* ***The Examiner fails to address how Features 1 and 2*** *will be Applicant further submits* ***that it is evident*** *that the Examiner is* ***failing to consider these Features 1 and 2 in the context of the invention as a whole.***

***(vii)*** Beginning on page 14 of the Examiner's Answer, the Examiner has disregarded

the evidence of unexpected results submitted by the Appellant because it is "…3 opinions of inventors running results on commercial units and academic acknowledgement." In response, the standard for consideration of evidence is that it *must be considered when timely submitted.* See MPEP 716.01(a). Furthermore, there is nothing in the MPEP or Rules of Practice that permits an Examiner to disregard opinion evidence even when presented by an inventor. See MPEP 716.01(c)(III). Although the Examiner may way the probative value of the evidence, such evidence is still entitled to consideration and some weight so long as it is not on the ultimate legal conclusion at issue. Here although the Appellant has timely submitted and argued the opinion evidence, the Examiner's Answer apparently disregards the opinion evidence on the basis that it is submitted by the inventors and also based on academic acknowledgement. ***Appellant respectfully submits that the Examiner has failed to meet the Office burden in considering this evidence of unexpected results which is timely submitted.***

***(viii)*** Beginning on page 14 of the Examiner's Answer, the Examiner has disregarded the Appellant's submitted evidence showing the unexpected results and commercial success of the invention. Appellant submits that this evidence is sufficient for one to reasonable conclude that there was a long-felt need and failure of others to address that need and also that there has been commercial success of the present invention over the disclosure of Li. Additionally the Appellant has submitted evidence of unexpected results as shown in Tables 1 and 2 and Annexes 1-50 which shows increase in profit and the praise of 10 experts and two awards. In responding to this significant showing of evidence the Examiner falls back on the original *prima facie* case over Li and indicates "Li teaches the same claim limitations achieving the same individual reaction zone and regeneration control with the same benefits as alleged from the claimed invention. The presented evidence cites positive attributes of the claimed invention but does not contrast the cited reference." However, Appellant respectfully points out that the Examiner has cited Li under a 103

obviousness rejection and so Li cannot be understood to teach all of the same claim limitations and to achieve the same steps as the claimed method.

Applicant submits that the Features 1 and 2 when taken together represent a contrast between the cited Li reference and the present invention. Taken with the significant evidence of long-felt need, failure of others, and unexpected results of increased profits *(much greater than before)*, praise of 10 experts, and two awards, Appellant submits that there is sufficient evidence of secondary considerations to rebut any prima facie case made by the Examiner. See MPEP 2141(II).

Here, Appellants respectfully indicate that ***the facticity and nexus of all objective Evidences*** *(i.e. Annexes 11-43)* **and** ***the present application*****,** ***is supported also by the declaration by Li*** *(see page 4, line 5-10, filed on March 19, 2018).*

Here, Appellants respectfully emphases also that

a. The criticality or ***unexpected effect/results*** and a commercial success ***over Li*** *is supported by Annexes 11-43 and* **by two declarations** *by Zhang, and by Gao, filed on October 23,2015, and is supported also* **by three declarations** *by Li, filed on January 17, 2018, on March 19, 2018 and on Sept.14,2021.*

In fact, Li, having another one riser (i.e. the auxiliary Riser or gasoline Riser) etc., is completely different from both the technical solution of the instant application and the technical problems to be solved of the instant application, therefore Li's technical effects are not comparable with the unexpected effect of the instant application.

b. But there are the following **three key facts to support a commercial success over Li**:

① Up to the end of 2014, totally ***15 commercial units in which the instant invention was applied are on stream successfully after 2008*** (See Table 1 and Annexes 11-43).

② Up to July, 2015, there are ***NO report for successful commercial application of Others' technology i***n the world (see Appendix 5, filed on October19, 2015).

- **The Others** *(such as US 4,396,531, US 6,059,958, and CN1288933A etc.)* **have failed in commercial use; and**

- **Li,** with the poor operability in commercial unit, dose not really realize "absolutely freely independent control of the catalyst-to-oil ratio" because of the mutual interference between the two catalyst coolers existing inherently in Li, **there is No one to adopt Li after 2008** *(see Table 1 and Appendix 5 i.e. Annex 17, Annexes 13-16, 25-43 ).*

③ It is the instant invention ***that solves the technical problem*** *that people* ***have been eager to solve*** *but* ***have never succeeded for more than 27 years from the filling date*** *of US 4,396,531, filed on Aug. 13,1981. (see Table 1 and Appendix 1-8, filed on October 19,2015,* ***and two declarations by Li,*** *filed on January 17,2018 and March 23, 2018).*

In fact, it is the instant application that solves truly and really a technical problem in the commercial unit that has plagued the FCC field for more than 40 years ***since the advent of riser reactor*** *(from the 1960s to 2008, the filed date of the instant application)*.

But the above all documentary Evidences and five declarations under C.F.R.1.132 have NOT been considered by Examiners with rationale documentary Evidence, which is NOT adequate under MPEP §716, §716.01, §716.02 and§2145.

Therefore, the Examiner's Response to Appellant's Argument *(see page 13 line 17 to page 15 line 18), without any written document support,* ***is in clear violation of*** **MPEP** 716, 2141.02 I, II, 2143.01 III, 2143.03, and 2144.03 A, B, C.

## II. In summary

A. In view of the above, Appellants respectfully indicate that the Non- obviousness of claim 1,13,20 and the Non- obviousness of the separate Feature 1 and Feature 2, is supported by five Declaration *by Zhang, Gao, and Li based on Table 1,2,3 and Annexes (1-54)*, **show that there are three "teaching away" from the claimed Feature 1** and **Feature 2** under MPEP§2145 X.D., and the **"Omission of an element with retention of its function"** under MPEP§2144.04 II.B.

① The Non- obviousness of the claimed **Feature 1** is supported by five Declaration by Zhang, Gao, and Li, and Table 1 and Annexes (1-6, 49-50).

② The Non- obviousness of the claimed Feature 2 is supported by five Declaration by Zhang, Gao, and Li, and Table 2, Table 3 and Annexes (7-10, 46-48,51-54).

But the above **key facts have not been considered by Examiners** with rationale by any documentary Evidence, therefore is NOT in line of MPEP §716, §716.01 and§2145 and § 2143.03 ***(especially MPEP §** 2144.03C*).

**B. Regarding the three Expert's Opinion Evidence** under MPEP §716.01(c)III and **the three Objective Evidence of non-obviousness** under MPEP §716.01(a), §716.02 , §716.03 and §716.04, such as: *unexpected results, commercial success, long-felt but unsolved needs and failure of others,* which is supported by the previously submitted ***Appendixes 1-8 and Annexes 11--43*** and by the previously submitted ***five Declarations by Gao, Zhang and Li.***

**Appellants respectfully indicate that Examiner** have also **NO comment or only one sentence** (i.e. one general statement) on the above **six key facts for argument** by Appellant. Therefore **it is insufficient** under MPEP §2144.03 A, B, C, and §716.

**Conclusion**

Appellant respectfully requests reversal of the Examiner's Rejections.

Respectfully submitted,

/Qunzhu Li/

Qunzhu Li

Date: 10/05/2022

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/576,565 | 08/01/2012 | Li Li | GBLYGX001-APPEAL | 8815 |

98346 7590 08/05/2022

Bayramoglu Law Offices LLC
Bayramoglu Law Offices LLC
1540 West Warm Springs Road
Suite 100
Henderson, NV 89014

| EXAMINER |
|---|
| DOYLE, BRANDI M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1771 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/05/2022 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

gokalp@bayramoglu-legal.com
gokalp@bayramoglu-legal.com

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

Application Number: 13/576,565
Filing Date: 1 Aug 2012
Appellant(s): Li, Li and Li, Qunzhu

____________________
Li et al.
For Appellant

**EXAMINER'S ANSWER**

This is in response to the appeal brief filed 4/21/2022.

**(1) Grounds of Rejection to be Reviewed on Appeal**

Every ground of rejection set forth in the Office action dated 12/24/2021 from which the appeal is taken is being maintained by the examiner except for the grounds of rejection (if any) listed under the subheading "WITHDRAWN REJECTIONS." New grounds of rejection (if any) are provided under the subheading "NEW GROUNDS OF REJECTION."

**Claims 1-7, 10, 13-25, 27, 29, and 31-33 are pending. Outstanding rejections include a rejection of all pending claims under 35 USC 103 and a non-statutory double patenting rejection of all pending claims.**

The following ground(s) of rejection are applicable to the appealed claims.

**Claim Rejection - 35 USC 103**

Claim(s) 1-7, 10, 13-25, 27, 29, 31, and 33 are rejected under pre-AIA 35 U.S.C. 103(a) as obvious over Chinese Patent Application Publication no. 1664074A, published 9/2/2005 (reference pages below are to the English Translation of CN 1664074A provided by applicant on 06/01/2016 and the figures originally cited).

With respect to claims 1-7, 10, 13-25, 27, 29, 31, and 33, Li discloses an FCC method (see e.g. figure 1; p. 18 - p. 21) comprising: reacting hydrocarbon materials with a catalyst in a riser reactor (p. 1, ¶ 3-4) generating gas, oil, and reacted catalyst (p. 21, ¶ 2); separating the reacted effluent in a settler producing a spent catalyst and a reacted effluent of gas and oil (p. 1, ¶ 3); stripping the separated catalyst in a stripping zone (p. 1, ¶ 3); regenerating the stripped catalyst in a regenerator by burning (p. 1, ¶ 3); and cooling at least a portion of the hot regenerated catalyst in a regenerated catalyst cooler using heat extraction medium fluid 37A/B/C that flows through a heat taking element in the tube side of the cooler 8A/B and fluidizing gas 35A/B/C distributed in the lower portion of the cooler (figure; p. 18, ¶ 3-4) before transferring the cooled catalyst directly to the riser for reuse (p. 4, ¶ 1; figure).

Li teaches that the regenerated catalyst cooler(s) comprise one or more coolers located inside or outside the regenerator (p. 2, ¶ 4). There may be separate coolers to adjust one or more of the risers and/or the regenerator or one catalyst cooler with a plurality of outlets for sending catalyst to each of the desired riser reactors and regenerator (e.g. p. 2, ¶ 4 to p. 4, ¶ 1). This includes wherein a catalyst cooler is connected to a riser and used to adjust the reaction temperature of each zone in the riser or the temperature. The cooler cools the catalyst to a temperature from 200 to 720ºC (p. 3, ¶ 2). The coolers may comprise a shell which the catalyst flows through and houses tubes (heat taking element) in the upper portion and fluidizing media in the lower portion, each for providing cooling (p. 18, ¶ 3-4). The temperature of the cooled catalyst is controlled using the flowrate of the fluidized media, the heat-taking media through the tube, or by adjusting the temperature of the regenerator which includes by adjusting the flow of cold catalyst returning to the regenerator (p. 4, ¶ 1; p. 8, ¶ 1; p. 18, ¶ 4- p. 20, ¶ 1). Fluidizing medium 35A/B enters the cooler below and downstream from the tubes (heat exchange element) (Figure; see p. 18, ¶ 3-4)). Heat taking media includes water, steam, oil (p. 18, ¶ 4). The term “mixing buffer space” is not used in Li, however, the space in the catalyst cooler in which cooled catalyst and the fluidizing gas mix before leaving the cooler is interpreted as the mixing buffer space for blending and buffering (figures; p. 18, ¶ 3-4). Note, blending is not used in the instant application with respect to the cooler, but does teach the mixing buffer space, for mixing catalyst and fluidized gas and thus blending is interpreted as a synonym for mixing.

Li teaches that the reaction zone may comprise one or more risers having a plurality of zones (p. 5, ¶ 3; p. 6, ¶ 1). One example is one heavy oil riser with two reaction zones (p. 2) wherein the first zone temperature is controlled with cold regenerated catalyst and the second is controlled with a cold shock agent that may include hot or cold regenerated catalyst, among other agents (p. 5, ¶ 1). The feed to the reaction zone(s) includes hydrocarbon oil feedstock, regenerated catalyst which may be one or a mixture of uncooled regenerated catalyst or cooled regenerated catalyst, and a fluidizing gas (p. 5, ¶ 5 to p. 6, ¶ 2). The feed and catalyst mixture

enters the riser in a pre-lift section of the risers or auxiliary rising pipes (p. 9, ¶ 1; p. 15, ¶ 1; p. 18, ¶ 3- p. 20, ¶ 1; p. 23, ¶ 3). The temperature of the catalyst mixture is controlled by adjusting the amount of each of the cold and hot catalyst supplied (p. 6, ¶ 2), which includes sending a portion of regenerated catalyst through the cooler and a portion bypassing the cooler. “After the lifting mixing of the cold regenerated catalyst and the hot regenerated catalyst by a lifting medium 32 in the pre-lifting zone 4 of the heavy oil riser reactor, the temperature reaches equilibrium" (p. 19, ¶ 2). The pre-lift medium includes e.g. gas, oil, water (p. 15, ¶ 1). The first reaction mixture from a first reaction zone may be mixed with a cold shock agent to independently adjust the mixture temperature and passed to the subsequent zone (p. 1, ¶ 4 to p. 2, ¶ 2; p. 5, ¶ 1; p. 5, ¶ 1). The cold shock agent ay include water, oil, cold regenerated catalyst, cold spent catalyst, etc. (p. 5, ¶ 1). Thus, cold regenerated catalyst may be passed directly to the second reaction zone to independently control the temperature. Cold regenerated catalyst may be passed through auxiliary or assistant riser with pre-lift media to a zone of one or more riser reactors as a cold shock or quenching agent for reuse in the riser (p. 6, ¶ 1). The operating temperature in the riser may be controlled using the hydrocarbon to oil ratio, the amount of cold catalyst and hot catalyst, temperature of cold catalyst (p. 6; p. 8, ¶ 1; p. 20, ¶ 1), multi-point feeding (p. 17, ¶ 3), and cold shock or quenching agents (p. 5, ¶ 2). The second reaction mixture is the mixture which is separated in the settler and regenerated (p. 2, ¶ 3).

Li teaches that the regenerator may comprise single-stage regeneration or two-stage regeneration wherein semi-regenerated catalyst is obtained from a first stage and regenerated in a second stage to obtain fully regenerated catalyst (p. 14, ¶ 3-4). The regeneration device/process may utilize conventional methods and devices for coke-burning regeneration (p. 15, ¶ 2). Hot regenerated catalyst is sent to a cooler or directly to a riser without cooling (p. 3, ¶ 1). Cooled catalyst may be recycled to the regenerator to regulate temperature therein (p.3, ¶ 4).

Claim 32 is rejected under pre-AIA 35 U.S.C. 103(a) as obvious over Chinese Patent Application Publication no. 1664074A, published 9/2/2005 (reference pages below are to the English Translation of CN 1664074A provided by applicant on 06/01/2016 and the figures originally cited) in view of Palmas (US 2010/0152515).

**With respect to claims 32, Li discloses an FCC method as claimed in claim 1 and described above. Li teaches wherein one or more reactors comprising two or more reaction zones for cracking heavy gas oil.**

Further, with respect to processing in an FCC system comprising a single riser with a single reaction zone or plurality of reaction zones as taught in Palmas (figure; 0018; 0022). It would have been obvious to one of ordinary skill in the art at the time of the invention to operate the process of Li with a single riser having one reaction zone to do no more than obtain predictable results of conversion of the heavy oil to lighter products using the single reaction zone. While the product slate and operating conditions would be tailored based on the reaction zones provided, whether one, two or six, the use of a single reaction zone is obvious and the results expected.

**Claim Rejection – Double Patenting**

Claims 1-7, 10, 13-25, 27, 29, 31 and 32-33 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 11-30 of copending Application No. 17/066,484 (reference application). Although the claims at issue are not identical, they are not patentably distinct from each other because while the claims are not identical the limitations of claims 1-7, 10, 13-25, 27, 29, 31 and 32-33 all limitations are claimed in the reference application in overlapping scope.

This is a provisional nonstatutory double patenting rejection because the patentably indistinct claims have not in fact been patented.

**(2) Response to Argument**

**<u>Appellant's Argument I(i), pages 12-17</u>**

Appellant argues claim limitation "wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is . . . used to adjust the reaction temperature of each of the reaction zones of the one riser, so as to keep the reaction temperature of each of the reaction zones in optimal value, respectively; or when the one riser reactor comprises only one reaction zone . . . to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the temperature in optimal value" is a "functional overall means [that] should not be split and the non-obviousness of the claimed Feature 1 should be evaluated in entirety". *Id*. at 13. Thus, Appellant argues that the obviousness rejection may not stand on a single embodiment having two or more reaction zones or a single embodiment having only one reaction zone, but must cover both embodiments to properly reject independent claim 1. Appellant argues Li does not disclose both embodiments or the limitation as a functional overall means limitation.

Appellants arguments have been considered but are not persuasive. First, Appellant errs in the claim interpretation that Feature 1 is a functional overall means comprised of the alternative embodiments which must be considered in whole. Functional overall means is not a term utilized in patent law and no such claim construction principal is discussed in the MPEP. The instant claims are Markush claims that claim alternative embodiments with respect to the number of reaction zones within the reactor. See MPEP 2117. The current claim interpretation selects one of the embodiments in the instant claims merely splits a single limitation into its alternatively recited embodiments and therefore is not "split[] excessively" to the extent that it "does not even reflect the sequence, function of the above basic step" as argued by Appellant. *See* Appeal Brief at 13. Further, the invention is expressly claimed as interpreted in

embodiments of claim 32 and 33. Dependent claim 32 exemplifies a process taking place in a single riser having "only one reaction zone", while claim 33 presents a process occurring in a single riser having "only at least two reaction zones". If "a functional overall means limitation" requires both embodiments, claims 32 and 33 would be improper dependent claims.

**Appellant's Argument I(ii), pages 12-17**

Next, Appellant argues the Li reference fails to teach (i) one riser comprising one reaction zone or comprising two or more zones, and (ii) adjusting the reaction temperature of multiple reaction zones with one cooler. *Id.* at 14. Appellant argues the invention of Li requires two essential features that go against the instant claim 1: the presence of cooler B for cooling the second reaction zone and a corresponding auxiliary riser. *Id.* at 15-16 (citing the example on page 18). Appellant also argues Li's teaching of cold regenerated catalyst followed by the term "cold shock" agent suggests rapid, "sudden and uncontrolled" cooling synonymous with quenching which Appellant concludes takes "the reaction temperature outside of the *optimum value*". *Id.* Appellant further argues Examiner has not established "cold shock" would not produce wide swings in temperature.

Appellant's arguments are not persuasive. Regarding Li requiring two risers, a heavy oil along with a gasoline or auxiliary riser, (i) Li teaches using one or more reactors having two or more reaction zones, which includes one reactor having two reaction zones as claimed in each independent claim. Li Patent, at 5, 18. Li is good for all it teaches and not merely preferred embodiments. Additionally, Li describes the invention operating in one of two embodiments. "The present invention may be solely implemented, that is, independently complete the process of reaction, regeneration, separation and so on, and may also be jointly implemented with the catalytic conversion device of another set of raising pipe or fluidized bed" for cracking gasoline in a second reactor unit. Li Patent, at 5, par. 3. The "joint implementation mode" has "two raising pipes, which are a heavy oil raising pipe and a gasoline riser reactor". Li Patent, at 8, par 4. On

the other hand, the sole implementation mode is a single riser comprising multiple zones for reacting heavy oil, at 5, par. 3-5, with no gasoline reactor. The sole implementation mode may comprise an auxiliary raising pipe, however, this is not a second reactor. "[T]he auxiliary raising pipe is a transporting pipe and is in communication with the middle [] of the heavy oil riser reactor." Li reactor, at 6, par. 1. The auxiliary riser acts as a mere conduit for transporting the cold catalyst and cold shock agent. Id. Regarding claim 32 in which a single riser comprising a single reaction zone is required, Palmas is cited for its teaching using one reactor comprising only one reaction zone (taught as one or more reaction zones).

With respect to (ii) controlling the temperature of each of the two or more reaction zones, Li teaches controlling the temperature of the reaction zones in its optimum valve. Li Patent, at 13, par. 2. With respect to the sole implementation method, Li teaches a method having two catalyst coolers, one to cool regenerated catalyst past to the first reactor zone, and a second cooler providing cooled catalyst to the second reaction zone. Li Patent, at 6-7. This allows controlling each reaction zone, but with two coolers. However, Li also teaches wherein the "catalyst cooler of the present invention is provided with one or more catalyst outlets, wherein one of them is used to transport the cold regenerated catalyst back to the regenerator, . . . [t]he other one or two catalyst outlets are individually used to transport the cold regenerated catalyst to recycle to on ore two raising pipes (reactor), and the temperatures of the reaction zones" controlled "to maintain it at the optimum value." *Id.* at 4. Thus, the two catalyst coolers may be replaced with a single cooler for cooling regenerator and the multiple zones as contemplated by Li. Additionally, Li teaches embodiments using one cooler for one reaction zone and a cold shock agent in the second reaction zone, not a second cooler. "Cold shock agent" is defined in Li as cold spent or regenerated catalyst and is used "to conveniently control the temperatures of each of the reaction zones". Li Patent, at 5, par. 1-2. Applicant has not shown that "cold shock agent" infers a lack of control of reactor temperature, such is not implied in the general art, and such is contrary to the direct teaching of Li.

**Appellant's Argument II, page 19-23**

Appellant argues that Li fails to teach "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space being disposed in the downstream location of the regenerated catalyst cooler before the cooled regenerated catalyst entering the riser reactor" as required in claims 13 and 20 (Appellant's "Feature 2"). Appeal Brief, at 19. Appellant then presents four conclusory statements regarding (l) radial gap, (2) figures fail to present a downstream axial space, (3) up-flow mode, and (4) size calculations of the buffering space. Id. at 21-22. Appellant argues against the obviousness of Feature 2 over Li concluding (1) the long standing common knowledge that catalyst cooler is isothermal is wrong, (2) discussion regarding the radial temperature in a commercial unit; and (3) lack of documentary evidence that Li teaches a mixing buffer space.

Appellant's arguments here are not persuasive. The majority of the arguments have been previously addressed in the previous Examiner's Answer (2/7/2019) and Board Decision (10/8/2020). Following is the interpretation of mixing buffer space and how it is satisfied by Li. Mixing buffer space is given its broadest reasonable interpretation in light of the specification and ordinary meaning of the terms (see Office Action mailed 4/4/2017, pages 3-4). The "mixing buffer space" is not described in the instant application. Looking at all mentions in the specification of a mixing buffer space and giving the terms their plain meaning, the term is defined as a lower region of the catalyst cooler in which the catalyst is combined (mixed) with the fluidizing media and withdrawn from the cooler. The specification was examined to glean a definition of the mixing buffer space. No express definition was provided in the specification. Relevant portions of the specification which define the cooler which houses the mixing buffer space disclose a cooler with "[the catalyst entrance of the shell of the described catalyst cooler directly (or through a pipeline)" having "internal components in the cooler for removing heat", "fluidized media distribution facilities under the cooler", and "a buffer space for mixed buffer

catalyst” (page 4, lines 18-21). The catalyst is "cooled by catalyst cooler within 200 to 720°C” or "within 360 to 650°C" with the temperature of the cold regenerated catalyst "controlled by adjusting the flows of the fluidized media and/or taking-heat media or adjusting other parameters” (page 5, lines 13-24; page 6, lines 1-8). The coolers are defined as “traditional industrial equipment” with the invention including a variety of structures and transmissions which one of skill in the art can easily understand (page 7, lines 8-14; page 8, lines 23-25). “When the cold regenerated catalyst through the catalyst cooler enters into the riser reactors directly (or fluidized bed reactor), the temperature of the cold regenerated catalyst in the reaction zones of riser reactors (or fluidized bed reactors) can be controlled by adjusting the flows of fluidized media and/or taking-heat media and/or the flows of cold catalysts retuned to the regenerator or adjusting other parameters." (page 7, lines 18-23; see also page 8, lines 11-15).

The specification defines mixed buffer space as “a buffer space for mixed buffer catalyst”, catalyst exiting “the catalyst mixed buffer space in the downstream of the described catalyst cooler", “the mixing buffer space in the lower part”, and “the regenerated catalyst after cooling enters into the mixing buffer space in the lower part”. Further, the transmission of catalyst forms the buffer space to the regenerator/reactor may all occur outside or within the cooler's shell (page 5, lines 1 -6). From each of the figures (mixing buffer space is designated 9A, Figure 1; 9A and 9B in Figures 2-4) the heat exchanger is depicted as (not to scale) a shell housing (e.g. Figure 1, 8A) with a heat-exchange element (e.g. Figure 1, element fed by 37A) positioned in the upper portion of the shell (8A), extending through a portion of the shell and located above a fluidizing gas inlet (Figure 1, fed by fluidizing gas 35A), with empty space (Figure 1, 9A) between the tube and distributor labeled the mixing buffer space. In the figures, the buffering space appears to be contained below the mid line and within the lower portion of the shell (though the drawing is not to scale). The specification indicates that a number of catalyst withdraw lines are connected to the buffering space and the figures show these withdraw lines (e.g. Figure 1, 12A) are connected to the vessel/ buffering space below the

fluidizing media distributor. The reference numeral 9 indicates that the buffering space is at least in part above the fluidizing media distributor. Thus, the fluidizing media distributor, at least in some embodiments, appears to be located within the buffer space which would cause mixing of the fluidizing media and catalyst in the buffer space. With respect to the specification, there is not description in terms of function, apparatus dimensions, or operating conditions for mixing buffer space.

Next, mixing buffer space does not appear to be a term in the art. Looking at the ordinary meaning of the phrase “a mixing buffer space", mixing indicates combining or blending together into one mass or mixture (to combine or join; to create by combining ingredients; to add to another; a mixture of ingredients; or a combination of diverse elements), which could be combining two streams such as the cooled catalyst and the fluidizing gas into one stream. Buffer is something that lessens the shock of an impact or protects by intercepting or moderating adverse influences and space is a blank or empty area or an area provided for a purpose. Considering the definitions provided to the words mixing, buffer and space and considering the figures and disclosure in the instant specification, a mixing buffer space can reasonably be interpreted as simply an area in the lower region of the shell/cooler designated for combining the catalyst with the fluidizing gas and/or hold up or space between the cooling tube and catalyst outlet which the cooled catalyst particles together pass through as the catalyst particles travel from the shell inlet in the upper region to the outlets in the lower base of the shell. This interpretation would allow the space “to perform mixing and buffering functions” as suggested by appellant.

There is no indication that the buffer space imparts any limitations beyond the empty area which allows the catalyst to pass through as it makes its way from the upper region of the shell and out of the withdraw lines in the lower region of the shell. There are no details regarding mixing in the claim that would require “a uniform and stable temperature" as argued by appellant and no details provided in the specification that require the mixing step occur in any particular

manner, under any particular conditions, for any time or happening, or to solve any known problem. Outside the phrase mixing/mixed buffer space, the instant specification does not use the word mix/mixed/mixing/mixture in discussing the steps of cooling the regenerated catalyst or the catalyst cooling apparatus.

Therefore, Li teaches a "mixed buffer space" and satisfies the limitations of claims 13 and 20. "Downstream axial space", "uniform and stable temperature" and "preventing radial temperature difference caused by non-uniform and abnormal flow" limitations Appellant argues are not taught by Li are not claimed limitations. Similarly, Appellants key facts regarding the fluidizing gas of Li set in a radial gap, no downstream axial space, use of an up-flow mode, and size calculation of the mixing buffer space, again are not claimed limitations and not persuasive to rebut the teaching of Li with respect to the anticipated claim limitations. Lastly, Appellant's arguments with respect to the teaching away and commercial use of a separate process are not relevant to the current rejection which anticipates the claimed cooler. Further, the specific arguments presented, and previously presented in the declarations, do not compare and show unexpected results of a claimed system to the closest art of record.

**<u>Appellant's Argument III, page 23-28</u>**

Appellant argues Examiner fails to consider the synergistic effect and unexpected results of claims 1, 13, and 20 as a whole. Appellants allege the criticality and unexpected results are presented by five Declarations by Zhang, Gao, and Li and Annexes 1-54 and such have not been considered by Examiner with adequate documentary evidence. Appeal Brief, at 23. Appellant argues three specific points:

**(i) Examiner overlook the overall understanding of the independent claims by dividing Feature 1 and Feature 2. *Id.* at 24.**

First, Feature 2 is not a limitation in claim 1, only claims 13 and 20. Second, Appellant's arguments with respect to improper division of the claim are in error. The claim presents a

process having two embodiments with respect to the reaction zone. It is not improper to consider a single embodiment where multiple embodiments are presented. The divisibility of Feature I is further discussed under Argument I, *supra*.

**(ii) Appellant argues expert and article opinions prove unexpected technical effect of claimed Feature 1 and 2. *Id.* at 24-25.**

Appellant argues concept of optimization of multi reaction zones and control of reaction, independent control of regeneration temperature, catalyst-to-oil ratio and reaction temperature in a commercial unit; and optimal control of reaction temperature of multi-zones of a riser in a commercial unit, show unexpected results. Evidence of such unexpected results is 3 opinions of inventors running results on commercial units and academic acknowledgement.

In response, the evidence alone is not sufficient to show unexpected results over the prior art which teaches the limitations of the claimed invention. Each of the affidavits were previously addressed in the subsequent office actions. Li also teaches the same benefits of catalyst-oil ratio becoming independently regulatable, Li at 15, maintaining the reaction temperature of the reaction zones at optimum values, Li at 16, and independent control of reaction zones and regeneration temperature, Li at 16.

**(iii) Appellant argues unexpected results and commercial success show claimed invention is unobvious over Li. *Id.* at 25-28.**

Appellant claims (1) Li has two risers, not one.

In response, as discussed in detail above, the second “auxiliary riser” is not a riser reactor but merely means for transporting cooled regenerated catalyst.

Appellant states as of 2014,15 commercial units of the instant invention were applied onstream and no one is willing to apply Li since 2008.

In response, 15 commercial units and non-use of the cited art does not negate the teaching in the prior art of the claimed invention or show the claimed invention is novel over Li.

Appellant further argues documentary Evidences and the five declarations have not been considered sufficiently because Examiner failed to provide written documentary support to rebut the evidence provided.

In response, the declarations were considered at the time submitted and addressed in the subsequent office action. Further note that the initial declarations were filed prior to latest amendment incorporating Feature 1. After consideration of the declaration and secondary evidence, the claim was maintained obvious because all the elements of the claimed composition were accounted for in the prior art and the evidence of successful operation of and acknowledgement of the claimed invention does not negate the teachings of the prior art.

**1. Appellant argues unexpected results shown in Tables 1, 2 and Annexes 1-50 shows increase in profit of an existing unit; praise of 10 experts in the area; and two awards.**

**2. Appellant argues commercial success over Li on sales of the process.**

**3. Appellant argues long-felt need and failure of others.**

Li teaches the same claim limitations achieving the same individual reaction zone and regenerator control with the same benefits as alleged from the claimed invention. The presented evidence cites positive attributes of the claimed invention but does not contrast the cited reference.

**Appellant's Argument IV, page 28-30**

Appellant argues "blending and buffering" is not taught by Li and the reasoning and support provided is inadequate. Li fails to teach independent and separate catalyst buffer space and uniform and stable catalyst temperature. Appellant further argues previously presented rejections under 103, response to arguments, and responses to evidence presented in the various affidavits are not sufficient because they are not supported by documentary evidence.

Appellant's arguments are not persuasive. Mixing buffer space is taught by Li as taught in detail with respect to Argument II above. Independent and separate catalyst buffer space and uniform and stable catalyst temperature are not limitations in the present claims and thus need not be taught by Li. Documentary evidence is not required to rebut appellants arguments, mostly conclusory, presented in the affidavits. The evidence presented was not sufficient to overcome the rejections for the reasons previously disclosed.

For the above reasons, it is believed that the rejections should be sustained.

Respectfully submitted,

/BRANDI M DOYLE/
Examiner, Art Unit 1771

Conferees

/PREM C SINGH/
Supervisory Patent Examiner, Art Unit 1771

/Walter D. Griffin/
Supervisory Patent Examiner, Art Unit 1774

**Requirement to pay appeal forwarding fee.** In order to avoid dismissal of the instant appeal in any application or ex parte reexamination proceeding, 37 CFR 41.45 requires payment of an appeal forwarding fee within the time permitted by 37 CFR 41.45(a), unless appellant had timely paid the fee for filing a brief required by 37 CFR 41.20(b) in effect on March 18, 2013.

| | |
|---|---|
| **To:** | gokalp@bayramoglu-legal.com,gokalp@bayramoglu-legal.com, |
| **From:** | PAIR_eOfficeAction@uspto.gov |
| **Cc:** | PAIR_eOfficeAction@uspto.gov |
| **Subject:** | Private PAIR Correspondence Notification for Customer Number 98346 |

Aug 05, 2022 04:15:01 AM

Dear PAIR Customer:

Bayramoglu Law Offices LLC
Bayramoglu Law Offices LLC
1540 West Warm Springs Road
Suite 100
Henderson, NV 89014
UNITED STATES

The following USPTO patent application(s) associated with your Customer Number, 98346 , have new outgoing correspondence. This correspondence is now available for viewing in Private PAIR.

The official date of notification of the outgoing correspondence will be indicated on the form PTOL-90 accompanying the correspondence.

Disclaimer:
The list of documents shown below is provided as a courtesy and is not part of the official file wrapper. The content of the images shown in PAIR is the official record.

| Application | Document | Mailroom Date | Attorney Docket No. |
|---|---|---|---|
| 13576565 | APEA | 08/05/2022 | GBLYGX001-APPEAL |

To view your correspondence online or update your email addresses, please visit us anytime at https://sportal.uspto.gov/secure/myportal/privatepair.

If you have any questions, please email the Electronic Business Center (EBC) at EBC@uspto.gov with 'e-Office Action' on the subject line or call 1-866-217-9197 during the following hours:

Monday - Friday 6:00 a.m. to 12:00 a.m.

Thank you for prompt attention to this notice,

UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT APPLICATION INFORMATION RETRIEVAL SYSTEM

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| In re Application of | : | |
| Li Li et al. | : | Confirmation No. 8815 |
| U.S. Patent Application No. 13/576,565 | : | Group Art Unit: 1771 |
| Filed: August 1, 2012 | : | Examiner: DOYLE, Brandi M. |

For: METHOD AND EQUIPMENT FOR CIRCULATING COOLED REGENERATED CATALYST

**Appeal Brief Under 37 C.F.R. § 41.37**

This Appeal Brief under Board Rule (BdR) 37 concerns the Appeal under 35 U.S.C. § 134 (transitional) of the Final Office Action filed on December 27, 2021. At least one claim in the above captioned application having been twice rejected Applicant submits this appeal under 35 USC 134 (transitional) (a). The Appeal Brief is timely as the Notice of Appeal was filed within three-month period from the Final Office Action Filed on December 27, 2021, and this appeal is filed within the time period granted by the notice of appeal and any extensions of time as required.

The Board has jurisdiction under 35 U.S.C. § 134(a) (transitional) and §6(b)(1).

# TABLE OF CONTENTS

| Section | Page |
|---|---|
| STATEMENT OF REAL PARTY IN INTEREST | 3 |
| RELATED APPEALS, INTERFERENCES, AND TRIALS | 4 |
| SUMMARY OF CLAIMED SUBJECT MATTER | 5 |
| ARGUMENTS | 9 |
| I. Arguments for independent claims 1, 13, and 20. | 12 |
| II. Separate arguments for independent claims 13 and 20. | 19 |
| III. Additional arguments for independent claims 1, 13, and 20. | 23 |
| i. Further discussion of claims 1, 13, 20. | 24 |
| ii. Opinion Evidence | 24 |
| iii. Other Evidence and secondary considerations | 25 |
| IV. Rebuttal to Examiner remarks in the Final Action of 12/24/21 | 28 |
| V. Summary Regarding the independent claims 1, 13, 20 | 30 |
| VI. Separate arguments for dependent claims 6, 16, and 22. | 33 |
| CLAIMS APPENDIX | 35 |

**BdR 37(c)(1)(i). Statement of the Real Party in Interest**

The real parties in interest are QUNZHU LI and LI LI of **Beijing City, Peoples Republic of China**. There has been no assignment of interest regarding the present application. An Application Data Sheet describing QUNZHU LI and LI LI as the original inventors in the present application was filed on August 1, 2012.

## BdR 37(c)(1)(ii). Statement of Related Cases

A. Appeal 2019-003658

Appellant amended the claim, and filed a Rehearing on Dec. 8,2020, and the Board ruled that Appellant should proceed with RCE.

## BdR 37(c)(1)(iii). Summary of Claimed Subject Matter

Claims 1, 13, and 20 are rejected independent claims.

Claim 1 reads as follows:

1. A method for circulating a cold regenerated catalyst (*See Specification page 3 line 26*), comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst (*See Specification page 4 lines 5-7*), wherein the one riser reactor comprises only one reaction zone or at least two reaction zones (*See Specification page 5 lines 8-10*);

separating the gas and oil products from the reacted catalyst in a settler (*See Specification page 4 lines 8-10; and see 1 in the Figs.*) , stripping the separated catalyst in a stripping section (*See Specification page 4 lines 9-10 and 1A in the Figs.*);

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst (*See Specification page 4 lines 8-9; and page 9 lines 25-26*);

cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use (*See Specification page 5 lines 13-15*);

wherein when the one riser reactor comprises at least two reaction zones (*See Specification page 5 lines 8-10*), the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor (*See Specification page 4 lines 12-17*), so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively (*See again Specification page 4 lines 12-17; and page 5 lines 7-13*), or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value (*See Specification page 4 lines 12-17, and page 5 lines 7-13*).

Claim 13 reads as follows:

13. A method for circulating a cold regenerated catalyst (*See Specification page 3 line 26*), comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst (*See Specification page 4 lines 5-7*), wherein the one riser reactor comprises only one reaction zone or at least two reaction zones (*See Specification page 5 lines 8-10*);

separating the reacted catalyst from the gas and oil products in a settler (*See Specification page 4 lines 8-10; and see 1 in the Figs.*); stripping the separated catalyst in a stripping section (*See Specification page 4 lines 9-10 and 1A in the Figs.*);

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst (*See Specification page 4 lines 8-9; and page 9 lines 25-26*);

cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use (*See Specification page 5 lines 13-15*);

wherein a heat-exchanging element-is mounted inside the regenerated catalyst cooler (*See Specification 37A in Fig. 1*), and a fluidizing medium distributor is located in the lower part of the regenerated catalyst cooler (*See Specification 35A in the Figs.*);

blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space being disposed in the downstream location of the regenerated catalyst cooler before the cooled regenerated catalyst entering the riser reactor (*See Specification page 16 lines 10-15*); and

wherein when the one riser reactor comprises at least two reaction zones (*See Specification page 5 lines 8-10*), the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor (*See Specification page 4 lines 12-17*), so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively (*See again Specification page 4 lines 12-17; and page 5 lines 7-13*), or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value(*See Specification page 4 lines 12-17, and page 5 lines 7-13*).

Claim 20 reads as follows:

20. A method for circulating a cold regenerated catalyst (*See Specification page 3 line 26*), comprising

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst (*See Specification page 4 lines 5-7*), wherein the one riser reactor comprises at least one reaction zone (*See Specification page 5 lines 8-10*);

separating the reacted catalyst from the gas and oil products in a settler (*See Specification page 4 lines 8-10; and see 1 in the Figs.*); stripping the separated catalyst in a stripping section(*See Specification page 4 lines 9-10 and 1A in the Figs.*);

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst (*See Specification page 4 lines 8-9; and page 9 lines 25-26*);

cooling the hot regenerated catalyst by a catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use (*See Specification page 5 lines 13-15*);

wherein a heat-exchanging element having a heat-taking medium inside is mounted inside the regenerated catalyst cooler (*See Specification 37A in Fig. 1*), and a fluidizing medium distributor is located in the lower part of a catalyst mixing buffer space (*See Specification 35A in the Figs.*);

blending and buffering the cooled regenerated catalyst in the catalyst mixing buffer space being disposed underneath the heat-exchanging element before the cooled regenerated catalyst entering the riser reactor (*See Specification page 16 lines 10-15*), wherein the catalyst mixing buffer space is independent and separate from spaces taken by the heat-exchanging element (*See at least in Fig. 1, the space taken by the heat exchange element 37A is above the fluidizing medium distributor and the buffer space is located in an independent and separate lower zone 9A of the reactor proximate to 35A*); and

wherein when the one riser reactor comprises at least two reaction zones (*See Specification page 5 lines 8-10*), the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor (*See Specification page 4 lines 12-17*), so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively (*See again Specification page 4 lines 12-17; and page 5 lines 7-13*), or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is

connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value (*See Specification page 4 lines 12-17, and page 5 lines 7-13*).

## BdR 37(c)(1)(iv). Argument

The Final Office Action of December 27, 2021, contains rejections under 35 U.S.C. § 103(a) (Final Office Action, pp.4 and 7). Each rejection is addressed under a separate header in the following order, which matches the order presented in the Final Office Action. The following issues are presented:

Claims 1-7, 10,13-25,27,29,31 and 33 are obvious under 35 U.S.C. § 103(a) over Chinese Patent Application Publication CN1664074A by Li (hereinafter *referred as* "Li reference" or "Li"), published September 2, 2005. (Final Office Action, page 4); and

Claim 32 are obvious under 35 U.S.C. § 103(a) over Li in view of Palmas (US 2010/0152515). (Final Office Action, page 7)

## A. Claims 1-7, 10,13-25,27,29,31 and 33 are Non-Obvious over Li

Claims 1-7, 10,13-25,27,29,31 and 33were rejected under 35 U.S.C. § 103(a) as being unpatentable over the Li reference. (Final Office Action, page 4).

Appellants submit that the Examiner erred in applying the obviousness rejection, and requests reversal thereof. For example, with respect to at least independent claims 1, 13, and 20 the law relating to obviousness is improperly applied, and the Li reference cannot be relied upon in the manner suggested by the Examiner to reject the pending claims. Proper application of the law, and reasonable interpretation of the references, demonstrates that the relevant standard for obviousness has not been met, and the claimed subject matter is allowable over the applied references.

Obviousness is a question of law based on underlying factual inquiries. The factual inquires are set forth in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966). The factual inquiries include:

(a) determining the scope and content of the prior art;

(b) ascertaining the differences between the claimed invention and the prior art; and

(c) resolving the level of ordinary skill in the pertinent art.

Objective evidence relevant to the issue of obviousness must be evaluated by Office personnel. *Id.* at 17-18, 148 USPQ at 467. Such evidence, sometimes referred to as "objective evidence" or "secondary considerations," may include evidence of commercial success, long-felt but unsolved needs, failure of others, and unexpected results.
*MPEP 2141.02*

"In determining the differences between the prior art and the claims, the question under 35 U.S.C. 103 is not whether the differences themselves would have been obvious, but whether the claimed invention as a whole would have been obvious. Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 218 USPQ 871 (Fed. Cir. 1983); Schenck v. Nortron Corp., 713 F.2d 782, 218 USPQ 698 (Fed. Cir. 1983) (Claims were directed to a vibratory testing machine (a hard-bearing wheel balancer) comprising a holding structure, a base structure, and a supporting means which form "a single integral and gaplessly continuous piece." Nortron argued the invention is just making integral what had been made in four bolted pieces, improperly limiting the focus to a structural difference from the prior art and failing to consider the invention as a whole. The prior art perceived a need for mechanisms to dampen resonance, whereas the inventor eliminated the need for dampening via the one-piece gapless

support structure. "Because that insight was contrary to the understandings and expectations of the art, the structure effectuating it would not have been obvious to those skilled in the art." 713 F.2d at 785, 218 USPQ at 700 (citations omitted).)."

"Distilling an invention down to the "gist" or "thrust" of an invention disregards the requirement of analyzing the subject matter "as a whole." W.L. Gore & Assoc., Inc. v. Garlock, Inc., 721 F.2d 1540, 220 USPQ 303 (Fed. Cir. 1983), cert. denied, 469 U.S. 851 (1984)"

"[A] patentable invention may lie in the discovery of the source of a problem even though the remedy may be obvious once the source of the problem is identified. This is part of the 'subject matter as a whole' which should always be considered in determining the obviousness of an invention under 35 U.S.C. § 103." In re Sponnoble, 405 F.2d 578, 585, 160 USPQ 237, 243 (CCPA 1969). *(Must show evidence in specification, affidavit, or declaration of discovery of source of problem)*

*MPEP 2143.03*

When evaluating claims for obviousness under 35 U.S.C. 103, all the limitations of the claims must be considered and given weight, including limitations which do not find support in the specification as originally filed (i.e., new matter). Ex parte Grasselli, 231 USPQ 393 (Bd. App. 1983) aff'd mem. 738 F.2d 453 (Fed. Cir. 1984) (Claim to a catalyst expressly excluded the presence of sulfur, halogen, uranium, and a combination of vanadium and phosphorous. Although the negative limitations excluding these elements did not appear in the specification as filed, it was error to disregard these limitations when determining whether the claimed invention would have been obvious in view of the prior art.).

To support an obviousness rejection, MPEP §2143.03 requires the "consideration" of every claimed feature in an obviousness determination and MPEP § 2141.02 requires consideration of the "[claimed] invention and prior art as a whole." Further, the Board of Patent Appeal and Interferences recently confirmed that a proper obviousness determination still requires the Office to make "a searching comparison of the claimed invention – *including all its limitations* – with the teaching of the prior art." In re Wada and Murphy, Appeal 2007-3733 (January 14, 2008), citing In re Ochiai, 71 F.3d 1565, 1572 (Fed. Cir. 1995) and CFMT v. Yieldup Intern. Corp., 349 F.3d 1333, 1342 (Fed. Cir. 2003) (emphasis in original). Further, the necessary presence of all claim features is axiomatic, since the Supreme Court has long held that obviousness is a question of law based on underlying factual inquiries, including … ascertaining the differences between *the claimed invention* and the prior art. *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966) (emphasis added). Indeed, Applicants submit that this is why Section 904 of the MPEP instructs Examiners to conduct an art search that

covers "the invention *as described and claimed*." (emphasis added). In sum, it remains well-settled law that an obviousness rejection requires at least a suggestion of all of the claim elements.

Here, a *prima facie* case of obviousness cannot be established for at least the following reasons.

## I. Non-obviousness of Feature 1 of Claims 1, 13, 20

The independent claims recite, *inter alia*:

" … wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so *as to keep the reaction temperature of each of the reaction zones in an optimal value*, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, *so as to keep the reaction temperature in an optimal value*."

The Examiner only to Li (CN 1664074A) to address all of the limitations of the independent claims. With respect to the above identified claim limitations, the Examiner concludes the following (See Final Office Action of 12/24/2021, Page 6):

equilibrium" (p. 19, ¶ 2). The pre-lift medium includes e.g. gas, oil, water (p. 15, ¶ 1). The first reaction mixture from a first reaction zone may be mixed with a cold shock agent to independently adjust the mixture temperature and passed to the subsequent zone (p. 1, ¶ 4 to p. 2, ¶ 2; p. 5, ¶ 1; p. 5, ¶ 1). The cold shock agent ay include water, oil, cold regenerated catalyst, cold spent catalyst, etc. (p. 5, ¶ 1). Thus, cold regenerated catalyst may be passed directly to the second reaction zone to independently control the temperature. Cold regenerated catalyst may be passed through auxiliary or assistant riser with pre-lift media to a zone of one or more riser reactors as a cold shock or quenching agent for reuse in the riser (p. 6, ¶ 1). The operating temperature in the riser may be controlled using the hydrocarbon to oil ratio, the amount of cold catalyst and hot catalyst, temperature of cold catalyst (p. 6; p. 8, ¶ 1; p. 20, ¶ 1), multi-point feeding (p. 17, ¶ 3), and cold shock or quenching agents (p. 5, ¶ 2). The second

The Appellant submits that the Examine has failed to address the use of the cooled regenerated

catalyst of one regenerated catalyst cooler to *keep respectively the reaction temperature of each of the reaction zone or zones in an optimum value*. In Li, the agent is called referred to as a "cold shock" agent, which would suggest to those skilled in the art that the cooling in the prior art occurs in a sudden and uncontrolled manner with an emphasis on rapidly cooling the reaction zones of the prior art. The Examiner has not established that the "cold shock" agent in Li does not produce wide swings in the reaction temperature which would take the reaction temperature outside of the *optimum value* in the reaction zones in the prior art. In fact, the Examiner finds that the cold shock agent is synonymous with being a "*quenching agent*" (See Final Office Action of 12/24/2021, Page 6, and reprinted above). Accordingly, the Examiner has failed to establish, that the reaction temperature of each of one or more reaction-zones in the prior art is *kept respectively in an optimum value* by the adjusting of one regenerated catalyst cooler as required by the claims.

The Appellant respectfully requests that the Examiners rejections of all claims be reversed because the Examiner has failed to address all elements of the independent claims

**Furthermore of Claim 1, 13, 20 reads as follows:**

> "wherein the one riser reactor comprises only one reaction zone or at least two reaction zones . . . wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and ***is used to adjust the reaction temperature of each of the reaction zone zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in optimal value, respectively;*** or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and ***is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the temperature in optimal value."*** (hereinafter referred as **"Feature 1"**)

**The claimed Feature 1 is a functional overall means,** rather than the selection of the specific operating parameters, **should not be split and the non-obviousness of the claimed Feature 1 should be evaluated in entirety** under MPEP 2141.02 I and II.

**Examiner splits excessively the claimed Feature 1** *(almost splits to the extent "technical term-levels", such as "a catalyst cooler or a reaction zone", etc.)*. But the above "over-splitting" does not even reflect the sequence, function of the above basic steps.

**Therefore, the Examiner's Response to Argument** (Para. No. 10, 11 in page 3 of Final Office Action filed on Dec. 27,2021), without any written document support, is in clear violation

of MPEP 2141.02 I, II, 2143.01 III, 2143.03, and 2144.03 A, B, C.

The claimed **Feature 1** have been proposed by instant application **for the first time** in FCC field, and there is No documentary record in Common Knowledge and Prior Art including **Li** before the filing date of the instant application (see Table 1 and Annexes 1-6,*filed on Jan. 17, 2018 and with Annex indications for all Annexes submitted on Jan. 17, 2018 being indicated on the form PTO-1449, considered by the Examiner on 2/7/2019*).

First, Li does not teach, disclose, or suggest that "the one riser reactor comprising **one** reaction zone" and "*the one regenerated catalyst cooler is used to* ***adjust the reaction temperature of each reaction zone of the one riser reactor*** *comprising* ***at least two*** *reaction zones, respectively"* as recited independent claim1,13, 20 of the present application.

Li discloses that "two regenerated catalyst coolers is used to adjust the reaction temperature of each reaction zone of the riser reactor comprising at least two reaction zones, respectively i.e., catalyst cooler A is used to adjust the reaction temperature of 1st reaction zone, catalyst cooler B is used to adjust the reaction temperature of 2nd reaction zone". (see Figs 1-4 of Li).

For example, cooler 8A in Fig. 1 of Li is configured to adjust only the reaction temperature of the first reaction zone of the riser reactor (heavy oil reactor); Cooler 8B in Fig. 1 of Li is only configured to adjust the reaction temperature of the second reaction zone through the auxiliary riser (or gasoline riser). Li fails to teach, disclose, or suggest that the one regenerated catalyst cooler is configured to **adjust** the reaction temperature of two or more reaction zones.

As annotated below, Li discloses the use of multiple catalyst coolers which is connected to one riser reactor comprising the ***auxiliary Riser etc***.




As disclosed at, e.g., page 18, penultimate paragraph of Li, cooler-A, cooler-B, and cooler-C respectively serve different functions. Specifically, cooler A is configured to adjust only the reaction temperature of the first reaction zone, and cooler B is configured to adjust the reaction temperature of only second reaction zone of one riser reactor. Cooler A is connected with a (heavy oil) riser reactor comprising a first reaction zone and a second reaction zone. Cooler B is connected with an auxiliary riser, which is connected with ***the joint between the first reaction zone and the second reaction zone*** of the heavy oil riser reactor. *Se*e page 6, first full paragraph of Li.

The (heavy oil) riser reactor is ***different from*** the auxiliary riser (or gasoline riser) substantially ***in feedstock and in technical function.*** Cooler B is only connected to the auxiliary riser (or gasoline riser), rather than the heavy oil riser reactor. Therefore, ***cooler B is different wholly from cooler A and cooler C substantially in technical function*** and in its downstream connections as recited in claim 1, 13, 20 of the present application. ***Li states***

***that cooler B is essential, and cooler A and coolers C are optional.*** *See* page 3, first full paragraph.

But as shown in the annotated Fig. 1 of Li below, the ***two essential features,*** including ***cooler B and its corresponding auxiliary riser***, **have been omitted** in the invention described in claim 1,13, 20 of the present application. **Cooler (8B)** described in the present application is *a common external catalyst cooler which is only used for removing excess-heat from regenerator* ***and is different substantially from the regenerated catalyst cooler A and its downstream connections etc.*** *as recited in independent claim 1,13, 20 of the instant application.* The regenerated catalyst subjected to the steps of cooling, mixing, buffering etc. based on claim 13, 20 of the instant application serve to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to realize optimal control of reaction temperature and optimal control of reaction extent.




Based on the foregoing, Li fails to teach, disclose, or suggest Feature 1 as recited in the independent claim 1, 13, 20 of the present application.

Here, Appellant respectfully emphasizes herewith the 2 key points at least as follows:

① **Cooler** 8B **and auxiliary Riser** 6 etc**. in Li are omitted!** ***Only one Cooler 8A*** is used to adjust the reaction temperature of **both 1st Reaction Zone and 2nd Reaction Zone** of only one Riser Reactor in the claimed **Feature 1**; **and**

② One Cooler (8A) is used to adjust the reaction temperature of Only one Reaction Zone, i.e., **1st reaction zone**; One Cooler (8B) is used to adjust the reaction temperature of Only one Reaction Zone, i.e., **2nd reaction zone in Li;** Cooler B is ***only connected*** to the auxiliary riser (or gasoline riser), ***rather than the heavy oil riser reactor,*** so cooler B **is different from** coolers A and C substantially **in technical function** and its connection etc.**; and**

According to **the guidance of Li,** only ***one cooler must be cooler B,*** *Not cooler A, cooler C,* **Li discloses** that ***coolers A and C can be omitted*** (See the 14th to18th line of page 3/18, and the 2th to 5th line of page 13/18 etc. in Specification In Li), which means that **cooler B cannot be omitted (** i.e. **Li** must have **two riser at least),** and **teaches away** from the claimed Feature 1.

In view of the above, Examiner's assertion that "Li implicitly discloses that one catalyst cooler is used to adjust the reaction temperature of each reaction zone of the one riser reactor" **is not supported by any documentary evidence**, which isn't appropriate and is **impermissible hindsight** *under MPEP§2143.03, and §2145 X.A., especially MPEP§2143.03 C.*

## Second, regarding the Non-obviousness of the claimed Feature 1

**The catalytic cracking is a complicated parallel/consecutive reaction** *(See table 1 and Annex 1, Page 326-327 and Annex 3, Page 916):*

① Catalytic cracking and thermal cracking occur synchronously.

② The ideal reactant, such as gasoline and diesel oil, will further react and produce coke and off gas.

Here, Appellant respectfully emphasizes herewith the 5 key facts (which is supported by *Annexes 1-6, 49,50; which is filed on Jan. 17, 2018* ) at least as follows*:*

① There is **a long-standing technical prejudice** in the FCC field **including Li** that the optimization of riser reaction requires "**large** catalyst-to-oil ratio and **high** reaction temperature"(see Item 1 of Table 1 and Annexes 1-5,49,50), which **teaches away from** the Claimed **Feature 1; and**

② **The interaction of** "**large** catalyst-to-oil ratio and **high** reaction temperature", **results**

**in an increase** in the yields of coke and off gas (**see Item 2 of Table 1** and Annexes 1,3;)**,** thus using "the **suitable** catalyst-to-oil ratio and the **suitable (relatively lower)** reaction temperature" **to realize** the optimal control of reaction temperature and **the optimal control of reaction extent is necessary; and**

③The problem to be solved of the claimed **Feature 1** is "to make **truly** the catalyst-to-oil ratio **an completely and absolutely freely independent adjustable variable**" (see **Para.[0012]**, in Specification), thereby using "the **suitable** catalyst-to-oil ratio and the **suitable (relatively lower)** reaction temperature"(see **Para.[0052]**,in Specification),so as **to realize the optimal control of reaction temperature** of the multi-reaction zone **for the first time** *(see Item 3 of Table 1 and Annex 3,4)* **with the better operability and stability***( see Item 5 of Table 1 and Annex 4,6)***,** rather than **"the selection of specific parameter** in a range of the operating parameters"***; and***

④ The present invention solves the technical problem that people have been eager to solve **for more than 40 years** but have never succeeded, and **for the first time truly realizes** the "completely and absolutely freely independent control of the catalyst-to-oil ratio" **in commercial units** ( see Item 3, 4 of Table 1 and Annex 3,4,and see Item 6 of Table 1 and Annex 1-6,11-43), **which is non-obvious over Li under MPEP §716.04; and**

⑤ The claimed **Feature 1**, **after "omitting catalyst cooler B and another riser etc.)"**, results in **a inevitable change in both** the operating parameters and the process scheme, for example, **a inevitable increase in the catalyst-oil ratio** etc., which will **substantially affect** the **optimization** of the major operating parameters of the reaction zones, which is **NOT anticipated or expected** for those skilled in the art before the filling date of instant invention.

**Therefore** the claimed **Feature 1**, after "omitting catalyst cooler B and another riser etc." is **with retention of Li's function also** (In fact, with the better function, especially with the better results over **Li**) (see Item 4, and Annex 1,3,4; and see item 5 of Table 1 and Annex 4,6) which is **non-obvious over Li under MPEP § 2144.04,II.B.**

In view of the above**, there is NO any documentary evidence including Li that teaches or suggests** the problem to be solve and the function/results of Feature 1. Therefore, there is **NO a suggestion or a motivation to improve Li,** so Feature 1 is non-obvious over Li.

Therefore **Li**, having the almost same range of the operating parameter, **do not affect the patentability and non-obviousness** of **Feature 1** Over **Li.**

*(For details, see **Table 1 and Annexes 1-6, 49,50,** filed on Jan. 17, 2018; and **Attachment I**, Page 35-38 of **Response** filed on Sept. 14,2021)*

## II. Non-obviousness of Feature 2 of Claims 13, 20 over Li reference

Claims 13 and 20 are additionally argued separately from claim 1.

**Feature 2 of Claims 13 and 20 reads as follows:**

> *"blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space being disposed in the downstream location of the regenerated catalyst cooler before the cooled regenerated catalyst entering the riser reactor;" (hereinafter referred as "**Feature 2**")*

First, it is clear from independent claims 13 and 20 that the step of "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space" is one independent step to get the cooled catalyst itself an uniform and stable temperature.

The claimed Feature 2 is a functional means, which have been proposed by instant application **for the first time in FCC field**, and there is No documentary record in Common Knowledge and Prior Act including **Li** before the filing date of the instant application (see Table 2 and Annexes 7-10).

"The downstream catalyst mixing buffer space" of the claimed Feature 2 shows a clear functional limitation "for mixing and buffering the cooled catalyst"; rather than "for the cooled catalyst mixing with the said fluidizing medium" (see Para. [0016], [0017] in Specification).

Therefore, **the Examiner's Response to Arguments** (Para. No .9, in page 3 of Final Office Action filed on Dec. 27,2021), **not in light of Specification of the instant application and without any written document support, is in clear violation of MPEP** 2143.01 III, 2143.03. 2144.03 A,B,C (especially 2144.03 A,C ).

While, Li reference *(the above CN1664074, hereinafter referred as "**Li**" or "**Li-patent**")* fails to teach, disclose, or suggest the claimed ***Feature 2***.

The Examiner **solely relies on the figures of Li and speculates** that there is a step in Li is blending and buffering the cooled regenerated catalyst at a catalyst mixing buffer

space as recited in independent claims of the present application. However, there is no documentary evidence for The Examiner's above assertion.

**Therefore, the Examiner's Response to Arguments** (Para. No. 7, in page 2 of Final Office Action filed on Dec. 27,2021), **without any written document support, is in clear violation of** MPEP 2143.01 III, 2143.03. 2144.03 A,B,C (especially 2144.03 A,C ), and is a ***'Impermissible Hindsight'*** *under MPEP§2145 X.A*.

Li does not disclose anywhere (including the figures) the separate step of "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space" as recited in independent claims of the instant application.

For the Board's convenience, Appellant reproduces below Fig. 1 of Li and Fig. 1 of the instant application.



Fig. 1 of Li



Fig. 1 of the instant application.

As can be see above, **Li** shows "a fluidizing medium enters the lower part of the cooler by a fluidizing medium (35B) distributor" and does not show **a downstream (axial) space**;

while **the instant application** clearly shows independent and separate "the catalyst mixing buffer space(9A) *downstream of the catalyst cooler* " which is used to blending and buffering the cooled catalyst so as to make the cooled catalyst itself a uniform and stable temperature, so as to solve the problem of **a radial temperature difference caused by a non-uniform or abnormal flow and heat-exchanging** etc. in the catalyst bed of the catalyst cooler.

Here, Appellant respectfully emphasizes herewith **the 4 key facts** (which is supported by Annexes 46-48, *filed on Jan. 17,2018* and Annexes 51-54, *filed on Jan. 21, 2021*) as follows:

① The fluidizing gas (35A/B) distributor **in Li** could be set at **the radial gap** between the two heat-exchanging elements **or the radial gap** between the heat-exchanging element and the wall; **and**

②There are **many examples** in which there is **No a downstream (axial) space** in the common catalyst cooler, such as Fig. 8-106, 8-107 on Page 1341, Fig.8-109, 8-110 on Page 1342 of Annex 51; Fig.6-60 on Page 337 of Annex 52; and the attached Figure of Annex 53, 54, therefore only a few the cooler has the geometric clearance or mechanical clearance which, obviously, are not the downstream catalyst mixing buffer space of the present application (*Please* see Table 3 for details); and

③ For "up-flow mode", due to the catalyst flows from down to up, the "downstream of" means at "a top of cooler", rather than "at a bottom of cooler".

④ **The size calculation** of the catalyst mixing buffering space, ***well-known as common knowledge,*** *is* ***determined by the strictly following control requirements*** of ***reaction temperature*** of downstream reactor *(see Table 2 and Annexes 46-48)*, ***rather than an arbitrary dimensions***, which is also well-known also to those skilled in the art.

## Second, regarding Non-obviousness of Feature 2

Appellant respectfully emphasizes herewith the 3 key facts (which is supported by Annexes 7-10, 46-48, *filed on Jan. 17,2018 and Annexes 51-54,filed on Jan. 21, 2021* )) at least are as follows:

① **Many textbooks**, as the common knowledge in the art, state that **"the catalyst bed of** the catalyst cooler **is isothermal** (i.e. **temperature is uniform**)", which **is a long-standing technical prejudice**, and **teaches from the objective fact** (see Table 2 and Annexes 7-10; filed on Jan. 17,2018); **and**

②Two sets operation data of a **commercial unit together prove** that there is **indeed a radial temperature difference** (up to 139.7 °C) **caused by a non-uniform or abnormal flow and heat-exchanging** etc. in the catalyst bed of the catalyst cooler using the instant application. But the temperature of the cold regenerated catalyst into the riser, after the mixing and buffering by the patented catalyst mixing buffer space of the present application, **has been mixed itself evenly, thereby fully meeting the control accuracy requirements** of the reaction temperature optimal control of riser reactor. (**See Li's Declaration** submitted *on Sept.14,2021*)

By the end of 2014, there are totally 15 sets of commercial units using the instant application,

all of which can run smoothly for a long period with safety and stability. And

③ Examiner's assertion that "**Li discloses implicitly a mixing buffer space** downstream **of the catalyst cooler**" is not supported by any documentary evidence", **is "impermissible hindsight"** under MPEP§2143.03, and§2145 X.A., especially §2143.03 C.

Therefore, Feature 2 is a typical example of which **the technical problem, existing indeed in production practice and being neglected for a long time, has been solved by the use of common knowledge** (in the chemical filed) which has been abandoned because of **technical prejudice** in FCC field, So, the claimed Feature 2 is non-obvious **over Li** under MPEP §2145 X.D.

In view of the above, those skilled in the art **do not have the motivation and Do be impossible** to think of that it is necessary "to be disposed a catalyst mixing buffer space in the downstream location of the catalyst cooler", **because it is a "superfluous, or useless" step.** Therefore, the Claimed **Feature 2 is patentable and non-obvious** over **Li.**

*(For details, see **Table 2 and Annexes** 7–10, 46-48, filed on Jan. 17,2018; **Table 3*** and Annexes *51–54, filed on Jan. 21,2021 and **Attachment II**, Page 39-46 of **Response** filed on Sept. 14,2021)*

## III. Non-obviousness of Claim 1, 13, 20 as a whole

● Appellants respectfully indicate that the Examiner has failed to consider the synergistic effect /result that is unexpected *to those skilled in the art* before the filed date of instant application, and the Non-obviousness of Claim 1, 13, 20 as a whole.

● Appellants respectfully indicate that the above-mentioned criticality or unexpected results of claim 1,13,20, is also supported by five Declaration by Zhang, Gao, and Li and Annexes 1-54), but which **have not been considered by Examiners** with rationale by adequate documentary Evidence, therefore it is NOT in line of MPEP §716, §716.01 and§2145 and § 2143.03 ***(especially MPEP** §2144.03C*).

Here, Appellants respectfully indicate that ***the facticity and nexus of all objective Evidences*** *(i.e. Annexes 11-43)* **and *the present application*, *which is supported also by the declaration by Li*** *(see page 4, line 5-10, filed on March 19, 2018).*

**Table 1,2,3 and Annexes 1~54 and their filing date as follows:**

1. The objective Evidences, Appendix 1-8, are filed on Oct. 19,2015, of which *Appendix 1-5* correspond to *Annex 18,40,24,12,17,* respectively;
2. Table 1 and the common knowledges *(Annexes 1-6,49-50)*, Table 2 and the common knowledges *(Annexes 7-10,46-48)*, are filed on Jan. 17,2018 by IDS;
3. The objective Evidences, *Annexes 11,13-16,19,25-43,* Table 3 and the common knowledges *(Annexes 51-54)*, are filed on Jan. 21,2021.

## i. Examiner overlook the overall understanding of claim 1, 13,20.

**1. Claim 1, as an integrated whole, is not dividable.**

**2. Claim 13, 20, as an integrated whole, is not dividable also.**

① wherein **Feature 1 put forward *the stricter requirement of the uniformity*** *(especially in temperature)* of the cooled regenerated catalyst exiting the catalyst cooler, so as to realize "precise and optimal control of reaction temperature of each reaction zone"; and meanwhile ***Feature 2 proposes*** *"the downstream catalyst mixing buffering space"* ***for the first time in FCC field***, to ensure the more uniform and more stable temperature of the cooled catalyst entering to the downstream riser reactor, so as to meet the above stricter requirement.

② There is a close connection between the **Feature 1** and **Feature 2** in the technical means and the technical effects/functions. In a cooperative combination of the **Feature 1** and **Feature 2** which are synergistic, can improve operational reliability, safety, controllability and flexibility, hereby really solving the problem of "achievability" in commercial unit with better operability.

### ii. OPINION EVIDENCE under MPEP §716.01(c) III:

The evidences (Annex 11-43; *filed on Oct.19,2015, and on Jan. 21,2021 respectively*) contain **13 commercial running or operation data** which **prove the unexpected technical effect** of the claimed **Feature 1 and Feature 2,** and **the non-obviousness of claim 1,13,20** of the present invention also.

The following 3 OPINIONS, supporting by the running results of more than 6 years operation of 13 commercial units, are **factually based expert opinions on the level** *of those skilled in the art*, and **are sufficient to rebut** *the prima facie case of obviousness*. (***see Annex 25-43***) See

also In re Oelrich, 579 F.2d 86, 198 USPQ 210 (CCPA 1978) *(factually based expert opinions on the level of ordinary skill in the art were sufficient to rebut the prima facie case of obviousness);*

A. In June 2014, Passed Appraisal of the Identification Committee led by **Yang Qiye** (**Academician** from Chinese Academy of Engineering), their opinions are mainly as follows:

1). To propose the conception of 'the optimization of multi- reaction-zone and the control of reaction extent of FCC reaction **for the first time** ……"; and

2) Developing temperature-controlled cooling system of regenerated catalyst to realize independent control of regeneration temperature, catalyst-to-oil ratio and reaction temperature **<u>in the commercial unit</u> for the first time;** and

3) To realize the optimal control of reaction temperature of multi-zone of the riser reactor **<u>in the commercial unit</u> for the first time.**

[See points 1)-3) in Page 2/4, line 8-15 of Appendix 1 *i.e. Annex 18*].

**The other 8 members** of the Identification Committee are all senior engineer, senior professor, senior researcher from Sinopec, CNPC, Tsinghua University, etc..

**B.** In February 2015, Obtained high praise of the Identification Committee led by **Jin Yong** （**Academician** from Chinese Academy of Engineering）， their opinions coincide with the above 3 opinions ( 1, 2, 3 ) of Yang Qiye etc. (See from line 2 from the bottom of Page 2/4 to line 6 of Page 3/4 of Appendix 2, *i.e. Annex 40*) .

**C. High praised** by **Chen Bingzhen** (***Academician*** *from Chinese Academy of Engineering)*, in July 2015 'In view of this problem, the present invention…, puts forward 'FCC process with cooled regenerated catalyst recycling technology'…, *which **solves the worldwide problem** by optimizing the above operation parameters, ……*'.(*See the underlined part of Appendix 3, i.e. Annex 24*).

## iii. <u>Objective Evidence under MPEP §716.02, §716.03 and §716.04</u>

**First, Appellants respectfully indicate that the following facts show a commercial success over the prior art including Li.**

● **The criticality or unexpected effect/results and a commercial succession over Li** is supported also by two declarations by Zhang, and by Gao, filed on October 23,2015, and is supported also by three declarations by Li, *filed on January 17, 2018, March 19, 2018 and Sept.14,2021.*

In fact, **Li,** having ***another one riser*** (i.e. the auxiliary Riser or gasoline Riser) etc., is completely different from both ***the technical solution*** of the instant application and ***the technical problems to be solved*** of the instant application**,** therefore Li's technical effects are not comparable with the unexpected effect of the instant application.

But there are the following **two key facts** to support a commercial success **over Li**:

① Up to the end of 2014, totally 15 commercial units in which the instant invention was applied are on stream successfully after 2008 *(See Table 1 and Annexes 11-19, 25-43)*. ***And***

No one is willing to apply Li since 2008 and the **4 commercial units using Li** before 2008 have been shut down and dismantled at present.

② Up to July, 2015, there are NO report for successful commercial application of Others' technology in the world (see Appendix 5, *i.e. Annex 17, filed on October19, 2015*).

But the above all documentary Evidences and five declarations under C.F.R.1.132 have NOT been considered by Examiners with rationale documentary Evidence, therefore it is NOT in line of MPEP§716, §716.01, §716.02 and§2145.

Therefore, the Examiner's Response to Argument (see Para. No. 12 in page 3 of Final Office Action filed on Dec. 27,2021), without any written document support, is in clear violation of MPEP 716, 2141.02 I, II, 2143.01 III, 2143.03, and 2144.03 A, B, C.

## 1. The unexpected results *under MPEP* § 716.02

① Appellants respectfully indicate that the unexpected results drives from the claimed invention, and flows from the function and the advantage disclosed or inherent in Specification, and accords with the scope and the contents of the instant invention, which ***is supported by all documentary Evidence*** *(see Table 1,2 and Annexes 1-50)*, as follows:

The multi-parameter overall optimization of the present invention brings out a unexpected synergetic effect and a huge "butterfly effect" *[see Amendment and Response (page 25-29), and Appendix 1-8, filed on Oct. 19,2015]*, as follows :

a. The running result of a unit with capacity of 1.0 million ton/year shows that there is a great increase in the profit of 166 million RMB annually *(see page 26,27, and Appendix 1,2)*; and

b. The running result of a unit with capacity of 1.4 million ton/year shows that there is a great increase in the profit of 189 million RMB annually, and ***the payback period of invest is about 1.5***

***months (normally around five years)*** *(see page 28, and Appendix 7).*

Appellants respectfully indicate that ***the above difference of 40 times in profit*** as different as before, ***much greater than those*** which would have been expected from the prior art ***to an unobvious extent,*** are of a significant, practical advantage, so the claimed claim 1 possesses non-obviousness and patentability under MPEP §716.02(a) I.

② The present invention was highly praised by more than 10 senior experts including **three Academician** of Chinese Academy of Engineering, such as Jin Yong, Yang Qiye, Chen Bingzhen *[see Amendment and Response (page26-28), and Appendix 1,2,3, filed on Oct.19, 2015].*

③ In June 2014, the Instant invention obtained First prize of the Science and Technology Progress Award by CPCIF. *[see Amendment and Response (page28), and Appendix 4, filed on Oct.19,2015]*

④ The instant invention obtained Second prize of National Science and Technology Progress Award in 2015 *(see Annex 11).*

In view of above, all documentary Evidences *(see Table 1,2 and Annex 1-50 )*, prove wholly the unexpected effect/results of instant invention **over Li.**

## 2. Commercial Success *under MPEP* § 716.03.

Appellants respectfully indicate that the nexus between the claimed invention and "commercial success" over Li, which, as mentioned above, drives from the above unexpected effect/results, and flows from the function and the advantage of the instant invention, and accords with the scope and the contents of the instant invention also.

So the claimed invention possesses non-obviousness and patentability under MPEP § 716.03.

Such success is sales ***on a process, Not a product made using the method,*** and is not also the results of heavy promotion or advertising, shift in advertising, etc..

## 3. Long-Felt Need and Failure of Others under MPEP §716.04.

Appellants respectfully indicate also that there is No a statement by Examiners with regard to ***"failure of others"***; and there is No a specific statement by Examiners with rationale and documentary Evidence to support with regard to ***"long-felt but unsolved needs to be solved",*** which is supported by two declarations by Li *(filed on January 17, 2018 and on March 23, 2018 under C.F.R.1.132)*, which is **NOT adequate** under MPEP §716, §716.01, §716.04 and §2145.

① The results of several Sci-tech search reports show that, **there are no report for successful commercial application of Others' technology in the world** *(see Table 1 and Appendix 5 i.e. Annex 17, Annexes 13-16, 25-43 )*.

● Appellants respectfully indicate that **the Others** *(such as US 4,396,531, US 6,059,958, and CN1288933A etc.)* **have failed in the research and exploration on commercial application; and**

● **Li,** with the poor operability in commercial unit, **dose not really realize "absolutely freely independent control of the catalyst-to-oil ratio"** because of the mutual interference between the two catalyst coolers existing inherently in Li, **there is No one to adopt Li after 2008** *(see Table 1 and Appendix 5 i.e. Annex 17, Annexes 13-16, 25-43 ).*

② It is the instant invention ***that solves the technical problem*** *that people* ***have been eager to solve*** *but* ***have never succeeded for more than 27 years from the filling date*** of US 4,396,531, *filed on Aug. 13,1981 (see* ***Table 1 and Appendix 1-8****, filed on October 19,2015,* ***and two declarations by Li,*** *filed on January 17,2018 and March 23, 2018).*

**In fact, it is the instant application that solves truly and really a technical problem in the commercial unit that has plagued the FCC field for more than 40 years** ***since the advent of riser reactor*** *(from the 1960s to 2008, the filed date of the instant application)***.**

*(For details, see* ***Table 1 and Appendix 1-8****, filed on Oct. 19,2015****and Annexes 11,13-16,19,25-43,*** *filed on Jan. 21,2021 and* ***Attachment III****, Page 47-53 of* ***Response*** *filed on Sept. 14,2021)*

## IV. Rebuttal Arguments to the Examiner's Response to Arguments

### 1. Para. 7 in Page 2 of Final Office Action:

The Examiner **solely relies on the figures of Li and speculates** that there is a step in Li is blending and buffering the cooled regenerated catalyst at a catalyst mixing buffer space as recited in independent claims of the present application. However, there is no documentary evidence for the Examiner's above assertion.

While **the instant application** clearly shows independent and separate "the catalyst mixing buffer space(9A) *downstream of the catalyst cooler* "which is used to blending and buffering the cooled catalyst so as to make the cooled catalyst itself a uniform and stable temperature, so as to solve the problem of **a radial temperature difference caused by a non-uniform or abnormal flow and heat-exchanging etc.** .

**Therefore, the Examiner's Response to Arguments** (see Para. No. 7, in page 2 of Final Office Action filed on Dec. 27,2021), **without any written document support, is in clear violation of** MPEP 2143.01 III, 2143.03. 2144.03 A,B,C (especially 2144.03 A,C ), and is a ***'Impermissible Hindsight'*** *under MPEP§2145 X.A.*

## 2. Para. 9 in Page 3 of Final Office Action:

"The downstream catalyst mixing buffer space" of the claimed **Feature 2** shows a clear functional limitation "for mixing and buffering the cooled catalyst"; rather than "for the cooled catalyst mixing with the said fluidizing medium" (see Para. [0016], [0017] in Specification).

Therefore, **the Examiner's Response to Arguments** (see Para. No .9, in page 3 of Final Office Action filed on Dec. 27,2021), **not in light of Specification** of the instant application **and without any written document support, is in clear violation of MPEP** 2143.01 III, 2143.03. 2144.03 A,B,C (especially 2144.03 A,C ).

## 3. Para. 10,11 in Page 3 of Final Office Action:

**The claimed Feature 1 is a functional overall means,** rather than the selection of the specific operating parameters, **should not be split** and **the non-obviousness of the claimed Feature 1 should be evaluated in entirety under MPEP 2141.02 I and II.**

**Examiner splits excessively the claimed Feature 1** *(almost splits **to the extent "technical term-levels"**, such as "a catalyst cooler or a reaction zone", etc.).* But the above "over-splitting" does not even reflect the sequence, function of the above basic steps.

**Therefore, the Examiner's Response to Argument** (see Para. No. 10, 11 in page 3 of Final Office Action filed on Dec. 27,2021), **without any written document support, is in clear violation of** MPEP 2141.02 I, II, 2143.01 III, 2143.03, and 2144.03 A, B, C.

## 4. Para. 12 in Page 3 of Final Office Action:

The criticality or ***unexpected effect/results*** and a commercial success ***over Li*** *is supported by Annexes 11-43 and **by two declarations** by Zhang, and by Gao, filed on October 23,2015, and is supported also **by three declarations** by Li, filed on January 17, 2018, on March 19, 2018 and on Sept.14,2021.*

In fact, **Li,** having **another one riser** (i.e. the auxiliary Riser or gasoline Riser) etc., **is**

**completely different from** both **the technical solution** of the instant application and **the technical problems to be solved** of the instant application, therefore Li's technical effects are not comparable with the unexpected effect of the instant application.

But there are the following two key facts **to support a commercial success over Li**:

① *Up to the end of 2014, totally 15 commercial units in which the instant invention was applied are on stream successfully* ***after 2008*** *(See Table 1 and Annexes 11-43).*

***No one is willing to apply Li since 2008*** *and the* ***4 commercial units*** *using* ***Li*** *before 2008 have been shut down and dismantled at present.*

② ***Up to July, 2015, there are NO report for successful commercial application of Others' technology in the world*** *(see Appendix 5, filed on October19, 2015).*

***But the above all documentary Evidences*** **and** ***five declarations*** *under C.F.R.1.132* ***have NOT been considered by Examiners with rationale documentary Evidence, which is NOT adequate under MPEP*** *§716, §716.01, §716.02 and§2145.*

*Therefore,* **the Examiner's Response to Argument** (Para. No. 12 in page 3 of Final Office Action filed on Dec. 27,2021), **without any written document support, is in clear violation of** MPEP 716, 2141.02 I, II, 2143.01 III, 2143.03, and 2144.03 A, B, C.

## V. In summary:

**Appellants respectfully indicate that there are the following 5 errors** at least on Examiner's factual assertion and findings:

① **Examiner's factual assertion and findings** that <u>"Li discloses Feature 1 of Claim 1,13,20 and Feature 2 of Claim 13,20"</u> **relying solely on theirs personal understanding** or experience without any documentary Evidence, **are <u>two 'Impermissible Hindsight'</u>** under MPEP§2145 X.A. and §2144.03 A, C.

● **MPEP§2144.03 A:**

> *It is* ***never appropriate to rely solely on "common knowledge"*** *in the art* ***without evidentiary support*** *in the record, as the principal evidence upon which a rejection was based. Zurko, 258 F.3d at 1385, 59 USPQ2d at 1697 ("[T]he Board cannot simply reach conclusions* ***based on its own understanding or experience****—or on its assessment of what would be basic knowledge or common sense.* ***Rather, the Board must point to some concrete evidence in the record in support of these findings.****").*

● **MPEP§2144.03C:** *If Appellant Traverses a Factual Assertion as Not Properly Officially Noticed or Not Properly Based Upon Common Knowledge, the Examiner Must Support the Finding With Adequate Evidence*

> *"…… If appellant adequately traverses the examiner's assertion of official notice,* ***the examiner must provide documentary evidence in the next Office action if the rejection is to be maintained.*** *See 37 CFR 1.104(c)(2). See also Zurko, 258 F.3d at 1386, 59 USPQ2d at 1697 ("[T]he Board [or examiner] must point to some concrete evidence in the record in support of these findings" to satisfy the substantial evidence test). If the examiner is relying on personal knowledge to support the finding of what is known in the art, the examiner must provide an affidavit or declaration setting forth specific factual statements and explanation to support the finding. See 37 CFR 1.104(d)(2).*
>
> *If appellant does not traverse the examiner's assertion of official notice or appellant' s traverse is not adequate, the examiner should clearly indicate in the next Office action that the common knowledge or well-known in the art statement is taken to be admitted prior art because appellant either failed to traverse the examiner's assertion of official notice or that the traverse was inadequate. If the traverse was inadequate, the examiner should include an explanation as to why it was inadequate.*

② **The Common Knowledge** *(see* ***Table 1*** *and Annexes 1-6, 49,50;* ***Table 2*** *and Annexes 7-10, 46-48,* ***Table 3*** *and Annexes 51-54, etc.)* **show that there are <u>three</u> "teaching away" from the claimed <u>Feature 1</u>** and **<u>Feature 2</u>** under MPEP§2145 X.D.

But **Examiner have not been considered *with any explanation by any documentary Evidence, therefore it is insufficient*** under MPEP §2144.03 A, B, C, and §2145 X.D. 【as to **the <u>three</u> "teaching away"**, argued many times by Appellants during Previous Procedures such as RCE, AFCP, Pre-appeal and Appeal, etc.】

③ **Regarding the three Expert's Opinion Evidence** under MPEP §716.01(c)III and **the three Objective Evidence of non-obviousness** under MPEP §716.01(a) , §716.02 , §716.03 and §716.04, which is supported by the previously submitted ***Appendixes 1-8 and Annex 25-39, 42-43;*** and by the previously submitted ***five Declarations by Gao, Zhang and Li.***

● **MPEP §716.01(c)III :**

> *See also In re Oelrich, 579 F.2d 86, 198 USPQ 210 (CCPA 1978) (factually based expert opinions on the level of ordinary skill in the art were sufficient to rebut the prima facie case of obviousness);*

**Appellants respectfully indicate that Examiner** have also **NO comment or only one general sentence** (i.e. one general statement) on the above **six key facts for argument** by Appellant. Therefore **it is insufficient** under MPEP §2144.03 A, B, C, and §716.

*(For details, see* ***Table 1*** *and Annexes 11-43, and Page 47-52 of* ***Response*** *filed on Sept. 14,2021)*

④ **It is not in conformity** with MPEP 2125 for Examiner **to infer or speculate** that "Li discloses the claimed Feature 1 and Feature 2", **by comparing merely Fig. 2** of the instant application with **Fig. 1 of Li,** because the regenerator structure, catalyst cooler structure and overall process flow of both **Fig. 2** of instant application **and Fig. 1** of Li, are totally different.

●**MPEP§2125:**

> *Drawings and pictures can anticipate claims if they clearly show the structure which is claimed. In re Mraz, 455 F.2d 1069, 173 USPQ 25 (CCPA 1972). However,* ***the picture must show all the claimed structural features and how they are put together.*** *Jockmus v. Leviton, 28 F.2d 812 (2d Cir. 1928).* ***When the reference is a utility patent,*** *it does not matter that the feature shown is unintended or unexplained in the specification.* ***The drawings must be evaluated*** *for what they* ***reasonably disclose*** *and* ***suggest to one of ordinary skill in the art.*** *In re Aslanian, 590 F.2d 911, 200 USPQ 500 (CCPA 1979).*

⑤ **Examiner** have **No comment on** "Omission of an element with retention of its function", which is **NOT appropriate** under MPEP§2144.04 II.B and §2144.03 A, C.

In view of the above, Appellants respectfully indicate also that, in any case, **Examiner overlooks the above two 'Impermissible Hindsight', the above rebuttal of three** "teaching away", **three** Expert's Opinion Evidence and **three** Objective Evidence of non-obviousness, therefore theirs assertions and findings **without relying on scientific theory** and merely **relying on legal precedent** without any documentary evidence, **is *theirs' personal understanding*,** *and* ***is NOT appropriate*** under MPEP §2144.04 and §2145**.**

●**MPEP§2144.04: Legal Precedent as Source of Supporting Rationale [R-11.2013]**

> *As discussed in MPEP § 2144, if the facts in a prior legal decision are sufficiently similar to those in an application under examination, the examiner may use the rationale used by the court. Examples directed to various common practices which the court has held normally require only ordinary skill in the art and hence are considered routine expedients are discussed below.* ***If the applicant has demonstrated the criticality of a specific limitation,*** *it would* ***not be appropriate to rely solely on case law as the rationale*** *to support an obviousness rejection.*

Accordingly, independent claims 1, 13, and 20 are all patentable under pre-AIA 35 U.S.C. § 103(a). The same reasons are also applicable to the remaining depending claims.

Accordingly, reconsideration and withdrawal of the rejection of Claim 1,13,20 under 35 U.S.C. § 103(a) over the applied references are respectfully requested.

## VI. As to claim 6, 16, 22 and other Claims

Appellant submits that claims 6, 16, and 22 are separately argued.

Appellants respectfully indicate that ***Li-patent uses only single-parameter adjustment of the catalyst-to-oil ratio*** to realize the control of reaction temperature.

*There is* ***no evidence*** *including* ***Li*** which discloses or suggests that ***the reaction temperature is controlled by the adjustment of the temperature of the cooled catalyst or the cold regenerated catalyst mixture, nor the <u>combined control</u> of the multi-parameters*** to realize the optimal control and accurate control of reaction temperature (*See para. 0024 in the specification*).

The ***criticality or unexpected results of claim 6 ,16 and 22 over Li, is also supported by four declarations*** by Zhang, Gao, and Li, which have ***not been considered also by Examiners*** with rationale by adequate documentary Evidence.

Therefore, the claim 6, 16, and 22 are non-obvious and patentable over Li-patent.

Appellants respectfully indicate that *the Examiner' finding* ***without any documentary support relying on scientific theory, which is NOT appropriate***.

**All other Claims** *(Claim 2-5,7,10,14-15,17-19,21,23 and 24-31,33)* are non-obvious and patentable over the Li reference for at least the reasons discussed above.

## <u>B. Claim 32 are Non-Obvious over Li in view of Palmas</u>

The Office rejected claim 32 under 35 U.S.C. § 103(a) as being unpatentable over Li in further view of Palmas. (Final Office Action, page 7). Applicants respectfully traverse this rejection.

Claim 32 depends from claim 1 and recites additional limitations. The deficiencies of Li with respect to claims 1 are presented above. The Office did not apply Palmas in a manner that overcomes the deficiencies of the Li reference with regard to claims 1, 13, and 20.

Claims 32, therefore, distinguish over the applied references for at least the reasons discussed above with respect to claims 1, 13 and 20, and/or for the additionally recited features.

Accordingly, reconsideration and withdrawal of the rejection of Claim 32 under 35 U.S.C. § 103(a) over the applied references are respectfully requested.

Should the Board have any comments, questions, suggestions, or objections, the

Examiner is respectfully requested to telephone the undersigned representative.

However, if any appeal fees or charges are required at this time, they may be charged to our Patent and Trademark Office Deposit Account No. 506203.

Respectfully submitted,

/Lucas Stelling/

Lucas Stelling

Reg. No. 60,020

Bayramoglu Law Offices LLC

Date: 04/15/2022

**CLAIMS APPENDIX**

1. (Previously presented) A method for circulating a cold regenerated catalyst, comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, wherein the one riser reactor comprises only one reaction zone or at least two reaction zones;

separating the gas and oil products from the reacted catalyst in a settler，

stripping the separated catalyst in a stripping section；

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;

cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use;

wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

2. (Previously presented) The method of claim 1, further comprising:

lifting the cooled regenerated catalyst through an assistant riser by a pre-lift medium to the riser reactor, and

using the cooled regenerated catalyst as a quenching agent for reuse.

3. (Previously presented) The method of claim 1, wherein the temperature of the cooled regenerated catalyst ranges from 360°C to 650°C.

4. (Previously presented) The method of claim 1, further comprising:

controlling the temperature of the cold regenerated catalyst by adjusting a flowrate of the fluidizing medium, the heat-taking medium, or a combination thereof.

5. (Previously presented) The method of claim 1, wherein the method comprises transferring the hot regenerated catalyst via a bypass transmission channel to mix with the cooled regenerated catalyst to form a regenerated catalyst mixture, and controlling the temperature of the regenerated catalyst mixture by adjusting a ratio of the cooled regenerated catalyst and the hot regenerated catalyst.

6. ( Previously presented) The method of claim 1, further comprising:

controlling the reaction temperature in the reaction zone of the riser reactor by adjusting a ratio of the cooled regenerated catalyst that enters the riser reactor and feed of the hydrocarbon materials that enter the riser reactor, adjusting the temperature of the cooled regenerated catalyst, using a multi-point feeding technology, adding a quenching agent to the riser reactor, or a combination thereof.

7. (Previously presented) The method of claim 1, wherein the heat-taking medium is selected from the group consisting of water, steam, air, and oils.

8. (Canceled).

9. (Canceled).

10. (Previously presented) The method of claim l, wherein the regenerated catalyst is a catalyst with a carbon content, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

11-12. (Canceled).

13. (Previously presented) A method for circulating a cold regenerated catalyst, comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, wherein the one riser reactor comprises only one reaction zone or at least two reaction zones;

separating the reacted catalyst from the gas and oil products in a settler;

stripping the separated catalyst in a stripping section;

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;

cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use;

wherein a heat-exchanging element is mounted insidethe regenerated catalyst cooler, and

a fluidizing medium distributor is located in the lower part of the regenerated catalyst cooler;

blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space being disposed in the downstream location of the regenerated catalyst cooler before the cooled regenerated catalyst entering the riser reactor; and

wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

14. (Previously presented) The method of claim 13, further comprising:

controlling the temperature of the cold regenerated catalyst by adjusting a flowrate of the fluidizing medium, the heat-taking medium, the cold catalyst returning to the regenerator, or a combination thereof.

15. ( Previously presented) The method of claim 13, further comprising:

mixing the cooled regenerated catalyst with the hot regenerated catalyst exiting directly from the regenerator to obtain a regenerated catalyst mixture;

controlling the temperature of the regenerated catalyst mixture by adjusting a ratio of the cooled regenerated catalyst and the hot regenerated catalyst;

transferring the regenerated catalyst mixture into the at least one reaction zone of the riser

reactor bya pre-lift medium; and

reusing the regenerate catalyst mixture in reaction in the riser reactor.

16. ( Previously presented) The method of claim 15, further comprising: _

controlling the reaction temperature in the reaction zone of the riser reactor by adjusting a ratio of the cooled regenerated catalyst mixture that enters the riser reactor and feed of the hydrocarbon materials that enters the riser reactor, adjusting the temperature of the cooled regenerated catalyst, using a multi-point feeding technology, adding a quenching agent to the riser reactor, or a combination thereof.

17. (Previously presented) The method of claim 13, wherein the heat-taking medium is selected from the group consisting of water, steam, air, and oils.

18. (Previously presented) The method of claim 13, wherein the regenerated catalyst is a catalyst with a carbon content, an incompletely regeneratedcatalyst, or a contact agent with a carbon content or coking particles.

19. (Previously presented) The method of claim 13, wherein the temperature of the cooled regenerated catalyst ranges from 360°C to 650°C.

20. (Previously presented) A method for circulating a cold regenerated catalyst, comprising

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil

products and a reacted catalyst, wherein the one riser reactor comprises at least one reaction zone;

separating the reacted catalyst from the gas and oil products in a settler;

stripping the separated catalyst in a stripping section;

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;

cooling the hot regenerated catalyst by a catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200ºC to 720ºC, for cycling use;

wherein a heat-exchanging element having a heat-taking medium inside is mounted inside the regenerated catalyst cooler, and a fluidizing medium distributor is located in the lower part of a catalyst mixing buffer space;

blending and buffering the cooled regenerated catalyst in the catalyst mixing buffer space being disposed underneath the heat-exchanging element before the cooled regenerated catalyst entering the riser reactor, wherein the catalyst mixing buffer space is independent and separate from spaces taken by the heat-exchanging element; and

wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

21. (Previously presented)) The method of claim 20, further comprising:

controlling the temperature of the regenerated catalyst by adjusting a flowrate of thefluidizing medium, the heat-taking medium, or a combination thereof.

22. ( Previously presented) The method of claim 20, further comprising:

controlling the reaction temperature in the reaction zone of the reactor by adjusting a ratioof the regenerated catalyst that enters the riser reactor and feed of the heavy oil that enters the riser reactor, adjusting the temperature of the regenerated catalyst, using a multi-point feeding technology, adding a quenching agent to the reactor, or a combination thereof.

23. (Previously presented) The method of claim 20, wherein the heat-taking medium is selected from the group consisting of water, steam, air, and oils.

24. (Previously presented) The method of claim 20, wherein the regenerated catalyst is a catalyst with a carbon content, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

25. (Previously presented) The method of claim 20, wherein the temperature of the cooled regenerated catalyst ranges from 360°C to 650°C.

26. (Cancelled).

27. (Previously presented) The method of claim 1, wherein the method is used for Heavy oil fluid catalytic cracking, gas oil catalytic cracking, gasoline catalytic conversion, or light

hydrocarbon catalytic conversion; or is used for Heavy oil pre-treating, methanol to olefins, fluid coking or flexible coking; and the regenerated catalyst entering the regenerated catalyst cooler is a regenerated catalyst, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

28. (Cancelled).

29. (Previously presented) The method of claim 13, wherein the method is used for Heavy oil fluid catalytic cracking, gas oil catalytic cracking, gasoline catalytic conversion, or light hydrocarbon catalytic conversion; or is used for Heavy oil pre-treating, methanol to olefins, fluid coking or flexible coking; and the regenerated catalyst entering the regenerated catalyst cooler is a regenerated catalyst, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

30. (Cancelled).

31. (Previously presented) The method of claim 20, wherein the method is used for Heavy oil fluid catalytic cracking, gas oil catalytic cracking, gasoline catalytic conversion, or light hydrocarbon catalytic conversion; or is used for Heavy oil pre-treating, methanol to olefins, fluid coking or flexible coking; and the regenerated catalyst entering the regenerated catalyst cooler is a regenerated catalyst, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

32. (Previously presented) The method of claim 1 wherein the riser reactor comprises only one reaction zone.

33. (Previously presented) The method of claim 1 wherein the riser reactor comprises only at least two reaction zones.

PTO/AIA/31 (03-14)
Approved for use through 11/30/2020. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# **NOTICE OF APPEAL** FROM THE EXAMINER TO THE PATENT TRIAL AND APPEAL BOARD

Docket Number (Optional): GBLYGX001-APPEAL

I hereby certify that this correspondence is being facsimile transmitted to the USPTO, EFS-Web transmitted to the USPTO, or deposited with the United States Postal Service with sufficient postage in an envelope addressed to "Commissioner for Patents, P.O. Box 1450, Alexandria, on Alexandria, VA 22313-1450" [37 CFR 1.8(a)]

on ______________________.

Signature ______________________

Typed or printed name ______________________

In re Application of: Li Li

Application Number: 13/576,565

Filed: 08-01-2012

For: METHOD AND EQUIPMENT FOR CIRCULATING COOLED REGENERATED CATALYST

Art Unit: 1771

Examiner: DOYLE, BRANDI M

Applicant hereby **appeals** to the Patent Trial and Appeal Board from the last decision of the examiner.

The fee for this Notice of Appeal is (37 CFR 41.20(b)(1)) $ ______________

[✓] Applicant asserts small entity status. See 37 CFR 1.27. Therefore, the fee shown above is reduced by 50%, and the resulting fee is: $ 420

[ ] Applicant certifies micro entity status. See 37 CFR 1.29. Therefore, the fee shown above is reduced by 75%, and the resulting fee is: $ ______________
Form PTO/SB/15A or B or equivalent must either be enclosed or have been submitted previously.

[ ] A check in the amount of the fee is enclosed.

[ ] Payment by credit card. Form PTO-2038 is attached.

[✓] The Director is hereby authorized to charge any fees which may be required, or credit any overpayment to Deposit Account No. 506203.

[✓] Payment made via EFS-Web.

[ ] A petition for an extension of time under 37 CFR 1.136(a) (PTO/AIA/22 or equivalent) is enclosed.
For extensions of time in reexamination proceedings, see 37 CFR 1.550.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

I am the

[ ] applicant

[✓] attorney or agent of record
Registration number 66305

[ ] attorney or agent acting under 37 CFR 1.34
Registration number ______________

Signature /Gokalp Bayramoglu/

Typed or printed name Gokalp Bayramoglu

Telephone Number 702-462-5973

Date 03/24/2022

**NOTE:** This form must be signed in accordance with 37 CFR 1.33. See 37 CFR 1.4 for signature requirements and certifications. Submit multiple forms if more than one signature is required, see below*.

[ ] * Total of ______________ forms are submitted.

This collection of information is required by 37 CFR 41.20(b)(1) and 41.31. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11, 1.14 and 41.6. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

# Privacy Act Statement

The **Privacy Act of 1974 (P.L. 93-579)** requires that you be given certain information in connection with your submission of the attached form related to a patent application or patent. Accordingly, pursuant to the requirements of the Act, please be advised that: (1) the general authority for the collection of this information is 35 U.S.C. 2(b)(2); (2) furnishing of the information solicited is voluntary; and (3) the principal purpose for which the information is used by the U.S. Patent and Trademark Office is to process and/or examine your submission related to a patent application or patent. If you do not furnish the requested information, the U.S. Patent and Trademark Office may not be able to process and/or examine your submission, which may result in termination of proceedings or abandonment of the application or expiration of the patent.

The information provided by you in this form will be subject to the following routine uses:

1. The information on this form will be treated confidentially to the extent allowed under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C 552a). Records from this system of records may be disclosed to the Department of Justice to determine whether disclosure of these records is required by the Freedom of Information Act.
2. A record from this system of records may be disclosed, as a routine use, in the course of presenting evidence to a court, magistrate, or administrative tribunal, including disclosures to opposing counsel in the course of settlement negotiations.
3. A record in this system of records may be disclosed, as a routine use, to a Member of Congress submitting a request involving an individual, to whom the record pertains, when the individual has requested assistance from the Member with respect to the subject matter of the record.
4. A record in this system of records may be disclosed, as a routine use, to a contractor of the Agency having need for the information in order to perform a contract. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. 552a(m).
5. A record related to an International Application filed under the Patent Cooperation Treaty in this system of records may be disclosed, as a routine use, to the International Bureau of the World Intellectual Property Organization, pursuant to the Patent Cooperation Treaty.
6. A record in this system of records may be disclosed, as a routine use, to another federal agency for purposes of National Security review (35 U.S.C. 181) and for review pursuant to the Atomic Energy Act (42 U.S.C. 218(c)).
7. A record from this system of records may be disclosed, as a routine use, to the Administrator, General Services, or his/her designee, during an inspection of records conducted by GSA as part of that agency's responsibility to recommend improvements in records management practices and programs, under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall be made in accordance with the GSA regulations governing inspection of records for this purpose, and any other relevant (*i.e.*, GSA or Commerce) directive. Such disclosure shall not be used to make determinations about individuals.
8. A record from this system of records may be disclosed, as a routine use, to the public after either publication of the application pursuant to 35 U.S.C. 122(b) or issuance of a patent pursuant to 35 U.S.C. 151. Further, a record may be disclosed, subject to the limitations of 37 CFR 1.14, as a routine use, to the public if the record was filed in an application which became abandoned or in which the proceedings were terminated and which application is referenced by either a published application, an application open to public inspection or an issued patent.
9. A record from this system of records may be disclosed, as a routine use, to a Federal, State, or local law enforcement agency, if the USPTO becomes aware of a violation or potential violation of law or regulation.

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/576,565 | 08/01/2012 | Li Li | 4912-0001USNP | 8815 |

166747 7590 12/24/2021
MagStone Law
1180 Avenue of the Americas, 8th Floor
New York, NY 10036

| EXAMINER | |
|---|---|
| DOYLE, BRANDI M | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1771 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/24/2021 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

IP@magstonelaw.com
eofficeaction@appcoll.com
ip@remotedocket.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 13/576,565 | Applicant(s) Li et al. | |
|---|---|---|---|
| | **Examiner** Brandi Doyle | **Art Unit** 1771 | **AIA (FITF) Status** No |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --***

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on 9/14/21.
☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☑ This action is **FINAL.** 2b) ☐ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) 1-7,10,13-25,27,29 and 31-33 is/are pending in the application.
5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6) ☐ Claim(s) _____ is/are allowed.

7) ☑ Claim(s) 1-7,10,13-25,27,29 and 31-33 is/are rejected.

8) ☐ Claim(s) _____ is/are objected to.

9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined allowable, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.
Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
**Certified copies:**
a)☐ All b)☐ Some** c)☐ None of the:
1.☐ Certified copies of the priority documents have been received.
2.☐ Certified copies of the priority documents have been received in Application No. _____.
3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)

2) ☐ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)
Paper No(s)/Mail Date ______.

3) ☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date ______.

4) ☐ Other: ______.

## DETAILED ACTION

1. The present application is being examined under the pre-AIA first to invent provisions.

2. This communication is in response to the amendment and reply filed 9/14/2021 and includes a response to the 1.132 declaration filed 9/14/2021.

3. Claims 1-7, 10, 13-25, 27, 29, 31 and 32-33 (new) are pending.

4. Previous rejections of the objections and rejections under 35 USC 112 are withdrawn in view of the amendments. Previous rejections under 103 are maintained. A new rejection under 35 USC 103 is provided below for new claim 32.

### ***Response to Arguments***

5. The declaration under 37 CFR 1.132 filed 9/14/2021 is insufficient to overcome the rejection of claims 1-7, 10, 13-25, 27, 29, and 31 based upon 103 as set forth in the last Office action because: the art teaches the claimed limitations and the affidavit does not distinguish the claims from the closest prior art.

6. Applicant's arguments filed 9/14/2021 have been fully considered but they are not persuasive.

7. Applicant’s arguments with respect to the previous rejections under 35 USC 112 do not appear to apply to the current claims and therefore a moot. Reply at pp. 15-16. Note the arguments would not be persuasive with respect to the previous claims for the reasons previously discussed. As now written, “the catalyst mixing buffer space is independent and separate from spaces taken by the heat-exchanging element”. This is necessarily true, the fluidizing and mixing space cannot occupy the space of the heat-exchanging element, and this is taught in Li (figure).

8. Applicant’s arguments have been previously addressed including in the Reply Brief filed 9/25/2020.

9. (I) Applicant argues blending and buffering in a mixing buffer space in a downstream location is not taught. Reply at pp. 17-22. Li teaches using fluidizing gas downstream of the cooling element which mixes and buffers the catalyst before the riser.

10. (II) Applicant argues the art fails to teach one reactor comprising one reaction zone. Reply at pp. 22-27. Li teaches one or more risers having two or more reaction zones. However, single reaction zones is well known in the art of FCC and now addressed below.

11. (III) Applicant argues that the art previously failed to teach the claim as a whole. Reply at pp. 27-28). However, the arguments center on the lack of teaching of the mixing buffer space. Examiner disagrees as previously discussed. See also Examiner's Answer, filed 2/7/2019, p. 13.

12. (iv) Applicant argues unexpected results. Reply at pp. 29-31. Applicant fails to present a showing of unexpected results or improvement over the invention as disclosed in Li. See also Examiner's Answer, filed 2/7/2019, pp. 14-15.

### ***Claim Rejections - 35 USC § 103***

13. In the event the determination of the status of the application as subject to AIA 35 U.S.C. 102 and 103 (or as subject to pre-AIA 35 U.S.C. 102 and 103) is incorrect, any correction of the statutory basis for the rejection will not be considered a new ground of rejection if the prior art relied upon, and the rationale supporting the rejection, would be the same under either status.

14. The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

15. The factual inquiries for establishing a background for determining obviousness under pre-AIA 35 U.S.C. 103(a) are summarized as follows:

1. Determining the scope and contents of the prior art.

2. Ascertaining the differences between the prior art and the claims at issue.

3. Resolving the level of ordinary skill in the pertinent art.

4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

16. This application currently names joint inventors. In considering patentability of the claims under pre-AIA 35 U.S.C. 103(a), the examiner presumes that the subject matter of the various claims was commonly owned at the time any inventions covered therein were made absent any evidence to the contrary. Applicant is advised of the obligation under 37 CFR 1.56 to point out the inventor and invention dates of each claim that was not commonly owned at the time a later invention was made in order for the examiner to consider the applicability of pre-AIA 35 U.S.C. 103(c) and potential pre-AIA 35 U.S.C. 102(e), (f) or (g) prior art under pre-AIA 35 U.S.C. 103(a).

**17. Claim(s) 1-7, 10, 13-25, 27, 29, 31, and 33 are rejected under pre-AIA 35 U.S.C. 103(a) as obvious over Chinese Patent Application Publication no. 1664074A, published 9/2/2005 (reference pages below are to the English Translation of CN 1664074A provided by applicant on 06/01/2016 and the figures originally cited).**

With respect to **claims 1-7, 10, 13-25, 27, 29, 31, and 33**, Li discloses an FCC method (see e.g. figure 1; p. 18 - p. 21) comprising: reacting hydrocarbon materials with a catalyst in a riser reactor (p. 1, ¶ 3-4) generating gas, oil, and reacted catalyst (p. 21, ¶ 2); separating the reacted effluent in a settler producing a spent catalyst and a reacted effluent of gas and oil (p. 1, ¶ 3); stripping the separated catalyst in a stripping zone (p. 1, ¶ 3); regenerating the stripped catalyst in a regenerator by burning (p. 1, ¶ 3); and cooling at least a portion of the hot regenerated catalyst in a regenerated catalyst cooler using heat extraction medium fluid

37A/B/C that flows through a heat taking element in the tube side of the cooler 8A/B and fluidizing gas 35A/B/C distributed in the lower portion of the cooler (figure; p. 18, ¶ 3-4) before transferring the cooled catalyst directly to the riser for reuse (p. 4, ¶ 1; figure).

Li teaches that the regenerated catalyst cooler(s) comprise one or more coolers located inside or outside the regenerator (p. 2, ¶ 4). There may be separate coolers to adjust one or more of the risers and/or the regenerator or one catalyst cooler with a plurality of outlets for sending catalyst to each of the desired riser reactors and regenerator (e.g. p. 2, ¶ 4 to p. 4, ¶ 1). This includes wherein a catalyst cooler is connected to a riser and used to adjust the reaction temperature of each zone in the riser or the temperature. The cooler cools the catalyst to a temperature from 200 to 720ºC (p. 3, ¶ 2). The coolers may comprise a shell which the catalyst flows through and houses tubes (heat taking element) in the upper portion and fluidizing media in the lower portion, each for providing cooling (p. 18, ¶ 3-4). The temperature of the cooled catalyst is controlled using the flowrate of the fluidized media, the heat-taking media through the tube, or by adjusting the temperature of the regenerator which includes by adjusting the flow of cold catalyst returning to the regenerator (p. 4, ¶ 1; p. 8, ¶ 1; p. 18, ¶ 4- p. 20, ¶ 1). Fluidizing medium 35A/B enters the cooler below and downstream from the tubes (heat exchange element) (Figure; see p. 18, ¶ 3-4)). Heat taking media includes water, steam, oil (p. 18, ¶ 4). The term “mixing buffer space” is not used in Li, however, the space in the catalyst cooler in which cooled catalyst and the fluidizing gas mix before leaving the cooler is interpreted as the mixing buffer space for blending and buffering (figures; p. 18, ¶ 3-4). Note, blending is not used in the instant application with respect to the cooler, but does teach the mixing buffer space, for mixing catalyst and fluidized gas and thus blending is interpreted as a synonym for mixing.

Li teaches that the reaction zone may comprise one or more risers having a plurality of zones (p. 5, ¶ 3; p. 6, ¶ 1). One example is one heavy oil riser with two reaction zones (p. 2) wherein the first zone temperature is controlled with cold regenerated catalyst and the second is controlled with a cold shock agent that may include hot or cold regenerated catalyst, among

other agents (p. 5, ¶ 1). The feed to the reaction zone(s) includes hydrocarbon oil feedstock, regenerated catalyst which may be one or a mixture of uncooled regenerated catalyst or cooled regenerated catalyst, and a fluidizing gas (p. 5, ¶ 5 to p. 6, ¶ 2). The feed and catalyst mixture enters the riser in a pre-lift section of the risers or auxiliary rising pipes (p. 9, ¶ 1; p. 15, ¶ 1; p. 18, ¶ 3- p. 20, ¶ 1; p. 23, ¶ 3). The temperature of the catalyst mixture is controlled by adjusting the amount of each of the cold and hot catalyst supplied (p. 6, ¶ 2), which includes sending a portion of regenerated catalyst through the cooler and a portion bypassing the cooler. “After the lifting mixing of the cold regenerated catalyst and the hot regenerated catalyst by a lifting medium 32 in the pre-lifting zone 4 of the heavy oil riser reactor, the temperature reaches equilibrium" (p. 19, ¶ 2). The pre-lift medium includes e.g. gas, oil, water (p. 15, ¶ 1). The first reaction mixture from a first reaction zone may be mixed with a cold shock agent to independently adjust the mixture temperature and passed to the subsequent zone (p. 1, ¶ 4 to p. 2, ¶ 2; p. 5, ¶ 1; p. 5, ¶ 1). The cold shock agent ay include water, oil, cold regenerated catalyst, cold spent catalyst, etc. (p. 5, ¶ 1). Thus, cold regenerated catalyst may be passed directly to the second reaction zone to independently control the temperature. Cold regenerated catalyst may be passed through auxiliary or assistant riser with pre-lift media to a zone of one or more riser reactors as a cold shock or quenching agent for reuse in the riser (p. 6, ¶ 1). The operating temperature in the riser may be controlled using the hydrocarbon to oil ratio, the amount of cold catalyst and hot catalyst, temperature of cold catalyst (p. 6; p. 8, ¶ 1; p. 20, ¶ 1), multi-point feeding (p. 17, ¶ 3), and cold shock or quenching agents (p. 5, ¶ 2). The second reaction mixture is the mixture which is separated in the settler and regenerated (p. 2, ¶ 3).

Li teaches that the regenerator may comprise single-stage regeneration or two-stage regeneration wherein semi-regenerated catalyst is obtained from a first stage and regenerated in a second stage to obtain fully regenerated catalyst (p. 14, ¶ 3-4). The regeneration device/process may utilize conventional methods and devices for coke-burning regeneration (p. 15, ¶ 2). Hot regenerated catalyst is sent to a cooler or directly to a riser without cooling (p. 3, ¶

1). Cooled catalyst may be recycled to the regenerator to regulate temperature therein (p.3, ¶ 4).

**18. Claim 32 is rejected under pre-AIA 35 U.S.C. 103(a) as obvious over Chinese Patent Application Publication no. 1664074A, published 9/2/2005 (reference pages below are to the English Translation of CN 1664074A provided by applicant on 06/01/2016 and the figures originally cited) in view of Palmas (US 2010/0152515).**

With respect to **claims 32**, Li discloses an FCC method as claimed in claim 1 and described above. Li teaches wherein one or more reactors comprising two or more reaction zones is used. Li is silent regarding the use of only one riser with only one reaction zone.

However, it is well known in the art that a riser in an FCC system may include a single reaction zone or plurality of reaction zones as taught in Palmas (figure; 0018; 0022). It would have been obvious to one of ordinary skill in the art at the time of the invention to operate the process of Li with a single riser having one reaction zone to do no more than obtain predictable results of conversion of the heavy oil to lighter products using the single reaction zone. While the product slate and operating conditions would be tailored based on the reaction zones provided, whether one, two or six, the use of a single reaction zone is obvious and the results expected.

***Double Patenting***

**19.** The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the “right to exclude” granted by a patent and to prevent possible harassment by multiple assignees. A nonstatutory double patenting rejection is appropriate where the conflicting claims are not identical, but at least one examined application claim is not patentably distinct from the reference claim(s) because the examined application claim is either anticipated by, or would have been obvious over, the reference claim(s). See, e.g., *In re Berg*, 140 F.3d 1428, 46 USPQ2d 1226 (Fed. Cir. 1998); *In re Goodman*, 11 F.3d

1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).

A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) or 1.321(d) may be used to overcome an actual or provisional rejection based on nonstatutory double patenting provided the reference application or patent either is shown to be commonly owned with the examined application, or claims an invention made as a result of activities undertaken within the scope of a joint research agreement. See MPEP § 717.02 for applications subject to examination under the first inventor to file provisions of the AIA as explained in MPEP § 2159. See MPEP § 2146 *et seq.* for applications not subject to examination under the first inventor to file provisions of the AIA. A terminal disclaimer must be signed in compliance with 37 CFR 1.321(b).

The USPTO Internet website contains terminal disclaimer forms which may be used. Please visit www.uspto.gov/patent/patents-forms. The filing date of the application in which the form is filed determines what form (e.g., PTO/SB/25, PTO/SB/26, PTO/AIA/25, or PTO/AIA/26) should be used. A web-based eTerminal Disclaimer may be filled out completely online using web-screens. An eTerminal Disclaimer that meets all requirements is auto-processed and approved immediately upon submission. For more information about eTerminal Disclaimers, refer to www.uspto.gov/patents/process/file/efs/guidance/eTD-info-I.jsp.

**20. Claims 1-7, 10, 13-25, 27, 29, 31 and 32-33 are provisionally rejected on the ground of nonstatutory double patenting as being unpatentable over claims 11-30 of copending Application No. 17/066,484 (reference application).** Although the claims at issue are not identical, they are not patentably distinct from each other because while the claims are not identical the limitations of claims 1-7, 10, 13-25, 27, 29, 31 and 32-33 all limitations are claimed in the reference application in overlapping scope.

This is a provisional nonstatutory double patenting rejection because the patentably indistinct claims have not in fact been patented.

### *Conclusion*

21. Applicant's amendment necessitated the new ground(s) of rejection presented in this Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the mailing date of this final action and the advisory action is not mailed until after the end of the THREE-MONTH shortened statutory period, then the shortened statutory period will expire on the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event, however, will the statutory period for reply expire later than SIX MONTHS from the date of this final action.

22. Any inquiry concerning this communication or earlier communications from the examiner should be directed to Brandi Doyle whose telephone number is (571)270-1141. The examiner can normally be reached Monday-Friday, 8:00 AM - 3:00 PM.

Examiner interviews are available via telephone, in-person, and video conferencing using a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is encouraged to use the USPTO Automated Interview Request (AIR) at http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Prem Singh can be reached on (571)272-6381. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and https://www.uspto.gov/patents/docx for information about filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/BRANDI M DOYLE/
Examiner, Art Unit 1771

/PREM C SINGH/
Supervisory Patent Examiner, Art Unit 1771

# METHOD AND EQUIPMENT FOR CIRCULATING COOLED REGENERATED CATALYST

## TECHNICAL FIELDS

This invention belongs to the technical field of fluid catalytic cracking(FCC), Particularly involving the use of the method and equipment for circulating cooled regenerated catalyst for tar catalytic cracking and low-grade gasoline catalytic cracking.

## BACKGROUD OF THE INVENTION

With the poor quality of the crude oil quality and heavy trend growing, and the blending ratio of residual oil in the FCC continuously increasing, the gasoline quality with FCC, coking, thermal cracking etc. processes becomes worse. The olefin in gasoline is an effectively high-octane component, on the other hand the olefin through the combustion process produces a lot of pollutants to pollute the environment. Although the use of traditional hydrotreating process can reduce olefins in gasoline, the octane number will be lost significantly. To solve above problems and improve the gasoline quality, many refineries in the world have also done a lot of research work.

Luoyang Petrochemical Engineering Corporation has developed a more flexible and efficient catalytic cracking process (CN92105596 X). The process utilizes dual riser reactor, one riser as gasoline modification reaction zone, and the other as the FCC main riser reaction zone. The process uses highly active catalyst to improve gasoline quality. The process takes into account the reaction conditions of main riser for tar FCC, thus the reaction conditions for improving gasoline quality is limited. With the gasoline riser, gasoline olefin can reduce 10 to 30 volume percent.

China University of Petroleum (East China) use two-series riser technology (CN302843A). The oil and gas in the reactor are series, and the catalyst relays the operation to achieve more light oil yield to reduce olefins contents in gasoline. But the technology uses two-series risers to make the process very complex. The flexibility of

the equipment operation is limited. Because the process is the two risers to connect operation the oil and gas, it will affect each other between the reaction of improving gasoline quality and the reaction of other components. Therefore, the final product selectivity in the reaction will be affected. The decline in gasoline olefin content may be reduced to about 15 volume percent.

Due to heavy raw materials and the high value of the residual carbon, the coke yield of heavy oil catalytic cracking has been increased. At the same time the produced heat is more than the required heat of the reaction system resulting in excess heat. Therefore a removing heat unit must be installed in the heavy oil catalytic cracking unit in order to remove excess heat from the system and be able to maintain the heart balance the heat of reactors and regenerators. Currently there are many kinds of catalyst coolers in heavy oil catalytic cracking for removing heat.

US5451313 discloses a FCC process, in which the catalyst after reaction and regenerated catalyst recycle together to reduce the reaction severity, improve feed atomization and promote contact with the catalyst. But it does not mention that the catalyst cooler can be used for cooling both of the regenerator bed and regeneratant of riser feeding.

UOP Corp develops a "X design" technology( the magazine 《World Petroleum Science》, 1996, 3(9)). The process is to mix some catalysts partly to be born (to be regenerated catalyst) without burning carbon regeneration and with regenerated catalyst in the mixing tank then directly return to riser reactor. Due to regenerated catalyst cooling, the catalyst and feed ratio can be increased. The disadvantage of the technology is to mixing regenerated catalyst and used catalyst without burning carbon regenerated directly so as to decrease the activity of catalyst from riser reactor and not conducive to cracking reactions .

The current heat removing technology, also known as catalyst cooling technology, only can take heat from the cold regenerated catalyst returned to regenerator dense phase and can not optimize the operating conditions of the reaction system. Thus there

are many shortcomings in the current reaction and regeneration system technologies.

As above, On the basis of the existing technology, the purpose of the present invention is to provide a kind of circulation process of cold regenerated catalyst which are mainly used to tar FCC with heavy feedstock and gasoline quality upgrading , and solve the problems about high blending ratio of residual oil with FCC and gasoline upgrading quality.

Another purpose of the invention is to ensure the conditions of an enough regenerated temperature and a good effect for regeneration. The cold regenerated catalyst circulation process can (1)drop the temperature of regenerated catalyst into a reactor, (2)increase crude oil preheating temperature, (3)improve the crude oil atomization effect, (4)increase the blending ratio of the catalyst and crude oil, (5)improve the tar FCC product distribution, and (6) increase liquid products yield.

The third purpose of the invention is to ensure the conditions of an enough regenerated temperature and a good effect for regeneration. The cold regenerated catalyst circulation process can drop the temperature of cooled regenerated catalyst into a reactor. In the proper ratio of the catalyst and feed, the process can reduce the riser reaction temperature and increase the catalyst activity in the riser so as to promote hydrogen transfer, isomerization, and aromatization reaction and reduce coke and gas yield. The gasoline and light distillation products yields will be increased; the octane number of gasoline will be increased too. Olefin and impurities in gasoline will be reduced.

**SUMMARY OF THE INVENTION**

The present invention is to provide a cycling method of cold regenerated catalyst or contact catalyst(hereinafter referred to as the catalyst), to utilize the normal technology of catalyst cooling in FCC, in keeping regeneration temperature unchanged， relying on reducing the regenerated catalyst temperature, to make the

ratio of catalyst and feed as the independent adjustable variables.

The present invention is to provide a cycling method and its equipment of cold regenerated catalyst. Specific technical solutions are detailed below:

A cycling method and its equipment of cold regenerated catalyst, characterized in that, including a FCC process: hydrocarbon materials react with catalyst in the riser reactor(with or without a fluidized bed reactor); the materials enter into a settler for the separation of catalyst from gas and oil; Separated catalyst will be stripped and enter into regenerator to burn for regeneration; The regenerated catalyst will be cold or/and not be cold to return the riser reactor directly for cycling use; The details are as follows:

(1) the regenerator includes one, two, or more catalyst coolers, each connected to the riser reactor (or the fluidized bed reactor) is used to adjust the reaction temperature of the reaction zone, or/and to adjust regenerator temperatures, so as to keep them in the best value; the catalyst coolers connected with the riser reactor (or the fluidized set in the inside or outside of regenerator, or set under its riser reactor;

(2) The catalyst entrance of the shell of the described catalyst cooler directly (or through a pipeline) connects with the regenerator dense phase; there are internal components in the cooler for removing heat; there are fluidized media distribution facilities under the cooler; In the downstream, there is a buffer space for mixed buffer catalyst; the upper part is installed or not installed the gas channel to return to diluting phase of the regenerator;

(3) There are one, two or more catalyst exits set in the catalyst mixed buffer space in the downstream of the described catalyst cooler; One, two or more exits of catalysts are connected to the transmission channel of cold catalyst used to deliver cold-regenerated catalyst circulation to one, two or more of the riser (reactor or auxiliary riser); Another one, two or more (or not) catalyst exists are connected to the transmission channel of cold catalyst for conveying cold

regenerated catalyst return to the regenerator; The described transmission channel of cold catalyst to the riser is set in the outside of the described catalyst cooler's shell, or all (or partly) set in the inside of the described catalyst cooler's shell; The return channel of the cooled catalyst back to the regenerator all set in the outside of the described catalyst cooler's shell, or all (or partly) set in the inside of the described catalyst cooler's shell.

(4) The described riser reactor is set one, two or more reaction zones with or without fluidized bed reactor; Before cold regenerated catalyst enters into the riser reactor or fluidized bed reactor, the riser reactor is set (or not set) a pre-lift section, with pre-lift media to send the cold regenerated catalyst to the riser reactor or the fluidized bed reactor; The described pre-lift section can all be set outside of the catalyst cooler shell, or all(or part) set inside.

(5) Part of regenerated catalysts coming from regenerator are cooled by catalyst cooler within 200 to 720°C and enter into the pre-lift or directly into each reaction zone of riser reactor; Or these regenerated catalysts mix or/and with hot regenerated catalyst without cooling to get the regenerated catalyst mixture which temperature is lower than regenerator temperature and then the mixture enter into pre-lift or/and each reaction zone of the riser reactor; Or the cold and the hot regenerated catalysts enter into the pre-lift of riser separately and directly with pre-lift media for increasing the catalysts temperature to reach a proper temperature and then the mixture enter into each reaction zone of riser reactor; Or the regenerated catalyst without cooling by catalyst cooler enter into the pre-lift zone or/and each reaction zone of the riser reactor directly for cycling .

Setting (or not setting) one, two or more assistant risers, the described cold regenerated catalyst through the assistant risers with the pre-lift media are lifted to one, two or more riser reactors or fluidized bed reactor reaction zones as a cold shock agent for cycling.

The regenerated catalysts coming from regenerator as step (5) described are cooled by the catalyst cooler within 360 to 650 °C.

The temperature of the described cold regenerated catalyst can be controlled by adjusting the flows of the fluidized media and/or taking-heat media or adjusting other parameters; or controlled by adjusting the flows of the fluidized media and/or taking-heat media and/or adjusting the flows of cool catalyst returning regenerator or other parameters.

The temperature of the described regenerated catalysts mixture can be controlled by adjusting the ratio of cold and hot regenerated catalyst.

The reaction temperature of the described riser reactor or fluidized bed reactor reaction zones can be controlled by adjusting the ratio of the catalyst and feed, or/and by adjusting the temperature of the described cold regenerated catalyst or the temperature of the described regenerated catalyst mixture, or/and by using multi-point feeding technology, and /or by adding various cold shock agents to the riser reactor.

The described taking-heat medias in the catalyst cooler include water, steam, air and various oils.

The described cycling method and its equipment of the cold regenerated catalyst can be used widely for various FCC including tar catalytic cracking, wax oil catalytic cracking, gasoline catalytic modification for improving quality, or light hydrocarbon catalytic conversion, or for other burning process of gas-solid fluidized reaction including residue pre-processing, ethylene made by methanol, fluidize coking or flexible coking.

The cycling method and its equipment of cold regenerated catalyst can be implemented independently for each reaction zone of a riser reactor (or fluidized bed

reactor) of all kinds of FCC; or jointed to implement for each reaction zone of one, two or more riser reactors (or fluidized bed reactor) including tar risers and gasoline risers of the dual risers FCC units or different feeds riser reactors.

The described catalyst in the catalyst cooler is the regenerated catalyst with any carbon content or the regenerated catalyst without completed regeneration or the contact agents with any carbon content or coking particles.

The catalyst coolers are traditional industrial equipment. The methods and units of the present invention can be a variety of structures (such as the upward mode, downward mode, etc.), the catalyst transmission channels can be also the various connecting structures (such as inner-loop pipe, Y-shaped, U-shaped outer transmission (cycling) pipe, etc.). The person skilled in the art can be easy to understand the structures, connection styles, operation and control process, which will not be restricted by any specific implement.

The temperature of the described regenerated catalyst mixture into the reaction zones of the riser reactors (or fluidized bed reactors) can be controlled independently by adjusting the above mentioned ratio of cold and hot regenerated catalysts. When the cold regenerated catalyst through the catalyst cooler enters into the riser reactors directly (or fluidized bed reactor), the temperature of the cold regenerated catalyst in the reaction zones of riser reactors (or fluidized bed reactors) can be controlled by adjusting the flows of fluidized media and /or taking-heat media and /or the flows of cold catalysts retuned to the regenerator or adjusting other parameters. Therefore, the ratio of catalyst and oil (the ratio of regenerated catalyst and raw materials) in the riser reactors (fluidized bed reactors) and the reaction temperatures can be controlled independently.

According to process requirements, the catalyst coolers which adjust the regenerator temperature can not be set, and/or one; two or more catalyst coolers which

adjust the reaction zone temperatures of riser reactors (or fluidized bed reactors) can not be set too. The hot regenerated catalysts enter into the risers directly.

The catalyst coolers for adjusting regenerator temperature can be not set, or only set one, two or more which connect with the riser reactors (or fluidized bed reactors). The temperature of regenerator can mainly be controlled by adjusting heat balance of regeneration system for reaction, and/or mainly can be controlled by adjusting the flows of fluidized media and /or taking-heat media and /or the catalysts retuned to the regenerator or adjusting other parameters.

When the catalyst coolers for adjusting the temperature of reaction zones for riser reactors (or fluidized bed reactors) can be set or not set, the regenerator temperature can be controlled by adjusting the heat balance of reaction regeneration system, and /or by adjusting the flows of fluidized media and /or taking-heat media and /or the catalysts retuned to the regenerator or adjusting other parameters.

The mentioned reaction temperature of reaction zones for riser reactors (or fluidized bed reactors) can be controlled by adjusting the ratio of catalyst and oil (The said cold catalyst return channel can set in control elements such as slide valves, plug valves, etc.), and /or by adjusting the temperatures both cold regenerated catalyst and regenerated catalyst mixtures to keep the temperature at the best value.

Of course, there are also many other control devices and control methods, which the person skilled in the art know clearly. They will not be restricted by any specific implement.

The mentioned fluidized medias and transmission medias can be air, steam, etc, the taking-heat medias can be water, steam, air, oils, etc. The mentioned pre-lift medias can be water, steam, various refinery dry gases, etc.

The mentioned regenerated catalysts entering into catalyst coolers can be the regenerated catalysts with any carbon contents or no completely regenerated catalysts. The mentioned regenerated catalysts entering into catalyst coolers also include the contact agent with any carbon contents or coke particles, etc.

The mentioned catalyst coolers can be connected with regenerators and risers directly, or connected them with pipes.

The cycling method and its equipment of the cold regenerated catalyst in the present invention can be used for various reaction regeneration types of FCC units (such as coaxial, parallel, etc.). The method and equipment can be combined with various regenerators, such as setting the first regenerator, the second regenerator, etc. The person skilled in the art can know clearly about combination types, operation and control process. They will not be restricted by any invention ideas and any specific implement.

In the FCC units with the cycling method and its equipment of cold regenerated catalyst in the present invention, the reaction products are separated and the catalysts are regenerated in conventional method. The separation and regeneration can use various reaction regeneration types used by the riser in the FCC including risers types (including equal diameters or non-equal diameters, with fluidized bed or not with fluidized bed reactors, etc.), various regeneration types and various combinations types. The catalyst after reaction in regenerators in normal FCC conditions will be burned for regenerating. The regeneration temperatures are controlled at 630-800°C (preferably 680-730°C).

The riser catalytic cracking process and its equipment is mature industrial process. The person skilled in the art know clearly about the combination types,

operation and control process, which will not be restricted by any specific implement. The present invention will not restrict any catalysts and process conditions about them.

The cycling method and its equipment of cold regenerated catalyst in the present invention can be used widely for the various fluidized catalytic cracking process including tar FCC, wax FCC, light hydrocarbons (liquefied petroleum gas, carbon four, EPA, gasoline, etc.) FCC etc, and can also be used for the burning process of other gas-solid fluidized bed reaction including pretreatment of residue oil, ethylene produced by methanol, fluidized coking, flexible coking, etc. The mentioned cycling method and its equipment of cold regenerated catalyst can be implemented independently for a riser reactor (or fluidized bed reactor) reaction zones in various fluidized catalytic cracking. According to the requirement, it can be equipped with one or more assistant risers for sending catalyst to a riser reactor (or a fluidized bed reactor) as a quenched agent. Or it can be implemented jointly, equipped with one or more assistant risers for sending catalyst to one or more riser reactors (or fluidized bed reactors) reaction zones as quenched agents. One or more riser reactors reaction zones include the tar risers and gasoline risers in the dual riser catalytic cracking units, to process a variety of raw materials in one or more riser reaction zones. According to the requirement, it can be equipped with one or more assistant risers for sending catalyst to a riser reactor (or a fluidized bed reactor) as a quenched agent

The cycling method and its equipment of cold regenerated catalyst in the present invention can be use for tar FCC. The tar hydrocarbons are mixed with cold regenerated catalyst from tar riser pre-lift zone (or not set) into the tar riser reactors (with or without fluidized bed reactors). The main operating conditions are as follows:

Reaction temperature 400-650°C (preferably 520-600°C),

Reaction pressure 0.11-0.4MPa,

Contact time 0.05-5seconds (preferably 0.1-3seconds),

Weight ratio of catalysts and feeds, 3-15 (preferably 5-12).

To compare with existing technologies, the tar riser reactor operation conditions in this FCC invention are independent relatively, and the reaction temperature, catalyst/oil ratio and feeding-preheat temperature etc can be adjusted flexible based on the quality heavy oil and reaction requirement. Therefore, the process can increase the residue ratio, produce poor quality tar, increase yield of light oil. The process can reduce gasoline olefin content significantly, and increase the octane value of gasoline, reduce other impurity contents in products. The advantages of the process are operation easily, simple and flexible, wide-ranging application.

To compare with the existing technology, the advantages of the present invention are as follows:

1) better atomization for raw materials.

In the conditions of keeping regeneration temperature unchanged, to reduce the temperature of regenerated catalyst, the ratio of catalyst and oil becomes an independent and adjustable variable number. In the normal mixed temperature of the riser, it can increase the catalyst/oil ratio and the preheat temperature of feed, improve feed atomization for promoting the feed to contact the catalyst so as to reduce the yields of coke and dry gas.

2) tar riser reactor can flexibly adjust the temperature of reaction zones and the temperature of regenerator so that the temperatures will be kept at the best value. Therefore, the tar riser reaction zones can use more appropriate reaction time and reaction temperature.

3) higher regeneration temperature

The regeneration temperature is not limited by the catalyst /oil ratio and feed preheat temperature. The regeneration temperature can be increased

because this is good for regenerating efficiency, and has a function for passive heavy metal. Higher regeneration temperature can make flue gas take the heat out more, so the heat taken from regenerators will be reduced.

4) higher catalyst activity

Due to reduce the temperature of regenerated catalyst, the water-and-heat inactivation of the regenerated catalyst in the riser pre-heat section will be reduced.

5) to process the heavier hydrocarbon raw materials.

The blending ratio of vacuum residue can reach at 100%, that is to process 100% vacuum residue, to reduce unwanted products yields such as coke and gas, meanwhile to increase gasoline and light distillation points yields, to increase the octane number of gasoline, to reduce olefin in products and impurity contents. Thus the technology economy is improved.

6) to increase the processing capacity

In the unchanged conditions of the raw materials and product solutions, due to coke and dry gas yield reducing, the processing capacity will be increased at 15-20%.

7) to combine with other technologies, the effect of technology in the present invention will be better.

The use of the technology does not affect to use other technologies, such as to combine with the technology for existing dense segments to take heat out, the technology of riser reaction terminator injection, technologies of multi–reaction zones and multi-points feeding etc. The effect will be better. Of course, the technology of the present invention can be used with other processes too. It will not be affected by any specific implementation.

To compare with the individual use of the technology of mixing temperature control or the individual use of the technology of terminator injection, the technology of the present invention can reach at higher temperature for taking heat and make heat utilization more rational.

The technology of the present invention can also be used in gasoline catalytic conversion. The operating conditions of the riser reactor are independent relatively. According to the reaction requirement, the operating conditions such as temperature, the catalyst/oil ratio and feed pre-heat temperature etc. can be adjusted flexibly.

To compare with the existing technologies, the technology of the present invention can reduce the volume contents of gasoline olefin significantly. The technology of the present invention technology possesses the advantages i.e. increasing octane number of gasoline and reducing of the product impurity contents, operating easily, simple and flexible, use widely. To compare with the existing technologies, the low-grade gasoline processed by FCC process of the present invention, the volume contents of gasoline olefin can be reduced to 30-70%, octane numbers (RON) can be increased to 0.5-40units; the sulfur content in gasoline can be reduced in 30-70% (weight).

After pre-heat (or not pre-heat), the gasoline e (gas style or liquid style) enter into a riser and will be mixed with cold regenerated catalyst from the pre-lift section (can not be set) of the gasoline riser, and then enter into the gasoline riser reactor (with or without a fluidized bed reactor). The purposes are the reactions for isomerization; aromatization and other product improving qualities, for reduce olefins, sulfur, and nitrogen content and increase octane number.

The main operating conditions for improving gasoline quality by the gasoline catalytic conversion with the technology y of the present invention are as follows:

Reaction temperature: 350-650°C (preferably 400-600°C)

Absolute pressure: 0.11-0.4MPa,

Contact time: 0.5-30second (preferably 1-15seconds)

The gasoline catalytic conversion process of the present invention can be implemented jointly with the tar catalytic cracking process can also be implemented alone. The operating conditions of gasoline riser reactors can be adjusted independently and flexibly. According to the market situation, the reaction temperature and other conditions for improving quality can be adjusted flexibly:

1) to use the lower temperature for producing low-sulfur, low olefin gasoline.

When the purposes are for reducing olefin in gasoline and sulfur contents so as to get clean gasoline, the reaction temperature can be very low (350-520°C, preferably 400-480°C), the isomerization, hydrogen transfer, aromatization, alkylation can dominate absolutely in ideal secondary reaction under enough time. The light product yield is more than 98.5%.

2) To use the higher reaction temperature can produce more quantities of LPG, light olefins, meanwhile to produce low sulfur and low olefin gasoline.

When the purposes are for getting more quantities of LPG, light olefin, reaction temperature can be very high (500-650°C, preferably 520-600°C). It will make olefin cracking reaction as dominant reaction, meanwhile the reaction increase diesel/gasoline ration, reduce gasoline olefin and sulfur contents, and produce high-octane number clean gasoline.

The gasoline distillate can be all fractions, for example, from initial boiling point to around 220°C fractions; It can also be a part of narrow fractions, for example, 70-145°C fractions. The gasoline fractions can be the fractions with one time processing such as straight-run gasoline, natural gasoline, or can be the gasoline fractions with the secondary time processing such as coking gasoline, FCC gasoline, visbreaker gasoline, thermal cracking gasoline, etc. or more than one gasoline fraction

mixture. The olefin contents of the gasoline fractions can be 0-80%(weight), and the fractions contain a small amount of sulfur, nitrogen and other impurities, such as sulfur contents can be more than 200ppm, nitrogen contents can be more than 30ppm.

The mentioned all fraction or narrow fraction poor quality gasoline are one or more kinds of gasoline mixtures including distilled gasoline, natural gasoline, FCC gasoline, thermal cracking gasoline, visbreaker gasoline, coking gasoline, ethylene gasoline processed by cracking.

**DRAWING DESCRIPTION**

The drawing is for the description of the present invention, it will not be restricted by any specific implement.

The drawing 1 is a special schematic diagram.

The drawing 2 – 4 is a schematic diagram for tar catalytic cracking units with the present invention.

**DETAILED DESCRIPTION**

As following, the present invention is further illustrated by the drawings.

Drawing 1: A special schematic diagram (a cold regenerated catalyst cycle process)

As Figure 1 shown: the cycling instruments of cold regenerated catalyst of the present invention include the disengager 1, the riser 2 with the pre-lift sect 4 and the regenerator 5. For transporting the spent catalyst to he regenerator 5, the pipeline 7 of spent catalyst is set between the regenerator 5 and the stripping section 1A and the control valve 20 can connect the regenerator 5 and stripping section 1A.

The regenerator has two inside or outside taking-heat equipments as the catalyst coolers, including the entrance of the catalyst directly with the dense of the

regenerator (or through a pipe), the mixing buffer space in the lower part, internal taking-heat element (including telescopic or tube-wire, etc.), the facilities for distribution of streaming media in the lower part.

Catalyst cooler 8A is mainly used to adjust the reaction temperature of the first reaction zone, to keep it in the best value. Another catalyst cooler (not shown) is primarily used for regulating the temperature of the regenerator to keep it in the best value. 35A is fluidized media, such as air, steam, etc., 36A is lifting media, such as air, steam, etc, 37A is taking-heat medium, including water, steam, air, and all kinds of oil.

The regenerator 5 is connected with the catalyst cooler 8A through regenerator duct 10A and the regenerated catalyst after cooling enters into the mixing buffer space in the lower part. The cold regenerated catalyst is connected with the pre-lift sect 4 of the riser reactor through the cold pipeline 11. Leaving the catalyst cooler 8A (the mixing buffer space in the lower part 9A), the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media 35A (including air, steam, etc.) and / or the flow rate of the lifting media 36A (including air, steam, etc.) of the return pipe 12A of the cold regenerated catalyst. The control valve 21A is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

For conveniently controlling the temperature of the reaction zone of the riser reactor, the pipeline of the hot regenerated catalyst (including the control valve) (not drawn) can connect the regenerator 5 directly with the pre-lift sect 4 of the heavy oil riser reactor. After lifting the cold regenerated catalyst mixed with hot regenerated catalyst in the pre-lift sect 4 of the riser reactor by the mixed media 32 of pre-lift area (including water, steam, and refinery gas, etc.), the temperature can reach to equilibrium.

Heavy oil riser reactor can also set the two reaction zones. The cold regenerated catalyst can enter the auxiliary riser through the pipeline of the cold regenerated catalyst, and reach the second reaction zone of the riser reactor as the

cold-shocking agent by the lifting medium (not drawn).

According to requirements of the process, the catalyst cooler mainly used to adjust the temperature of the regenerator can not be set. The temperature of the regenerator 5 can be controlled by regulating the flow rate of the medium 35A including the flow rates of air, steam, etc. and the lifting media 36A of the return pipe 12A of the cold regenerated catalyst.

Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

The above-mentioned catalyst cooler can also be connected with the regenerator and the riser as a single entity, or connected through the pipelines.

Cooling to 200-720 ° C (preferably 360-650 ° C), the cold regenerated catalyst can enter into the riser reactor through pre-lift sect 4. Hydrocarbon raw materials in the riser reactor 2 react with the catalyst, and the flow after reaction can enter the disengager 1 for separation of catalysts and oil /gas, the spent catalyst after separation can be stripped by stripping section 1A, then enters into the regenerator 5 in the presence of the oxygen-containing gas 38 (including air) to be burnt for the regeneration. the regenerated catalyst after cooling can return directly to the riser reactor for cycling use.

Figure 2 is a typical scheme of the heavy oil catalytic device of the present invention.

Such as shown in Figure 2: the method and its equipment of the present invention for the heavy oil catalytic conversion, include the disengager 1, heavy oil riser reactor, which can include the pre-lift sect 4, the first reaction zone 3, the second reaction zone 2, the regenerator 5, the combustor 5A. The part between the combustor 5A and the stripper 1A of the disengager 1 set the pipeline 7 of the spent catalyst and control valve 20 to connect the combustor 5A and the stripping section 1A for transporting the spent catalyst to the combustor 5A. In order to ensure the start combusting temperature of the combustor 5A, the pipe 16 of the regenerated catalyst and control valve 23 can be set.

The regenerator has two inside or outside taking-heat equipments as the catalyst coolers, including the entrance of the catalyst directly with the dense of the regenerator (or through a pipe), the mixing buffer space in the lower part, internal taking-heat element (including telescopic or tube-wire, etc.), the facilities for distribution of streaming media in the lower part.

35A, 35B are fluided media such as air, water, steam, etc. 36A, 36B are lifting media such as air, steam, etc. 37A, 37B are taking-heat media, including water, steam, air, and all kinds of oil. Catalyst cooler 8A is mainly used to adjust the reaction temperature of the first reaction zone, to keep it in the best value. Catalyst cooler 8B can primarily regulate the temperature of the regenerator for keeping it in the best value.

According to requirements of the process, any one or two of catalyst cooler 8A, 8B can not be set.

The regenerator 5 is connected with the catalyst cooler 8A through regenerator duct 10A and the regenerated catalyst after cooling enters into the mixing buffer space in the lower part. The cold regenerated catalyst is connected with the pre-lift sect 4 of the riser reactor through the cold pipeline 11. Leaving the catalyst cooler 8A, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media 35A (including air, steam, etc.) and / or the flow rate of the lifting media 36A (including air, steam, etc.) of the return pipe 12A of the cold regenerated catalyst. The control valve 21A is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

For conveniently controlling the temperature of the first reaction zone of the riser reactor, the pipeline of the hot regenerated catalyst (including the control valve) (not drawn) can connect the regenerator 5 directly with the pre-lift sect 4 of the heavy oil riser reactor. After lifting the cold regenerated catalyst mixed with hot regenerated catalyst in the pre-lift sect 4 of the riser reactor by the mixed media 32 of pre-lift area (including water, steam, and refinery gas, etc.), the temperature can reach to

equilibrium.

Of course, there are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

In order to easily control the temperature of the second reaction zone 2 of the riser reactor, the cold-shocking agent 34 can be injected into the downstream of the first reaction zone to conveniently control the temperature of the second reaction zone. The above-mentioned cold-shocking agent can be any one of gas or liquid (including water, or any kinds of oil, etc.) and cold catalysts, or two or more of them. The cold catalyst is the one of the cold regenerated catalyst, the spent catalyst, or the cold semi-regenerated catalyst, or two or more of them.

As the cold-shocking agent, the cold regenerated catalyst can enter the auxiliary riser through the pipeline of the cold regenerated catalyst, and reach the second reaction zone of the riser reactor as the cold shock agent by the lifting medium (not drawn).

The regenerator 5 is connected with the catalyst cooler 8B through regenerator duct 10B and the regenerated catalyst after cooling enters into the mixing buffer space 9B in the lower part. The temperature of the regenerator 5 can be controlled by regulating the flow rate of the fluidized media 35B (including air, steam, etc.) and / or the flow rate of the lifting media 36B (including air, steam, etc.) of the return pipe 12B of the cold regenerated catalyst.

Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

The above-mentioned catalyst cooler can also be connected with the regenerator and the riser as a single entity, or connected through the pipelines.

Heavy oil as the raw materials 33 and the regenerated catalyst from the pre-lifting zone 4 of the riser reactor with heavy oil are mixed and then enter into the first reaction zone 3 of the riser reactor with heavy oil in FCC. The main operating conditions are as follows: reaction temperature 400-650 °C(preferably 520-600 °C), reaction pressure 0.11 ~ 0.4MPa, contact time 0.05 ~ 5 seconds (preferably 0.1-3

seconds), the ratio of catalysts and raw materials average of 3 to 15, preferably 5 to 12.

The cold-shocking agent 34, oil and gas from the first reaction zone 3, and the mixture of catalyst are mixed for cooling, and then enter into the second reaction zone 2 of the riser reactor with heavy oil, in which the secondary reactions such as hydrogen transfer, isomerization, aromatization occur for further reducing the olefin and sulfur content, and increasing octane. The main operating conditions are as follows: reaction temperature of 350-620 °C (preferably 450-530 °C), reaction pressure 0.11 ~ 0.4MPa, 0.5 to 30 seconds of contact time (preferably 1-5 seconds).

The mixture of the oil and gas from the second reaction zone 2 and the catalyst enters the disengager 1 and can be separated. The oil and gas enter the system of fractionation and absorption for fractionation and liquefied petroleum gas (LPG) recovery, to obtain catalytic cracking gasoline products and unconverted oil.

The spent catalyst stripped by the stripper 1A of the disengager 1 enters into the combustor 5A through the pipeline 7 of the spent catalyst and control valve 20. In the presence of the main wind 38A (oxygen-containing gases including air, etc.), the spent catalyst was fast burnt and transports to the regenerator 5 for further burning. The secondary air 38B (oxygen-containing gas, including air) is supplied on the bottom of the regenerator 5. The regenerated catalyst from the regenerator bottom enters the catalyst cooler 8A and catalyst cooler 8B by two routes. One is that the cold regenerated catalyst mixed or not with hot regenerated catalyst for recycling use, the other way is back to the regenerator.

The gas or liquid injection point of the cold-shocking agent is set at the upstream or downstream of the injection point in the cold catalyst to easily control the temperature of the reaction zone, or form another reaction zone.

Figure 3 is a typical schematic diagram of the heavy oil catalytic conversion device (gasoline modified joint implementation) for the application of the present invention.

Such as shown in Figure 3: the method and its equipment of the present invention for the heavy oil catalytic conversion, include the disengager 1 of heavy oil,

the disengager 18 of gasoline, heavy oil riser reactor, which can include the pre-lift sect 4, the first reaction zone 3, the second reaction zone 2, the regenerator 5, the gasoline riser 6. The part between the regenerator 5 and the stripper 1A of the disengager 1 set the pipeline 7 of the spent catalyst and control valve (not drawn) to connect the regenerator 5 and the stripping section 1A of the disengager 1 of heavy oil for transporting the spent catalyst to the regenerator 5.

The pipeline 15 of the spent catalyst and the control valve 23 are set for connection with the regenerator 5 and the stripping section 18A of the disengager 18. The control valve 23 is set in order to easily control the flow rate of the spent catalyst for cold-shocking agents. Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

The regenerator has three inside or outside taking-heat equipments as the catalyst coolers, including the entrance of the catalyst directly with the dense of the regenerator (or through a pipe), the mixing buffer space in the lower part, internal taking-heat element (including telescopic or tube-wire, etc.), the facilities for distribution of streaming media in the lower part.

Catalyst cooler 8A is mainly used to adjust the reaction temperature of the first reaction zone, to keep it in the best value. Catalyst cooler 8B is mainly used to adjust the reaction temperature of the gasoline riser, to keep it in the best value. Another catalyst cooler (not shown) is primarily used for regulating the temperature of the regenerator to keep it in the best value.

35A, 35B are fluidized media, such as air, steam, etc., 36A , 36B are lifting media, such as air, steam, etc. 37A , 37B are taking-heat medium, including water, steam, air, and all kinds of oil.

According to requirements of the process, these three catalyst coolers in any one or two can not be set.

When the catalyst coolers for adjusting the temperature of the regenerator is not set, the temperature of regenerator is controlled by adjusting the catalyst cooler 8A, and /

or the flow rate of streaming media 35A, 35B (including air, steam, etc.) of catalyst cooler 8B and / or the content of the catalyst returned to the regenerator and / or controlled by the thermal equilibrium of the reaction and regeneration system.

In order to easily control the temperature of the second reaction zone 2 of the riser reactor, the cold-shocking agent 34 can be injected into the downstream of the first reaction zone to conveniently control the temperature of the second reaction zone. The above-mentioned cold-shocking agent can be any one of gas or liquid (including water, or any kinds of oil, etc.) and cold catalysts, or two or more of them. The cold catalyst is the one of the cold regenerated catalyst, the spent catalyst, or the cold semi-regenerated catalyst, or two or more of them. As the cold-shocking agent, the cold regenerated catalyst can enter the auxiliary riser through the pipeline of the cold regenerated catalyst, and reach the second reaction zone of the riser reactor as the cold shock agent by the lifting medium (not drawn).

The regenerator 5 is connected with the catalyst cooler 8A through regenerator duct 10A and the regenerated catalyst after cooling enters into the mixing buffer space 9A in the lower part. The cold regenerated catalyst is connected with the pre-lift sect 4 of the riser reactor through the cold pipeline 11A. Leaving the catalyst cooler 8A, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media 35A (including air, steam, etc.) and / or the flow rate of the lifting media 36A (including air, steam, etc.) of the return pipe 12A of the cold regenerated catalyst. The control valve 21A is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

For conveniently controlling the temperature of the first reaction zone of the riser reactor of heavy oil, the pipeline of the hot regenerated catalyst (including the control valve) can connect directly with the pre-lift sect 4 of the heavy oil riser reactor. After lifting the cold regenerated catalyst mixed with hot regenerated catalyst in the pre-lift sect 4 of the riser reactor by the mixed media 32 of pre-lift area (including water, steam, and refinery gas, etc.), the temperature can reach to equilibrium. Of course, There are also many other control equipments and control methods, which do

not limit any specific implementations of the present invention.

The regenerator 5 is connected with the catalyst cooler 8B through regenerator duct 10B and the regenerated catalyst after cooling enters into the mixing buffer space 9B in the lower part. The cold regenerated catalyst is connected with the pre-lift sect of the riser reactor of gasoline through the cold pipeline 11B. Leaving the catalyst cooler 8B, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media 35B (including air, steam, etc.) and / or the flow rate of the lifting media 36B (including air, steam, etc.) of the return pipe 12B of the cold regenerated catalyst. The control valve 21B is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

To easily control the temperature of the riser reactor of gasoline, the pipeline 19B of the hot regenerated catalyst (including control valve 22B) is set connected with gasoline pre-lift zone 4. The cold regenerated catalyst with hot regenerated catalyst in pre-lift area 4 of gasoline riser reactor can be lifted and mixed by pre-lift medium 30 (including water, steam, and refinery gas and other) and then the temperature reaches equilibrium. Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

The above-mentioned catalyst cooler can also be connected with the regenerator and the riser as a single entity, or connected through the pipelines.

Heavy oil as the raw materials 33 and the regenerated catalyst from the pre-lifting zone 4 of the riser reactor with heavy oil are mixed and then enter into the first reaction zone 3 of the riser reactor with heavy oil in FCC. The main operating conditions are as follows: reaction temperature 400-650 °C(preferably 520-600 °C), reaction pressure 0.11 ~ 0.4MPa, contact time 0.05 ~ 5 seconds (preferably 0.1-3 seconds), the ratio of catalysts and raw materials average of 3 to 15, preferably 5 to 12.

The cold-shocking agent 34, oil and gas from the first reaction zone 3, and the

mixture of catalyst are mixed for cooling, and then enter into the second reaction zone 2 of the riser reactor with heavy oil, in which the secondary reactions such as hydrogen transfer, isomerization, aromatization occur for further reducing the olefin and sulfur content, and increasing octane. The main operating conditions are as follows: reaction temperature of 350-620°C (preferably 450-530 °C), reaction pressure 0.11 ~ 0.4MPa, 0.5 to 30 seconds of contact time (preferably 1-5 seconds).

Poor-quality gasoline 31 and the regenerated catalyst from the pre-lifting zone of the gasoline riser are mixed, and then enter into gasoline riser reactor. Under the conditions of the reaction temperature of 300-650 ° C (preferably 400-560 ° C), reaction pressure 0.11 ~ 0.4MPa, the contact time 0.5 to 30 seconds (preferably 1-15 seconds), the weight ratio of the catalyst and the raw materials the average of 1 to 50, preferably 2 to 20, mainly gasoline modification reactions, such as isomerization, aromatization happen to reduce the content of olefins and sulfur, and to improve the octane number.

The mixture of the oil and gas from the second reaction zone 2 and the catalyst enters the disengager 1 and can be separated. The oil and gas, or mixed with the oil and gas from the disengager 18 enter the system of fractionation and absorption for fractionation and liquefied petroleum gas (LPG) recovery, to obtain catalytic cracking gasoline products and unconverted oil. The spent catalyst stripped by the stripper 1A of the disengager 1 enters into the regenerator 5 through the pipeline 7 of the spent catalyst and control valve (not drawn).

The reactants from the gasoline riser 6 enter the disengager 18 and can be separated as the gas and oil or the catalyst. The oil and gas, enter the system of fractionation and absorption for fractionation and LPG recovery, to obtain catalytic cracking gasoline products; Or mixed with the oil and gas from the disengager 18 enter the system of fractionation and absorption for fractionation and liquefied petroleum gas (LPG) recovery.

The spent catalyst can be stripped by stripping section18A, and then enters into the regenerator 5 by the pipeline 15 of the spent catalyst and the control valve 23.

After entering the regenerator 5, the spent catalyst from the stripping sections of the two disengagers is burnt regenerated in the presence of oxygen-containing gas 38 (including air, etc.), then enters into the catalyst cooler 8A and catalyst cooling device 8B by two routes. The cold-regenerated catalyst of these two routes with /or not mixed with hot-regenerated catalyst for cycling use.

The gas or liquid injection point of the cold-shocking agent is set at the upstream or downstream of the injection point in the cold catalyst to easily control the temperature of the reaction zone, or form another reaction zone.

Figure 4 is a typical Scheme of the heavy oil catalytic converter device (shared disengager) for the application of the present invention.

Such as shown in Figure 4: the method and its equipment of the present invention for the heavy oil catalytic conversion, include the disengager 1 , two heavy oil riser reactor shared one disengager, (which can include the pre-lift sect 4A, 4B, the first reaction zone 3A, 3B, the second reaction zone 2A, 2B), the regenerator 5, the combustor 5A. The part between the combustor 5 and the stripper 1A of the disengager 1 set the pipeline 7 of the spent catalyst and control valve 20 to connect the combustor 5a and the stripping section 1A for transporting the spent catalyst to the combustor 5A. To keep the start combusting temperature of the combustor 5, the recycling pipeline 16 of the spent catalyst and the control valve 23 are set.

The regenerator has three inside or outside taking-heat equipments as the catalyst coolers, including the entrance of the catalyst directly with the dense of the regenerator (or through a pipe), the mixing buffer space in the lower part, internal taking-heat element (including telescopic or tube-wire, etc.), the facilities for distribution of streaming media in the lower part.

Catalyst cooler 8A, 8B are mainly used to adjust the reaction temperature of the first reaction zone for two heavy oil riser reactors , to keep it in the best value. Another catalyst cooler (not shown) is primarily used for regulating the temperature of the regenerator to keep it in the best value.

35A, 35B are fluidized media, such as air, steam, etc., 36A , 36B are lifting

media, such as air, steam, etc. 37A , 37B are taking-heat medium, including water, steam, air, and all kinds of oil.

According to requirements of the process, any one or two in these three catalyst coolers can not be set.

The regenerator 5 is connected with the catalyst cooler 8A through regenerator duct 10A and the regenerated catalyst after cooling enters into the mixing buffer space 9A in the lower part. The cold regenerated catalyst is connected with the pre-lift sect 4A of the riser reactor through the cold pipeline 11A. Leaving the catalyst cooler 8A, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media 35A (including air, steam, etc.) and / or the flow rate of the lifting media 36A (including air, steam, etc.) of the return pipe 12A of the cold regenerated catalyst. The control valve 21A is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

The regenerator 5 is connected with the catalyst cooler 8B through regenerator duct 10B and the regenerated catalyst after cooling enters into the mixing buffer space 9B in the lower part. The cold regenerated catalyst is connected with the pre-lift sect 4B of the riser reactor through the cold pipeline 11B. Leaving the catalyst cooler 8A, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media 35B (including air, steam, etc.) and / or the flow rate of the lifting media 36B (including air, steam, etc.) of the return pipe 12B of the cold regenerated catalyst. The control valve 21B is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

For conveniently controlling the temperature of the first reaction zone of the riser reactor of heavy oil, the pipeline of the hot regenerated catalyst (including the control valve) (not drawn) can connect directly with the pre-lift sect 4A, 4B of the heavy oil riser reactor. After lifting the cold regenerated catalyst mixed with hot regenerated catalyst in the pre-lift sect 4A, 4B of the riser reactor by the mixed media

32A, 32B of pre-lift area (including water, steam, and refinery gas, etc.), and the temperature can reach to equilibrium. Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

In order to easily control the temperature of the second reaction zone 2 of the riser reactor, the cold-shocking agent 34A, 34 B can be injected into the downstream of the first reaction zone to conveniently control the temperature of the second reaction zone. The above-mentioned cold-shocking agent can be any one of gas or liquid (including water, or any kinds of oil, etc.) and cold catalysts, or two or more of them. The cold catalyst is the one of the cold regenerated catalyst, the spent catalyst, or the cold semi-regenerated catalyst, or two or more of them. As the cold-shocking agent, the cold regenerated catalyst can enter the auxiliary riser through the pipeline of the cold regenerated catalyst, and reach the second reaction zone of the riser reactor as the cold shock agent by the lifting medium (not drawn).

The above-mentioned catalyst cooler can also be connected with the regenerator and the riser as a single entity, or connected through the pipelines.

Heavy oil (as the raw materials) 33A and the regenerated catalyst from the pre-lifting zone 4A of the riser reactor with heavy oil are mixed and then enter into the first reaction zone 3A of the riser reactor with heavy oil in FCC. The main operating conditions are as follows: reaction temperature 400-650 °C(preferably 520-600 °C), reaction pressure 0.11 ~ 0.4MPa, contact time 0.05 ~ 5 seconds (preferably 0.1-3 seconds), the ratio of catalysts and raw materials average of 3 to 15, preferably 5 to 12.

The cold-shocking agent 34A, oil and gas from the first reaction zone 3A, and the mixture of catalyst are mixed for cooling, and then enter into the second reaction zone 2A of the riser reactor with heavy oil, in which the secondary reactions such as hydrogen transfer, isomerization, aromatization occur for further reducing the olefin and sulfur content, and increasing octane. The main operating conditions are as follows: reaction temperature of 350-620°C (preferably 450-530 °C), reaction

pressure 0.11 ~ 0.4MPa, 0.5 to 30 seconds of contact time (preferably 1-5 seconds).

The mixture of the reactive oil and gas form the second reaction zone 2A and the catalyst enter into the shared disengager 1 for separation.

Heavy oil as raw materials (back to the refinery, slurry, etc.) 33B and the regenerated catalyst from the pre-lifting zone 4B of the riser reactor with heavy oil are mixed and then enter into the first reaction zone 3B of the riser reactor with heavy oil in FCC. The main operating conditions are as follows: reaction temperature 400-650 °C(preferably 520-600 °C), reaction pressure 0.11 ~ 0.4MPa, contact time 0.05 ~ 5 seconds (preferably 0.1-3 seconds), the ratio of catalysts and raw materials average of 3 to 15, preferably 5 to 12.

The cold-shocking agent 34B, oil and gas from the first reaction zone 3B, and the mixture of catalyst are mixed for cooling, and then enter into the second reaction zone 2B of the riser reactor with heavy oil, in which the secondary reactions such as hydrogen transfer, isomerization, aromatization occur for further reducing the olefin and sulfur content, and increasing octane. The main operating conditions are as follows: reaction temperature of 350-620°C (preferably 450-530 °C), reaction pressure 0.11 ~ 0.4MPa, 0.5 to 30 seconds of contact time (preferably 1-5 seconds).

The mixture of the reactive oil and gas form the second reaction zone 2B and the catalyst enter into the shared disengager 1 for separation (the separation device not drawn).

The mixture of the oil and gas from two heavy oil riser reactors and the catalyst can be further separated, then entered into the system of fractionation and absorption for fractionation and liquefied petroleum gas (LPG) recovery.

The spent catalysts from two heavy oil riser reactors are mixed and then enter into the stripper 1A of the disengager 1. After stripping, the mixtures enter into the combustor 5A through the pipeline 7 of the spent catalyst and control valve 20. In the presence of the main wind 38A (oxygen-containing gases including air, etc.), the spent catalyst was fast burnt and transports to the regenerator 5 for further burning. The secondary air 38B (oxygen-containing gas, including air) is supplied on the bottom of

the regenerator 5. The regenerated catalyst from the regenerator 5 bottom enters the catalyst cooler 8A , catalyst cooler 8B and another catalyst cooler (not draw) by three routes. One is that the cold regenerated catalyst mixed or not with hot regenerated catalyst for recycling use, the other way is back to the regenerator.

The gas or liquid injection point of the cold-shocking agent is set at the upstream or downstream of the injection point in the cold catalyst to easily control the temperature of the reaction zone, or form another reaction zone.

Embodiment 1:

To confirm the effect of the present invention, the process shown in Figure 2, the raw materials shown in Table 1, Table 2 shows the process conditions and the GOR catalyst from Changling refinery catalyst plants. The experimental results are shown in Table 3.

Table 1

| Flow | atmospheric residue |
|---|---|
| density，20/4°C | 0.928 |
| Carbon residue | 7.8%(Wt) |
| Sulfur content | 0.8%(Wt) |
| Nitrogen content | 1800PPm |
| | |

In Table 2, the plan A in the art is conventional FCC process technology: the temperature of regenerator catalyst bed 680 ° C, the reaction temperature 525 ℃, the raw material temperature 200 ° C, the catalyst/ oil ratio 6.7. Therefore, the temperature difference of the regenerated catalyst and raw materials is 480 °C. The plan A in the art has the following deficiencies:

(1) raw material temperature of 200 ° C to crack residue-containing raw materials is quite low.

(2) Although the temperature of the regenerator can meet the renewable requirements, but the temperature is too high when contacting with the raw material,

prone to thermal cracking.

It should be understood that Table 2 of the embodiment is not limited. Unlike existing technologies, the plan B of the present invention, any combination of the catalyst circulation rate can be determined between the two risers in order to ensure that the catalyst/ oil ratio required by the reaction instead of forcibly determined by the device thermal equilibrium.

Table 2

| Parameter | Plan A in the art | Plan B in the present invention |
|---|---|---|
| Temperature of riser reactor, °C | 525 | - |
| Temperature of the first reaction zone °C | - | 525 |
| Temperature of the second reaction zone, °C | - | 505 |
| Feed temperature, °C | 200 | 350 |
| Regeneration temperature, °C | 680 | 700 |
| Temperature of the regenerated catalyst in the entrance of riser, °C | 680 | 630 |
| Temperature difference of catalyst feed, °C | 450 | 287 |
| Catalyst/oil ratio, weight/weight | 6.7 | 8.6 |

Table 3

| Product | Plan A in the art | Plan B in the present invention |
|---|---|---|
| H2S % | 0.6 | 0.7 |

| Product | Plan A in the art | Plan B in the present invention |
|---|---|---|
| Fuel gas % | 5.5 | 4.2 |
| LPG % | 14.5 | 14.8 |
| Gasoline % | 38.9 | 41.9 |
| Light cycle oil % | 26.2 | 25.5 |
| Decant oil % | 5.0 | 5.0 |
| Carbon % | 9.3 | 7.9 |
| Total | 100.0 | 100.0 |
| Gasoline | | |
| Olefin content % | 45.6 | 27.6 |
| Aromatic content % | 14.9 | 18.9 |
| Sulfur content PPm | 696 | 486 |
| Octane number | 89.7 | 90.6 |
| | | |

The results in Table 3showed that production rate of coke and dry gas decreased by 2.7%, olefin content in gasoline is reduced by 39%, 30% reduction in sulfur content, octane number (RON), increased by 0.9 units.

## CLAIMS

1 . A cycling method and its equipment of cold regenerated catalyst, characterized in that, including a FCC process: hydrocarbon materials react with catalyst in the riser reactor(with or without a fluidized bed reactor); the materials enter into a settler for the separation of catalyst from gas and oil; Separated catalyst will be stripped and enter into regenerator to burn for regeneration; The regenerated catalyst will be cold or/and not be cold to return the riser reactor directly for cycling use; The details are as follows:

the regenerator includes one, two, or more catalyst coolers, each connected to the riser reactor (or the fluidized bed reactor) is used to adjust the reaction temperature of the reaction zone, or/and to adjust regenerator temperatures, so as to keep them in the best value; the catalyst coolers connected with the riser reactor (or the fluidized set in the inside or outside of regenerator, or set under its riser reactor;

The catalyst entrance of the shell of the described catalyst cooler directly (or through a pipeline) connects with the regenerator dense phase; there are internal components in the cooler for removing heat; there are fluidized media distribution facilities under the cooler; In the downstream, there is a buffer space for mixed buffer catalyst; the upper part is installed or not installed the gas channel to return to diluting phase of the regenerator;

There are one, two or more catalyst exits set in the catalyst mixed buffer space in the downstream of the described catalyst cooler; One, two or more exits of catalysts are connected to the transmission channel of cold catalyst used to deliver cold-regenerated catalyst circulation to one, two or more of the riser (reactor or auxiliary riser); Another one, two or more (or not) catalyst exists are connected to the transmission channel of cold catalyst for conveying cold regenerated catalyst return to the regenerator; The described transmission channel of cold catalyst to the riser is set in the outside of the described catalyst cooler's shell, or all (or partly) set in the inside of the described catalyst cooler's shell; The return channel of the cooled catalyst back

to the regenerator all set in the outside of the described catalyst cooler's shell, or all (or partly) set in the inside of the described catalyst cooler's shell.

The described riser reactor is set one, two or more reaction zones with or without fluidized bed reactor; Before cold regenerated catalyst enters into the riser reactor or fluidized bed reactor, the riser reactor is set (or not set) a pre-lift section, with pre-lift media to send the cold regenerated catalyst to the riser reactor or the fluidized bed reactor; The described pre-lift section can all be set outside of the catalyst cooler shell, or all (or part) set inside.

Part of regenerated catalysts coming from regenerator are cooled by catalyst cooler within 200 to 720°C and enter into the pre-lift or directly into each reaction zone of riser reactor; Or these regenerated catalysts mix or/and with hot regenerated catalyst without cooling to get the regenerated catalyst mixture which temperature is lower than regenerator temperature and then the mixture enter into pre-lift or/and each reaction zone of the riser reactor; Or the cold and the hot regenerated catalysts enter into the pre-lift of riser separately and directly with pre-lift media for increasing the catalysts temperature to reach a proper temperature and then the mixture enter into each reaction zone of riser reactor; Or the regenerated catalyst without cooling by catalyst cooler enter into the pre-lift zone or/and each reaction zone of the riser reactor directly for cycling .

2. The method and its equipment of claim 1, wherein Setting (or not setting) one, two or more assistant risers, the described cold regenerated catalyst through the assistant risers with the pre-lift media are lifted to one, two or more riser reactors or fluidized bed reactor reaction zones as a cold shock agent for cycling.

3. The method and its equipment of one of claim 1 and 2, wherein the regenerated catalysts coming from regenerator as step (5) described are cooled by the catalyst cooler within 360 to 650 °C.

4. The method and its equipment of one of claim 1， wherein the temperature of

the described cold regenerated catalyst can be controlled by adjusting the flows of the fluidized media and/or taking-heat media or adjusting other parameters; or controlled by adjusting the flows of the fluidized media and/or taking-heat media and/or adjusting the flows of cool catalyst returning regenerator or other parameters.

5. The method and its equipment of one of claim 1， wherein the temperature of the described regenerated catalysts mixture can be controlled by adjusting the ratio of cold and hot regenerated catalyst.

6. The method and its equipment of one of claim 1， wherein the reaction temperature of the described riser reactor or fluidized bed reactor reaction zones can be controlled by adjusting the ratio of the catalyst and feed, or/and by adjusting the temperature of the described cold regenerated catalyst or the temperature of the described regenerated catalyst mixture, or/and by using multi-point feeding technology, and /or by adding various cold shock agents to the riser reactor.

7. The method and its equipment of one of claim 1， wherein the described taking-heat medias in the catalyst cooler include water, steam, air and various oils.

8. The method and its equipment of one of claim 1， wherein the described cycling method and its equipment of the cold regenerated catalyst can be used widely for various FCC including tar catalytic cracking, wax oil catalytic cracking, gasoline catalytic modification for improving quality, or light hydrocarbon catalytic conversion, or for other burning process of gas-solid fluidized reaction including residue pre-processing, ethylene made by methanol, fluidize coking or flexible coking.

9. The method and its equipment of one of claim 1，wherein the cycling method and its equipment of cold regenerated catalyst can be implemented independently for each reaction zone of a riser reactor (or fluidized bed reactor) of all kinds of FCC; or jointed to implement for each reaction zone of one, two or more riser reactors (or

fluidized bed reactor) including tar risers and gasoline risers of the dual risers FCC units or different feeds riser reactors.

10. The method and its equipment of one of claim 1, wherein the described catalyst in the catalyst cooler is the regenerated catalyst with any carbon content or the regenerated catalyst without completed regeneration or the contact agents with any carbon content or coking particles.

ABSTRACT

A method for circulating a cooled regenerated catalyst comprises the following steps: a regenerated catalyst derived from a regenerator(5) is cooled to 200-720℃ by a catalyst cooler (8A), which either directly enters into a riser reactor(2)without mixing with hot regenerated catalyst, or enters the same after mixing with another portion of uncooled hot regenerated catalyst and thereby obtaining a hybrid regenerated catalyst with its temperature lower than that of the regenerator; a contact reaction between a hydrocarbon raw materials and the catalyst is performed in the riser reactor (2); the reaction product is introduced into a settling vessel (1) to separated the catalyst and oil gas; the separated catalyst ready for regeneration is stream-stripped in a stream stripping phase (1A) and enters the regenerator (5) for regeneration through charring; after cooling, the regenerated catalyst returns to the riser reactor (2) for recycling.


Product
1
1A
Fuse
5
7
20
12A
38
37A
10A
8A
9A
11A
35A
12A
2
4
11A
21A
12A
32
36A

Figure 1


Product
Fuse
1
1A
5
12B
12A
10B
10A
7
2
20
38B
23
16
5A
37B
37A
38A
34
10A
8B
8A
3
9B
9A
33
35B
12B
35A
12A
4
21A
11A
32
36B
36A

Figure 2


Product-2
Product-1
18
1
18A
2
Fuse
1A
5
15
7
6
34
23
37A
12B
37B
10A
10B
3
8A
38
12A
22B
12B
33
9A
9B
8B
31
9B
35A
35B
4
11A
36B
21B
36A
21A
11B
19B
32
30

Figure 3


Product
Fuse
1
1A
5
12B
12A
10B
10A
7
20
2A
2B
38B
23
16
5A
37B
38A
37A
34A
34B
10A
3A
3B
8B
8A
9B
9A
33A
33B
12B
35B
35A
12A
4A
4B
11B
21B
21A
11A
32A
11B
36B
36A
32B

Figure 4

US 20120298556A1

(19) **United States**
(12) **Patent Application Publication**
**Li et al.**
(10) **Pub. No.: US 2012/0298556 A1**
(43) **Pub. Date: Nov. 29, 2012**

(54) **METHOD AND EQUIPMENT FOR CIRCULATING COOLED REGENERATED CATALYST**

(76) Inventors: **Li Li**, Luoyang (CN); **Qunzhu Li**, Luoyang (CN)

(21) Appl. No.: **13/576,565**

(22) PCT Filed: **Feb. 11, 2010**

(86) PCT No.: **PCT/CN2010/070661**

§ 371 (c)(1),
(2), (4) Date: **Aug. 1, 2012**

**Publication Classification**

(51) **Int. Cl.**
*B01J 38/00* (2006.01)
*B01J 8/26* (2006.01)
*F27B 15/14* (2006.01)
*C10G 11/00* (2006.01)
*B01J 8/00* (2006.01)

(52) **U.S. Cl.** .......... **208/113**; 422/619; 422/144; 422/141

(57) **ABSTRACT**

A method for circulating a cooled regenerated catalyst comprises the following steps: a regenerated catalyst derived from a regenerator (**5**) is cooled to 200-720° C. by a catalyst cooler (**8**A), which either directly enters into a riser reactor (**2**) without mixing with hot regenerated catalyst, or enters the same after mixing with another portion of uncooled hot regenerated catalyst and thereby obtaining a hybrid regenerated catalyst with its temperature lower than that of the regenerator; a contact reaction between a hydrocarbon raw materials and the catalyst is performed in the riser reactor (**2**); the reaction product is introduced into a settling vessel (**1**) to separated the catalyst and oil gas; the separated catalyst ready for regeneration is stream-stripped in a stream stripping phase (**1**A) and enters the regenerator (**5**) for regeneration through charring; after cooling, the regenerated catalyst returns to the riser reactor (**2**) for recycling.




Product
1
1A
Fuse
5
7
20
12A
38
37A
10A
8A
9A
11A
35A
12A
2
4
11A
21A
12A
32
36A

Figure 1


Product
1
1A
Fuse
5
12B
12A
10B
10A
7
20
38B
23
16
5A
38A
2
37B
37A
34
8B
10A
3
8A
9B
9A
33
35B
35A
12B
12A
4
21A
11A
32
36B
36A

Figure 2



Product-2
Product-1
18
1
18A
2
Fuse
1A
5
15
7
6
34
23
37A
12B
37B
10A
10B
3
8A
38
12A
22B
12B
8B
9A
9B
33
9B
31
35A
35B
4
11A
36B
21B
36A
11B
21A
19B
32
30


Figure 3


Product
Fuse
1
1A
5
12B
12A
10B
10A
7
20
2A
2B
38B
23
16
5A
38A
37B
37A
34A
34B
10A
3A
3B
8B
8A
9B
9A
33A
33B
12B
35B
35A
12A
4A
4B
11B
21A
21B
11A
32A
11B
36B
36A
32B

Figure 4

# METHOD AND EQUIPMENT FOR CIRCULATING COOLED REGENERATED CATALYST

## TECHNICAL FIELDS

**[0001]** This invention belongs to the technical field of fluid catalytic cracking (FCC), Particularly involving the use of the method and equipment for circulating cooled regenerated catalyst for tar catalytic cracking and low-grade gasoline catalytic cracking.

## BACKGROUND OF THE INVENTION

**[0002]** With the poor quality of the crude oil quality and heavy trend growing, and the blending ratio of residual oil in the FCC continuously increasing, the gasoline quality with FCC, coking, thermal cracking etc. processes becomes worse. The olefin in gasoline is an effectively high-octane component, on the other hand the olefin through the combustion process produces a lot of pollutants to pollute the environment. Although the use of traditional hydrotreating process can reduce olefins in gasoline, the octane number will be lost significantly. To solve above problems and improve the gasoline quality, many refineries in the world have also done a lot of research work.

**[0003]** Luoyang Petrochemical Engineering Corporation has developed a more flexible and efficient catalytic cracking process (CN92105596 X). The process utilizes dual riser reactor, one riser as gasoline modification reaction zone, and the other as the FCC main riser reaction zone. The process uses highly active catalyst to improve gasoline quality. The process takes into account the reaction conditions of main riser for tar FCC, thus the reaction conditions for improving gasoline quality is limited. With the gasoline riser, gasoline olefin can reduce 10 to 30 volume percent.

**[0004]** China University of Petroleum (East China) use two-series riser technology (CN302843A). The oil and gas in the reactor are series, and the catalyst relays the operation to achieve more light oil yield to reduce olefins contents in gasoline. But the technology uses two-series risers to make the process very complex. The flexibility of the equipment operation is limited. Because the process is the two risers to connect operation the oil and gas, it will affect each other between the reaction of improving gasoline quality and the reaction of other components. Therefore, the final product selectivity in the reaction will be affected. The decline in gasoline olefin content may be reduced to about 15 volume percent.

**[0005]** Due to heavy raw materials and the high value of the residual carbon, the coke yield of heavy oil catalytic cracking has been increased. At the same time the produced heat is more than the required heat of the reaction system resulting in excess heat. Therefore a removing heat unit must be installed in the heavy oil catalytic cracking unit in order to remove excess heat from the system and be able to maintain the heart balance the heat of reactors and regenerators. Currently there are many kinds of catalyst coolers in heavy oil catalytic cracking for removing heat.

**[0006]** U.S. Pat. No. 5,451,313 discloses a FCC process, in which the catalyst after reaction and regenerated catalyst recycle together to reduce the reaction severity, improve feed atomization and promote contact with the catalyst. But it does not mention that the catalyst cooler can be used for cooling both of the regenerator bed and regeneratant of riser feeding.

**[0007]** UOP Corp develops a "X design" technology (the magazine <<World Petroleum Science>>, 1996, 3(9)). The process is to mix some catalysts partly to be born (to be regenerated catalyst) without burning carbon regeneration and with regenerated catalyst in the mixing tank then directly return to riser reactor. Due to regenerated catalyst cooling, the catalyst and feed ratio can be increased. The disadvantage of the technology is to mixing regenerated catalyst and used catalyst without burning carbon regenerated directly so as to decrease the activity of catalyst from riser reactor and not conducive to cracking reactions.

**[0008]** The current heat removing technology, also known as catalyst cooling technology, only can take heat from the cold regenerated catalyst returned to regenerator dense phase and can not optimize the operating conditions of the reaction system. Thus there are many shortcomings in the current reaction and regeneration system technologies.

**[0009]** As above, On the basis of the existing technology, the purpose of the present invention is to provide a kind of circulation process of cold regenerated catalyst which are mainly used to tar FCC with heavy feedstock and gasoline quality upgrading, and solve the problems about high blending ratio of residual oil with FCC and gasoline upgrading quality.

**[0010]** Another purpose of the invention is to ensure the conditions of an enough regenerated temperature and a good effect for regeneration. The cold regenerated catalyst circulation process can (1) drop the temperature of regenerated catalyst into a reactor, (2) increase crude oil preheating temperature, (3) improve the crude oil atomization effect, (4) increase the blending ratio of the catalyst and crude oil, (5) improve the tar FCC product distribution, and (6) increase liquid products yield.

**[0011]** The third purpose of the invention is to ensure the conditions of an enough regenerated temperature and a good effect for regeneration. The cold regenerated catalyst circulation process can drop the temperature of cooled regenerated catalyst into a reactor. In the proper ratio of the catalyst and feed, the process can reduce the riser reaction temperature and increase the catalyst activity in the riser so as to promote hydrogen transfer, isomerization, and aromatization reaction and reduce coke and gas yield. The gasoline and light distillation products yields will be increased; the octane number of gasoline will be increased too. Olefin and impurities in gasoline will be reduced.

## SUMMARY OF THE INVENTION

**[0012]** The present invention is to provide a cycling method of cold regenerated catalyst or contact catalyst (hereinafter referred to as the catalyst), to utilize the normal technology of catalyst cooling in FCC, in keeping regeneration temperature unchanged, relying on reducing the regenerated catalyst temperature, to make the ratio of catalyst and feed as the independent adjustable variables.

**[0013]** The present invention is to provide a cycling method and its equipment of cold regenerated catalyst. Specific technical solutions are detailed below:

**[0014]** A cycling method and its equipment of cold regenerated catalyst, characterized in that, including a FCC process: hydrocarbon materials react with catalyst in the riser reactor (with or without a fluidized bed reactor); the materials enter into a settler for the separation of catalyst from gas and oil; Separated catalyst will be stripped and enter into regenerator to burn for regeneration; The regenerated catalyst will

be cold or/and not be cold to return the riser reactor directly for cycling use; The details are as follows:

[0015] (1) the regenerator includes one, two, or more catalyst coolers, each connected to the riser reactor (or the fluidized bed reactor) is used to adjust the reaction temperature of the reaction zone, or/and to adjust regenerator temperatures, so as to keep them in the best value; the catalyst coolers connected with the riser reactor (or the fluidized set in the inside or outside of regenerator, or set under its riser reactor;

[0016] (2) The catalyst entrance of the shell of the described catalyst cooler directly (or through a pipeline) connects with the regenerator dense phase; there are internal components in the cooler for removing heat; there are fluidized media distribution facilities under the cooler; In the downstream, there is a buffer space for mixed buffer catalyst; the upper part is installed or not installed the gas channel to return to diluting phase of the regenerator;

[0017] (3) There are one, two or more catalyst exits set in the catalyst mixed buffer space in the downstream of the described catalyst cooler; One, two or more exits of catalysts are connected to the transmission channel of cold catalyst used to deliver cold-regenerated catalyst circulation to one, two or more of the riser (reactor or auxiliary riser); Another one, two or more (or not) catalyst exists are connected to the transmission channel of cold catalyst for conveying cold regenerated catalyst return to the regenerator; The described transmission channel of cold catalyst to the riser is set in the outside of the described catalyst cooler's shell, or all (or partly) set in the inside of the described catalyst cooler's shell; The return channel of the cooled catalyst back to the regenerator all set in the outside of the described catalyst cooler's shell, or all (or partly) set in the inside of the described catalyst cooler's shell.

[0018] (4) The described riser reactor is set one, two or more reaction zones with or without fluidized bed reactor; Before cold regenerated catalyst enters into the riser reactor or fluidized bed reactor, the riser reactor is set (or not set) a pre-lift section, with pre-lift media to send the cold regenerated catalyst to the riser reactor or the fluidized bed reactor; The described pre-lift section can all be set outside of the catalyst cooler shell, or all (or part) set inside.

[0019] (5) Part of regenerated catalysts coming from regenerator are cooled by catalyst cooler within 200 to 720° C. and enter into the pre-lift or directly into each reaction zone of riser reactor; Or these regenerated catalysts mix or/and with hot regenerated catalyst without cooling to get the regenerated catalyst mixture which temperature is lower than regenerator temperature and then the mixture enter into pre-lift or/and each reaction zone of the riser reactor; Or the cold and the hot regenerated catalysts enter into the pre-lift of riser separately and directly with pre-lift media for increasing the catalysts temperature to reach a proper temperature and then the mixture enter into each reaction zone of riser reactor; Or the regenerated catalyst without cooling by catalyst cooler enter into the pre-lift zone or/and each reaction zone of the riser reactor directly for cycling.

[0020] Setting (or not setting) one, two or more assistant risers, the described cold regenerated catalyst through the assistant risers with the pre-lift media are lifted to one, two or more riser reactors or fluidized bed reactor reaction zones as a cold shock agent for cycling.

[0021] The regenerated catalysts coming from regenerator as step (5) described are cooled by the catalyst cooler within 360 to 650° C.

[0022] The temperature of the described cold regenerated catalyst can be controlled by adjusting the flows of the fluidized media and/or taking-heat media or adjusting other parameters; or controlled by adjusting the flows of the fluidized media and/or taking-heat media and/or adjusting the flows of cool catalyst returning regenerator or other parameters.

[0023] The temperature of the described regenerated catalysts mixture can be controlled by adjusting the ratio of cold and hot regenerated catalyst.

[0024] The reaction temperature of the described riser reactor or fluidized bed reactor reaction zones can be controlled by adjusting the ratio of the catalyst and feed, or/and by adjusting the temperature of the described cold regenerated catalyst or the temperature of the described regenerated catalyst mixture, or/and by using multi-point feeding technology, and/or by adding various cold shock agents to the riser reactor.

[0025] The described taking-heat medias in the catalyst cooler include water, steam, air and various oils.

[0026] The described cycling method and its equipment of the cold regenerated catalyst can be used widely for various FCC including tar catalytic cracking, wax oil catalytic cracking, gasoline catalytic modification for improving quality, or light hydrocarbon catalytic conversion, or for other burning process of gas-solid fluidized reaction including residue preprocessing, ethylene made by methanol, fluidize coking or flexible coking.

[0027] The cycling method and its equipment of cold regenerated catalyst can be implemented independently for each reaction zone of a riser reactor (or fluidized bed reactor) of all kinds of FCC; or jointed to implement for each reaction zone of one, two or more riser reactors (or fluidized bed reactor) including tar risers and gasoline risers of the dual risers FCC units or different feeds riser reactors.

[0028] The described catalyst in the catalyst cooler is the regenerated catalyst with any carbon content or the regenerated catalyst without completed regeneration or the contact agents with any carbon content or coking particles.

[0029] The catalyst coolers are traditional industrial equipment. The methods and units of the present invention can be a variety of structures (such as the upward mode, downward mode, etc.), the catalyst transmission channels can be also the various connecting structures (such as inner-loop pipe, Y-shaped, U-shaped outer transmission (cycling) pipe, etc.). The person skilled in the art can be easy to understand the structures, connection styles, operation and control process, which will not be restricted by any specific implement.

[0030] The temperature of the described regenerated catalyst mixture into the reaction zones of the riser reactors (or fluidized bed reactors) can be controlled independently by adjusting the above mentioned ratio of cold and hot regenerated catalysts. When the cold regenerated catalyst through the catalyst cooler enters into the riser reactors directly (or fluidized bed reactor), the temperature of the cold regenerated catalyst in the reaction zones of riser reactors (or fluidized bed reactors) can be controlled by adjusting the flows of fluidized media and/or taking-heat media and/or the flows of cold catalysts retuned to the regenerator or adjusting other parameters. Therefore, the ratio of catalyst and oil (the ratio of

regenerated catalyst and raw materials) in the riser reactors (fluidized bed reactors) and the reaction temperatures can be controlled independently.

**[0031]** According to process requirements, the catalyst coolers which adjust the regenerator temperature can not be set, and/or one; two or more catalyst coolers which adjust the reaction zone temperatures of riser reactors (or fluidized bed reactors) can not be set too. The hot regenerated catalysts enter into the risers directly.

**[0032]** The catalyst coolers for adjusting regenerator temperature can be not set, or only set one, two or more which connect with the riser reactors (or fluidized bed reactors). The temperature of regenerator can mainly be controlled by adjusting heat balance of regeneration system for reaction, and/or mainly can be controlled by adjusting the flows of fluidized media and/or taking-heat media and/or the catalysts retuned to the regenerator or adjusting other parameters.

**[0033]** When the catalyst coolers for adjusting the temperature of reaction zones for riser reactors (or fluidized bed reactors) can be set or not set, the regenerator temperature can be controlled by adjusting the heat balance of reaction regeneration system, and/or by adjusting the flows of fluidized media and/or taking-heat media and/or the catalysts retuned to the regenerator or adjusting other parameters.

**[0034]** The mentioned reaction temperature of reaction zones for riser reactors (or fluidized bed reactors) can be controlled by adjusting the ratio of catalyst and oil (The said cold catalyst return channel can set in control elements such as slide valves, plug valves, etc.), and/or by adjusting the temperatures both cold regenerated catalyst and regenerated catalyst mixtures to keep the temperature at the best value.

**[0035]** Of course, there are also many other control devices and control methods, which the person skilled in the art know clearly. They will not be restricted by any specific implement.

**[0036]** The mentioned fluidized medias and transmission medias can be air, steam, etc, the taking-heat medias can be water, steam, air, oils, etc. The mentioned pre-lift medias can be water, steam, various refinery dry gases, etc.

**[0037]** The mentioned regenerated catalysts entering into catalyst coolers can be the regenerated catalysts with any carbon contents or no completely regenerated catalysts. The mentioned regenerated catalysts entering into catalyst coolers also include the contact agent with any carbon contents or coke particles, etc.

**[0038]** The mentioned catalyst coolers can be connected with regenerators and risers directly, or connected them with pipes.

**[0039]** The cycling method and its equipment of the cold regenerated catalyst in the present invention can be used for various reaction regeneration types of FCC units (such as coaxial, parallel, etc.). The method and equipment can be combined with various regenerators, such as setting the first regenerator, the second regenerator, etc. The person skilled in the art can know clearly about combination types, operation and control process. They will not be restricted by any invention ideas and any specific implement.

**[0040]** In the FCC units with the cycling method and its equipment of cold regenerated catalyst in the present invention, the reaction products are separated and the catalysts are regenerated in conventional method. The separation and regeneration can use various reaction regeneration types used by the riser in the FCC including risers types (including equal diameters or non-equal diameters, with fluidized bed or not with fluidized bed reactors, etc.), various regeneration types and various combinations types. The catalyst after reaction in regenerators in normal FCC conditions will be burned for regenerating. The regeneration temperatures are controlled at 630-800° C. (preferably 680-730° C.).

**[0041]** The riser catalytic cracking process and its equipment is mature industrial process. The person skilled in the art know clearly about the combination types, operation and control process, which will not be restricted by any specific implement. The present invention will not restrict any catalysts and process conditions about them.

**[0042]** The cycling method and its equipment of cold regenerated catalyst in the present invention can be used widely for the various fluidized catalytic cracking process including tar FCC, wax FCC, light hydrocarbons (liquefied petroleum gas, carbon four, EPA, gasoline, etc.) FCC etc, and can also be used for the burning process of other gas-solid fluidized bed reaction including pretreatment of residue oil, ethylene produced by methanol, fluidized coking, flexible coking, etc. The mentioned cycling method and its equipment of cold regenerated catalyst can be implemented independently for a riser reactor (or fluidized bed reactor) reaction zones in various fluidized catalytic cracking. According to the requirement, it can be equipped with one or more assistant risers for sending catalyst to a riser reactor (or a fluidized bed reactor) as a quenched agent. Or it can be implemented jointly, equipped with one or more assistant risers for sending catalyst to one or more riser reactors (or fluidized bed reactors) reaction zones as quenched agents. One or more riser reactors reaction zones include the tar risers and gasoline risers in the dual riser catalytic cracking units, to process a variety of raw materials in one or more riser reaction zones. According to the requirement, it can be equipped with one or more assistant risers for sending catalyst to a riser reactor (or a fluidized bed reactor) as a quenched agent

**[0043]** The cycling method and its equipment of cold regenerated catalyst in the present invention can be use for tar FCC. The tar hydrocarbons are mixed with cold regenerated catalyst from tar riser pre-lift zone (or not set) into the tar riser reactors (with or without fluidized bed reactors). The main operating conditions are as follows:

**[0044]** Reaction temperature 400-650° C. (preferably 520-600° C.),

**[0045]** Reaction pressure 0.11-0.4 MPa,

**[0046]** Contact time 0.05-5 seconds (preferably 0.1-3 seconds),

**[0047]** Weight ratio of catalysts and feeds, 3-15 (preferably 5-12).

**[0048]** To compare with existing technologies, the tar riser reactor operation conditions in this FCC invention are independent relatively, and the reaction temperature, catalyst/oil ratio and feeding-preheat temperature etc can be adjusted flexible based on the quality heavy oil and reaction requirement. Therefore, the process can increase the residue ratio, produce poor quality tar, increase yield of light oil. The process can reduce gasoline olefin content significantly, and increase the octane value of gasoline, reduce other impurity contents in products. The advantages of the process are operation easily, simple and flexible, wide-ranging application.

**[0049]** To compare with the existing technology, the advantages of the present invention are as follows:

**[0050]** 1) better atomization for raw materials.

**[0051]** In the conditions of keeping regeneration temperature unchanged, to reduce the temperature of regenerated catalyst, the ratio of catalyst and oil

becomes an independent and adjustable variable number. In the normal mixed temperature of the riser, it can increase the catalyst/oil ratio and the preheat temperature of feed, improve feed atomization for promoting the feed to contact the catalyst so as to reduce the yields of coke and dry gas.

**[0052]** 2) tar riser reactor can flexibly adjust the temperature of reaction zones and the temperature of regenerator so that the temperatures will be kept at the best value. Therefore, the tar riser reaction zones can use more appropriate reaction time and reaction temperature.

**[0053]** 3) higher regeneration temperature

**[0054]** The regeneration temperature is not limited by the catalyst/oil ratio and feed preheat temperature. The regeneration temperature can be increased because this is good for regenerating efficiency, and has a function for passive heavy metal. Higher regeneration temperature can make flue gas take the heat out more, so the heat taken from regenerators will be reduced.

**[0055]** 4) higher catalyst activity

**[0056]** Due to reduce the temperature of regenerated catalyst, the water-and-heat inactivation of the regenerated catalyst in the riser pre-heat section will be reduced.

**[0057]** 5) to process the heavier hydrocarbon raw materials.

**[0058]** The blending ratio of vacuum residue can reach at 100%, that is to process 100% vacuum residue, to reduce unwanted products yields such as coke and gas, meanwhile to increase gasoline and light distillation points yields, to increase the octane number of gasoline, to reduce olefin in products and impurity contents. Thus the technology economy is improved.

**[0059]** 6) to increase the processing capacity

**[0060]** In the unchanged conditions of the raw materials and product solutions, due to coke and dry gas yield reducing, the processing capacity will be increased at 15-20%.

**[0061]** 7) to combine with other technologies, the effect of technology in the present invention will be better.

**[0062]** The use of the technology does not affect to use other technologies, such as to combine with the technology for existing dense segments to take heat out, the technology of riser reaction terminator injection, technologies of multi-reaction zones and multi-points feeding etc. The effect will be better. Of course, the technology of the present invention can be used with other processes too. It will not be affected by any specific implementation.

**[0063]** To compare with the individual use of the technology of mixing temperature control or the individual use of the technology of terminator injection, the technology of the present invention can reach at higher temperature for taking heat and make heat utilization more rational.

**[0064]** The technology of the present invention can also be used in gasoline catalytic conversion. The operating conditions of the riser reactor are independent relatively. According to the reaction requirement, the operating conditions such as temperature, the catalyst/oil ratio and feed pre-heat temperature etc. can be adjusted flexibly.

**[0065]** To compare with the existing technologies, the technology of the present invention can reduce the volume contents of gasoline olefin significantly. The technology of the present invention technology possesses the advantages i.e. increasing octane number of gasoline and reducing of the product impurity contents, operating easily, simple and flexible, use widely. To compare with the existing technologies, the low-grade gasoline processed by FCC process of the present invention, the volume contents of gasoline olefin can be reduced to 30-70%, octane numbers (RON) can be increased to 0.5-40 units; the sulfur content in gasoline can be reduced in 30-70% (weight).

**[0066]** After pre-heat (or not pre-heat), the gasoline e (gas style or liquid style) enter into a riser and will be mixed with cold regenerated catalyst from the pre-lift section (can not be set) of the gasoline riser, and then enter into the gasoline riser reactor (with or without a fluidized bed reactor). The purposes are the reactions for isomerization; aromatization and other product improving qualities, for reduce olefins, sulfur, and nitrogen content and increase octane number.

**[0067]** The main operating conditions for improving gasoline quality by the gasoline catalytic conversion with the technology y of the present invention are as follows:

**[0068]** Reaction temperature: 350-650° C. (preferably 400-600° C.)

**[0069]** Absolute pressure: 0.11-0.4 MPa,

**[0070]** Contact time: 0.5-30 second (preferably 1-15 seconds)

**[0071]** The gasoline catalytic conversion process of the present invention can be implemented jointly with the tar catalytic cracking process can also be implemented alone. The operating conditions of gasoline riser reactors can be adjusted independently and flexibly. According to the market situation, the reaction temperature and other conditions for improving quality can be adjusted flexibly:

**[0072]** 1) to use the lower temperature for producing low-sulfur, low olefin gasoline.

**[0073]** When the purposes are for reducing olefin in gasoline and sulfur contents so as to get clean gasoline, the reaction temperature can be very low (350-520° C., preferably 400-480° C.), the isomerization, hydrogen transfer, aromatization, alkylation can dominate absolutely in ideal secondary reaction under enough time. The light product yield is more than 98.5%.

**[0074]** 2) To use the higher reaction temperature can produce more quantities of LPG, light olefins, meanwhile to produce low sulfur and low olefin gasoline.

**[0075]** When the purposes are for getting more quantities of LPG, light olefin, reaction temperature can be very high (500-650° C., preferably 520-600° C.). It will make olefin cracking reaction as dominant reaction, meanwhile the reaction increase diesel/gasoline ration, reduce gasoline olefin and sulfur contents, and produce high-octane number clean gasoline.

**[0076]** The gasoline distillate can be all fractions, for example, from initial boiling point to around 220° C. fractions; It can also be a part of narrow fractions, for example, 70-145° C. fractions. The gasoline fractions can be the fractions with one time processing such as straight-run gasoline, natural gasoline, or can be the gasoline fractions with the secondary time processing such as coking gasoline, FCC gasoline, visbreaker gasoline, thermal cracking gasoline, etc. or more than one gasoline fraction mixture. The olefin contents of the gasoline fractions can be 0-80% (weight), and the fractions contain a small amount of sulfur, nitrogen and other impurities, such as sulfur contents can be more than 200 ppm, nitrogen contents can be more than 30 ppm.

**[0077]** The mentioned all fraction or narrow fraction poor quality gasoline are one or more kinds of gasoline mixtures including distilled gasoline, natural gasoline, FCC gasoline, thermal cracking gasoline, visbreaker gasoline, coking gasoline, ethylene gasoline processed by cracking.

## DRAWING DESCRIPTION

**[0078]** The drawing is for the description of the present invention, it will not be restricted by any specific implement.

**[0079]** The drawing **1** is a special schematic diagram.

**[0080]** The drawing **2-4** is a schematic diagram for tar catalytic cracking units with the present invention.

## DETAILED DESCRIPTION

**[0081]** As following, the present invention is further illustrated by the drawings.

**[0082]** Drawing **1**: A special schematic diagram (a cold regenerated catalyst cycle process)

**[0083]** As FIG. **1** shown: the cycling instruments of cold regenerated catalyst of the present invention include the disengager **1**, the riser **2** with the pre-lift sect **4** and the regenerator **5**. For transporting the spent catalyst to he regenerator **5**, the pipeline **7** of spent catalyst is set between the regenerator **5** and the stripping section **1**A and the control valve **20** can connect the regenerator **5** and stripping section **1**A.

**[0084]** The regenerator has two inside or outside taking-heat equipments as the catalyst coolers, including the entrance of the catalyst directly with the dense of the regenerator (or through a pipe), the mixing buffer space in the lower part, internal taking-heat element (including telescopic or tube-wire, etc.), the facilities for distribution of streaming media in the lower part.

**[0085]** Catalyst cooler **8**A is mainly used to adjust the reaction temperature of the first reaction zone, to keep it in the best value. Another catalyst cooler (not shown) is primarily used for regulating the temperature of the regenerator to keep it in the best value. **35**A is fluidized media, such as air, steam, etc., **36**A is lifting media, such as air, steam, etc, **37**A is taking-heat medium, including water, steam, air, and all kinds of oil.

**[0086]** The regenerator **5** is connected with the catalyst cooler **8**A through regenerator duct **10**A and the regenerated catalyst after cooling enters into the mixing buffer space in the lower part. The cold regenerated catalyst is connected with the pre-lift sect **4** of the riser reactor through the cold pipeline **11**. Leaving the catalyst cooler **8**A (the mixing buffer space in the lower part **9**A), the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media **35**A (including air, steam, etc.) and/or the flow rate of the lifting media **36**A (including air, steam, etc.) of the return pipe **12**A of the cold regenerated catalyst. The control valve **21**A is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

**[0087]** For conveniently controlling the temperature of the reaction zone of the riser reactor, the pipeline of the hot regenerated catalyst (including the control valve) (not drawn) can connect the regenerator **5** directly with the pre-lift sect **4** of the heavy oil riser reactor. After lifting the cold regenerated catalyst mixed with hot regenerated catalyst in the pre-lift sect **4** of the riser reactor by the mixed media **32** of pre-lift area (including water, steam, and refinery gas, etc.), the temperature can reach to equilibrium.

**[0088]** Heavy oil riser reactor can also set the two reaction zones. The cold regenerated catalyst can enter the auxiliary riser through the pipeline of the cold regenerated catalyst, and reach the second reaction zone of the riser reactor as the cold-shocking agent by the lifting medium (not drawn).

**[0089]** According to requirements of the process, the catalyst cooler mainly used to adjust the temperature of the regenerator can not be set. The temperature of the regenerator **5** can be controlled by regulating the flow rate of the medium **35**A including the flow rates of air, steam, etc. and the lifting media **36**A of the return pipe **12**A of the cold regenerated catalyst.

**[0090]** Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

**[0091]** The above-mentioned catalyst cooler can also be connected with the regenerator and the riser as a single entity, or connected through the pipelines.

**[0092]** Cooling to 200-720° C. (preferably 360-650° C.), the cold regenerated catalyst can enter into the riser reactor through pre-lift sect **4**. Hydrocarbon raw materials in the riser reactor **2** react with the catalyst, and the flow after reaction can enter the disengager **1** for separation of catalysts and oil/gas, the spent catalyst after separation can be stripped by stripping section **1**A, then enters into the regenerator **5** in the presence of the oxygen-containing gas **38** (including air) to be burnt for the regeneration. the regenerated catalyst after cooling can return directly to the riser reactor for cycling use.

**[0093]** FIG. **2** is a typical scheme of the heavy oil catalytic device of the present invention.

**[0094]** Such as shown in FIG. **2**: the method and its equipment of the present invention for the heavy oil catalytic conversion, include the disengager **1**, heavy oil riser reactor, which can include the pre-lift sect **4**, the first reaction zone **3**, the second reaction zone **2**, the regenerator **5**, the combustor **5**A. The part between the combustor **5**A and the stripper **1**A of the disengager **1** set the pipeline **7** of the spent catalyst and control valve **20** to connect the combustor **5**A and the stripping section **1**A for transporting the spent catalyst to the combustor **5**A. In order to ensure the start combusting temperature of the combustor **5**A, the pipe **16** of the regenerated catalyst and control valve **23** can be set.

**[0095]** The regenerator has two inside or outside taking-heat equipments as the catalyst coolers, including the entrance of the catalyst directly with the dense of the regenerator (or through a pipe), the mixing buffer space in the lower part, internal taking-heat element (including telescopic or tube-wire, etc.), the facilities for distribution of streaming media in the lower part.

**[0096]** **35**A, **35**B are fluided media such as air, water, steam, etc. **36**A, **36**B are lifting media such as air, steam, etc. **37**A, **37**B are taking-heat media, including water, steam, air, and all kinds of oil. Catalyst cooler **8**A is mainly used to adjust the reaction temperature of the first reaction zone, to keep it in the best value. Catalyst cooler **8**B can primarily regulate the temperature of the regenerator for keeping it in the best value.

**[0097]** According to requirements of the process, any one or two of catalyst cooler **8**A, **8**B can not be set.

**[0098]** The regenerator **5** is connected with the catalyst cooler **8**A through regenerator duct **10**A and the regenerated catalyst after cooling enters into the mixing buffer space in the lower part. The cold regenerated catalyst is connected with the pre-lift sect **4** of the riser reactor through the cold pipeline **11**. Leaving the catalyst cooler **8**A, the temperature of the cold regenerated catalyst can be controlled by regulat-

ing the flow rate of the fluidized media **35**A (including air, steam, etc.) and/or the flow rate of the lifting media **36**A (including air, steam, etc.) of the return pipe **12**A of the cold regenerated catalyst. The control valve **21**A is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

**[0099]** For conveniently controlling the temperature of the first reaction zone of the riser reactor, the pipeline of the hot regenerated catalyst (including the control valve) (not drawn) can connect the regenerator **5** directly with the pre-lift sect **4** of the heavy oil riser reactor. After lifting the cold regenerated catalyst mixed with hot regenerated catalyst in the pre-lift sect **4** of the riser reactor by the mixed media **32** of pre-lift area (including water, steam, and refinery gas, etc.), the temperature can reach to equilibrium.

**[0100]** Of course, there are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

**[0101]** In order to easily control the temperature of the second reaction zone **2** of the riser reactor, the cold-shocking agent **34** can be injected into the downstream of the first reaction zone to conveniently control the temperature of the second reaction zone. The above-mentioned cold-shocking agent can be any one of gas or liquid (including water, or any kinds of oil, etc.) and cold catalysts, or two or more of them. The cold catalyst is the one of the cold regenerated catalyst, the spent catalyst, or the cold semi-regenerated catalyst, or two or more of them.

**[0102]** As the cold-shocking agent, the cold regenerated catalyst can enter the auxiliary riser through the pipeline of the cold regenerated catalyst, and reach the second reaction zone of the riser reactor as the cold shock agent by the lifting medium (not drawn).

**[0103]** The regenerator **5** is connected with the catalyst cooler **8**B through regenerator duct **10**B and the regenerated catalyst after cooling enters into the mixing buffer space **9**B in the lower part. The temperature of the regenerator **5** can be controlled by regulating the flow rate of the fluidized media **35**B (including air, steam, etc.) and/or the flow rate of the lifting media **36**B (including air, steam, etc.) of the return pipe **12**B of the cold regenerated catalyst.

**[0104]** Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

**[0105]** The above-mentioned catalyst cooler can also be connected with the regenerator and the riser as a single entity, or connected through the pipelines.

**[0106]** Heavy oil as the raw materials **33** and the regenerated catalyst from the pre-lifting zone **4** of the riser reactor with heavy oil are mixed and then enter into the first reaction zone **3** of the riser reactor with heavy oil in FCC. The main operating conditions are as follows: reaction temperature 400-650° C. (preferably 520-600° C.), reaction pressure 0.11~0.4 MPa, contact time 0.05~5 seconds (preferably 0.1-3 seconds), the ratio of catalysts and raw materials average of 3 to 15, preferably 5 to 12.

**[0107]** The cold-shocking agent **34**, oil and gas from the first reaction zone **3**, and the mixture of catalyst are mixed for cooling, and then enter into the second reaction zone **2** of the riser reactor with heavy oil, in which the secondary reactions such as hydrogen transfer, isomerization, aromatization occur for further reducing the olefin and sulfur content, and increasing octane. The main operating conditions are as follows: reaction temperature of 350-620° C. (preferably 450-530° C.), reaction pressure 0.11~0.4 MPa, 0.5 to 30 seconds of contact time (preferably 1-5 seconds).

**[0108]** The mixture of the oil and gas from the second reaction zone **2** and the catalyst enters the disengager **1** and can be separated. The oil and gas enter the system of fractionation and absorption for fractionation and liquefied petroleum gas (LPG) recovery, to obtain catalytic cracking gasoline products and unconverted oil.

**[0109]** The spent catalyst stripped by the stripper **1**A of the disengager **1** enters into the combustor **5**A through the pipeline **7** of the spent catalyst and control valve **20**. In the presence of the main wind **38**A (oxygen-containing gases including air, etc.), the spent catalyst was fast burnt and transports to the regenerator **5** for further burning. The secondary air **38**B (oxygen-containing gas, including air) is supplied on the bottom of the regenerator **5**. The regenerated catalyst from the regenerator bottom enters the catalyst cooler **8**A and catalyst cooler **8**B by two routes. One is that the cold regenerated catalyst mixed or not with hot regenerated catalyst for recycling use, the other way is back to the regenerator.

**[0110]** The gas or liquid injection point of the cold-shocking agent is set at the upstream or downstream of the injection point in the cold catalyst to easily control the temperature of the reaction zone, or form another reaction zone.

**[0111]** FIG. **3** is a typical schematic diagram of the heavy oil catalytic conversion device (gasoline modified joint implementation) for the application of the present invention.

**[0112]** Such as shown in FIG. **3**: the method and its equipment of the present invention for the heavy oil catalytic conversion, include the disengager **1** of heavy oil, the disengager **18** of gasoline, heavy oil riser reactor, which can include the pre-lift sect **4**, the first reaction zone **3**, the second reaction zone **2**, the regenerator **5**, the gasoline riser **6**. The part between the regenerator **5** and the stripper **1**A of the disengager **1** set the pipeline **7** of the spent catalyst and control valve (not drawn) to connect the regenerator **5** and the stripping section **1**A of the disengager **1** of heavy oil for transporting the spent catalyst to the regenerator **5**.

**[0113]** The pipeline **15** of the spent catalyst and the control valve **23** are set for connection with the regenerator **5** and the stripping section **18**A of the disengager **18**. The control valve **23** is set in order to easily control the flow rate of the spent catalyst for cold-shocking agents. Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

**[0114]** The regenerator has three inside or outside taking-heat equipments as the catalyst coolers, including the entrance of the catalyst directly with the dense of the regenerator (or through a pipe), the mixing buffer space in the lower part, internal taking-heat element (including telescopic or tube-wire, etc.), the facilities for distribution of streaming media in the lower part.

**[0115]** Catalyst cooler **8**A is mainly used to adjust the reaction temperature of the first reaction zone, to keep it in the best value. Catalyst cooler **8**B is mainly used to adjust the reaction temperature of the gasoline riser, to keep it in the best value. Another catalyst cooler (not shown) is primarily used for regulating the temperature of the regenerator to keep it in the best value.

**[0116]** **35**A, **35**B are fluidized media, such as air, steam, etc., **36**A, **36**B are lifting media, such as air, steam, etc. **37**A, **37**B are taking-heat medium, including water, steam, air, and all kinds of oil.

**[0117]** According to requirements of the process, these three catalyst coolers in any one or two can not be set.

**[0118]** When the catalyst coolers for adjusting the temperature of the regenerator is not set, the temperature of regenerator is controlled by adjusting the catalyst cooler **8**A, and/or the flow rate of streaming media **35**A, **35**B (including air, steam, etc.) of catalyst cooler **8**B and/or the content of the catalyst returned to the regenerator and/or controlled by the thermal equilibrium of the reaction and regeneration system.

**[0119]** In order to easily control the temperature of the second reaction zone **2** of the riser reactor, the cold-shocking agent **34** can be injected into the downstream of the first reaction zone to conveniently control the temperature of the second reaction zone. The above-mentioned cold-shocking agent can be any one of gas or liquid (including water, or any kinds of oil, etc.) and cold catalysts, or two or more of them. The cold catalyst is the one of the cold regenerated catalyst, the spent catalyst, or the cold semi-regenerated catalyst, or two or more of them. As the cold-shocking agent, the cold regenerated catalyst can enter the auxiliary riser through the pipeline of the cold regenerated catalyst, and reach the second reaction zone of the riser reactor as the cold shock agent by the lifting medium (not drawn).

**[0120]** The regenerator **5** is connected with the catalyst cooler **8**A through regenerator duct **10**A and the regenerated catalyst after cooling enters into the mixing buffer space **9**A in the lower part. The cold regenerated catalyst is connected with the pre-lift sect **4** of the riser reactor through the cold pipeline **11**A. Leaving the catalyst cooler **8**A, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media **35**A (including air, steam, etc.) and/or the flow rate of the lifting media **36**A (including air, steam, etc.) of the return pipe **12**A of the cold regenerated catalyst. The control valve **21**A is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

**[0121]** For conveniently controlling the temperature of the first reaction zone of the riser reactor of heavy oil, the pipeline of the hot regenerated catalyst (including the control valve) can connect directly with the pre-lift sect **4** of the heavy oil riser reactor. After lifting the cold regenerated catalyst mixed with hot regenerated catalyst in the pre-lift sect **4** of the riser reactor by the mixed media **32** of pre-lift area (including water, steam, and refinery gas, etc.), the temperature can reach to equilibrium. Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

**[0122]** The regenerator **5** is connected with the catalyst cooler **8**B through regenerator duct **10**B and the regenerated catalyst after cooling enters into the mixing buffer space **9**B in the lower part. The cold regenerated catalyst is connected with the pre-lift sect of the riser reactor of gasoline through the cold pipeline **11**B. Leaving the catalyst cooler **8**B, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media **35**B (including air, steam, etc.) and/or the flow rate of the lifting media **36**B (including air, steam, etc.) of the return pipe **12**B of the cold regenerated catalyst. The control valve **21**B is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

**[0123]** To easily control the temperature of the riser reactor of gasoline, the pipeline **19**B of the hot regenerated catalyst (including control valve **22**B) is set connected with gasoline pre-lift zone **4**. The cold regenerated catalyst with hot regenerated catalyst in pre-lift area **4** of gasoline riser reactor can be lifted and mixed by pre-lift medium **30** (including water, steam, and refinery gas and other) and then the temperature reaches equilibrium. Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

**[0124]** The above-mentioned catalyst cooler can also be connected with the regenerator and the riser as a single entity, or connected through the pipelines.

**[0125]** Heavy oil as the raw materials **33** and the regenerated catalyst from the pre-lifting zone **4** of the riser reactor with heavy oil are mixed and then enter into the first reaction zone **3** of the riser reactor with heavy oil in FCC. The main operating conditions are as follows: reaction temperature 400-650° C. (preferably 520-600° C.), reaction pressure 0.11~0.4 MPa, contact time 0.05~5 seconds (preferably 0.1-3 seconds), the ratio of catalysts and raw materials average of 3 to 15, preferably 5 to 12.

**[0126]** The cold-shocking agent **34**, oil and gas from the first reaction zone **3**, and the mixture of catalyst are mixed for cooling, and then enter into the second reaction zone **2** of the riser reactor with heavy oil, in which the secondary reactions such as hydrogen transfer, isomerization, aromatization occur for further reducing the olefin and sulfur content, and increasing octane. The main operating conditions are as follows: reaction temperature of 350-620° C. (preferably 450-530° C.), reaction pressure 0.11~0.4 MPa, 0.5 to 30 seconds of contact time (preferably 1-5 seconds).

**[0127]** Poor-quality gasoline **31** and the regenerated catalyst from the pre-lifting zone of the gasoline riser are mixed, and then enter into gasoline riser reactor. Under the conditions of the reaction temperature of 300-650° C. (preferably 400-560° C.), reaction pressure 0.11~0.4 MPa, the contact time 0.5 to 30 seconds (preferably 1-15 seconds), the weight ratio of the catalyst and the raw materials the average of 1 to 50, preferably 2 to 20, mainly gasoline modification reactions, such as isomerization, aromatization happen to reduce the content of olefins and sulfur, and to improve the octane number.

**[0128]** The mixture of the oil and gas from the second reaction zone **2** and the catalyst enters the disengager **1** and can be separated. The oil and gas, or mixed with the oil and gas from the disengager **18** enter the system of fractionation and absorption for fractionation and liquefied petroleum gas (LPG) recovery, to obtain catalytic cracking gasoline products and unconverted oil. The spent catalyst stripped by the stripper **1**A of the disengager **1** enters into the regenerator **5** through the pipeline **7** of the spent catalyst and control valve (not drawn).

**[0129]** The reactants from the gasoline riser **6** enter the disengager **18** and can be separated as the gas and oil or the catalyst. The oil and gas, enter the system of fractionation and absorption for fractionation and LPG recovery, to obtain catalytic cracking gasoline products; Or mixed with the oil and gas from the disengager **18** enter the system of fractionation and absorption for fractionation and liquefied petroleum gas (LPG) recovery.

**[0130]** The spent catalyst can be stripped by stripping section **18**A, and then enters into the regenerator **5** by the pipeline **15** of the spent catalyst and the control valve **23**.

**[0131]** After entering the regenerator **5**, the spent catalyst from the stripping sections of the two disengagers is burnt regenerated in the presence of oxygen-containing gas **38** (including air, etc.), then enters into the catalyst cooler **8**A and

catalyst cooling device **8**B by two routes. The cold-regenerated catalyst of these two routes with/or not mixed with hot-regenerated catalyst for cycling use.

**[0132]** The gas or liquid injection point of the cold-shocking agent is set at the upstream or downstream of the injection point in the cold catalyst to easily control the temperature of the reaction zone, or form another reaction zone.

**[0133]** FIG. **4** is a typical Scheme of the heavy oil catalytic converter device (shared disengager) for the application of the present invention.

**[0134]** Such as shown in FIG. **4**: the method and its equipment of the present invention for the heavy oil catalytic conversion, include the disengager **1**, two heavy oil riser reactor shared one disengager, (which can include the pre-lift sect **4**A, **4**B, the first reaction zone **3**A, **3**B, the second reaction zone **2**A, **2**B), the regenerator **5**, the combustor **5**A. The part between the combustor **5** and the stripper **1**A of the disengager **1** set the pipeline **7** of the spent catalyst and control valve **20** to connect the combustor **5***a* and the stripping section **1**A for transporting the spent catalyst to the combustor **5**A. To keep the start combusting temperature of the combustor **5**, the recycling pipeline **16** of the spent catalyst and the control valve **23** are set.

**[0135]** The regenerator has three inside or outside taking-heat equipments as the catalyst coolers, including the entrance of the catalyst directly with the dense of the regenerator (or through a pipe), the mixing buffer space in the lower part, internal taking-heat element (including telescopic or tube-wire, etc.), the facilities for distribution of streaming media in the lower part.

**[0136]** Catalyst cooler **8**A, **8**B are mainly used to adjust the reaction temperature of the first reaction zone for two heavy oil riser reactors, to keep it in the best value. Another catalyst cooler (not shown) is primarily used for regulating the temperature of the regenerator to keep it in the best value.

**[0137]** **35**A, **35**B are fluidized media, such as air, steam, etc., **36**A, **36**B are lifting media, such as air, steam, etc. **37**A, **37**B are taking-heat medium, including water, steam, air, and all kinds of oil.

**[0138]** According to requirements of the process, any one or two in these three catalyst coolers can not be set.

**[0139]** The regenerator **5** is connected with the catalyst cooler **8**A through regenerator duct **10**A and the regenerated catalyst after cooling enters into the mixing buffer space **9**A in the lower part. The cold regenerated catalyst is connected with the pre-lift sect **4**A of the riser reactor through the cold pipeline **11**A. Leaving the catalyst cooler **8**A, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media **35**A (including air, steam, etc.) and/or the flow rate of the lifting media **36**A (including air, steam, etc.) of the return pipe **12**A of the cold regenerated catalyst. The control valve **21**A is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

**[0140]** The regenerator **5** is connected with the catalyst cooler **8**B through regenerator duct **10**B and the regenerated catalyst after cooling enters into the mixing buffer space **9**B in the lower part. The cold regenerated catalyst is connected with the pre-lift sect **4**B of the riser reactor through the cold pipeline **11**B. Leaving the catalyst cooler **8**A, the temperature of the cold regenerated catalyst can be controlled by regulating the flow rate of the fluidized media **35**B (including air, steam, etc.) and/or the flow rate of the lifting media **36**B (including air, steam, etc.) of the return pipe **12**B of the cold regenerated catalyst. The control valve **21**B is set as one of control components in order to facilitate the control of the flow rate of the cold regenerated catalyst.

**[0141]** Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

**[0142]** For conveniently controlling the temperature of the first reaction zone of the riser reactor of heavy oil, the pipeline of the hot regenerated catalyst (including the control valve) (not drawn) can connect directly with the pre-lift sect **4**A, **4**B of the heavy oil riser reactor. After lifting the cold regenerated catalyst mixed with hot regenerated catalyst in the pre-lift sect **4**A, **4**B of the riser reactor by the mixed media **32**A, **32**B of pre-lift area (including water, steam, and refinery gas, etc.), and the temperature can reach to equilibrium. Of course, There are also many other control equipments and control methods, which do not limit any specific implementations of the present invention.

**[0143]** In order to easily control the temperature of the second reaction zone **2** of the riser reactor, the cold-shocking agent **34**A, **34** B can be injected into the downstream of the first reaction zone to conveniently control the temperature of the second reaction zone. The above-mentioned cold-shocking agent can be any one of gas or liquid (including water, or any kinds of oil, etc.) and cold catalysts, or two or more of them. The cold catalyst is the one of the cold regenerated catalyst, the spent catalyst, or the cold semi-regenerated catalyst, or two or more of them. As the cold-shocking agent, the cold regenerated catalyst can enter the auxiliary riser through the pipeline of the cold regenerated catalyst, and reach the second reaction zone of the riser reactor as the cold shock agent by the lifting medium (not drawn).

**[0144]** The above-mentioned catalyst cooler can also be connected with the regenerator and the riser as a single entity, or connected through the pipelines.

**[0145]** Heavy oil (as the raw materials) **33**A and the regenerated catalyst from the pre-lifting zone **4**A of the riser reactor with heavy oil are mixed and then enter into the first reaction zone **3**A of the riser reactor with heavy oil in FCC. The main operating conditions are as follows: reaction temperature 400-650° C. (preferably 520-600° C.), reaction pressure 0.11~0.4 MPa, contact time 0.05~5 seconds (preferably 0.1-3 seconds), the ratio of catalysts and raw materials average of 3 to 15, preferably 5 to 12.

**[0146]** The cold-shocking agent **34**A, oil and gas from the first reaction zone **3**A, and the mixture of catalyst are mixed for cooling, and then enter into the second reaction zone **2**A of the riser reactor with heavy oil, in which the secondary reactions such as hydrogen transfer, isomerization, aromatization occur for further reducing the olefin and sulfur content, and increasing octane. The main operating conditions are as follows: reaction temperature of 350-620° C. (preferably 450-530° C.), reaction pressure 0.11~0.4 MPa, 0.5 to 30 seconds of contact time (preferably 1-5 seconds).

**[0147]** The mixture of the reactive oil and gas form the second reaction zone **2**A and the catalyst enter into the shared disengager **1** for separation.

**[0148]** Heavy oil as raw materials (back to the refinery, slurry, etc.) **33**B and the regenerated catalyst from the pre-lifting zone **4**B of the riser reactor with heavy oil are mixed and then enter into the first reaction zone **3**B of the riser reactor with heavy oil in FCC. The main operating conditions are as follows: reaction temperature 400-650° C. (preferably 520-600° C.), reaction pressure 0.11~0.4 MPa, contact time

0.05~5 seconds (preferably 0.1-3 seconds), the ratio of catalysts and raw materials average of 3 to 15, preferably 5 to 12.

**[0149]** The cold-shocking agent **34**B, oil and gas from the first reaction zone **3**B, and the mixture of catalyst are mixed for cooling, and then enter into the second reaction zone **2**B of the riser reactor with heavy oil, in which the secondary reactions such as hydrogen transfer, isomerization, aromatization occur for further reducing the olefin and sulfur content, and increasing octane. The main operating conditions are as follows: reaction temperature of 350-620° C. (preferably 450-530° C.), reaction pressure 0.11~0.4 MPa, 0.5 to 30 seconds of contact time (preferably 1-5 seconds).

**[0150]** The mixture of the reactive oil and gas form the second reaction zone **2**B and the catalyst enter into the shared disengager **1** for separation (the separation device not drawn).

**[0151]** The mixture of the oil and gas from two heavy oil riser reactors and the catalyst can be further separated, then entered into the system of fractionation and absorption for fractionation and liquefied petroleum gas (LPG) recovery.

**[0152]** The spent catalysts from two heavy oil riser reactors are mixed and then enter into the stripper **1**A of the disengager **1**. After stripping, the mixtures enter into the combustor **5**A through the pipeline **7** of the spent catalyst and control valve **20**. In the presence of the main wind **38**A (oxygen-containing gases including air, etc.), the spent catalyst was fast burnt and transports to the regenerator **5** for further burning. The secondary air **38**B (oxygen-containing gas, including air) is supplied on the bottom of the regenerator **5**. The regenerated catalyst from the regenerator **5** bottom enters the catalyst cooler **8**A, catalyst cooler **8**B and another catalyst cooler (not draw) by three routes. One is that the cold regenerated catalyst mixed or not with hot regenerated catalyst for recycling use, the other way is back to the regenerator. The gas or liquid injection point of the cold-shocking agent is set at the upstream or downstream of the injection point in the cold catalyst to easily control the temperature of the reaction zone, or form another reaction zone.

## Embodiment 1

**[0153]** To confirm the effect of the present invention, the process shown in FIG. **2**, the raw materials shown in Table 1, Table 2 shows the process conditions and the GOR catalyst from Changling refinery catalyst plants. The experimental results are shown in Table 3.

TABLE 1

| Flow | atmospheric residue |
|---|---|
| density, 20/4° C. | 0.928 |
| Carbon residue | 7.8% (Wt) |
| Sulfur content | 0.8% (Wt) |
| Nitrogen content | 1800 PPm |

**[0154]** In Table 2, the plan A in the art is conventional FCC process technology: the temperature of regenerator catalyst bed 680° C., the reaction temperature 525° C., the raw material temperature 200° C., the catalyst/oil ratio 6.7. Therefore, the temperature difference of the regenerated catalyst and raw materials is 480° C. The plan A in the art has the following deficiencies:

**[0155]** (1) raw material temperature of 200° C. to crack residue-containing raw materials is quite low.

**[0156]** (2) Although the temperature of the regenerator can meet the renewable requirements, but the temperature is too high when contacting with the raw material, prone to thermal cracking.

**[0157]** It should be understood that Table 2 of the embodiment is not limited Unlike existing technologies, the plan B of the present invention, any combination of the catalyst circulation rate can be determined between the two risers in order to ensure that the catalyst/oil ratio required by the reaction instead of forcibly determined by the device thermal equilibrium.

TABLE 2

| Parameter | Plan A in the art | Plan B in the present invention |
|---|---|---|
| Temperature of riser reactor, ° C. | 525 | — |
| Temperature of the first reaction zone ° C. | — | 525 |
| Temperature of the second reaction zone, ° C. | — | 505 |
| Feed temperature, ° C. | 200 | 350 |
| Regeneration temperature, ° C. | 680 | 700 |
| Temperature of the regenerated catalyst in the entrance of riser, ° C. | 680 | 630 |
| Temperature difference of catalyst feed, ° C. | 450 | 287 |
| Catalyst/oil ratio, weight/weight | 6.7 | 8.6 |

TABLE 3

| Product | Plan A in the art | Plan B in the present invention |
|---|---|---|
| H2S % | 0.6 | 0.7 |
| Fuel gas % | 5.5 | 4.2 |
| LPG % | 14.5 | 14.8 |
| Gasoline % | 38.9 | 41.9 |
| Light cycle oil % | 26.2 | 25.5 |
| Decant oil % | 5.0 | 5.0 |
| Carbon % | 9.3 | 7.9 |
| Total Gasoline | 100.0 | 100.0 |
| Olefin content % | 45.6 | 27.6 |
| Aromatic content % | 14.9 | 18.9 |
| Sulfur content PPm | 696 | 486 |
| Octane number | 89.7 | 90.6 |

**[0158]** The results in Table 3 showed that production rate of coke and dry gas decreased by 2.7%, olefin content in gasoline is reduced by 39%, 30% reduction in sulfur content, octane number (RON), increased by 0.9 units.

**1**. A cycling method and its equipment of cold regenerated catalyst, characterized in that, including a FCC process: hydrocarbon materials react with catalyst in the riser reactor (with or without a fluidized bed reactor); the materials enter into a settler for the separation of catalyst from gas and oil; Separated catalyst will be stripped and enter into regenerator to burn for regeneration; The regenerated catalyst will be cold or/and not be cold to return the riser reactor directly for cycling use; The details are as follows:

the regenerator includes one, two, or more catalyst coolers, each connected to the riser reactor (or the fluidized bed reactor) is used to adjust the reaction temperature of the

reaction zone, or/and to adjust regenerator temperatures, so as to keep them in the best value; the catalyst coolers connected with the riser reactor (or the fluidized set in the inside or outside of regenerator, or set under its riser reactor;

The catalyst entrance of the shell of the described catalyst cooler directly (or through a pipeline) connects with the regenerator dense phase; there are internal components in the cooler for removing heat; there are fluidized media distribution facilities under the cooler; In the downstream, there is a buffer space for mixed buffer catalyst; the upper part is installed or not installed the gas channel to return to diluting phase of the regenerator;

There are one, two or more catalyst exits set in the catalyst mixed buffer space in the downstream of the described catalyst cooler; One, two or more exits of catalysts are connected to the transmission channel of cold catalyst used to deliver cold-regenerated catalyst circulation to one, two or more of the riser (reactor or auxiliary riser); Another one, two or more (or not) catalyst exists are connected to the transmission channel of cold catalyst for conveying cold regenerated catalyst return to the regenerator; The described transmission channel of cold catalyst to the riser is set in the outside of the described catalyst cooler's shell, or all (or partly) set in the inside of the described catalyst cooler's shell; The return channel of the cooled catalyst back to the regenerator all set in the outside of the described catalyst cooler's shell, or all (or partly) set in the inside of the described catalyst cooler's shell.

The described riser reactor is set one, two or more reaction zones with or without fluidized bed reactor; Before cold regenerated catalyst enters into the riser reactor or fluidized bed reactor, the riser reactor is set (or not set) a pre-lift section, with pre-lift media to send the cold regenerated catalyst to the riser reactor or the fluidized bed reactor; The described pre-lift section can all be set outside of the catalyst cooler shell, or all (or part) set inside.

Part of regenerated catalysts coming from regenerator are cooled by catalyst cooler within 200 to 720° C. and enter into the pre-lift or directly into each reaction zone of riser reactor; Or these regenerated catalysts mix or/and with hot regenerated catalyst without cooling to get the regenerated catalyst mixture which temperature is lower than regenerator temperature and then the mixture enter into pre-lift or/and each reaction zone of the riser reactor; Or the cold and the hot regenerated catalysts enter into the pre-lift of riser separately and directly with pre-lift media for increasing the catalysts temperature to reach a proper temperature and then the mixture enter into each reaction zone of riser reactor; Or the regenerated catalyst without cooling by catalyst cooler enter into the pre-lift zone or/and each reaction zone of the riser reactor directly for cycling.

**2**. The method and its equipment of claim **1**, wherein Setting (or not setting) one, two or more assistant risers, the described cold regenerated catalyst through the assistant risers with the pre-lift media are lifted to one, two or more riser reactors or fluidized bed reactor reaction zones as a cold shock agent for cycling.

**3**. The method and its equipment of claim **1**, wherein the regenerated catalysts coming from regenerator as step (5) described are cooled by the catalyst cooler within 360 to 650° C.

**4**. The method and its equipment of claim **1**, wherein the temperature of the described cold regenerated catalyst can be controlled by adjusting the flows of the fluidized media and/or taking-heat media or adjusting other parameters;

or controlled by adjusting the flows of the fluidized media and/or taking-heat media and/or adjusting the flows of cool catalyst returning regenerator or other parameters.

**5**. The method and its equipment of claim **1**, wherein the temperature of the described regenerated catalysts mixture can be controlled by adjusting the ratio of cold and hot regenerated catalyst.

**6**. The method and its equipment of claim **1**, wherein the reaction temperature of the described riser reactor or fluidized bed reactor reaction zones can be controlled by adjusting the ratio of the catalyst and feed, or/and by adjusting the temperature of the described cold regenerated catalyst or the temperature of the described regenerated catalyst mixture, or/and by using multi-point feeding technology, and/or by adding various cold shock agents to the riser reactor.

**7**. The method and its equipment of claim **1**, wherein the described taking-heat medias in the catalyst cooler include water, steam, air and various oils.

**8**. The method and its equipment of claim **1**, wherein the described cycling method and its equipment of the cold regenerated catalyst can be used widely for various FCC including tar catalytic cracking, wax oil catalytic cracking, gasoline catalytic modification for improving quality, or light hydrocarbon catalytic conversion, or for other burning process of gas-solid fluidized reaction including residue preprocessing, ethylene made by methanol, fluidize coking or flexible coking.

**9**. The method and its equipment of claim **1**, wherein the cycling method and its equipment of cold regenerated catalyst can be implemented independently for each reaction zone of a riser reactor (or fluidized bed reactor) of all kinds of FCC; or jointed to implement for each reaction zone of one, two or more riser reactors (or fluidized bed reactor) including tar risers and gasoline risers of the dual risers FCC units or different feeds riser reactors.

**10**. The method and its equipment of claim **1**, wherein the described catalyst in the catalyst cooler is the regenerated catalyst with any carbon content or the regenerated catalyst without completed regeneration or the contact agents with any carbon content or coking particles.

**11**. The method and its equipment of claim **2**, wherein the regenerated catalysts coming from regenerator as step (5) described are cooled by the catalyst cooler within 360 to 650° C.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/576,565 | 08/01/2012 | Li Li | SHENBIN001 | 8815 |

110339 7590 10/04/2023

Timothy T. Wang
8140 Walnut Hill Lane, Suite 615
Dallas, TX 75231

| EXAMINER | |
|---|---|
| DOYLE, BRANDI M | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1771 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 10/04/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

mzhang@nilawfirm.com
twang75231@gmail.com
twang@nilawfirm.com

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

*Ex parte* LI LI and QUNZHU LI

---

Appeal 2023-000079
Application 13/576,565
Technology Center 1700

---

Before JEFFREY T. SMITH, MICHAEL P. COLAIANNI, and DEBRA L. DENNETT, *Administrative Patent Judges*.

COLAIANNI, *Administrative Patent Judge*.

DECISION ON REQUEST FOR REHEARING

This is in response to a Request, filed July 21, 2023, for rehearing of our Decision dated May 22, 2023.

Appellant argues the Board disregarded the 37 C.F.R. § 1.132 Declarations by Zhang, Gao, Qunzhu Li, Tables 1, 2, and 3, and Annexes 1–54 in rendering the Decision (Request 3[1], 6, 12). Appellant argues the Board

[1] Appellant did not number the pages of the Request for Rehearing. We numbered the pages of the Request starting with page 1 as the cover page of the Request.

disregarded the evidence in Table 1, and Annexes 1–6, 49 and 50 that allegedly show a person skilled in the art would understand the prior art to teach away from feature 1 of claims 1, 13, and 20 (Request 3). Appellant argues the Board disregarded the synergistic effect/result of features 1 and 2 recited in claim 1 (Request 3). Appellant argues the Board disregarded Appellant's analysis of an "omission of an element" as described in the Manual of Patent Examining Procedure (MPEP) § 2144.04(II)(B) (Request 3). Appellant asserts the Board disregarded that Annexes 11–43 prove the six "objective evidence" under MPEP § 716 and the five Declarations prove unexpected results of the claim reciting Features 1 and 2 (Request 3). Appellant argues that the Board's disregarding the evidence resulted in errors in factual assertion and findings in the Decision (Request 3). Appellant argues the Board's statement in the Decision that

> Although Li teaches that a second catalyst cooler 8B may be used to feed cold regenerated catalyst to reaction zone 2 of riser reactor 4 via auxiliary pipe 6 (i.e., transporting pipe) and pipeline 11B, we note that claim 1 uses the open-ended claim language "comprising" and does not exclude an additional catalyst cooler (e.g., 8A or 8B).

constitutes a new ground of rejection. (Request 3–4). Presumably, Appellant refers to the Decision's claim construction based on their use of the open-ended transitional claim term "comprising" as a new ground of rejection.

Regarding the argued "mixing buffer space" in claim 13 and 21, Appellant argues the Board disregarded that the Specification describes catalyst entering the mixing buffer space, which apparently indicates it as independent and separate from the catalyst cooler 8A/B (Request 5). Appellant contends the Board disregarded that the mixing buffer space and

catalyst cooler shown in Figure 1–4 are two different pieces of equipment that have the same diameter (Request 4–5). Appellant argues the Board did not provide any documentary evidence to support its findings (Request 6). Appellant contends the Board's findings are based on personal opinions or understandings (Request 6). Appellant alleges that the Board disregarded the arguments and evidence referred to and/or attached to their Appeal Brief (Request 12–23). Appellant contends that the Board mischaracterizes the mixing buffer space as a "*downstream portion of the catalyst cooler*" instead of "*in the downstream location of the catalyst cooler*" as recited in claims 13 and 21 (Request 20). Appellant argues the Board erred in its statement that "*the Examiner's finding that the lower part of Li's catalyst cooler 8A or 8B is considered a mixing buffer space is reasonable*" (Request 21, 36–38). Appellant argues the Board splits the claim limitation "blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space" such that the function (i.e., blending and buffering the cooled catalyst) is not reflected in the method steps (Request 38–39). Appellant contends the Board disregarded 17 arguments made related to teaching away, omission of an element and retention of its function argument, unexpected results, long-felt need, commercial success and impermissible hindsight (Request 23, 31–34, 40–41). Appellant argues the Board added a new ground of rejection by stating that the commercial success evidence fails to show relative market share of the 15 commercial units in this industry (Request 43). Appellant contends the Board's finding that long felt need in the art has been satisfied by Li is wrong (Request 44). Appellant argues the Examiner has not shown how Li teaches to keep the reaction temperature of each of the reaction zones in an optimum value (Request 24). Appellant argues the "cold shock"

agent in Li could produce wide swings in the reaction temperature outside of the optimum value and Appellant is under no burden to show this cold shock agent will necessarily infer a lack of control of the reaction temperature (Request 25). Appellant alleges the Board's finding in the decision that the "long-standing need [to control independently the catalyst-to-oil ratio] has been fulfilled by Li is wrong (Request 26). Appellant argues the Board's finding that cooler 8A feeding cold regenerated catalyst into reaction zone 1 (ref. no. 3) would also feed the catalyst to reaction zone 2 (ref. no. 2) in Li's Figure 1 and adjust the temperature at some level within reaction zone 2 is based on pure conjecture and impermissible hindsight (Request 26–27). Appellant argues there is no evidence that cooler 8A would have any effect on zone 2 when cooler 8A is responsible for that zone (Request 27). Appellant contends the Board erred in determining the claims are open to including additional coolers because claim 1 is limited to only one regenerated catalyst cooler connected to only one riser reactor (Request 28). Appellant argues the Board disregarded supplementary information provided by them after oral hearing to rebut the new ground of rejection (Request 30). Appellant argues the Board disregarded the evidence that shows Li's two cooler system does not make the catalyst-to-oil ratio wholly independent (Request 30). Appellant argues the Board overlooked Annexes 11–43 in that they made no comment or only a general sentence statement regarding the Annexes 11–43 regarding unexpected results over Li (Appeal Br. 41–42). Appellant argues the Board disregarded the five declarations filed because Li is found to teach the claimed subject matter (Request 44–45).

According to 37 C.F.R. § 41.52, a request for rehearing must "state with particularity the points believed to have been misapprehended or

overlooked by the Board." We will respond to Appellant's arguments to the extent Appellant's request complies with this rule. Appellant's general rehashing of arguments and evidence made in the Briefs and already considered by the Board are not deemed to point out with particularity the point "misapprehended or overlooked by the Board." Indeed, all of Appellant's arguments and evidence discussed in the Briefs have been considered by the Board. As noted on page 10 of the May 22, 2023 Decision, "We now consider Appellant's allegation of secondary consideration. Appellant cites to voluminous annexes and declarations as showing secondary considerations (i.e., unexpected results, commercial success, and long felt need)." The decision further states, "As noted in our previous decision on pages 13 to 14, Appellant's reference to several declarations in a rather skeletal and conclusory fashion is insufficient because, as the Examiner explains (Ans. 14–15) and as we discussed above, Li teaches the limitations on which Appellant relies as critical or significant." In other words, Appellant's evidence has been fully considered and not overlooked or, as Appellant states, "disregarded" by the Board.

The Board finds the evidence argued by Appellant in the Briefs and this Request insufficient and unpersuasive in rebutting the Examiner's prima facie case for the reasons stated in the Decision. The evidence must be called to our attention and explained with sufficient detail such that we do not have to undertake a search of the record to make out a case on behalf of the Appellant. The Board will not scour the record in search of evidence relevant to a particular issue, nor will it attempt to fit evidence together into a coherent explanation that supports an argument. Such activities are the province of advocacy. *See Stampa v. Jackson*, 78 USPQ2d 1567, 1571

(BPAI 2005) (*quoting Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 111–12 (2d Cir. 1999) ("Appellant's Brief is at best an invitation to the court to scour the record, research any legal theory that comes to mind, and serve generally as an advocate for appellant. We decline the invitation.")). Nor, where Appellant points the Board to a multi-page exhibit without citing a specific portion or page, will the Board pour over the document or the record to extract the relevant information. *Clintec Nutrition Co. v. Baxa Corp.*, 44 USPQ2d 1719, 1723 n.16 (N.D. Ill. 1997), *citing United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). We also note that a mere description of a process in a publication or patent may indicate that others knew of the process, but does not, standing alone, indicate that the process is in commercial use by the authors of the publication or others.

Notwithstanding the above, Appellant has presented 5 declarations purported to show unexpected results and commercial success (Request 17). The Zhang and Gao declarations are specific to a claim that is not the same scope as the claim on appeal (compare appealed claim 1 to ¶ 10 of the declarations). Appellant has not explained why these declarations—addressing claims that have a different scope than the appealed claims—are relevant to the appealed claims. The Li January 15, 2018 declaration asserts unexpected technical effects and great commercial success (Declaration ¶ 8). The declaration is insufficient to establish unexpected results, and commercial success. The declaration does not reproduce the claim that is alleged to be the basis of unexpected result and commercial success. The declaration does not provide comparative data for establishing unexpected results. The declaration does not have sufficient evidence describing the market, the sales data for the unit performing the process that is

representative of the claimed invention, and the sales data for units performing the other processes in the market.

The Li, March 19, 2018 declaration is insufficient to establish unexpected results, and commercial success. The declaration does not reproduce the claim that is alleged to be the basis of unexpected result and commercial success. The reference to documentary evidence in ¶ 4 of the declaration, is insufficient to explain the unexpected results and commercial success. The declaration does not have sufficient evidence describing the market, the sales data for the unit performing the process that is representative of the claimed invention, and the sales data for units performing the other processes in the market.

The Li declaration dated August 8, 2021 is insufficient to establish unexpected results, and commercial success. The declaration does not adequately explain the showing in the table to establish what is representative of the claimed invention and what is representative of the closest prior art.

Appellant asserting secondary considerations to support the contention of non-obviousness bears the burden of proof of establishing a nexus between the claimed invention and evidence of secondary considerations. It is Appellant's burden to demonstrate that the claimed invention as a whole imparts unexpected advantages relative to the closest prior art. *In re Klosak*, 455 F.2d 1077, 1080 (CCPA 1972) ("[I]t is not enough to show that results are obtained which differ from those obtained in the prior art: that difference must be shown to be an *unexpected* difference."); *In re Heyna*, 360 F.2d 222, 228 (CCPA 1966) ("It was incumbent upon appellants to submit clear and convincing evidence to

support their allegation of unexpected expected property."); *In re Greenfield*, 571 F.2d 1185, 1189 (CCPA 1978) ("[O]bjective evidence of non obviousness must be commensurate in scope with the claims which the evidence is offered to support.").

The statements in the declaration(s) alone are insufficient to establish commercial success of the product. The declarations do not specifically indicate the reasons for their purchase. An inventor's opinion as to the purchaser's reason for buying the product is insufficient to demonstrate a nexus between the sales and the claimed invention. *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996). The declarations do not indicate the products sold are commensurate in scope with the claimed invention. The identification of gross sales does not show commercial success absent evidence as to market share. *See Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1026–27 (Fed. Cir. 1985). The evidence presented also does not assert what sales would have normally been expected in the market during the time period which the product was sold. *See Ex parte Standish*, 10 USPQ2d 1454, 1458 (BPAI 1988).

Appellant refers to Annexes 1–54 to support various arguments such as common knowledge in the art (Annexes 1–10, 46–49, 5–54) and unexpected results (Annexes 11–43) (Request 3, 12). Although Appellant quotes different portions of the Annexes, Appellant does not meaningfully connect how those disclosures support the particular argument they are making. For example, Appellant quotes Annex 3 as teaching high reaction temperature, which according to Appellant teaches away from the suitable reaction temperature and suitable catalyst-to-oil ratio (Request 14). Appellant does not explain how they reach that conclusion or how that ties

into the present claims (Request 14). In particular the argued catalyst-to-oil ratio is not recited in claim 1. The same or similar analysis applies to Appellant's use of the Annexes throughout the Request and Briefs (Request *generally*). Appellant has the burden of explaining how the evidence they present relates to the claims and obviousness rejection. *Ex parte Ishizaka*, 24 USPQ2d 1621, 1624 (BPAI 1992). As noted *supra* in this decision on rehearing, the Board will not scour the record to put together an argument for Appellant. It is incumbent on Appellant to apply the evidence to the rejection and claims and make their case and not merely include conclusory statements based on the unexplained evidence. *Cf. Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1339 (Fed. Cir. 2016) ("Recognizing the Board operates under stringent time constraints, we do not hold that it is obliged to explicitly address conclusory and unsupported arguments raised by a litigant. [citation omitted]"). In this case, Appellant's numerous citations for teaching "common knowledge", for example, does not explain how that "common knowledge" would not have led to the subject matter of claim 1.

As explained on page 11 of the Decision, a primary reason Appellant's evidence in the Annexes and declarations are not persuasive is that "Li teaches the limitations on which Appellant relies as critical or significant." In other words, the objective reach of claim 1 includes the subject matter of Li. A comparison of Li and the claimed invention would be encompassed by Appellant's broadly drafted claim 1. Indeed, as we stated on pages 11 to 12 of the Decision, ". . . to the extent that the Appellant can substantiate that "[n]o one is willing to utilize the solution of [Li] since 2008," whereas a total of 15 commercial units were successfully implemented from 2008-2014. . . *such would merely demonstrate that*

*something falling within the scope of claim 1 suffers from the same deficiencies as Li's method or system*." (emphasis added). All of Appellant's submitted evidence has been considered and fails to overcome the obviousness rejection over Li. Appellant argues that the Board entered a new ground of rejection when we interpreted claim 1 as being open-ended and not excluding additional catalyst coolers (Request 27). However, our interpretation of claim 1 is not new to the prosecution history. The Examiner finds that claim 1 would have been obvious over Li that teaches using multiple catalyst coolers (Final Act. 4–5). Accordingly, our determination regarding claim 1 is not a new ground.

Claim interpretation in a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970 (Fed. Cir. 1995). The term "comprising" in United States' patent law conveys an open-ended meaning to the claim where any limitations in addition to the those recited are permitted. *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Our analysis of claim 1 makes explicit that the claim is open-ended and does not exclude using an additional catalyst cooler. This determination is not a new ground of rejection.

Appellant argues our analysis of the mixing buffer space limitation is based on an altering of the claim language in the decision (Request 20). Appellant argues the Board mistakenly altered the claim 1 language "in the downstream location of the catalyst cooler" to "in a downstream portion of the catalyst cooler" (Request 20). Appellant argues the mixing buffer space

and the catalyst cooler are separate pieces of equipment having the same diameter only and the two pieces of equipment constitute an integrated device that is the heat-taking equipment (Request 20).

We are unpersuaded by Appellant's arguments. As noted on page 6 to 7 of the Decision, our understanding of what constitutes a "mixing buffer space" is based on the Specification's disclosure. Although Appellant contends that the mixing buffer space is a separate piece of equipment, the Specification does not support that position as noted on pages 6 to 7 of the Decision. Specifically, page 4 of the Specification describes:

> [t]he catalyst entrance of the shell of the described catalyst cooler directly [ ] connects with the regenerator dense phase . . . ; In the downstream, there is a buffer space for mixed buffer catalyst . . . There are one, two or more catalyst exits set in the catalyst mixed buffer space *in the downstream of described catalyst cooler*. (Spec. 4: 18–25 emphasis added).

The Specification plainly describes the mixed buffer space as "in the downstream of described catalyst cooler." *Id.* That disclosure coupled with Appellant's figures that depict the mixed buffer space 9A or 9B as a downstream space in the catalyst coolers 8A, 8B respectively, underscores that Appellant's arguments are not persuasive and our Decision did not overlook or misapprehend this point in rendering our Decision.

Appellant argues that the Board's reasoning that Li's catalyst cooler 8A feeding cold regenerated catalyst into reaction zone 1 (ref. no. 3) in Li's Figure 1, would also feed the catalyst to reaction zone 2 (ref. no. 2) and adjust the temperature at some level within reaction zone 2 is based on pure conjecture (Request 27). Appellant argues Li's catalyst coolers 8A and 8B are used to adjust the reaction temperature of only one (not each) reaction zone (Request 27).

Contrary to Appellant's arguments, Li discloses that catalyst cooler 8A is "mainly" used to adjust the reaction temperature in first reaction zone and catalyst cooler 8B is "mainly" used to adjust the reaction temperature in the second reaction zone (Li 2: paragraph bridging pages 2 and 3). In other words, Li discloses that the catalyst cooler 8A's main use is cooling the first reaction zone, but its cooling is not limited solely to the first reaction zone. Indeed, when the cold regenerated catalyst from catalyst cooler 8A is directed into the first reaction zone (3) in Li's Figure 1, that catalyst is sent through second reaction zone (2) on its way to settler 1 and catalyst regenerator 5. The catalyst injected into the bottom of first reaction zone 3 will necessarily adjust the reaction conditions in the second reaction zone 4 because it travels through zone 4 and thus will interact with the catalyst and reactions happening in reaction zone 4. This interaction of the catalyst in the first reaction zone 3 and second reaction zone 2 is controlled to maintain the reactor at the optimum values as disclosed by Li on pages 2 to 3 of the English language translation. We adhere to our Decision.

Appellant argues the Board erred in its interpretation of claim 1 as including multiple catalyst coolers (Request 28). Appellant argues claim 1 recites a closed-ended relationship between one regenerated catalyst cooler, one riser reactor, one regenerated catalyst cooler and thus does not include additional catalyst coolers (Request 28). As stated on page 5 of the Decision, claim 1 uses the open-ended transitional language "comprising" which does not exclude any other feature from those recited in the claims. The Specification discloses that one, two, or more catalyst coolers may be used in the invention (Spec. 4:12–13). This disclosure supports the open-ended nature of the claims.

## CONCLUSION

Appellant's myriad of arguments fails to show the Board misapprehended or overlooked any evidence or argument presented by them. For the above reasons, we deny the Request for Rehearing.

## DECISION SUMMARY

Outcome of Decision on Rehearing:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/Basis | Denied | Granted |
|---|---|---|---|---|
| 1–7, 10, 13–25, 27, 29, 31, 33 | 103 | Li | 1–7, 10, 13–25, 27, 29, 31, 33 | |
| 32 | 103 | Li, Palmas | 32 | |

Final Outcome of Appeal after Rehearing:

| Claim(s) Rejected | 35 U.S.C. § | Reference(s)/ Basis | Affirmed | Reversed |
|---|---|---|---|---|
| 1–7, 10, 13–25, 27, 29, 31, 33 | 103 | Li | 1–7, 10, 13–25, 27, 29, 31, 33 | |
| 32 | 103 | Li, Palmas | 32 | |
| **Overall Outcome** | | | 1–7, 10, 13–25, 27, 29, 31–33 | |

DENIED

**CLAIMS APPENDIX**

1. (Previously presented) A method for circulating a cold regenerated catalyst, comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, wherein the one riser reactor comprises only one reaction zone or at least two reaction zones;

separating the gas and oil products from the reacted catalyst in a settler,

stripping the separated catalyst in a stripping section;

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;

cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use;

wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

2. (Previously presented) The method of claim 1, further comprising:

lifting the cooled regenerated catalyst through an assistant riser by a pre-lift medium to the riser reactor, and

using the cooled regenerated catalyst as a quenching agent for reuse.

3. (Previously presented) The method of claim 1, wherein the temperature of the cooled regenerated catalyst ranges from 360°C to 650°C.

4. (Previously presented) The method of claim 1, further comprising:

controlling the temperature of the cold regenerated catalyst by adjusting a flowrate of the fluidizing medium, the heat-taking medium, or a combination thereof.

5. (Previously presented) The method of claim 1, wherein the method comprises transferring the hot regenerated catalyst via a bypass transmission channel to mix with the cooled regenerated catalyst to form a regenerated catalyst mixture, and controlling the temperature of the regenerated catalyst mixture by adjusting a ratio of the cooled regenerated catalyst and the hot regenerated catalyst.

6. ( Previously presented) The method of claim 1, further comprising:

controlling the reaction temperature in the reaction zone of the riser reactor by adjusting a ratio of the cooled regenerated catalyst that enters the riser reactor and feed of the hydrocarbon materials that enter the riser reactor, adjusting the temperature of the cooled regenerated catalyst, using a multi-point feeding technology, adding a quenching agent to the riser reactor, or a combination thereof.

7. (Previously presented) The method of claim 1, wherein the heat-taking medium is selected from the group consisting of water, steam, air, and oils.

8. (Canceled).

9. (Canceled).

10. (Previously presented) The method of claim l, wherein the regenerated catalyst is a catalyst with a carbon content, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

11-12. (Canceled).

13. (Previously presented) A method for circulating a cold regenerated catalyst, comprising:

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil products and a reacted catalyst, wherein the one riser reactor comprises only one reaction zone or at least two reaction zones;

separating the reacted catalyst from the gas and oil products in a settler；

stripping the separated catalyst in a stripping section；

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst；

cooling the hot regenerated catalyst by a regenerated catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200°C to 720°C, for cycling use；

wherein a heat-exchanging element is mounted insidethe regenerated catalyst cooler, and

a fluidizing medium distributor is located in the lower part of the regenerated catalyst cooler;

blending and buffering the cooled regenerated catalyst in a catalyst mixing buffer space being disposed in the downstream location of the regenerated catalyst cooler before the cooled regenerated catalyst entering the riser reactor; and

wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

14. (Previously presented) The method of claim 13, further comprising:

controlling the temperature of the cold regenerated catalyst by adjusting a flowrate of the fluidizing medium, the heat-taking medium, the cold catalyst returning to the regenerator, or a combination thereof.

15. ( Previously presented) The method of claim 13, further comprising:

mixing the cooled regenerated catalyst with the hot regenerated catalyst exiting directly from the regenerator to obtain a regenerated catalyst mixture;

controlling the temperature of the regenerated catalyst mixture by adjusting a ratio of the cooled regenerated catalyst and the hot regenerated catalyst;

transferring the regenerated catalyst mixture into the at least one reaction zone of the riser

reactor bya pre-lift medium; and

reusing the regenerate catalyst mixture in reaction in the riser reactor.

16. ( Previously presented) The method of claim 15, further comprising: _

controlling the reaction temperature in the reaction zone of the riser reactor by adjusting a ratio of the cooled regenerated catalyst mixture that enters the riser reactor and feed of the hydrocarbon materials that enters the riser reactor, adjusting the temperature of the cooled regenerated catalyst, using a multi-point feeding technology, adding a quenching agent to the riser reactor, or a combination thereof.

17. (Previously presented) The method of claim 13, wherein the heat-taking medium is selected from the group consisting of water, steam, air, and oils.

18. (Previously presented) The method of claim 13, wherein the regenerated catalyst is a catalyst with a carbon content, an incompletely regeneratedcatalyst, or a contact agent with a carbon content or coking particles.

19. (Previously presented) The method of claim 13, wherein the temperature of the cooled regenerated catalyst ranges from 360°C to 650°C.

20. (Previously presented) A method for circulating a cold regenerated catalyst, comprising

reacting hydrocarbon materials with a catalyst in a riser reactor to generate gas and oil

products and a reacted catalyst, wherein the one riser reactor comprises at least one reaction zone;

separating the reacted catalyst from the gas and oil products in a settler;

stripping the separated catalyst in a stripping section;

burning and regenerating the stripped catalyst in a regenerator to obtain a hot regenerated catalyst;

cooling the hot regenerated catalyst by a catalyst cooler to form a cooled regenerated catalyst having a temperature in a range of 200ºC to 720ºC, for cycling use;

wherein a heat-exchanging element having a heat-taking medium inside is mounted inside the regenerated catalyst cooler, and a fluidizing medium distributor is located in the lower part of a catalyst mixing buffer space;

blending and buffering the cooled regenerated catalyst in the catalyst mixing buffer space being disposed underneath the heat-exchanging element before the cooled regenerated catalyst entering the riser reactor, wherein the catalyst mixing buffer space is independent and separate from spaces taken by the heat-exchanging element; and

wherein when the one riser reactor comprises at least two reaction zones, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of each of the reaction zones of the one riser reactor, so as to keep the reaction temperature of each of the reaction zones in an optimal value, respectively, or when the one riser reactor comprises only one reaction zone, the one regenerated catalyst cooler is connected to the one riser reactor and is used to adjust the reaction temperature of the only one reaction zone of the one riser reactor, so as to keep the reaction temperature in an optimal value.

21. (Previously presented)) The method of claim 20, further comprising:

controlling the temperature of the regenerated catalyst by adjusting a flowrate of thefluidizing medium, the heat-taking medium, or a combination thereof.

22. ( Previously presented) The method of claim 20, further comprising:

controlling the reaction temperature in the reaction zone of the reactor by adjusting a ratioof the regenerated catalyst that enters the riser reactor and feed of the heavy oil that enters the riser reactor, adjusting the temperature of the regenerated catalyst, using a multi-point feeding technology, adding a quenching agent to the reactor, or a combination thereof.

23. (Previously presented) The method of claim 20, wherein the heat-taking medium is selected from the group consisting of water, steam, air, and oils.

24. (Previously presented) The method of claim 20, wherein the regenerated catalyst is a catalyst with a carbon content, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

25. (Previously presented) The method of claim 20, wherein the temperature of the cooled regenerated catalyst ranges from 360°C to 650°C.

26. (Cancelled).

27. (Previously presented) The method of claim 1, wherein the method is used for Heavy oil fluid catalytic cracking, gas oil catalytic cracking, gasoline catalytic conversion, or light

hydrocarbon catalytic conversion; or is used for Heavy oil pre-treating, methanol to olefins, fluid coking or flexible coking; and the regenerated catalyst entering the regenerated catalyst cooler is a regenerated catalyst, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

28. (Cancelled).

29. (Previously presented) The method of claim 13, wherein the method is used for Heavy oil fluid catalytic cracking, gas oil catalytic cracking, gasoline catalytic conversion, or light hydrocarbon catalytic conversion; or is used for Heavy oil pre-treating, methanol to olefins, fluid coking or flexible coking; and the regenerated catalyst entering the regenerated catalyst cooler is a regenerated catalyst, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

30. (Cancelled).

31. (Previously presented) The method of claim 20, wherein the method is used for Heavy oil fluid catalytic cracking, gas oil catalytic cracking, gasoline catalytic conversion, or light hydrocarbon catalytic conversion; or is used for Heavy oil pre-treating, methanol to olefins, fluid coking or flexible coking; and the regenerated catalyst entering the regenerated catalyst cooler is a regenerated catalyst, an incompletely regenerated catalyst, or a contact agent with a carbon content or coking particles.

32. (Previously presented) The method of claim 1 wherein the riser reactor comprises only one reaction zone.

33. (Previously presented) The method of claim 1 wherein the riser reactor comprises only at least two reaction zones.